1  Ronda Baldwin-Kennedy, Esq. (SB #302813)
2  Jerome A. Clay, Esq. (SB #327175)
   **LAW OFFICE OF RONDA BALDWIN-KENNEDY**
3  5627 Kanan Rd. #614
4  Agoura Hills, CA 91301
   Phone: (951) 268-8977
5  Fax: (702) 974-0147
6  Email: ronda@lorbk.com

7  Raymond M. DiGuiseppe (SB #228457)
8  **The DiGuiseppe Law Firm, P.C.**
9  4320 Southport-Supply Road, Suite 300
   Southport, North Carolina 28461
10 Phone: 910-713-8804
11 Fax: 910-672-7705
   Email: law.rmd@gmail.com
12
13 Attorneys for Plaintiffs

14
          **UNITED STATES DISTRICT COURT**
15
       **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
16

| | |
|---|---|
| 17  DONALD MCDOUGALL, an individual; JULIANA GARCIA, an individual; SECOND AMENDMENT FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br> vs. <br><br> COUNTY OF VENTURA, CALIFORNIA; BILL AYUB, in his official capacity; WILLIAM T. FOLEY, in his official capacity, ROBERT LEVIN, in his official capacity; and VENTURA COUNTY PUBLIC HEALTH CARE AGENCY, | Case No. 2:20-cv-02927 <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br><br> First Amended Complaint Filed Apr. 13, 2020 |

1

2                                    Defendants.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................ 1

II.    STATEMENT OF FACTS ........................................................................ 3

III.   ARGUMENT .............................................................................................. 7

  A.  STANDARD FOR ISSUING A PRELIMINARY INJUNCTION. ............................... 7

  B.  PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS. ................ 8

      1. Defendants' Orders and Enforcement Actions Deny Access To,
         Exercise Of, and Infringe Fundamental, Individual Second
         Amendment Rights. ...................................................................... 8

         a.   Defendants' Orders and Enforcement Actions Are a Prohibition on
              Second Amendment Rights and are Categorically
              Unconstitutional. ................................................................ 10

         b.   The Orders Cannot Survive Any Level of Scrutiny. ..................... 12

      2. Defendants' Orders and Enforcement Actions Violate Due Process
         and the Right to Travel. .............................................................. 19

  C.  THE DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES
      IRREPARABLE INJURY. .................................................................. 20

IV.    CONCLUSION ....................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*Andrews v. State*, 50 Tenn. 165 (1871) ...................................................... 9

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) .............. 21

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106 (3d Cir. 2018) ..................................................... 16

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012) ......................................... 11

*Bateman v. Purdue*, 881 F.Supp.2d 709 (E.D. N.C. 2012) ............................... 13, 14

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017) ...................................................... 13

*Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989) .......... 15

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015) ............................... 16

*Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977) ............................................ 9

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ............................. 14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................................ passim

*Duncan v. Becerra*, 265 F.Supp.3d 1106 (S.D. Cal. 2017), aff'd, 742 F.App'x 218 (9th Cir. 2018) ........................................................................... 13, 21

*Edenfield v. Fane*, 507 U.S. 761 (1993) ........................................................... 15, 16

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................ 11, 20

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ..................................... passim

*Grace v. District of Columbia*, 187 F.Supp.3d 124 (D.D.C. 2016) ........................ 21

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999) ... 15, 16, 17

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*") ........ 16

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D. Ill. 2014) ........................................................................................ 9

*Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018) ............................ 15

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014) ................. 9

*Kent v. Dulles*, 357 U.S. 116 (1958) ..................................................................... 19

*King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) .......... 19

*Luis v. United States*, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016) ............................ 9

– iv –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AMENDED APPLICATION FOR ISSUANCE OF A PRELIMINARY INJUNCTION
CASE NO. 2:20-cv-02927

1    *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990) ................................. 19

2    *Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018)................................................... 9

3    *McCullen v. Coakley*, 134 S.Ct. 2518 (2014)....................................................... 15

4    *McCulloch v. State*, 17 U.S. 316, 415 (1819)........................................................ 1

5    *McDonald v. City of Chicago*,
         561 U.S. 742 (2010)........................................................................................ 8
6
     *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ............................................. 20
7
     *Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) .............................. 20
8
     *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012).................................................. 16
9
     *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F.Supp.3d 1133 (S.D.
10        Cal. 2018)....................................................................................................... 21

11   *Norsworthy v. Beard*, 87 F.Supp.3d 1164 (N.D.Cal. 2015) ................................. 20

12   *Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) ...................................... 8

13   *Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013) ......................................... 21

14   *Tattered Cover v. City of Thornton*, 44 P.3d 1044 (Colo. 2002) ........................... 9

15   *Turner Broad. Sys., Inc.*, 520 U.S. 180 (1997)..................................................... 15

16   *United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010) ..................................... 13

17   *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ............................... 12, 13

18   *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) ....................................... 16

19   *Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ............................................ 15

20   *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ........................................... 8

21   *Williams v. Fears*, 179 U.S. 270, 274 (1900)....................................................... 19

22   *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).............................. 1

23                                   <u>STATUTES</u>

24   Cal. Pen. Code § 27540 .......................................................................................... 11

25   Cal. Pen. Code § 27545 .......................................................................................... 10

26   Cal. Pen. Code § 28175 .......................................................................................... 10

27   Cal. Pen. Code § 28200 .......................................................................................... 11

28   Cal. Pen. Code § 30312 .......................................................................................... 10

– v –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' AMENDED APPLICATION FOR ISSUANCE OF A
PRELIMINARY INJUNCTION
CASE NO. 2:20-cv-02927

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>O<small>THER</small> A<small>UTHORITIES</small></u>

Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)
    ........................................................................................................................ 20

# I.    INTRODUCTION

The "constitution [was] intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. State*, 17 U.S. 316, 415 (1819). Indeed, "the forefathers … knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). And, "they made no express provision for exercise of extraordinary authority because of a crisis." *Id.* (Jackson, J., concurring). Put differently, the Constitution's protections remain robust through peace and turmoil. A declaration of emergency does not justify the denial or destruction of a constitutionally enumerated fundamental right – not even for a limited period of time.

In California, individuals must generally acquire all modern firearms and ammunition from and/or through duly licensed retailers by means of in-person transactions. (Pen. Code §§ 27545; 28050, et seq.; 30342, et seq.; 30370, et seq.). And, with few exceptions, only individuals holding a valid Firearm Safety Certificate ("FSC") can acquire and take possession of firearms. (Pen. Code § 26840.) Moreover, because of the State's waiting period laws and background check systems, individual purchasers and transferees must visit a retailer at least once for ammunition, and at least twice for firearms. Therefore, under these laws, the only way for a Californian to take possession of firearms and ammunition for their self-defense and lawful purposes is through in-person transactions. By their Orders and actions shuttering and criminalizing both operating retailers and shooting ranges, and going to and from retailers and ranges, shuttered firearm and ammunition retailers, Defendants have made it impossible for Plaintiffs, Plaintiffs' members and customers, and similarly situated individuals to purchase firearms and ammunition during this time of extended insecurity by prohibiting the operation of retailers, and the right of individuals to go to and from them, for an indefinite period of time, and

1   until Defendants say so. Defendants have used the COVID-19 pandemic to deprive
2   Californians of their fundamental rights – through mere executive decree, no less –
3   in Orders and enforcement actions affecting millions of people in thousands of
4   square miles—an entire region.

5       While Defendants have a legitimate interest in reducing the population's
6   exposure to COVID-19, the extreme manner in which Defendants are doing so – a
7   total ban – is unlawfully overbroad, irrationally tailored to meet that goal, and
8   categorically unconstitutional. The "enshrinement of constitutional rights
9   necessarily takes certain policy choices off the table." *District of Columbia v. Heller,*
10  554 U.S. 570, 636 (2008). These include policy choices and orders effecting an
11  absolute prohibition on the exercise of Second Amendment rights. *Id.* Licensed
12  firearm and ammunition retailers and shooting ranges are essential businesses,
13  provide law-abiding individuals with critical access to constitutionally protected
14  rights, and must remain open like other *essential* businesses.

15      Times of uncertainty and disturbance are *precisely when the right to self-*
16  *defense is most important*. When the Second Amendment was ratified, "Americans
17  understood the 'right of self-preservation' as permitting a citizen to 'repel force by
18  force' when 'the intervention of society in his behalf, may be too late to prevent an
19  injury.'" *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (quoting 1
20  Blackstone's Commentaries 145–46, n.42 (1803)) (brackets omitted). A global
21  pandemic epitomizes a setting in which waiting for "the intervention of society" on
22  one's behalf may be too late.

23      Through their Orders and enforcement actions, Defendants have implemented
24  a number of shockingly broad restrictions that affect both individuals and critically
25  essential small businesses. But not *all* individuals and businesses are affected alike.
26  Some are favored by Defendants and remain open to the public, while others, are
27  threatened with incarceration, fines, and the loss of their livelihoods. But Defendants
28  also threaten, on pain of criminal penalty, those individuals, like Plaintiffs',

Plaintiffs' members and customers, and others like them, should they dare exercise their rights (and legal obligation) to go to and use a retailer for the lawful acquisition of constitutionally protected items and services for self-defense. Criminalizing going to, coming from, and operating essential businesses that provide access to the constitutionally protected right to keep and bear arms for self-defense — especially in a manner that is inconsistent with other so-called "essential businesses"— cannot withstand constitutional scrutiny or even rational objectivity. The injunctive relief that Plaintiffs have been forced to seek through this action is necessary – and immediately so – to uphold this bedrock principle of the United States Constitution.

## II.    STATEMENT OF FACTS

### *State Orders Background*

In response to the COVID-19 coronavirus pandemic, on March 17, 2020, Governor Newsom told reporters that his declaring martial law was an option if he feels it necessary.[1] Governor Newsom then signed Executive Order N-33-20 on March 19, 2020. ("Executive Order"). See Decl. of Ronda Baldwin-Kennedy ("BK Dec.") **Ex. 1**. Governor Newsom's Executive Order included an order from Dr. Sonia Y. Angell, the State Public Health Officer. On March 22, 2020, Dr. Angell issued a list of "Essential Critical Infrastructure Workers." Taken together, the State's Orders directed "all individuals living in the State of California to stay home or at their place of residence." The only exceptions are for whatever is "needed to maintain continuity of operations of the federal critical infrastructure sectors." The State Orders granted Dr. Angell the authority to "designate additional sectors as critical in order to protect the health and well-being of all Californians," but do not identify any additional sectors nor indicate which sectors may qualify as critical.

---

[1] "We have the ability to do martial law . . . if we feel the necessity." https://www.independent.co.uk/news/world/americas/coronavirus-california-martial-law-shelter-in-place-lockdown-army-a9410256.html.

These Orders took effect "immediately" and remain in effect indefinitely. Then, on April 3, 2020, counsel for Gov. Newsom and Public Health Officer Angell represented to the court in another federal action that, "As the Governor has publicly confirmed, the Executive Order does not mandate the closure of firearms and ammunition retailers. To the extent any local official acting on his or her own authority requires the closure of those retailers, such actions do not concern the Executive Order."[2]

### *Ventura County Orders and Enforcement*

On March 17, 2020, the Public Health Department of the County of Ventura issued an order directing all residents of the County to shelter in place and restrict conduct (the "March 17 Order"). (BK Dec. **Ex. 2**).[3]

On March 20, 2020, the Public Health Department of Ventura issued an additional order (the "March 20 Order") supplementing and extending the March 17 Order, directing all residents of the County to continue sheltering in place and restrict their conduct until April 19, 2020. (BK Dec. **Ex. 3**).[4]

On March 31, 2020, the Public Health Department of Ventura issued another order, supplementing and extending the March 17 and March 20 Orders and directing all residents of the County to continue to shelter in place and restrict conduct until April 19, 2020 (the "March 31 Order"). (BK Dec. **Ex. 4**).[5] Section 12

---

[2] State Defs.' Opp. Pls.' Ex Parte App. Temp. Restraining Ord. (C.D.Cal no. 2:20-cv-02874-AB-AK) at , online at https://www.courtlistener.com/recap/gov.uscourts.cacd.777785/gov.uscourts.cacd.777785.24.0_1.pdf.

[3] https://vcportal.ventura.org/CEO/VCNC/2020-03-17_Ventura_County_Public_Health_Order.pdf.

[4] https://s30623.pcdn.co/wp-content/uploads/2020/03/StayWellAtHomeOrder.pdf.

[5] https://vcportal.ventura.org/covid19/docs/March_31_2020_Order.pdf.

of the Order also tasked the Sheriff and all police chiefs within the County to enforce the provisions of the Order, asserting that "violation of any provision of this Order constitutes a threat to public health."

On April 9, 2020, the Public Health Department of Ventura issued another order, supplementing and amending the March 17, March 20, and March 31 Orders (the "April 9 Order"). Furthermore, the April 9 Order bans all gatherings, and added three types of businesses to the list of "Essential Businesses". (BK Dec. **Ex. 5**).[6] Section 8 of the Order also tasked the Sheriff and all police chiefs within the County to enforce the provisions of the Order, asserting that "violation of any provision of this Order constitutes a threat to public health..."

Additionally, the aforementioned Orders, define and allow for only the operation of "Essential Businesses". Furthermore, the March 20 Order also prohibits travel unless related to "Essential Travel" or "Essential Activities" as defined by the Order. As defined by the Order, such travel and activities do not include departing the County in order to obtain firearms and/or ammunition from an adjacent jurisdiction.

Plaintiff Donald McDougall, a resident of Ventura County, would like to take possession of a firearm that he ordered which is currently in the possession of a licensed firearm dealer. Declaration of Donald McDougall ("McDougall Dec.") at ¶¶1 and 9. Plaintiff McDougall would also like to retrieve a firearm of his that is in the possession of a licensed gunsmith for repair. (*Id*. at ¶10). Plaintiff McDougall is not prohibited from possessing firearms under state or federal law. (*Id*. at ¶3). Furthermore, Plaintiff McDougall possesses a California Carry Concealed Weapons License ("CCW"). (*Id*. at ¶8). He can lawfully take possession of a purchased firearm and ammunition upon completion of a background check. (*Id*. at ¶12). However, as

---

[6] https://vcportal.ventura.org/covid19/docs/2020-04-09_COVID19_PH_Order_April_9_2020.pdf.

a result of the Defendants' Orders and enforcement actions, he is unable to retrieve his firearms or acquire ammunition. (*Id.* at ¶¶12-15).

Plaintiff Juliana Garcia, another resident of Ventura County, would like to purchase a firearm and ammunition for self-defense purposes. Declaration of Juliana Garcia ("Garcia Dec.") at ¶¶ 1 and 10). Plaintiff Garcia is not prohibited from possessing firearms under state or federal law. (*Id.* at ¶3). Plaintiff Garcia does not possess a FSC but desires to obtain one. (*Id.* at ¶11). However, due to the Defendants' Orders and enforcement actions, she is unable to obtain a FSC nor purchase a self-defense firearm and ammunition. (*Id.* at ¶¶11 and 14-17). Plaintiff Garcia cannot purchase either firearms or ammunition except through a licensed firearms dealer and/or licensed ammunition vendor under California law. (*Id.* at ¶7).

In California, a violation of a statute is a misdemeanor unless specified to be punishable otherwise. California Penal Code Prelim. Prov. 19.4 ("When an act or omission is declared by a statute to be a public offense and no penalty for the offense is prescribed in any statute, the act or omission is punishable as a misdemeanor."). County Defendants' Orders, enforced by Defendant sheriffs and police chiefs, among others, commonly state: "Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both." Thus, under Defendants' Orders and enforcement policies, it is a crime for individuals to leave their homes and go to firearms and ammunition retailers and shooting ranges. Additionally, it is a crime for retailers and ranges, including Plaintiffs herein, to operate.

Notably, the Department of Homeland Security, Cyber-Infrastructure Division ("CISA"), issued updated (Version 2.0) "Guidance on the Essential Critical

Infrastructure Workforce" during the COVID-19 pandemic. (BK Dec. **Ex. 6**).[7] While the CISA's guidance is advisory in nature, its findings and conclusions were "developed, in collaboration with other federal agencies, State and local governments, and the private sector" for the specific purpose of "help[ing] State, local, tribal and territorial officials as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." To that end, CISA determined that "[w]orkers supporting the operation of firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges" fall squarely within the "critical infrastructure workforce."

In addition to the individual Plaintiffs, Plaintiffs Second Amendment Foundation, Inc. ("SAF"), California Gun Rights Foundation ("CGF"), California Association of Federal Firearms Licensees, Inc. ("CAL-FFL"), and Firearms Policy Coalition, Inc. ("FPC") are themselves damaged by the Orders and enforcement actions. Beyond their own direct damages, these institutional plaintiffs have California members and supporters who are affected by Defendants' Orders and enforcement actions. (See Declarations of Brandon Combs, Alan Gottlieb, Gene Hoffman, Mike Baryla, and Josh Savani.) All Plaintiffs accordingly seek this necessary relief.

### III.  ARGUMENT

#### A.  STANDARD FOR ISSUING A PRELIMINARY INJUNCTION.

A movant seeking a preliminary injunction must typically demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities favor an injunction; and (4) that an injunction

---

[7] Guidance on the Essential Critical Infrastructure Workforce, https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce

1    promotes the public interest. *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir.
2    2017).

3

4    **B.     PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS.**

5         Plaintiffs will succeed on the merits of their claims, as the Defendants'
6    sweeping Orders and enforcement actions at issue prohibit millions of Californians
7    in an entire region from exercising fundamental rights guaranteed by the Second
8    Amendment, and violate their right to travel as protected by Article IV, Section 2,
9    Cl. I and the Due Process clause under the Fifth and Fourteenth Amendments to the
10   United States Constitution.

11        **1.   Defendants' Orders and Enforcement Actions Deny Access To,**
           **Exercise Of, and Infringe Fundamental, Individual Second**
12         **Amendment Rights.**

13        The Second Amendment to the United States Constitution provides: "A well
14   regulated Militia, being necessary to the security of a free State, the right of the
15   people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The
16   Second Amendment "guarantee[s] the individual right to possess and carry weapons
17   in case of confrontation." *Heller*, 554 U.S. at 592. And because "the Framers and
18   ratifiers of the Fourteenth Amendment counted the right to keep and bear arms
19   among those fundamental rights necessary to our system of ordered liberty," it
20   applies to the States through the Fourteenth Amendment. *McDonald v. City of*
21   *Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion).

22        The Supreme Court has held that the Second Amendment guarantees the right
23   to "possess" weapons. *Heller*, 554 U.S. at 592. And "the Court has acknowledged
24   that certain unarticulated rights are implicit in enumerated guarantees. . . .
25   [F]undamental rights, even though not expressly guaranteed, have been recognized
26   by the Court as indispensable to the enjoyment of rights explicitly defined."
27   *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579–80 (1980). Accordingly, "the
28   right to possess firearms for protection implies a corresponding right to obtain the

1   bullets necessary to use them." *Jackson v. City & Cty. of San Francisco*, 746 F.3d

2   953, 967 (9th Cir. 2014) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir.

3   2011)). And "[t]he right to keep arms, necessarily involves the right to purchase

4   them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). *See Illinois Ass'n of Firearms*

5   *Retailers v. City of Chicago*, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014) ("the right to

6   keep and bear arms for self-defense under the Second Amendment … must also

7   include the right to *acquire* a firearm") (emphasis in original); *cf. Tattered Cover v.*

8   *City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002) ("When a person buys a book at

9   a bookstore, he engages in activity protected by the First Amendment because he is

10  exercising his right to read and receive ideas and information."). Thus, the right to

11  possess weapons necessarily also includes the right to acquire and transfer them.

12  "Without protection for these closely related rights, the Second Amendment would

13  be toothless." *Luis v. United States*, 136 S.Ct. 1083, 1098 (2016) (Thomas, J.,

14  concurring).

15         For all these same reasons, firearm retailers are protected by the Second

16  Amendment. If "[a] total prohibition against sale of contraceptives … would

17  intrude upon individual decisions in matters of procreation and contraception as

18  harshly as a direct ban on their use," *Carey v. Population Servs., Int'l*, 431 U.S. 678,

19  687–88 (1977), the same rationale applies to firearms. Thus, "[c]ommercial

20  regulations on the sale of firearms do not fall outside the scope of the Second

21  Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). "If

22  there were somehow a categorical exception for these restrictions [on gun sales], it

23  would follow that there would be no constitutional defect in prohibiting the

24  commercial sale of firearms. Such a result would be untenable under *Heller*." *Id. See*

25  *also Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) (implicitly recognizing a right

26  to sell firearms by analyzing a burden on that right). As a result, those who would

27  seek to engage in the commercial acquisition of firearms must therefore also be

28  protected.

### a. Defendants' Orders and Enforcement Actions Are a Prohibition on Second Amendment Rights and are Categorically Unconstitutional.

The Supreme Court held in *Heller* that the appropriate test to be applied is a categorical one, first looking to the text of the Constitution itself, and then looking to history and tradition to inform the scope and meaning of that text. Indeed, *Heller* held a handgun ban – which is the effect of Defendants' expansive Orders and actions, among other restrictions – categorically unconstitutional: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." *Ezell*, 651 F.3d at 703 (emphasis added).

At issue here is a complete and unilateral suspension on the right of ordinary citizens to acquire firearms and ammunition, a right protected by the Second Amendment. Due to the ever-expanding nature of the laws regulating firearm transfers, in-person visits to gun stores and retailers are the *only* legal means for ordinary, law-abiding citizens to acquire and purchase firearms—and now, ammunition—within the State of California. See, e.g., Cal. Pen. Code § 27545 (requiring all firearm transfers be processed through a licensed dealer); Pen. Code § 30312 (requiring all ammunition transactions to be made through a licensed ammunition vendor, in a face-to-face transfer). In addition, firearm and ammunition retailers are required to initiate background checks at the point of transfer to fulfill the State's mandates, administer the vast majority of FSC tests to ensure that a recipient is aware of firearm safety rules, and administer the safe handling demonstration. Pen. Code §§ 28175 ("The dealer or salesperson making a sale shall ensure that all required information has been obtained from the purchaser. The dealer

1   and all salespersons shall be informed that incomplete information will delay

2   sales."); 28200 et seq. (establishing procedure for collecting information and fees

3   associated with required background checks). These are additional services that gun

4   store dealers now *must* provide in furtherance of the State's statutes and regulations.

5       The State has mandated these burdensome in-person requirements, requiring,

6   for example, at least two visits to licensed retailers for each firearm transaction, and

7   at least one for ammunition transactions. Defendants simply cannot be permitted to

8   take actions that effectively ban access to, on pain of criminal liability, and shut

9   down all firearm and ammunition transfers in their jurisdictions. Such transactions

10  cannot be done remotely as many other, non-firearm online retailers are able to do.

11  *See* Pen. Code § 27540 (requirements for dealer delivery of firearms). The effect of

12  Defendants' Orders and enforcement actions is a destruction of a fundamental,

13  individual right. It is well established that the deprivation of constitutionally

14  protected individual liberty, even temporarily, constitutes irreparable injury.

15  *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ("the loss of First

16  Amendment freedoms, for even minimal periods of time, unquestionably constitutes

17  irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

18      The effect of Defendants' Orders, and Defendants' enforcement of them, is a

19  ban on individuals' going to and from, and on the operation of, all firearm and

20  ammunition retailers and shooting ranges in the massive jurisdictions within which

21  their various Orders apply. As the Orders are now being interpreted and enforced,

22  millions of Californians are being prevented from acquiring or practicing with

23  firearms or ammunition, and during a time of national *crisis*.

24      Defendants' is a policy outcome that is completely taken off the table under

25  *Heller*. The "central" holding in *Heller* was "that the Second Amendment protects a

26  personal right to keep and bear arms for lawful purposes, most notably for self-

27  defense within the home." *McDonald*, 561 U.S. at 780. "The very enumeration of

28  the right takes out of the hands of government—even the Third Branch of

1    Government—the power to decide on a case-by-case basis whether the right is really
2    worth insisting upon." *Heller*, 554 U.S. at 634.

3        Plaintiffs must here preserve and maintain their position that any interest-
4    balancing test, including tiered scrutiny, is inappropriate under *Heller*, particularly
5    for categorical bans like and including those at issue here. *Heller*, 554 U.S. at 634,
6    635 ("We know of no other enumerated constitutional right whose core protection
7    has been subjected to a freestanding 'interest-balancing' approach"; "The Second
8    Amendment . . . is the very product of an interest balancing by the people"); *Ezell*,
9    651 F.3d at 703 ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws
10   restricting the core Second Amendment right—like the handgun bans at issue in
11   those cases, which prohibited handgun possession even in the home—are
12   categorically unconstitutional.").

13       Anyone who does not already own a firearm in Ventura County, such as
14   Plaintiff Garcia, is now entirely prohibited from exercising their Second Amendment
15   rights, at a time when those rights are most important. As such, Defendants' actions
16   amount to a categorical ban and should be categorically invalidated.

17            **b.    The Orders Cannot Survive Any Level of Scrutiny.**

18       The Defendants' orders and actions also fail the Ninth Circuit's two-part test
19   applying tiered scrutiny. Assuming *arguendo* that an interest-balancing test is
20   appropriate, the challenged provisions fail any level of scrutiny. Generally, the Ninth
21   Circuit applies a two-part test for Second Amendment challenges. *United States v.*
22   *Chovan*, 735 F.3d 1127 (9th Cir. 2013). "The two-step Second Amendment inquiry
23   we adopt (1) asks whether the challenged law burdens conduct protected by the
24   Second Amendment and (2) if so, directs courts to apply an appropriate level of
25   scrutiny." *Id.* at 1136–37. But consistent with Supreme Court precedent, "[a] law
26   that imposes such a severe restriction on the fundamental right of self defense of the
27   home that it amounts to a destruction of the Second Amendment right is
28   unconstitutional under any level of scrutiny." *Silvester v. Harris*, 843 F.3d 816, 821

(9th Cir. 2016). *Accord Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) ("A law that . . . amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny"). "That is what was involved in *Heller*." *Silvester*, 843 F.3d at 821 (citing *Heller*, 554 U.S. at 628–29).

As discussed above, Defendants' acts strike at the very core of the Second Amendment, thereby satisfying the first step of the two-part test. At the second step of the inquiry, a court is to measure "how severe the statute burdens the Second Amendment right. 'Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.'''' *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1119 (S.D. Cal. 2017) (granting preliminary injunction), aff'd, 742 F.App'x 218 (9th Cir. 2018) (quoting *Bauer*, 858 F.3d at 1222). "Guided by this understanding, [the] test for the appropriate level of scrutiny amounts to 'a sliding scale.' […] 'A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.' […] Further down the scale, a 'law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is appropriate.'" *Bauer*, 858 F.3d at 1222 (citing *Silvester*, 843 F.3d at 821, and *Chovan*, 735 F.3d at 1138; *see also*, *Bateman v. Purdue*, 881 F.Supp.2d 709, 715 (E.D. N.C. 2012) (applying strict scrutiny to North Carolina's emergency declaration statutes that effectively prevented access to firearms).

If heightened scrutiny applies, Defendants' policies should be evaluated under strict scrutiny, meaning Defendants must show that their policies are narrowly tailored to achieve a compelling state interest, and that no less restrictive alternative exists to achieve the same ends. *United States v. Alvarez*, 617 F.3d 1198, 1216 (9th Cir. 2010) (citing *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340

(2010)). With the wide breadth of the Order and its effect of completing destroying the right to keep and bear arms during this pandemic, by no stretch of imagination would it survive strict scrutiny – which highlights the reality that it is the very sort of categorical ban that can never be tolerated under *Heller*. This calculus does not change in an emergency, declared or otherwise. In *Bateman v. Purdue*, the district court evaluated North Carolina's statutes which authorized government officials to impose various restrictions on the possession, transportation, sale, and purchase of "dangerous weapons" during declared states of emergency. 881 F.Supp.2d at 710–11. The district court evaluated the statutes under the two-part test, and found first that "[i]t cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment." *Id*. at 713–14. "Additionally, although the statutes do not directly regulate the possession of firearms within the home, they effectively prohibit law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense. As such, these laws burden conduct protected by the Second Amendment." Accordingly, under strict scrutiny, the emergency declaration statutes were voided and declared to be unconstitutional since the statutes were not narrowly tailored, e.g., with reasonable time, place and manner restrictions. *Id*. at 716.

Accordingly, if heightened scrutiny is appropriate here, strict scrutiny should likewise apply. However, even if intermediate scrutiny were applicable, as this Court stated in denying Plaintiff McDougall's request for a temporary restraining order[8], the Order, and the Defendants' enforcement of it, are unconstitutional. Under intermediate scrutiny review, the government bears the burden of demonstrating a reasonable fit between the challenged regulation or law and a substantial

---

[8] *See* ECF Doc. 12 at 2 ("…this Court finds that intermediate scrutiny is appropriate because the County Order 'is simply not as sweeping as the complete handgun ban at issue in *Heller*'.").

governmental objective that the law ostensibly advances. *Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480–81 (1989). To carry this burden, the government must not only present evidence, but "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Turner Broad. Sys., Inc.*, 520 U.S. 180, 195 (1997). And in the related First Amendment context, the government is typically put to the evidentiary test to show that the harms it recites are not only real, but "that [the speech] restriction will in fact alleviate them to a material degree." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1177 (9th Cir. 2018) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)). This same evidentiary burden should apply with equal force to Second Amendment cases, where equally fundamental rights are similarly at stake. See, *Ezell*, 651 F.3d at 706–07 ("Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context") (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045; *see also Marzzarella,* 614 F.3d at 89 n.4 ("[W]e look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice.").

Moreover, under intermediate scrutiny, a court must ensure that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). Thus, in the First Amendment context, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S.Ct. 2518, 2540 (2014). For example, restrictions on commercial speech must "tailored in a reasonable manner to serve a substantial state interest." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). The Supreme Court has made abundantly clear that such

"reasonable tailoring" requires a considerably closer fit than mere rational basis scrutiny, and requires evidence that the restriction directly and materially advances a *bona fide* state interest. In the Second Amendment context, even Justice Breyer's balancing test proposed in his *Heller* dissent (and expressly rejected by the majority) considered "reasonable, but less restrictive, alternatives." 554 U.S. at 710 (Breyer, J., dissenting). Many circuit courts recognize the obligation in the Second Amendment context. *Heller v. District of Columbia*, 801 F.3d 264, 277–78 (D.C. Cir. 2015) ("*Heller III*"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 124 n.28 (3d Cir. 2018); *Ezell*, 651 F.3d at 709; *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *United States v. Reese*, 627 F.3d 792, 803 (10th Cir. 2010); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1128 (10th Cir. 2015).

"[The Court] must determine whether the regulation *directly* advances the governmental interest asserted, *and whether it is not more extensive than is necessary to serve that interest*." *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183 (internal citations omitted) (emphasis added). The government bears the burden of justifying its restriction on constitutional rights, and that "burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71. "The Government is not required to employ the least restrictive means conceivable . . . but one whose scope is in proportion to the interest served." *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 188.

Furthermore, a governmental interest that is as inconsistently pursued as Defendants' here is not and cannot be a substantial one for constitutional purposes. To be sure, the question is not whether an interest is important at the highest level of generality; rather, the fundamental concern is whether a government is genuinely applying rules about its interest in a consistent manner such that it demonstrates the

1   importance of the interest. Like the regulatory regime that failed constitutional
2   muster in *Greater New Orleans Broad. Ass'n, Inc.*, Defendants' Orders and
3   enforcement actions here are "so pierced by exemptions and inconsistencies that
4   [they] cannot hope to exonerate [them]." *Id*. at 190.

5        Moreover, the substantiality of the interest in Defendants' Orders and
6   enforcement actions, relative to the incontrovertible importance of and right to the
7   constitutionally enumerated, fundamental right to keep and bear arms – particularly
8   for self-defense in times of crisis – is informed by the federal government's
9   declaration that the firearm industry, its workers, and its products, are all critical
10  infrastructure. So too must those who would go to and use them to acquire
11  constitutionally protected items and services be protected in doing so.

12       Here, there can be no "reasonable fit" nor a "proportional fit" between blanket
13  Orders and enforcement actions that prohibit all legal firearm and ammunition
14  transfers and training at shooting ranges, and the Defendants' presumptive desire to
15  abate the spread of a viral pandemic. Nor can it be said that the mandatory closing
16  of all firearms retailers in their entirety "is not more extensive than is necessary" to
17  limit community spread. Like all other businesses, retailers, and service providers
18  that are exempt from Defendants' Orders and enforcement actions, firearm and
19  ammunition retailers and ranges, and the people, like Plaintiffs, who would go to
20  them, could abide by maximum occupancy limitations, social distancing
21  requirements, and sanitation regimens just as with the many other essential
22  businesses allowed to continue operating. And likewise, to the extent that certain
23  activities (such as the pickup/transfer of firearms, ammunition, and the safe handling
24  demonstration) are statutorily mandated to be conducted using in-person
25  transactions, these activities can be conducted while adhering to the same best
26  practices and necessary precautions required of other businesses that are permitted
27  to continue operating during this time.

28       In denying Plaintiff McDougall's request for a temporary restraining order,

this Court dedicated one paragraph to a purported intermediate scrutiny analysis, simply stating that the government has a compelling interest in stopping the spread of the COVID-19 virus and that there was no evidence or argument disputing the County's determination that the closure of non-essential businesses would help mitigate the spread. This Court's declaration that the County order is "temporary" in analyzing whether Defendant Ventura's Order can survive intermediate scrutiny ignores the impact it has on individuals such as Plaintiff Garcia and continues the trend of treating the Second Amendment like a second-class right by lower courts.[9] As recounted *supra*, there is no manner in which the Defendants can claim that their shuttering of firearm retailers is not the least restrictive means available to them, particularly when they let other so-called "Essential Businesses" operate that don't implicate the ability to exercise an enumerated constitutional right.

Adherence to the Defendants' Orders is simply a take-it-or-leave it proposition, with no room for less restrictive alternatives that would otherwise allow transactions to proceed. This zero-tolerance approach, whether motivated by ideological concerns or otherwise, runs afoul of the government's burden that the restrictions at issue be "proportional in scope," "not more extensive than necessary," or reasonably tailored to achieve the government's interest. However laudable an interest may be, well-settled United States Supreme Court jurisprudence has clearly spoken on what constitutes intermediate scrutiny. Defendants' Orders and enforcement actions do not pass constitutional muster under categorical, heightened, or even intermediate constitutional scrutiny.

---

[9] *See Silvester v. Becerra*, 138 S. Ct. 945, 200 L. Ed. 2d 293 (2018) (Thomas, J., dissenting from denial of certiorari)(Stating the analysis was "symptomatic of the lower courts' general failure to afford the Second Amendment the respect due an enumerated constitutional right.")

1
2

**2. Defendants' Orders and Enforcement Actions Violate Due Process and the Right to Travel.**

3      Plaintiffs will further prevail on their second claim, set forth in their First

4  Amended Complaint, that the Defendants' Orders and enforcement practices

5  specifically precluding so-called "Non-Essential" travel within and outside of

6  Ventura County for the purpose of purchasing firearms or ammunition, effect a

7  deprivation of the right to travel under the Article IV, Section 2, Cl. I, and the Fifth

8  and Fourteenth Amendments of the United States Constitution. Article IV, Section

9  2, Clause 1 of the United States Constitution requires that "[t]he Citizens of each

10  State shall be entitled to all Privileges and Immunities of Citizens in the several

11  States." The Fifth Amendment to the United States Constitution provides, in

12  pertinent part: "No person shall be. . .deprived of life, liberty or property, without

13  due process of law. . . ." Likewise, the Fourteenth Amendment provides "nor shall

14  any state deprive any person of life, liberty, or property, without due process of

15  law[.]" Of note, the Privileges and Immunities clause provides important protections

16  for non-residents who enter the state to obtain employment, or for any other

17  purposes, including the right to travel. *Saenz v. Roe*, 526 U.S. 489. 502 (1999).

18      The right to travel is both fundamental and guaranteed by the substantive due

19  process protections afforded under the Fifth and Fourteenth Amendments. *Williams*

20  *v. Fears*, 179 U.S. 270, 274 (1900); *Kent v. Dulles*, 357 U.S. 116 (1958). The right

21  to freedom of movement is not limited to state lines; the freedom to drive in one's

22  neighborhood, town, or county is "implicit in the concept of ordered liberty" and

23  "deeply rooted in the Nation's history." *Lutz v. City of York, Pa.*, 899 F.2d 255, 268

24  (3d Cir. 1990); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir.

25  1971)(Explaining that to describe the right to travel between states as fundamental

26  to personal liberty without acknowledging a correlative right to travel intrastate

27  would be meaningless); *see also Johnson v. City of Cincinnati*, 310 F.3d 484, 498

28

1    (6th Cir. 2002)(the "Constitution protects a right to travel locally through public

2    spaces and roadways").

3        By forcing the closure of firearms retailers, the Defendants have precluded

4    the Plaintiffs from exercising their right to keep and bear arms within Ventura

5    County. The alternative for the Plaintiffs would, of course, be to seek licensure

6    and/or to purchase firearms for self-defense in an adjacent county, but because the

7    Defendants continue to enforce their Orders by threat of criminal sanction, the

8    Plaintiffs have also been precluded from exercising their right to travel in order to

9    exercise their Second Amendment rights.

10       Legislatures are supposed to enact laws; executive agencies are supposed to

11   enforce them. Even had a legislative body made these irrational and constitutionally

12   repugnant rules, after due deliberation and debate, they would be invalid. And while

13   the constitutional harms are not made more (or less) illegal because of the violation

14   of separation of powers, that harm arises from both the substance of unconstitutional

15   polices, and also from the process that gave rise to them. Defendants here, acting

16   unilaterally, deserve no deference or legislative benefit of the doubt.

17   **C.    THE DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES**

18   **IRREPARABLE INJURY.**

19       "It is well established that the deprivation of constitutional rights

20   'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990,

21   1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A

22   Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)

23   ("When an alleged deprivation of a constitutional right is involved, most courts hold

24   that no further showing of irreparable injury is necessary"); *Norsworthy v. Beard*, 87

25   F.Supp.3d 1164, 1193 (N.D.Cal. 2015) ("Irreparable harm is presumed if plaintiffs

26   are likely to succeed on the merits because a deprivation of constitutional rights

27   always constitutes irreparable harm."); *Monterey Mech. Co. v. Wilson*, 125 F.3d 702,

28   715 (9th Cir. 1997) (an alleged constitutional infringement will often alone constitute

irreparable harm); *Duncan*, 265 F.Supp.3d at 1135 ("The same is true for Second Amendment rights. Their loss constitutes irreparable injury.… The right to keep and bear arms protects tangible and intangible interests which cannot be compensated by damages.… 'The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary.'") (citing *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016)). See also, *Ezell*, 651 F.3d at 699–700 (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law").

Plaintiffs have established a strong likelihood of success based on clear violations of their right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution, and their right to travel under Article IV, Section 2, Cl. I and the Fifth and Fourteenth Amendments of the United States Constitution. "As with irreparable injury, when a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F.Supp.3d 1133, 1147 (S.D. Cal. 2018) (quoting *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.") Because Plaintiffs have made such a showing, both the public interest and the balance of the equities weigh in favor of and compel the relief they seek of a temporary restraining order and preliminary injunction.

## IV.   CONCLUSION

There is no dispute that the coronavirus pandemic is serious in nature. Plaintiffs certainly do not intend to say or imply otherwise. But despite the abrupt

way that the coronavirus has imposed itself upon our society, the ability to access and exercise fundamental human rights cannot be cast into oblivion. This is especially true of the right to keep and bear arms for self-defense. For these reasons, and as set forth above, Plaintiffs respectfully request that this Court grant their Motion for Preliminary Injunction.

Dated: April 14, 2020

                                    /s/ *Ronda Baldwin-Kennedy*
                                    Ronda Baldwin-Kennedy

                                    /s/ *Raymond DiGuiseppe*
                                    Raymond DiGuiseppe

                                    Attorneys for Plaintiffs