Ronda Baldwin-Kennedy, Esq. (SB #302813)
Jerome A. Clay, Esq. (SB #327175)
**LAW OFFICE OF RONDA BALDWIN-KENNEDY**
5627 Kanan Rd. #614
Agoura Hills, CA 91301
Phone: (951) 268-8977
Fax: (702) 974-0147
Email: ronda@lorbk.com

Raymond M. DiGuiseppe (SB #228457)
**The DiGuiseppe Law Firm, P.C.**
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705
Email: law.rmd@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD MCDOUGALL, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF VENTURA, CALIFORNIA, *et al.*,<br><br>Defendants. | Case No. 2:20-cv-02927-CBM (ASX)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ISSUANCE OF ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br><u>First Amended Complaint Filed Apr. 14, 2020</u> |

# TABLE OF CONTENTS

I.       INTRODUCTION ........................................................................ 1

II.     STATEMENT OF FACTS ........................................................ 3

III.    ARGUMENT ............................................................................ 8

  A.    STANDARD FOR ISSUING A TEMPORARY RESTRAINING ORDER. ........... 8

  B.    PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS. ......... 8

     1.   Defendants' Orders and Enforcement Actions Deny Access To, Exercise Of, and Infringe Fundamental, Individual Second Amendment Rights. ...................................................... 9

       a.   Defendants' Orders and Enforcement Actions Are a Prohibition on Second Amendment Rights and are Categorically Unconstitutional. ................................ 10

       b.   The Orders Cannot Survive Any Level of Scrutiny. .................... 13

     2.   Defendants' Orders and Enforcement Actions Violate Due Process and the Right to Travel. ........................................ 20

  C.    THE DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES IRREPARABLE INJURY. ........................................................ 21

IV.    CONCLUSION ........................................................................ 23

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Andrews v. State*, 50 Tenn. 165 (1871)............................................................9

4

*Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) ..............22

5

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910

6
 F.3d 106 (3d Cir. 2018) ................................................................16

7

*Associated Press v. Otter*, 682 F.3d 821 (9th Cir. 2012)........................................12

8

*Bateman v. Purdue*, 881 F.Supp.2d 709 (E.D. N.C. 2012) ....................................14

9

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017).............................................13, 14

10

*Board of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469 (1989)..........15

11

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015)................................16

12

*Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977) ..........................................10

13

*Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) ...........................14

14

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ......................................passim

15

*Duncan v. Becerra*, 265 F.Supp.3d 1106 (S.D. Cal. 2017), aff'd, 742 F.App'x 218
 (9th Cir. 2018) .............................................................................14, 21

16

*Edenfield v. Fane*, 507 U.S. 761 (1993) ...............................................................15, 17

17

*Elrod v. Burns*, 427 U.S. 347 (1976) ..............................................................12, 21

18

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011)....................................passim

19

*Grace v. District of Columbia*, 187 F.Supp.3d 124 (D.D.C. 2016).......................21

20

*Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173 (1999)...15,
 17

21

22

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ("*Heller III*").........16

23

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928 (N.D.
 Ill. 2014) .......................................................................................9

24

*Italian Colors Rest. v. Becerra*, 878 F.3d 1165 (9th Cir. 2018)............................15

25

*Jackson v. City & Cty. of San Francisco*, 746 F.3d 953 (9th Cir. 2014)..................9

26

*Kent v. Dulles*, 357 U.S. 116 (1958)....................................................................20

27

*King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971) ..........20

28

*Luis v. United States*, 136 S.Ct. 1083, 194 L.Ed.2d 256 (2016) ...........................10

*Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990)....................................20

*Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018)........................................10

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014)..........................................16

*McCulloch v. State*, 17 U.S. 316, 415 (1819) ............................................1

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ............................................................9

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) ...............................21

*Monterey Mech. Co. v. Wilson*, 125 F.3d 702 (9th Cir. 1997) ...............21

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ..................................16

*Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F.Supp.3d 1133 (S.D.
    Cal. 2018)..................................................................22

*Norsworthy v. Beard*, 87 F.Supp.3d 1164 (N.D.Cal. 2015) ....................21

*Richmond Newspapers v. Virginia*, 448 U.S. 555 (1980) ........................9

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013).............................22

*Tattered Cover v. City of Thornton*, 44 P.3d 1044 (Colo. 2002)................9

*Turner Broad. Sys., Inc.*, 520 U.S. 180 (1997) .......................................15

*United States v. Alvarez*, 617 F.3d 1198 (9th Cir. 2010).........................14

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ...............13, 14

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010) .........................16

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)..............................16

*Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017) ............................8

*Williams v. Fears*, 179 U.S. 270, 274 (1900) ........................................20

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952)..............1

## STATUTES

Cal. Pen. Code § 27540 ...............................................................11

Cal. Pen. Code § 27545 ...............................................................11

Cal. Pen. Code § 28175 ...............................................................11

Cal. Pen. Code § 28200 ...............................................................11

Cal. Pen. Code § 30312 ...............................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

OTHER AUTHORITIES

Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)
..................................................................................................................... 21

# I.    INTRODUCTION

Plaintiffs bring forth this request for a temporary restraining order ("TRO") in light of this Court's calendaring of their Motion for Preliminary Injunction (ECF Doc. 20) for July 28, 2020, notwithstanding the Plaintiffs' request for an expedited track and the parties' stipulation to a hearing date of May 19, 2020 or shortly thereafter. ECF Doc. 25 (Order calendaring hearing). Plaintiffs, and those similarly situated, have been and continue to suffer an ongoing constitutional injury that requires immediate intervention in order to protect their rights. Indeed, since this Court denied the initial application for a temporary restraining order, the complaint has been amended to add several additional Plaintiffs, each of whom is directly and materially impacted by the challenged actions of Defendants. With the uncertainty surrounding the COVID-19 situation and Orders stemming from it, the scheduling of a preliminary injunction hearing for late July places in jeopardy the essence of the relief that Plaintiffs seek and immediately require to avert irreparable harm.

The "constitution [was] intended to endure for ages to come, and consequently, to be adapted to the various *crises* of human affairs." *McCulloch v. State*, 17 U.S. 316, 415 (1819). Indeed, "the forefathers … knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 650 (1952) (Jackson, J., concurring). And, "they made no express provision for exercise of extraordinary authority because of a crisis." *Id.* (Jackson, J., concurring). Put differently, the Constitution's protections remain robust through peace and turmoil. A declaration of emergency does not justify the denial or destruction of a constitutionally enumerated fundamental right – not even for a limited period of time.

In California, individuals must generally acquire all modern firearms and ammunition from and/or through duly licensed retailers by means of in-person transactions. (Pen. Code §§ 27545; 28050, et seq.; 30342, et seq.; 30370, et seq.).

And, with few exceptions, only individuals holding a valid Firearm Safety Certificate ("FSC") can acquire and take possession of firearms. (Pen. Code § 26840.) Moreover, because of the State's waiting period laws and background check systems, individual purchasers and transferees must visit a retailer at least once for ammunition, and at least twice for firearms. Therefore, under these laws, the only way for a Californian to take possession of firearms and ammunition for their self-defense and lawful purposes is through in-person transactions. By their Orders and actions shuttering and criminalizing both operating retailers and shooting ranges, and going to and from retailers and ranges, shuttered firearm and ammunition retailers, Defendants have made it impossible for Plaintiffs, Plaintiffs' members and customers, and similarly situated individuals to purchase firearms and ammunition during this time of extended insecurity by prohibiting the operation of retailers, and the right of individuals to go to and from them, for an indefinite period of time, and until Defendants say so. Defendants have used the COVID-19 pandemic to deprive Californians of their fundamental rights – through mere executive decree, no less – in Orders and enforcement actions affecting millions of people in thousands of square miles—an entire region.

While Defendants have a legitimate interest in reducing the population's exposure to COVID-19, the extreme manner in which Defendants are doing so – a total ban – is unlawfully overbroad, irrationally tailored to meet that goal, and categorically unconstitutional. The "enshrinement of constitutional rights necessarily takes certain policy choices off the table." *District of Columbia v. Heller,* 554 U.S. 570, 636 (2008). These include policy choices and orders effecting an absolute prohibition on the exercise of Second Amendment rights. *Id.* Licensed firearm and ammunition retailers and shooting ranges are essential businesses, provide law-abiding individuals with critical access to constitutionally protected rights, and must remain open like other *essential* businesses.

Times of uncertainty and disturbance are *precisely when the right to self-*

*defense is most important.* When the Second Amendment was ratified, "Americans understood the 'right of self-preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008) (quoting 1 Blackstone's Commentaries 145–46, n.42 (1803)) (brackets omitted). A global pandemic epitomizes a setting in which waiting for "the intervention of society" on one's behalf may be too late.

Through their Orders and enforcement actions, Defendants have implemented a number of shockingly broad restrictions that affect both individuals and critically essential small businesses. But not *all* individuals and businesses are affected alike. Some are favored by Defendants and remain open to the public, while others, are threatened with incarceration, fines, and the loss of their livelihoods. But Defendants also threaten, on pain of criminal penalty, those individuals, like Plaintiffs', Plaintiffs' members and customers, and others like them, should they dare exercise their rights (and legal obligation) to go to and use a retailer for the lawful acquisition of constitutionally protected items and services for self-defense. Criminalizing going to, coming from, and operating essential businesses that provide access to the constitutionally protected right to keep and bear arms for self-defense — especially in a manner that is inconsistent with other so-called "essential businesses"— cannot withstand constitutional scrutiny or even rational objectivity. The injunctive relief that Plaintiffs have been forced to seek through this action is necessary – and immediately so – to uphold this bedrock principle of the United States Constitution.

## II.   STATEMENT OF FACTS

### *State Orders Background*

In response to the COVID-19 coronavirus pandemic, on March 17, 2020,

Governor Newsom told reporters that his declaring martial law was an option if he feels it necessary.[1] Governor Newsom then signed Executive Order N-33-20 on March 19, 2020. ("Executive Order"). See Decl. of Ronda Baldwin-Kennedy (*See* ECF Doc. 20-7) **Ex. 1**. Governor Newsom's Executive Order included an order from Dr. Sonia Y. Angell, the State Public Health Officer. On March 22, 2020, Dr. Angell issued a list of "Essential Critical Infrastructure Workers." Taken together, the State's Orders directed "all individuals living in the State of California to stay home or at their place of residence." The only exceptions are for whatever is "needed to maintain continuity of operations of the federal critical infrastructure sectors." The State Orders granted Dr. Angell the authority to "designate additional sectors as critical in order to protect the health and well-being of all Californians," but do not identify any additional sectors nor indicate which sectors may qualify as critical. These Orders took effect "immediately" and remain in effect indefinitely. Then, on April 3, 2020, counsel for Gov. Newsom and Public Health Officer Angell represented to the court in another federal action that, "As the Governor has publicly confirmed, the Executive Order does not mandate the closure of firearms and ammunition retailers. To the extent any local official acting on his or her own authority requires the closure of those retailers, such actions do not concern the Executive Order."[2]

### *Ventura County Orders and Enforcement*

---

[1] "We have the ability to do martial law . . . if we feel the necessity."
https://www.independent.co.uk/news/world/americas/coronavirus-california-martial-law-shelter-in-place-lockdown-army-a9410256.html.
[2] State Defs.' Opp. Pls.' Ex Parte App. Temp. Restraining Ord. (C.D.Cal no. 2:20-cv-02874-AB-AK) at , online at
https://www.courtlistener.com/recap/gov.uscourts.cacd.777785/gov.uscourts.cacd.777785.24.0_1.pdf.

On March 17, 2020, the Public Health Department of the County of Ventura issued an order directing all residents of the County to shelter in place and restrict conduct (the "March 17 Order"). (ECF Doc. 20-7 **Ex. 2**).[3]

On March 20, 2020, the Public Health Department of Ventura issued an additional order (the "March 20 Order") supplementing and extending the March 17 Order, directing all residents of the County to continue sheltering in place and restrict their conduct until April 19, 2020. (ECF Doc. 20-7 **Ex. 3**).[4]

On March 31, 2020, the Public Health Department of Ventura issued another order, supplementing and extending the March 17 and March 20 Orders and directing all residents of the County to continue to shelter in place and restrict conduct until April 19, 2020 (the "March 31 Order"). (ECF Doc. 20-7 **Ex. 4**).[5] Section 12 of the Order also tasked the Sheriff and all police chiefs within the County to enforce the provisions of the Order, asserting that "violation of any provision of this Order constitutes a threat to public health."

On April 9, 2020, the Public Health Department of Ventura issued another order, supplementing and amending the March 17, March 20, and March 31 Orders (the "April 9 Order"). Furthermore, the April 9 Order bans all gatherings, and added three types of businesses to the list of "Essential Businesses". (ECF Doc. 20-7 **Ex. 5**).[6] Section 8 of the Order also tasked the Sheriff and all police chiefs within the County to enforce the provisions of the Order, asserting that "violation of any provision of this Order constitutes a threat to public health..."

Additionally, the aforementioned Orders, define and allow for only the

---

[3] https://vcportal.ventura.org/CEO/VCNC/2020-03-17_Ventura_County_Public_Health_Order.pdf.
[4] https://s30623.pcdn.co/wp-content/uploads/2020/03/StayWellAtHomeOrder.pdf.
[5] https://vcportal.ventura.org/covid19/docs/March_31_2020_Order.pdf.
[6] https://vcportal.ventura.org/covid19/docs/2020-04-09_COVID19_PH_Order_April_9_2020.pdf.

operation of "Essential Businesses". Furthermore, the March 20 Order also prohibits travel unless related to "Essential Travel" or "Essential Activities" as defined by the Order. As defined by the Order, such travel and activities do not include departing the County in order to obtain firearms and/or ammunition from an adjacent jurisdiction.

Plaintiff Donald McDougall, a resident of Ventura County, would like to take possession of a firearm that he ordered which is currently in the possession of a licensed firearm dealer. Declaration of Donald McDougall (*See* ECF Doc. 20-2) at ¶¶1 and 9. Plaintiff McDougall would also like to retrieve a firearm of his that is in the possession of a licensed gunsmith for repair. (*Id*. at ¶10). Plaintiff McDougall is not prohibited from possessing firearms under state or federal law. (*Id*. at ¶3). Furthermore, Plaintiff McDougall possesses a California Carry Concealed Weapons License ("CCW"). (*Id*. at ¶8). He can lawfully take possession of a purchased firearm and ammunition upon completion of a background check. (*Id*. at ¶12). However, as a result of the Defendants' Orders and enforcement actions, he is unable to retrieve his firearms or acquire ammunition. (*Id*. at ¶¶12-15).

Plaintiff Juliana Garcia, another resident of Ventura County, would like to purchase a firearm and ammunition for self-defense purposes. Declaration of Juliana Garcia (*See* ECF Doc. 20-3) at ¶¶ 1 and 10). Plaintiff Garcia is not prohibited from possessing firearms under state or federal law. (*Id*. at ¶3). Plaintiff Garcia does not possess a FSC but desires to obtain one. (*Id*. at ¶11). However, due to the Defendants' Orders and enforcement actions, she is unable to obtain a FSC nor purchase a self-defense firearm and ammunition. (*Id*. at ¶¶11 and 14-17). Plaintiff Garcia cannot purchase either firearms or ammunition except through a licensed firearms dealer and/or licensed ammunition vendor under California law. (*Id*. at ¶7).

In California, a violation of a statute is a misdemeanor unless specified to be

punishable otherwise. California Penal Code Prelim. Prov. 19.4 ("When an act or omission is declared by a statute to be a public offense and no penalty for the offense is prescribed in any statute, the act or omission is punishable as a misdemeanor."). County Defendants' Orders, enforced by Defendant sheriffs and police chiefs, among others, commonly state: "Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order. The violation of any provision of this Order constitutes an imminent threat and menace to public health, constitutes a public nuisance, and is punishable by fine, imprisonment, or both." Thus, under Defendants' Orders and enforcement policies, it is a crime for individuals to leave their homes and go to firearms and ammunition retailers and shooting ranges. Additionally, it is a crime for retailers and ranges, including Plaintiffs herein, to operate.

Notably, the Department of Homeland Security, Cyber-Infrastructure Division ("CISA"), issued updated (Version 2.0) "Guidance on the Essential Critical Infrastructure Workforce" during the COVID-19 pandemic. (ECF Doc. 20-7 **Ex. 6**).[7] While the CISA's guidance is advisory in nature, its findings and conclusions were "developed, in collaboration with other federal agencies, State and local governments, and the private sector" for the specific purpose of "help[ing] State, local, tribal and territorial officials as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security." To that end, CISA determined that "[w]orkers supporting the operation of firearm or ammunition product

---

[7] Guidance on the Essential Critical Infrastructure Workforce, https://www.cisa.gov/publication/guidance-essential-critical-infrastructure-workforce

manufacturers, retailers, importers, distributors, and shooting ranges" fall squarely within the "critical infrastructure workforce."

In addition to the individual Plaintiffs, Plaintiffs Second Amendment Foundation, Inc. ("SAF"), California Gun Rights Foundation ("CGF"), California Association of Federal Firearms Licensees, Inc. ("CAL-FFL"), and Firearms Policy Coalition, Inc. ("FPC") are themselves damaged by the Orders and enforcement actions. Beyond their own direct damages, these institutional plaintiffs have California members and supporters who are affected by Defendants' Orders and enforcement actions. (*See* ECF Docs. 20-4, 20-5, and 20-6) All Plaintiffs accordingly seek this necessary relief, and they require this relief as soon as possible in order to preserve their opportunity for meaningful and effective redress.

## III.   ARGUMENT

### A.   STANDARD FOR ISSUING A TEMPORARY RESTRAINING ORDER.

The standard for issuing a TRO is the same as the standard for issuing a preliminary injunction. A movant seeking a preliminary injunction must typically demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent relief; (3) that the balance of equities favor an injunction; and (4) that an injunction promotes the public interest. *Washington v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017).

### B.   PLAINTIFFS WILL SUCCEED ON THE MERITS OF THEIR CLAIMS.

Plaintiffs will succeed on the merits of their claims, as the Defendants' sweeping Orders and enforcement actions at issue prohibit millions of Californians in an entire region from exercising fundamental rights guaranteed by the Second Amendment, and violate their right to travel as protected by Article IV, Section 2,

Cl. I and the Due Process clause under the Fifth and Fourteenth Amendments to the United States Constitution.

### 1. Defendants' Orders and Enforcement Actions Deny Access To, Exercise Of, and Infringe Fundamental, Individual Second Amendment Rights.

The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. And because "the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty," it applies to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010) (plurality opinion).

The Supreme Court has held that the Second Amendment guarantees the right to "possess" weapons. *Heller*, 554 U.S. at 592. And "the Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees. . . . [F]undamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579–80 (1980). Accordingly, "the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). And "[t]he right to keep arms, necessarily involves the right to purchase them." *Andrews v. State*, 50 Tenn. 165, 178 (1871). *See Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F.Supp.2d 928, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense under the Second Amendment … must also include the right to *acquire* a firearm") (emphasis in

original); *cf. Tattered Cover v. City of Thornton*, 44 P.3d 1044, 1052 (Colo. 2002) ("When a person buys a book at a bookstore, he engages in activity protected by the First Amendment because he is exercising his right to read and receive ideas and information."). Thus, the right to possess weapons necessarily also includes the right to acquire and transfer them. "Without protection for these closely related rights, the Second Amendment would be toothless." *Luis v. United States*, 136 S.Ct. 1083, 1098 (2016) (Thomas, J., concurring).

For all these same reasons, firearm retailers are protected by the Second Amendment. If "[a] total prohibition against sale of contraceptives … would intrude upon individual decisions in matters of procreation and contraception as harshly as a direct ban on their use," *Carey v. Population Servs., Int'l*, 431 U.S. 678, 687–88 (1977), the same rationale applies to firearms. Thus, "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment." *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010). "If there were somehow a categorical exception for these restrictions [on gun sales], it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *Id. See also Mance v. Sessions*, 896 F.3d 699 (5th Cir. 2018) (implicitly recognizing a right to sell firearms by analyzing a burden on that right). As a result, those who would seek to engage in the commercial acquisition of firearms must therefore also be protected.

> **a.   Defendants' Orders and Enforcement Actions Are a Prohibition on Second Amendment Rights and are Categorically Unconstitutional.**

The Supreme Court held in *Heller* that the appropriate test to be applied is a categorical one, first looking to the text of the Constitution itself, and then looking to history and tradition to inform the scope and meaning of that text. Indeed, *Heller* held a handgun ban – which is the effect of Defendants' expansive Orders and

actions, among other restrictions – categorically unconstitutional: "Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." 554 U.S. at 629. "Both *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right—like the handgun bans at issue in those cases, which prohibited handgun possession even in the home—are categorically unconstitutional." *Ezell*, 651 F.3d at 703 (emphasis added).

At issue here is a complete and unilateral suspension on the right of ordinary citizens to acquire firearms and ammunition, a right protected by the Second Amendment. Due to the ever-expanding nature of the laws regulating firearm transfers, in-person visits to gun stores and retailers are the *only* legal means for ordinary, law-abiding citizens to acquire and purchase firearms—and now, ammunition—within the State of California. See, e.g., Cal. Pen. Code § 27545 (requiring all firearm transfers be processed through a licensed dealer); Pen. Code § 30312 (requiring all ammunition transactions to be made through a licensed ammunition vendor, in a face-to-face transfer). In addition, firearm and ammunition retailers are required to initiate background checks at the point of transfer to fulfill the State's mandates, administer the vast majority of FSC tests to ensure that a recipient is aware of firearm safety rules, and administer the safe handling demonstration. Pen. Code §§ 28175 ("The dealer or salesperson making a sale shall ensure that all required information has been obtained from the purchaser. The dealer and all salespersons shall be informed that incomplete information will delay sales."); 28200 et seq. (establishing procedure for collecting information and fees associated with required background checks). These are additional services that gun store dealers now *must* provide in furtherance of the State's statutes and regulations.

The State has mandated these burdensome in-person requirements, requiring, for example, at least two visits to licensed retailers for each firearm transaction,

and at least one for ammunition transactions. Defendants simply cannot be permitted to take actions that effectively ban access to, on pain of criminal liability, and shut down all firearm and ammunition transfers in their jurisdictions. Such transactions cannot be done remotely as many other, non-firearm online retailers are able to do. *See* Pen. Code § 27540 (requirements for dealer delivery of firearms). The effect of Defendants' Orders and enforcement actions is a destruction of a fundamental, individual right. It is well established that the deprivation of constitutionally protected individual liberty, even temporarily, constitutes irreparable injury. *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) ("the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The effect of Defendants' Orders, and Defendants' enforcement of them, is a ban on individuals' going to and from, and on the operation of, all firearm and ammunition retailers and shooting ranges in the massive jurisdictions within which their various Orders apply. As the Orders are now being interpreted and enforced, millions of Californians are being prevented from acquiring or practicing with firearms or ammunition, and during a time of national *crisis*.

Defendants' is a policy outcome that is completely taken off the table under *Heller*. The "central" holding in *Heller* was "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634.

Plaintiffs must here preserve and maintain their position that any interest-balancing test, including tiered scrutiny, is inappropriate under *Heller*, particularly for categorical bans like and including those at issue here. *Heller*, 554 U.S. at 634,

1   635 ("We know of no other enumerated constitutional right whose core protection

2   has been subjected to a freestanding 'interest-balancing' approach"; "The Second

3   Amendment . . . is the very product of an interest balancing by the people"); *Ezell*,

4   651 F.3d at 703 ("Both *Heller* and *McDonald* suggest that broadly prohibitory laws

5   restricting the core Second Amendment right—like the handgun bans at issue in

6   those cases, which prohibited handgun possession even in the home—are

7   categorically unconstitutional.").

8       Anyone who does not already own a firearm in Ventura County, such as

9   Plaintiff Garcia, is now entirely prohibited from exercising their Second

10  Amendment rights, at a time when those rights are most important. As such,

11  Defendants' actions amount to a categorical ban and should be categorically

12  invalidated.

13           **b.     The Orders Cannot Survive Any Level of Scrutiny.**

14      The Defendants' orders and actions also fail the Ninth Circuit's two-part test

15  applying tiered scrutiny. Assuming *arguendo* that an interest-balancing test is

16  appropriate, the challenged provisions fail any level of scrutiny. Generally, the

17  Ninth Circuit applies a two-part test for Second Amendment challenges. *United*

18  *States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). "The two-step Second

19  Amendment inquiry we adopt (1) asks whether the challenged law burdens conduct

20  protected by the Second Amendment and (2) if so, directs courts to apply an

21  appropriate level of scrutiny." *Id.* at 1136–37. But consistent with Supreme Court

22  precedent, "[a] law that imposes such a severe restriction on the fundamental right

23  of self defense of the home that it amounts to a destruction of the Second

24  Amendment right is unconstitutional under any level of scrutiny." *Silvester v.*

25  *Harris*, 843 F.3d 816, 821 (9th Cir. 2016). *Accord Bauer v. Becerra*, 858 F.3d

26  1216, 1222 (9th Cir. 2017) ("A law that . . . amounts to a destruction of the Second

27  Amendment right is unconstitutional under any level of scrutiny"). "That is what

28  was involved in *Heller*." *Silvester*, 843 F.3d at 821 (citing *Heller*, 554 U.S. at 628–

1    29).

2       As discussed above, Defendants' acts strike at the very core of the Second

3    Amendment, thereby satisfying the first step of the two-part test. At the second step

4    of the inquiry, a court is to measure "how severe the statute burdens the Second

5    Amendment right. 'Because *Heller* did not specify a particular level of scrutiny for

6    all Second Amendment challenges, courts determine the appropriate level by

7    considering '(1) how close the challenged law comes to the core of the Second

8    Amendment right, and (2) the severity of the law's burden on that right.'"" *Duncan

9    v. Becerra*, 265 F.Supp.3d 1106, 1119 (S.D. Cal. 2017) (granting preliminary

10   injunction), aff'd, 742 F.App'x 218 (9th Cir. 2018) (quoting *Bauer*, 858 F.3d at

11   1222). "Guided by this understanding, [the] test for the appropriate level of

12   scrutiny amounts to 'a sliding scale.' […] 'A law that imposes such a severe

13   restriction on the fundamental right of self defense of the home that it amounts to a

14   destruction of the Second Amendment right is unconstitutional under any level of

15   scrutiny.' […] Further down the scale, a 'law that implicates the core of the Second

16   Amendment right and severely burdens that right warrants strict scrutiny.

17   Otherwise, intermediate scrutiny is appropriate.'" *Bauer*, 858 F.3d at 1222 (citing

18   *Silvester*, 843 F.3d at 821, and *Chovan*, 735 F.3d at 1138; *see also*, *Bateman v.

19   Purdue*, 881 F.Supp.2d 709, 715 (E.D. N.C. 2012) (applying strict scrutiny to

20   North Carolina's emergency declaration statutes that effectively prevented access

21   to firearms).

22       If heightened scrutiny applies, Defendants' policies should be evaluated

23   under strict scrutiny, meaning Defendants must show that their policies are

24   narrowly tailored to achieve a compelling state interest, and that no less restrictive

25   alternative exists to achieve the same ends. *United States v. Alvarez*, 617 F.3d

26   1198, 1216 (9th Cir. 2010) (citing *Citizens United v. Fed. Election Comm'n*, 558

27   U.S. 310, 340 (2010)). With the wide breadth of the Order and its effect of

28   completing destroying the right to keep and bear arms during this pandemic, by no

---

stretch of imagination would it survive strict scrutiny – which highlights the reality that it is the very sort of categorical ban that can never be tolerated under *Heller*. This calculus does not change in an emergency, declared or otherwise. In *Bateman v. Purdue*, the district court evaluated North Carolina's statutes which authorized government officials to impose various restrictions on the possession, transportation, sale, and purchase of "dangerous weapons" during declared states of emergency. 881 F.Supp.2d at 710–11. The district court evaluated the statutes under the two-part test, and found first that "[i]t cannot be seriously questioned that the emergency declaration laws at issue here burden conduct protected by the Second Amendment." *Id*. at 713–14. "Additionally, although the statutes do not directly regulate the possession of firearms within the home, they effectively prohibit law abiding citizens from purchasing and transporting to their homes firearms and ammunition needed for self-defense. As such, these laws burden conduct protected by the Second Amendment." Accordingly, under strict scrutiny, the emergency declaration statutes were voided and declared to be unconstitutional since the statutes were not narrowly tailored, e.g., with reasonable time, place and manner restrictions. *Id*. at 716.

Accordingly, if heightened scrutiny is appropriate here, strict scrutiny should likewise apply. However, even if intermediate scrutiny were applicable, as this Court stated in denying Plaintiff McDougall's request for a temporary restraining order[8], the Order, and the Defendants' enforcement of it, are unconstitutional. Under intermediate scrutiny review, the government bears the burden of demonstrating a reasonable fit between the challenged regulation or law and a substantial governmental objective that the law ostensibly advances. *Board of*

---

[8] *See* ECF Doc. 12 at 2 ("…this Court finds that intermediate scrutiny is appropriate because the County Order 'is simply not as sweeping as the complete handgun ban at issue in *Heller*'.").

*Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 480–81 (1989). To carry this burden, the government must not only present evidence, but "substantial evidence" drawn from "reasonable inferences" that actually support its proffered justification. *Turner Broad. Sys., Inc.*, 520 U.S. 180, 195 (1997). And in the related First Amendment context, the government is typically put to the evidentiary test to show that the harms it recites are not only real, but "that [the speech] restriction will in fact alleviate them to a material degree." *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1177 (9th Cir. 2018) (citing *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999) (quoting *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993)). This same evidentiary burden should apply with equal force to Second Amendment cases, where equally fundamental rights are similarly at stake. See, *Ezell*, 651 F.3d at 706–07 ("Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and on the strength of that suggestion, we and other circuits have already begun to adapt First Amendment doctrine to the Second Amendment context") (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045; *see also Marzzarella,* 614 F.3d at 89 n.4 ("[W]e look to other constitutional areas for guidance in evaluating Second Amendment challenges. We think the First Amendment is the natural choice.").

Moreover, under intermediate scrutiny, a court must ensure that "the means chosen are not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). Thus, in the First Amendment context, "the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *McCullen v. Coakley*, 134 S.Ct. 2518, 2540 (2014). For example, restrictions on commercial speech must "tailored in a reasonable manner to serve a substantial state interest." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). The Supreme Court has made abundantly clear that such "reasonable tailoring" requires a considerably

closer fit than mere rational basis scrutiny, and requires evidence that the restriction directly and materially advances a *bona fide* state interest. In the Second Amendment context, even Justice Breyer's balancing test proposed in his *Heller* dissent (and expressly rejected by the majority) considered "reasonable, but less restrictive, alternatives." 554 U.S. at 710 (Breyer, J., dissenting). Many circuit courts recognize the obligation in the Second Amendment context. *Heller v. District of Columbia*, 801 F.3d 264, 277–78 (D.C. Cir. 2015) ("*Heller III*"); *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 124 n.28 (3d Cir. 2018); *Ezell*, 651 F.3d at 709; *Moore v. Madigan*, 702 F.3d 933, 940 (7th Cir. 2012); *United States v. Reese*, 627 F.3d 792, 803 (10th Cir. 2010); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1128 (10th Cir. 2015).

"[The Court] must determine whether the regulation *directly* advances the governmental interest asserted, *and whether it is not more extensive than is necessary to serve that interest*." *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 183 (internal citations omitted) (emphasis added). The government bears the burden of justifying its restriction on constitutional rights, and that "burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770-71. "The Government is not required to employ the least restrictive means conceivable . . . but one whose scope is in proportion to the interest served." *Greater New Orleans Broad. Ass'n, Inc.*, 527 U.S. at 188.

Furthermore, a governmental interest that is as inconsistently pursued as Defendants' here is not and cannot be a substantial one for constitutional purposes. To be sure, the question is not whether an interest is important at the highest level of generality; rather, the fundamental concern is whether a government is genuinely applying rules about its interest in a consistent manner such that it

demonstrates the importance of the interest. Like the regulatory regime that failed constitutional muster in *Greater New Orleans Broad. Ass'n, Inc.*, Defendants' Orders and enforcement actions here are "so pierced by exemptions and inconsistencies that [they] cannot hope to exonerate [them]." *Id.* at 190.

Moreover, the substantiality of the interest in Defendants' Orders and enforcement actions, relative to the incontrovertible importance of and right to the constitutionally enumerated, fundamental right to keep and bear arms – particularly for self-defense in times of crisis – is informed by the federal government's declaration that the firearm industry, its workers, and its products, are all critical infrastructure. So too must those who would go to and use them to acquire constitutionally protected items and services be protected in doing so.

Here, there can be no "reasonable fit" nor a "proportional fit" between blanket Orders and enforcement actions that prohibit all legal firearm and ammunition transfers and training at shooting ranges, and the Defendants' presumptive desire to abate the spread of a viral pandemic. Nor can it be said that the mandatory closing of all firearms retailers in their entirety "is not more extensive than is necessary" to limit community spread. Like all other businesses, retailers, and service providers that are exempt from Defendants' Orders and enforcement actions, firearm and ammunition retailers and ranges, and the people, like Plaintiffs, who would go to them, could abide by maximum occupancy limitations, social distancing requirements, and sanitation regimens just as with the many other essential businesses allowed to continue operating. And likewise, to the extent that certain activities (such as the pickup/transfer of firearms, ammunition, and the safe handling demonstration) are statutorily mandated to be conducted using in-person transactions, these activities can be conducted while adhering to the same best practices and necessary precautions required of other businesses that are permitted to continue operating during this time.

In denying Plaintiff McDougall's request for a temporary restraining order,

1 this Court dedicated one paragraph to a purported intermediate scrutiny analysis,

2 simply stating that the government has a compelling interest in stopping the spread

3 of the COVID-19 virus and that there was no evidence or argument disputing the

4 County's determination that the closure of non-essential businesses would help

5 mitigate the spread. This Court's declaration that the County order is "temporary"

6 in analyzing whether Defendant Ventura's Order can survive intermediate scrutiny

7 ignores the impact it has on individuals such as Plaintiff Garcia and continues the

8 trend of treating the Second Amendment like a second-class right by lower courts.[9]

9 As recounted *supra*, there is no manner in which the Defendants can claim that

10 their shuttering of firearm retailers is not the least restrictive means available to

11 them, particularly when they let other so-called "Essential Businesses" operate that

12 don't implicate the ability to exercise an enumerated constitutional right.

13      Adherence to the Defendants' Orders is simply a take-it-or-leave it

14 proposition, with no room for less restrictive alternatives that would otherwise

15 allow transactions to proceed. This zero-tolerance approach, whether motivated by

16 ideological concerns or otherwise, runs afoul of the government's burden that the

17 restrictions at issue be "proportional in scope," "not more extensive than

18 necessary," or reasonably tailored to achieve the government's interest. However

19 laudable an interest may be, well-settled United States Supreme Court

20 jurisprudence has clearly spoken on what constitutes intermediate scrutiny.

21 Defendants' Orders and enforcement actions do not pass constitutional muster

22 under categorical, heightened, or even intermediate constitutional scrutiny.

23

24 _____

25 [9] *See Silvester v. Becerra*, 138 S. Ct. 945, 200 L. Ed. 2d 293 (2018) (Thomas, J.,
dissenting from denial of certiorari)(Stating the analysis was "symptomatic of the

26 lower courts' general failure to afford the Second Amendment the respect due an

27 enumerated constitutional right.")

28

## 2. Defendants' Orders and Enforcement Actions Violate Due Process and the Right to Travel.

Plaintiffs will further prevail on their second claim, set forth in their First Amended Complaint, that the Defendants' Orders and enforcement practices specifically precluding so-called "Non-Essential" travel within and outside of Ventura County for the purpose of purchasing firearms or ammunition, effect a deprivation of the right to travel under the Article IV, Section 2, Cl. I, and the Fifth and Fourteenth Amendments of the United States Constitution. Article IV, Section 2, Clause 1 of the United States Constitution requires that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States." The Fifth Amendment to the United States Constitution provides, in pertinent part: "No person shall be. . .deprived of life, liberty or property, without due process of law. . . ." Likewise, the Fourteenth Amendment provides "nor shall any state deprive any person of life, liberty, or property, without due process of law[.]" Of note, the Privileges and Immunities clause provides important protections for non-residents who enter the state to obtain employment, or for any other purposes, including the right to travel. *Saenz v. Roe*, 526 U.S. 489. 502 (1999).

The right to travel is both fundamental and guaranteed by the substantive due process protections afforded under the Fifth and Fourteenth Amendments. *Williams v. Fears*, 179 U.S. 270, 274 (1900); *Kent v. Dulles*, 357 U.S. 116 (1958). The right to freedom of movement is not limited to state lines; the freedom to drive in one's neighborhood, town, or county is "implicit in the concept of ordered liberty" and "deeply rooted in the Nation's history." *Lutz v. City of York, Pa.*, 899 F.2d 255, 268 (3d Cir. 1990); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648 (2d Cir. 1971)(Explaining that to describe the right to travel between states as fundamental to personal liberty without acknowledging a correlative right to travel intrastate would be meaningless); *see also Johnson v. City of Cincinnati*,

1   310 F.3d 484, 498 (6th Cir. 2002)(the "Constitution protects a right to travel locally
2   through public spaces and roadways").

3       By forcing the closure of firearms retailers, the Defendants have precluded
4   the Plaintiffs from exercising their right to keep and bear arms within Ventura
5   County. The alternative for the Plaintiffs would, of course, be to seek licensure
6   and/or to purchase firearms for self-defense in an adjacent county, but because the
7   Defendants continue to enforce their Orders by threat of criminal sanction, the
8   Plaintiffs have also been precluded from exercising their right to travel in order to
9   exercise their Second Amendment rights.

10      Legislatures are supposed to enact laws; executive agencies are supposed to
11  enforce them. Even had a legislative body made these irrational and
12  constitutionally repugnant rules, after due deliberation and debate, they would be
13  invalid. And while the constitutional harms are not made more (or less) illegal
14  because of the violation of separation of powers, that harm arises from both the
15  substance of unconstitutional polices, and also from the process that gave rise to
16  them. Defendants here, acting unilaterally, deserve no deference or legislative
17  benefit of the doubt.

18  **C.   THE DESTRUCTION OF CONSTITUTIONAL RIGHTS CONSTITUTES
19       IRREPARABLE INJURY.**

20      "It is well established that the deprivation of constitutional rights
21  'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990,
22  1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A
23  Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995)
24  ("When an alleged deprivation of a constitutional right is involved, most courts
25  hold that no further showing of irreparable injury is necessary"); *Norsworthy v.*
26  *Beard*, 87 F.Supp.3d 1164, 1193 (N.D.Cal. 2015) ("Irreparable harm is presumed if
27  plaintiffs are likely to succeed on the merits because a deprivation of constitutional
28  rights always constitutes irreparable harm."); *Monterey Mech. Co. v. Wilson*, 125

F.3d 702, 715 (9th Cir. 1997) (an alleged constitutional infringement will often alone constitute irreparable harm); *Duncan*, 265 F.Supp.3d at 1135 ("The same is true for Second Amendment rights. Their loss constitutes irreparable injury.… The right to keep and bear arms protects tangible and intangible interests which cannot be compensated by damages.… 'The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary.'") (citing *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016)). See also, *Ezell*, 651 F.3d at 699–700 (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law").

Plaintiffs have established a strong likelihood of success based on clear violations of their right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution, and their right to travel under Article IV, Section 2, Cl. I and the Fifth and Fourteenth Amendments of the United States Constitution. "As with irreparable injury, when a plaintiff establishes 'a likelihood that Defendants' policy violates the U.S. Constitution, Plaintiffs have also established that both the public interest and the balance of the equities favor a preliminary injunction.'" *Ms. L. v. U.S. Immigration and Customs Enforcement*, 310 F.Supp.3d 1133, 1147 (S.D. Cal. 2018) (quoting *Arizona Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1146 (9th Cir. 2013) ("Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution.") Because Plaintiffs have made such a showing, both the public interest and the balance of the equities weigh in favor of and compel the relief they seek of a temporary restraining order and preliminary injunction.

## IV.   CONCLUSION

There is no dispute that the coronavirus pandemic is serious in nature. Plaintiffs certainly do not intend to say or imply otherwise. But despite the abrupt way that the coronavirus has imposed itself upon our society, the ability to access and exercise fundamental human rights cannot be cast into oblivion. This is especially true of the right to keep and bear arms for self-defense. For these reasons, and as set forth above, Plaintiffs respectfully request that this Court grant their Application for Temporary Restraining Order.

Dated: April 24, 2020

> /s/ *Ronda Baldwin-Kennedy*
> Ronda Baldwin-Kennedy
>
> /s/ *Raymond DiGuiseppe*
> Raymond DiGuiseppe
>
> Attorneys for Plaintiffs