LEROY SMITH, State Bar No. 107702
County Counsel, County of Ventura
CHARMAINE H. BUEHENER, State Bar No. 220868
Assistant County Counsel
800 South Victoria Avenue, L/C #1830
Ventura, California 93009
Telephone:   (805) 654-2588
Facsimile:   (805) 654-2185
E-mail:       charmaine.buehner@ventura.org

Attorneys for Defendants County of Ventura
(also erroneously sued as Ventura County Public
Health Care Agency), Sheriff William Ayub
(erroneously sued as "Bill Ayub"), Robert Levin
and William T. Foley

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD MCDOUGALL, an individual; JULIANA GARCIA, an individual; SECOND AMENDMENT FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC.,<br><br>             Plaintiffs,<br><br>   vs.<br><br>COUNTY OF VENTURA, CALIFORNIA; BILL AYUB, in his official capacity; WILLIAM T. FOLEY, in his official capacity, ROBERT LEVIN, in his official capacity; and VENTURA COUNTY PUBLIC HEALTH CARE AGENCY,<br><br>             Defendants. | No. 2:20 cv-029927 CBM(ASX)<br><br>DEFENDANTS' OPPOSITION TO SECOND EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER<br><br>Date:<br>Time:<br>Ctrm: 8b<br>Judge: Hon. Consuelo B. Marshall<br><br>Trial:          Not Set<br>Complaint Filed:   March 28, 2020 |

i

# TABLE OF CONTENTS

**Page**

I  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II  RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.  The County's Emergency and Temporary Orders Are to Prevent the Spread of a Virulent, Highly Contagious Disease with No Known Cure . . . . . . . . . . . . . . . . . . . 2

    B.  Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.  Legal Standard for Pre-Trial Injunctive Relief . . . . . . . . . . . . . . . . . 8

    B.  Plaintiffs Are Not Entitled to Emergency Relief . . . . . . . . . . . . . . . . 9

    C.  Plaintiffs Cannot Establish a Likelihood of Success on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        1.  The County's Emergency and Temporary Orders Are a Valid Exercise of Its Police Power Entitled to a Minimal Scrutiny and Judicial Deference . . . . . . . . . . . 12

        2.  Even Under Traditional Scrutiny, the Stay Well at Home Orders Do Not Violate the Second Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

            a.  The Stay Well at Home Order Does Not Impinge on the Second Amendment as it Was Historically Understood . . . . . . . . . . . . . . . . . . . 15

            b.  The Stat Well at Home Orders Are Presumptively Lawful Regulations of General Applicability That Do Not Infringe Anyone's Ability to Possess or Use Arms and Only Incidentally Delay the Purchase of Firearms . . . . . . . . 17

            c.  The Stay Well at Home Orders Do not Substantially Burden Second Amendment Rights and Are Substantially Related to Mitigating the Public Health Crisis Presented By COVID-19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                i.  Even if Intermediate Scrutiny Is Applied, the Orders Should Stand . . . . . . . . . . . . . . . . . . . 18

ii

**TABLE OF CONTENTS (Cont'd.)**

**Page**

ii.    Preventing the Spread of COVID-19 Is a
Compelling Government Interest and the
Closure of Non-Essential Businesses,
Including Gun Stores, Is Reasonably
Suited to Achieve That Objective . . . . . . . . . . . 20

3.    Plaintiffs Are Unlikely to Prevail on Their Right
To Travel Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

D.    The Temporary "Pause" on Plaintiff's Ability to
Purchase or Sell Firearms Does Not Amount to An
Irreparable Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

E.    The Balance of Equities of the Hardships to the Parties
and Public Interest Tips Sharply in the County's Favor . . . . . . . . . 23

IV    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Amoco Production Co. v. Village of Gambell, Alaska* (1987)
   480 U.S. 531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bateman v. Perdue* (E.D.N.C. 2012)
   881 F.Supp.2d 709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Brandy v. Villanueva* (C.D.Cal. April 6, 2020)
   Case No. 2:20-cv-02874-AB-SK . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Camara v. Municipal Court of City and County of
   San Francisco* (1967)
   387 U.S. 523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*Community Hospital v. Maricopa County* (1974)
   415 U.S. 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21

*Compagnie Francaise de Navigation a Vapeur v. Louisiana
   State Board of Health* (1902)
   186 U.S. 380 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

*District of Columbia v. Heller* (2008)
   554 U.S. 570 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Dogloo, Inc. v. Doskocil Mfg. Co., Inc.* (C.D.Cal. 1995)
   893 F.Supp. 911 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Elrod v. Burns* (1976)
   427 U.S. 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ezell v. Chicago* (7th Cir. 2011)
   651 F.3d 684 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Federal Trade Comm'n v. Enforma Natural
   Products, Inc.* (9th Cir. 2004)
   362 F.3d 1204 ) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Four Seasons Hotels & Resorts, B.V. v. Conscorcio Barr, S.A.* (11th Cir. 2003)
   320 F.3d 1205 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Fyock v. City of Sunnyvale* (N.D.Cal. 2014)
   25 F.Supp.3d. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 22

*Fyock v. Sunnyvale* (9th Cir. 2015)
   779 F.3d 991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gish v. Newsom* (C.D.Cal. 2020)
   Case No. 5:20-cv-00755-JGB-KK 1021 . . . . . . . . . . . . . . 2, 9, 11, 12, 13

iv

## TABLE OF AUTHORITIES (Cont'd.)

<u>Page</u>

*Granny Goose Farms, Inc. v. Brotherhood of Teamsters*
*of Alameda County* (1974)
   415 U.S. 423 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Hunt v. Nat'l. Broad Co., Inc.* (9th Cir. 1989)
   872 F.2d 289 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*In re Abbott* (5th Cir. April 7, 2020)
   2020 WL 1685929 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*In re Rutledge* (8th Cir. April 22, 2010)
   2020 WL 1933122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*In re Intermagnetics America, Inc.* (C.D.Cal. 1989)
   101 B.R. 191 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jackson v. City & County of San Francisco* (9th Cir. 2014)
   746 F.3d 953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

*Jacobson v. Massachusetts* (1905)
   197 U.S. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9, 11, 12, 13, 24

*Kansas v. Hendricks* (1997)
   521 U.S. 346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Legacy Church v, Kunkel* (D.N.M. April 17, 2020)
   2020 WL 1905586 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lockheed Missile & Space Co. v. Hughes Aircraft Co.* (N.D.Cal. 1995)
   887 F.Supp. 1320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Lutz v. City of York , PA* (3d Cir. 1990)
   899 F.2d 255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Mazurek v. Armstrong* (1997)
   520 U.S. 968 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*McDonald v. City of Chicago, Ill.* (2010)
   561 U.S. 742 [130 S.Ct. 3020] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mega Vape, LLC v. City of San Antonio* (W.D.Tex. April 22, 2020)
   2020 WL 1933938 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mission Power Engineering Co. v. Continental Gas Co.* (C.D.Cal. 1995)
   883 F.Supp. 488 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Mohamed v. Holder* (E.D. Va. 2017)
   266 F.Supp.3d 868 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*North American Cold Storage Co. v. City of Chicago* (1908)
   211 U.S. 306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

v

1

**TABLE OF AUTHORITIES (Cont'd.)**

2

**Page**

3

*Nunez v. City of San Diego* (9th Cir. 1997)
    114 F. 3d 935 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21

4

5

*Peruta v. California* (1995)
    ____ U.S. ____ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

6

*Peruta v. County of San Diego* (9th Cir. 2016)
    824 F.3d 919 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

7

8

*Prince v. Massachusetts* (1944)
    321 U.S. 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

9

*Railroad Comm'n of Tex. v. Pullman Co.* (1941)
    312 U.S. 496 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

10

11

*Reno Air Racing Ass'n v. McCord* (9th Cir. 2006)
    452 F.3d 1126 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

12

*Robinson v. Attorney General* (11th Cir. April 23, 2020)
    2020 WL 1952370 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

13

14

*Saenz v. Roe* (1999)
    526 U.S. 489 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 21

15

*Schall v. Martin* (1984)
    467 U.S. 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

16

17

*Shows v. Swain County Sheriff* (W.D.N.C. April 23, 2020)
    2020 WL 1953621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18

*Silvester v. Harris* (9th Cir. 2016)
    843 F.3d 816 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17, 18, 19, 21

19

20

*Stanley v. University of Southern Calif.* (9th Cir. 1994)
    13 F.3d 1313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

21

*Teixeira v. County of Alameda* (9th Cir. 2017)
    873 F.3d 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

22

23

*U.S. v. Carpio-Leon* (4th Cir. 2012)
    701 F.3d 974 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

24

*U.S. v. Chovan* (9th Cir. 2013)
    735 F.3d 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

25

26

*U.S. v. Huitron-Guizar* (10th Cir. 2012)
    678 F.3d 1164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

27

*U.S.A. v. Sears* (C.D. Cal. April 6, 2015)
    2015 WL 13359437 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

28

DEFENDANTS' OPPOSITION TO SECOND EX PARTE APPLICATION FOR TRO

# TABLE OF AUTHORITIES (Cont'd.)

**Page**

*United States v. Salerno* (1987)
  467 U.S. 739 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Torres* (9th Cir. 2019)
  911 F.3d 1253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Weinberger v. Romero-Barcelo* (1982)
  456 U.S. 305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23

*Winter v. National Resources Defense Council, Inc.* (2008)
  555 U.S. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 13, 23, 25

## STATE CASES

*Coelho v. Truckell* (1935)
  9 Cal.App.2d 47 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kroplin v. Truax* (1929)
  119 Ohio St. 610 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATE STATUTES

California Code of Regulations

  tit. 7, § 2500 et. seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

California Government Code

  § 8558 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

California Health & Safety Code

  § 101040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  § 101080 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  § 101085 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  § 120175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

California Penal Code

  § 26815 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  § 27535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  § 27540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  § 28220, subd. (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## OTHER

Federal Rules of Civil Procedure

  rule 65(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# I

## INTRODUCTION

The Ventura County Health Officer, defendant Robert Levin, M.D. ("Health Officer"), has issued a series of temporary, specific and emergency "Stay Well at Home" orders, on March 17, 20, and 31, 2020, and April 9, 18 and 20, 2020 (collectively, "Stay Well at Home Order" or "Order") to slow the spread of a highly contagious and potentially fatal virus, for which there is no known cure.[1] Since the outbreak of the global coronavirus ("COVID-19") pandemic, the Health Officer has closely monitored the evolving pandemic and the outbreak of COVID-19 in Ventura County.  In response to the outbreak, the Health Officer declared a local health emergency in Ventura County on March 12 and has since issued, and continues to modify, the Stay Well at Home Order narrowly tailored slow the spread of COVID-19 while providing minimal disruption to Ventura County residents.  The Order bears a "real or substantial relation" to both slow the spread of COVID-19 and provide for the physical, social, economic and emotional well-being of Ventura County residents, without imposing, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law.  (*Jacobson v. Commonwealth of Massachusetts* (1905) 197 U.S. 11 [25 S.Ct. 358] ("*Jacobson*").)

Contrary to the arguments of plaintiffs,[2] the temporary pause imposed by the Stay Well at Home Order on a person's ability to purchase or sell a firearm does not implicate the Second Amendment of the Constitution, as this Court previously ruled, nor does the Stay Well at Home Order implicate a person's right to travel into or out of Ventura County in a way that violates the Privileges and Immunities Clause or the Fifth and Fourteenth Amendments of the Constitution.  And even if the Order has curtailed some rights in any of these respects, the Health Officer's

---

[1] All further dates are in 2020, unless otherwise indicated.

[2] Plaintiffs are Donald McDougall, Juliana Garcia, Second Amendment Foundation, California Gun Rights Foundation and Firearms Policy Coalition, Inc.

1

overriding and compelling need to protect public health through the temporary and emergency measures justifies the intrusion, whether under the applicable *Jacobson* framework or traditional constitutional scrutiny.  Accordingly, plaintiffs' request for a temporary restraining order must be denied.

## II

## RELEVANT BACKGROUND

**A.     The Emergency and Temporary Orders Are to Designed to Prevent the Spread of a Virulent, Highly Contagious Disease with No Known Cure**

According to the Centers for Disease Control and Prevention, COVID-19 is highly contagious and potentially deadly, especially for older persons and persons with serious chronic health conditions.  The incubation period for COVID-19 is anywhere from 1 day to 14 days, during which time a person may not experience any symptoms but will be contagious to others.  The virus spreads easily and sustainably through respiratory droplets produced when an infected person coughs or sneezes, person-to-person contact, and surfaces that can remain infectious for several days.  (Request for Judicial Notice ("RJN"), Exh. 1, 2,[3] & 3.)  Since December 2019, COVID-19 has "swept the globe, infecting millions and killing nearly two-hundred thousand people."  (RJN, Exhs. 2 & 3.)  From early March through April 26, there have been 42,164 confirmed cases and 1,710 deaths in California attributable to COVID-19, with 509 cases and 17 deaths occurring within Ventura County.  (RJN, Exh. 21.)  There are no known treatments or immunizations available for COVID-19.  (RJN, Exh. 1.)  "Without a vaccine, measures limiting physical contact between citizens . . .  are widely recognized as the only way to effectively slow the spread of the virus."  (RJN, Exhs. 2, 3 & 4.)

*/ / /*

---

[3] *Gish v. Newsom* (C.D.Cal. April 23, 2020) Case No. 5:20-cv-00755-JGB-KK, ECF 51, pg. ID 1021 ("*Gish*").

2

1    On March 4, citing an increasing number of confirmed COVID-19 cases in

2 the United States and worldwide, Governor Gavin Newsom declared that a state of

3 emergency existed in the State of California.  (RJN, Exh. 5.)  On March 11, the

4 World Health Organization declared COVID-19 to be a global pandemic.  (RJN,

5 Exh. 5.)  On March 12, based on the confirmation of COVID-19 cases in Ventura

6 County, and the likelihood that the number of cases would increase, the County's

7 Health Officer declared that a local health emergency existed in Ventura County.

8 (RJN, Exh. 6.)

9    On March 17, following a marked increase of COVID-19 cases in the

10 County, the Health Officer issued an order requiring persons living, working and

11 doing business in Ventura County to take a number of precautions to prevent or

12 slow the spread of the disease ("March 17 Order").  Among other provisions, the

13 March 17 Order required the immediate closure of a number of businesses,

14 including bars and nightclubs, movie theaters, live-performance venues, bowling

15 alleys and gyms.  Restaurants were ordered to close except for take-out and

16 delivery and to practice social distancing.  (RJN, Exh. 7.)

17    On March 19, Governor Newsom issued Executive Order N-33-20, which

18 required all persons living in California to stay at their places of residence except

19 as needed to maintain continuity of operations in "critical infrastructure sectors"

20 specified by the state health officer.  Supplementary guidance from the state health

21 officer identified "critical infrastructure workers" in sectors such as health care,

22 emergency services, food and agriculture, water, energy, transportation,

23 government services, and financial services.  (RJN, Exh. 8.)[4]

24

25    [4] Executive Order N-33-20 defines "critical infrastructure sectors"
consistent with the "March 19, 2020, Memorandum on Identification of Critical
26 Infrastructure Workers During COVID-19 Response" published by the United
States Department of Homeland Security's Cybersecurity and Infrastructure
27 Security Agency ("CISA").  (RJN, Exh. 9 ("March 19 CISA Memo").)  The March
19 CISA Memo does not identify retail gun stores as a component of critical
28 infrastructure.  On March 22, the state health officer issued a list of "Essential

(continued...)

3

1   On March 20, March 31, and April 9, the Health Officer issued supplemental

2   and restated Stay Well at Home orders to impose further restrictions.  (RJN, Exhs.

3   12, 13 & 14 ("Further Orders").)  The Further Orders sought to slow the spread of

4   COVID-19 by ensuring, among other things, that all persons living in Ventura

5   County stay at their places of residence, except for the purpose of engaging in

6   essential activities and working at essential businesses.  The Further Orders

7   prohibited public or private gatherings, prohibited non-essential travel, required the

8   closure of "non-essential" businesses, and mandated social distancing protocols for

9   the operation of essential businesses and for persons engaging in essential

10  activities.  (RJN, Exhs. 12-14.)  Under the Further Orders, "essential businesses"

11  were those business activities the Health Officer determined to be necessary to stop

12  the spread of COVID-19 or to enable persons to shelter at home.  Essential

13  businesses included health care providers, grocery stores, gas stations, newspapers

14  and radio stations, gas stations, banks, hardware stores, certain tradesmen, mailing

15  and shipping services, educational institutions (for purposes of facilitating distance

16  learning), restaurants (for service of takeout food only), airlines, taxis and other

17  transportation services, childcare facilities, hotels and motels, and commercial

18  construction.  Gun stores were not an essential business

19

20

_____

21       [4/](...continued)
    Critical Infrastructure Workers."  (RJN, Exh. 10.)  On March 25, in response to

22  inconsistent local views as to whether gun stores must remain open as an "essential
    business" under his order, Governor Newsom expressly deferred to local

23  jurisdictions to make the determination.  (RJN, Exh. 11.)  On March 28, CISA
    issued an additional "Advisory Memorandum on Identification of Essential Critical

24  Infrastructure Workers During COVID-19 Response" ("Revised CISA Memo"),
    which included "the operation of firearm or ammunition product manufacturers,

25  retailers, importers, distributors, and shooting ranges" as a component of critical
    infrastructure.  The Revised CISA Memo expressly declared that it is "*not, nor*

26  *should it be considered, a federal directive or standard. . . .  Individual*
    *jurisdictions should add or subtract essential workforce categories based on their*

27  *own requirements and discretion*."  (RJN, Exh. 22, Revised CISA Memo (March
    28, 2020), italics added.)  Governor Newsom has not revised Executive Order N-

28  33-20 or issued a new executive order to incorporate the Revised CISA Memo and
    its inclusion of gun retailers.

4

1   under the Further Orders.  The Further Orders were set to expire on April 19.

2   (RJN, Exhs. 12-14.)

3       Based on a determination that COVID-19 continued to present an imminent

4   and continuing threat to the residents of Ventura County, the Health Officer issued

5   a new Stay Well at Home Order, effective April 20, that superseded all prior orders

6   ("April 20 Order").  (RJN, Exh. 15.)  All provisions of the April 20 Order "shall be

7   interpreted to effectuate" the intent and purpose of the Order:  "to cause persons to

8   stay at their places of residence to the maximum extent feasible with the minimum

9   disruption to their social, emotional and economic well-being consistent with the

10  overarching goal of eliminating the COVID-19 pandemic."  (RJN, Exh. 15, p. 2, ¶

11  1.)

12      As with the prior orders, the April 20 Order stated that the Health Officer

13  "will continue to assess the quickly evolving situation [and] may issue additional

14  orders related to COVID-19. . . ."  (RJN, Exh. 15, p. 20, ¶ 23.)  The April 20 Order

15  is set to expire on May 15, 2020.  (RJN, Exh. 15, p. 1.)

16      The April 20 Order is, in some respects, less restrictive than the prior orders

17  consistent with the intent and purpose of the Order.  For example, while "non-

18  essential businesses" are still ordered to close, certain businesses that fall outside

19  of the Stay Well at Home Order's definition of essential businesses but within the

20  state health officer's list of essential critical infrastructure (as incorporated into the

21  Governor's Executive Order N-33-20) may now operate to the extent they can

22  minimize the risk of spreading COVID-19, i.e., the non-essential businesses must

23  be closed to the public, operate with a limited number of employees who follow

24  strict social distancing guidelines, and deliver to the purchaser any goods to be

25  sold.  (RJN, Exh. 15, pp. 3-4, ¶ 7.)  The April 20 Order also makes a "[s]pecial

26  allowance for completion of firearm sales":

27          "Under California law persons wishing to purchase a

28          firearm must complete a background check and waiting

5

1       period, and all sales must be completed in-person.  It is

2       not feasible, therefore, for the Health Officer to require

3       that firearm sales be conducted on-line only.  To

4       accommodate persons who initiated the purchase of a

5       firearm at a store located within the County before March

6       20 . . . , firearm purchasers may engage in the actions

7       necessary to complete firearm purchases initiated before

8       March 20, 2020, provided that:  [¶] a. All activities,

9       including the transfer of possession of any firearm, occur

10      by appointment only, and only the purchaser and one

11      person of behalf of the store shall be present; [¶] b. The

12      firearm store shall remain closed to the general public;

13      and [¶] c. Social Distancing Requirements shall be

14      followed to the greatest extent feasible." (RJN, Exh. 15,

15      p. 7, ¶ 11.)

16      The April 20 Order prohibits "Non-Essential Travel" within the County but

17  *expressly* provides that the Order "allows travel into or out of the County."  (RJN,

18  Exh. 15, p. 3, ¶ 6.)  It also expressly provides that "Essential Travel" includes

19  "[t]ravel engaged in interstate commerce and otherwise subject to the provisions of

20  the Commerce Clause of the United States Constitution."  (RJN, Exh. 15, p. 18,

21  ¶ g(7).)

22  **B**.   **Procedural History**

23      Plaintiff Donald McDougall filed the original complaint in this action on

24  March 28, alleging that the then-operative Stay Well at Home Order prevented him

25  from taking possession of his previously purchased firearm in violation of the

26  Second Amendment.  (ECF 1, pg. ID 5, ¶¶ 31-33.)  McDougall sought a temporary

27  restraining order ("TRO") to enjoin the County from "ordering gun stores closed"

28  under the then-operative Stay Well at Home Order.  (ECF 9, pg. ID 31.)  This

Court denied the TRO, finding that McDougall would be unlikely to succeed on the merits of his Second Amendment claim.  (ECF 12.)  In particular, the Court found that the Stay Well at Home Order survived intermediate scrutiny given that the Order was temporary, did not target handgun ownership, did not prohibit the ownership of a handgun outright, and because of the Health Officer's "compelling" government interest in preventing the spread of COVID-19.  (ECF Doc. No. 12, pg. ID 51.)

On April 14, McDougall filed a first amended complaint ("FAC"), adding four co-plaintiffs:  a would-be gun purchaser, Juliana Garcia, and three associations that promote Second Amendment rights, Second Amendment Foundation, California Gun Rights Foundation, and Firearms Policy Coalition, Inc. The FAC reasserts McDougall's Second Amendment claim and adds a claim that the then-operative Stay Well at Home Order violated the right to travel under the Privileges and Immunities clause at article IV, section 2 of the Constitution and the due process clauses of the Fifth and Fourteenth Amendments.  (ECF 19.)

On April 21, plaintiffs served the FAC on defendants County of Ventura ("County"), the Health Officer, William Ayub, the County Sheriff, and William T. Foley, the director of the County Health Care Agency, which houses the Public Health Department, together with an improperly noticed motion for a preliminary injunction set for hearing on May 12.  (Declaration of C. Buehner ("Buehner Decl."), ¶ 2, Exh. 1, pp. 3-7.)  The parties jointly stipulated for a later hearing date of May 19 or as soon thereafter as could be heard by the Court.  (ECF 24.)  In response, this Court set the hearing for July 28.  (ECF 25.)

On the afternoon of April 24, plaintiffs inquired whether defendants would oppose a second ex parte TRO application by plaintiffs.  Defendants indicated that they would oppose any such request, providing in writing the bases for such opposition, including that plaintiffs' claims were mooted by the issuance of the April 20 Order, that plaintiffs would be unlikely to prevail on the merits of their

claims and that this Court's prior orders impliedly denied plaintiffs' request for
expedited and preliminary relief.  (Buehner Decl., ¶ 3, Exh. 1, pp. 1-2.)  Without
responding to the County's correspondence, Plaintiffs filed their second TRO
application late in the evening of Friday, April 24.  (ECF 27.)  This time, plaintiffs
seek to enjoin defendants from "closing or compelling the closure of retail firearm
and ammunition businesses on the grounds that they are 'non-essential businesses'
and preventing individuals from traveling to obtain firearms and ammunition
under" the Stay Well at Home Order.  (ECF 27, Pg. ID 203.)

### III

### ARGUMENT

**A.**   **Legal Standard for Pre-Trial Injunctive Relief**

The purpose of a TRO is to preserve the status quo and prevent irreparable
harm until a hearing may be held on the propriety of a preliminary injunction.
(*Reno Air Racing Ass'n v. McCord* (9th Cir. 2006) 452 F.3d 1126, 1131.)  Except
for a heightened focus on the alleged irreparable injury in the context of a TRO, the
standard for issuance of a TRO and preliminary injunction are the same.
(*Lockheed Missile & Space Co. v. Hughes* Aircraft Co. (N.D.Cal. 1995) 887
F.Supp. 1320, 1323 [identical standard]; *Hunt v. Nat'l Broad Co., Inc.* (9th Cir.
1989) 872 F.2d 289, 292 [heightened focus for TRO].)  Injunctive relief is an
"extraordinary remedy" that requires the moving party to make a clear showing of
irreparable injury.  (*Weinberger v. Romero-Barcelo* (1982) 456 U.S. 305, 312;
*Stanley v. University of Southern Calif.* (9th Cir. 1994) 13 F.3d 1313, 1320;
*Mazurek v. Armstrong* (1997) 520 U.S. 968, 972 ["clear" showing requirement
particularly strong when  TRO is sought].)

The court must "balance the competing claims of injury and must consider
the effect on each party of the granting or withholding of the requested relief.
Although particular regard should be given to the public interest . . . 'a federal
judge sitting as chancellor is not mechanically obligated to grant an injunction for

8

1   every violation of law.'" (*Amoco Production Co. v. Village of Gambell, Alaska*
2   (1987) 480 U.S. 531, 542; *Dogloo, Inc. v. Doskocil Mfg. Co., Inc.* (C.D.Cal. 1995)
3   893 F.Supp. 911, 917.)  A plaintiff must establish: (1) a likelihood of success on
4   the merits; (2) that the plaintiff will suffer irreparable harm in the absence of
5   preliminary relief; (3) the balance of equities tips in the plaintiff's favor; and (4)
6   that an injunction is in the public interest.  (*Winter v. National Resources Defense*
7   *Council, Inc.* (2008) 555 U.S. 7, 20 [vacating preliminary injunction] ("*Winter*");
8   *Fyock v. City of Sunnyvale* (N.D.Cal. 2014) 25 F.Supp.3d 1267 ("*Fyock*") [denying
9   preliminary injunction].)  Plaintiffs cannot make such a showing in this case.

10  **B.    Plaintiffs Are Not Entitled to Emergency Relief**

11           Plaintiffs' second TRO application requests relief similar to the first TRO
12  application.  Neither application presents an emergency justifying relief.  The
13  Court denied the first TRO application without waiting for service on or a response
14  by defendants.  Courts in the Central District have long held that ex parte
15  applications are "nearly always improper," unless the moving party first establishes
16  "some genuine urgency such that 'immediate and irreparable injury, loss, or
17  damage will result to the applicant before the adverse party or his attorney can be
18  heard in opposition'" according to a regular noticed motion.  (*In re Intermagnetics*
19  *America, Inc.* (C.D.Cal. 1989) 101 B.R. 191, 192-94, citing Fed. Rules Civ.Proc.,
20  rule 65(b) ("*Intermagnetics*"); see also *Mission Power Engineering Co. v.*
21  *Continental Cas. Co.* (C.D.Cal. 1995) 883 F.Supp. 488, 492 ("*Mission Power*")
22  [applicant must show "why the moving party should be allowed to go to the head
23  of the line in front of all other litigants and received [*sic*] special treatment"]; see
24  also *Hunt v. Nat'l Broad Co, Inc.* (9th Cir. 1989) 872 F.2d 289, 292 [TRO
25  applicants must show entitlement to immediate relief in addition to standard for
26  preliminary injunctive relief].)

27
28  / / /

**DEFENDANTS' OPPOSITION TO SECOND EX PARTE APPLICATION FOR TRO**

Entitlement to emergency relief hinges on whether the party seeking relief will suffer irreparable prejudice, decided with reference to the relief requested by the underlying proposed motion.  (*Ibid*.)  Here, plaintiffs have not identified any "irreparable" harm because this Court *has already determined* that they are unlikely to succeed on the merits of their Second Amendment claim.  (ECF 12.)

Neither plaintiffs' second TRO application nor the FAC alleges any new facts or adds new plaintiffs that would change the result of the outcome of the Court's decision on the first TRO application.  To the contrary, as explained below, the judicial deference that should be afforded to the Stay Well at Home Order under *Jacobson*, *supra*, 197 U.S. at 27, as recognized in *Gish, supra,* Case No. 5:20-cv-00755-JGB-KK, RJN, Exh. 2 (ECF 51, pg. ID 1021), makes it even less likely that plaintiffs will succeed on the merits of their claims.  In addition, the modifications to the Stay Well at Home Order since this Court denied the first TRO application further support denial of plaintiffs' second TRO application.[5/] These modifications evidence the Health Officer's continual assessment of the Stay Well at Home Order, both to prevent the spread of COVID-19 and to provide minimum disruption of the social, emotional and economic well-being of Ventura County residents.  To this end, the Stay Well at Home Order now contains provisions *solicitous* of plaintiffs' claimed Second Amendment rights so long as strict protocols are followed.  (See, e.g., *Legacy Church, Inc. v. Kunkel* (D.N.M. April 17, 2020) 2020 WL 1905586 [upholding orders based, in part, on fact that

----

[5/] Plaintiffs have argued that the global pandemic presents a unique and heightened need for them to purchase firearms because of a perceived increased need for self-defense from violent crime during this time.  (ECF 27-1, Pg. ID 212.) The widely reported facts, however, are that while certain types of property crime have increased, violent crime throughout the country has *dramatically* decreased concurrent with the issuance of shelter-in-place orders, including in Ventura County.  (RJN, Exh. 16 [violent crime down 11 percent in Los Angeles]; RJN, Exh. 17 [crime rate dropped 16.6 percent in New York City]; RJN, Exh. 18 [Chicago homicides decreased by 29 percent, shootings by 19 percent and sexual assault by 5 percent]; RJN, Exh. 19 [zero homicides recorded in Miami for six-week period for first time since 1964]; RJN, Exh. 20 [violent crime dropped in Ventura County].)

1    emergency COVID-19 orders were solicitous of plaintiff's First Amendment

2    rights].)  Plaintiff McDougall is now expressly authorized to take possession of the

3    weapon he alleges he previously purchased, mooting his Second Amendment claim

4    entirely.  (RJN Exh. 15, p. 7.)

5        Plaintiffs' newly asserted right-to-travel claim will fare no better.  Plaintiffs

6    complain that the Stay Well at Home Order prevents them (or their members) from

7    leaving Ventura County to purchase a gun elsewhere.  (ECF 19, pg. ID 94, ¶ 87;

8    ECF 27, pg. ID 203, ln. 6-8.)  This claim is contrary to the express language of the

9    Stay Well at Home Order, which *allows* persons to travel into and out of the

10   County.  (RJN, Exh. 15, p. 3 ["This Order allows travel into or out of the

11   County"].)  Moreover, the Stay Well at Home Order has, since March 20, included

12   in its definition of "Essential Travel" "[t]ravel engaged in interstate commerce and

13   otherwise subject to the provisions of the Commerce Clause of the United States

14   Constitution."  (See, e.g., RJN, Exh. 15, p. 18, ¶ g(7).)  Accordingly, because the

15   Orders do not restrict interstate travel, the Stay Well at Home Order does not

16   implicate the constitutional right to travel at all.  (See *Saenz v. Roe* (1999) 526 U.S.

17   489, 490 [119 S.Ct. 1518] ("*Saenz*") [detailing three components of right to travel,

18   all stemming from *interstate* travel]; see also *Memorial Hospital v. Maricopa*

19   *County* (1974) 415 U.S. 250, 256 [94 S.Ct. 1076]; *Nunez v. City of San Diego* (9th

20   Cir. 1997) 114 F.3d 935, 944 [declining to opine whether right to travel extends to

21   intrastate travel].)   The Court should deny plaintiffs' second ex parte TRO

22   application.

23   **C.    Plaintiffs Cannot Establish a Likelihood of Success on the Merits**

24       **1.  The Stay Well at Home Order Is a Valid Exercise of the Health**

25   **Officer's Power Entitled to Minimal Scrutiny and Judicial Deference.**

26       The Supreme Court has long recognized that "a community has the right to

27   protect itself against an epidemic of disease which threatens the safety of its

28   / / /

**DEFENDANTS' OPPOSITION TO SECOND EX PARTE APPLICATION FOR TRO**

members." (*Jacobson*, *supra*, 197 U.S. at p. 27.)[6/]  During such public emergencies, states and local governments may take action to curb the disease that would otherwise impermissibly burden constitutionally protected liberties.  (*Id*. at p. 19; see also *Prince v. Massachusetts* (1944) 321 U.S. 158, 166-167 [64 S.Ct. 438] [finding that First Amendment "right to practice religion freely does not include liberty to expose the community . . . to communicable disease"].)[7/]  The Health Officer's measures will be lawful so long as they bear "real or substantial relation" to the public health crisis and are not, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." (*Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, ECF 51 at p. 1022, citing *In re Abbott*, *supra*, 2020 WL 1685929 at * 7, and *Jacobson*, *supra*, 197 U.S. at p. 31; see also *Robinson v. Attorney General* (11th Cir. April 23, 2020) 2020 WL 1952370, *5, and *Mega Vape, LLC v. City of San Antonio* (W.D.Tex. April 22, 2020) 2020 WL 1933938, *6, and *In re Rutelidge, supra,* 2020 WL 1933122.)  In other words, under *Jacobson*, the Stay Well at Home Order is subject to "judicial deference and not subject to traditional constitutional scrutiny." (*Gish*, *supra*, Case No. 5:20-cv-

---

[6/]*Jacobson*'s restriction of civil liberties in the face of overriding circumstances has been recognized as precedent by the Supreme Court as recently as 1997, and more widely by federal courts throughout the country in the context of the current pandemic as the framework by which constitutional claims should be analyzed.  (See *Kansas v. Hendricks* (1997) 521 U.S. 346, 356 [recognizing that individual's constitutionally protected interest in avoiding physical restraint may be overridden in civil context], citing *Jacobson*, *supra*, 197 U.S. at p. 26; *In re Abbott* (5th Cir. April 7, 2020) 2020 WL 1685929 at * 7; *In re Rutelidge* (8th Cir. April 22, 2010) 2020 WL 1933122; see also *Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, ECF 51, pg. ID 1022.)

[7/] See also *Camara v. Municipal Court of City and County of San Francisco* (1967) 387 U.S. 523, 539 [87 S.Ct. 1727] [noting that warrantless searches permitted under Fourth Amendment when conducted to protect public health in emergency situations], citing *North American Cold Storage Co. v. City of Chicago* (1908) 211 U.S. 306 [29 S.Ct. 101] [seizure of unwholesome food]; *Jacobson*, *supra*, 197 U.S. 11 [compulsory smallpox vaccination]; *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health* (1902) 186 U.S. 380 [22 S.Ct. 811] [health quarantine prohibiting disembarkation of healthy passengers and cargo into infected area]; *Kroplin v. Truax* (1929) 119 Ohio St. 610 [165 N.E. 498] [summary destruction of tubercular cattle].)

12

1    00755-JGB-KK, RJN, Exh. 2, pg. ID 1021, citing *Jacobson*, *supra*, 197 U.S. at

2    p. 27.)

3    　　　The Stay Well at Home Order in this case easily meets the *Jacobson* test.[8/]

4    The Stay Well at Home Order bears a substantial relation to the public health

5    crisis.  The Order is temporary, specific and tailored to prevent the spread of a

6    highly contagious and potentially deadly disease through a combination of targeted

7    requirements, all of which are aimed at minimizing human-to-human contact by

8    directing Ventura County residents to stay at their places of residence to the

9    maximum extent feasible.  (RJN, Exh. 15.)  The Health Officer is continually

10   monitoring the pandemic's impact on Ventura County residents and has updated

11   the Order as necessary to meet its goals.  (RJN, Exh. 15.)  The public's compliance

12   with, and the County's enforcement of, the Stay Well at Home Order has slowed

13   the spread of the disease, saved lives and prevented Ventura County's health care

14   systems from being overwhelmed, unlike the situation elsewhere around the

15   globe.[9/]  The Health Officer's determination of what businesses are deemed

16   "essential" is entitled to "great deference," notwithstanding any federal advisory

17   documents or differing decisions by other jurisdictions.  (See *Winter*, *supra*, 555

18   U.S. at p. 24; see also *Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, RJN, Exh. 2

19   at p. 1022.)

20   / / /

21   ―――――――――――――――――――――――――

22   [8/] Nor can the authority of the Health Officer be reasonably questioned:  The
     Health Officer has broad, long-standing and well-established powers to make
23   orders necessary to preserve and protect public health.  For example, the California
     Health and Safety Code provides that "[t]he local health officer may take any
24   preventive measure that may be necessary to protect and preserve the public health
     from any public health hazard during any 'state of war emergency,' 'state of
25   emergency,' or 'local emergency,' as defined by section 8558 of the [California]
     Government Code, within his or her jurisdiction."  (Cal. Health & Saf. Code, §
26   101040; see also Cal. Heath & Saf. Code, §§ 101080, 101085, 120175 & Cal. Code
     Regs., tit. 7, § 2500 et seq.)

27   [9/] See, e.g., L.A. Times, Social Distancing May Have Helped California
     Slow the Virus and Avoid New York's Fate (March 31, 2020) (available at
28   https://news.yahoo.com/social-distancing-may-helped-california-120003221.html
     (visited April 27, 2020).

Plaintiffs, on the other hand, cannot demonstrate that the Order's imposition of a temporary and emergency pause on their ability to purchase or sell a firearm for the next few weeks will be, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." (*Jacobson*, *supra*, 197 U.S. at p. 31.) Unlike the right to use, possess, or otherwise keep and bear arms in the name of self-defense, the law is well-established that any right to purchase or sell firearms is subject to regulation without violating the Second Amendment, as explained below.  Similarly, plaintiffs' right-to-travel claim will fail.

**2.   Even Under Traditional Scrutiny, the Stay Well at Home Order Does Not Violate the Second Amendment**

The Second Amendment protects the right of law-abiding, responsible citizens to use arms in defense of hearth and home.  (*District of Columbia v. Heller* (2008) 554 U.S. 570, 635 [128 S.Ct. 2783] ("*Heller*").)  That right, however, is not unlimited.  (*Id*. at p. 626.)  The government may place certain limits on where the right is exercised, how the right is exercised and who may exercise the right.  (*Id*. at pp. 626-627; *U.S v. Carpio-Leon* (4th Cir. 2012) 701 F.3d 974, 977 ["the Second Amendment does not guarantee the right to possess for *every purpose*, to possess *every type of weapon*, to possess at *every place*, or to possess by *every person*"]); *U.S. v. Huitron-Guizar* (10th Cir. 2012) 678 F.3d 1164, 1166 ["The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why'"].)

In *U.S. v. Chovan* (9th Cir. 2013) 735 F.3d 1127, 1136 ("*Chovan*"), the court adopted a two-step inquiry to analyze claims that a law violates the Second Amendment.  This test "(1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny."  (*Ibid*.)

/ / /

/ / /

14

**a. The Stay Well at Home Order Does Not Impinge on the Second Amendment as It Was Historically Understood**

Under the first *Chovan* step, a court cannot "apply the Second Amendment to protect a right that does not exist under the Amendment." (*Peruta v. County of San Diego* (9th Cir. 2016) 824 F.3d 919, 942 (en banc) ("*Peruta*"), *cert. denied sub nom.*; *Peruta v. California* (1995) ___ U.S. ___ [137 S.Ct. 1995 (Mem), 198 L.Ed.2d 746].) Therefore, the first step of the analysis requires the court to explore the amendment's reach "based on a 'historical understanding of the scope of the [Second Amendment] right.'" (*Jackson v. City & County of San Francisco* (9th Cir. 2014) 746 F.3d 953, 960 ("*Jackson*"), quoting *Heller*, *supra*, 554 U.S. at p. 625.)

Whether the challenged law falls outside the scope of the Second Amendment involves examining whether there is persuasive historical evidence showing that the regulation does not impinge on the Second Amendment right as it was historically understood. (*Jackson*, *supra*, 554 U.S. at p. 625.) Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis. (See *Peruta*, *supra*, 824 F.3d at p. 919.)

The Stay Well at Home Order requires the closure of non-essential businesses, including gun stores. Plaintiffs argue that the temporary closure hinders the ability of certain persons to finalize gun purchases during the pendency of the Stay Well at Home Order or prevents would-be gun purchasers from buying a firearm. As an initial matter, the Stay Well at Home Order now allows the completion of gun purchases initiated before March 20. To the extent would-be gun purchasers are unable to temporarily buy guns within Ventura County, however, California has a long history of delaying possession of firearms without impinging on the Second Amendment. California has had some kind of waiting period statute for firearm purchases continuously since 1923. (*Silvester v. Harris*

15

1    (9th Cir. 2016) 843 F.3d 816, 823 ("*Silvester*").)  The waiting periods

2    encompassed both time for the California Department of Justice ("Cal DOJ") to

3    conduct a background check and time for a cooling-off period (so that guns were

4    not purchased in the heat of a conflict).  (*Id*. at pp. 823-824.)  The Cal DOJ has up

5    to 30 days to complete a background check, and the cooling-off period extends 10

6    days beyond that.  As such, the Second Amendment has never protected immediate

7    or convenient purchase and sale of guns.

8         Moreover, in times of emergency such as war, pandemic or natural disaster,

9    federal, state and local governments have historically issued temporary, general

10   regulations that overrode the convenience of purchasers of various goods and

11   services, including firearms.  (See, e.g., *Compagnie Francaise de Navigation a*

12   *Vapeur v. Louisiana State Board of Health*, *supra*, 186 U.S. 380 [health quarantine

13   prohibiting disembarkation of healthy passengers and cargo into infected area],

14   cited with approval in *Camara v. Municipal Court of City and County of San*

15   *Francisco*, *supra*, 387 U.S. at p. 539 [recognizing that warrantless search may be

16   permissible under Fourth Amendment in public health emergency].)  As such, the

17   temporary delay in a person's ability to purchase a firearm as a result of the Stay

18   Well at Home Order does not impinge on the Second Amendment right as it was

19   historically understood.

20        **b.  The Stay Well at Home Order Is a Presumptively Lawful**

21   **Regulation of General Applicability that Does Not Infringe the Ability to**

22   **Possess or Use, and Only Incidentally Delays the Purchase of, Firearms**

23        A law also does not burden Second Amendment rights if it falls within "one

24   of the 'presumptively lawful regulatory measures' identified" in *Heller*, *supra*, 554

25   U.S. 570.  (*Jackson*, *supra*, 746 F.3d at p. 960; see also *Fyock v. Sunnyvale* (9th

26   Cir. 2015) 779 F.3d 991, 996-997.)

27        *Heller* made explicit that "nothing in [its] opinion should be taken to cast

28   doubt on the longstanding prohibitions on the possession of firearms by felons and

16

the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." (*Heller, supra,* 554 U.S. 570 at pp. 626-627.)  Such measures are "presumptively lawful." (*Id*. at p. 627, n. 26.)  The Supreme Court reiterated, two years later, that *Heller* does not undermine the validity of regulations on the commercial sale of firearms.  (*McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742, 786 [130 S.Ct. 3020].)

In that regard, the Ninth Circuit has held that the Constitution provides "no freestanding right on commercial proprietors to sell firearms" and gun buyers have no right to particular seller locations "so long as their access is not meaningfully constrained." (*Teixiera v. County of Alameda* (9th Cir. 2017) 873 F.3d 670, 673, 680.)  Here, the Stay Well at Home Order only incidentally regulates the commercial sale of firearms.  The Order does nothing to regulate or limit the ability of persons to keep or bear arms.  Rather, the Order requires, among other things, the temporary closure of businesses that are non-essential to the purposes of keeping persons isolated at their places of residence as determined by the Health Officer.  (RJN, Exhs. 12-15.)  Gun stores, and all other retail operations that are not necessary to stop the spread of COVID-19 or otherwise enable persons to shelter in their places of residence, are required by the Stay Well at Home Order to be closed to the public.  (RJN, Exhs. 12-15.)  On its face, the Stay Well at Home Order does not prohibit persons from possessing firearms and does not regulate what persons may do with firearms in their own home.  To the extent that the Stay Well at Home Order delays the ability of some persons to purchase a firearm, the immediate and convenient acquisition of firearms has never been protected under the Second Amendment.  (See § III.3.C.2.a, *supra*; *Silvester*, *supra*, 843 F.3d at pp. 823-824.)

/ / /

/ / /

17

**c. The Stay Well at Home Order Does Not Substantially Burden Second Amendment Rights and Is Substantially Related to Mitigating the Public Health Crisis Presented by COVID-19**

Even if the Stay Well at Home Order has burdened plaintiffs' Second Amendment rights, the Order easily survives intermediate scrutiny as this Court previously determined (ECF 12), in accordance with the other COVID-19-related Second Amendment decision in the Central District. (*Brandy v. Villanueva* (C.D.Cal. April 6, 2020) Case No. 2:20-cv-02874-AB-SK, ECF 20.)

**i. Even if Intermediate Scrutiny Is Applied, the Order Should Stand**

Courts determine the appropriate level of scrutiny to apply in a Second Amendment challenge by considering (1) how close the challenged law comes to the core of the Second Amendment right and (2) the severity of the law's burden on that right. (*United States v. Torres* (9th Cir. 2019) 911 F.3d 1253, 1262.) The core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home (i.e., self-defense). (*Ibid.*; *Heller*, *supra*, 554 U.S. at p. 628.) Only laws that implicate the core of the Second Amendment right and severely burden that right will be subjected to strict scrutiny. (*Silvester*, *supra*, 843 F.3d at p. 821.) Intermediate scrutiny is the appropriate level of scrutiny for all other laws that do not implicate the core Second Amendment right or do not place a substantial burden on that right. (*Ibid.*) There has been "near unanimity in the post-*Heller* case law that when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." (*Id.* at p. 823.)

In *Silvester*, the Ninth Circuit examined the constitutionality of California's 10-day waiting period between the purchase and delivery of a firearm. In California, citizens who want to purchase a firearm (and do not fall into one of the law's 18 exemptions, including law enforcement) must pass a background check to

18

show that they do not fall into one of the prohibited classes.  (*Id*. at pp. 824-825.)
The background check is conducted by the Cal DOJ, which has the authority to
delay the delivery of a firearm for up to 30 days in order to complete the
background check.  (*Id*. at p. 825, citing Cal. Pen. Code, § 28220, subd. (f).)
Additionally, a person cannot purchase more than one firearm within a 30-day
period.  (*Id*., citing Cal. Pen. Code, § 27535.)  After passing the Cal DOJ
background check, a person may purchase a firearm but must wait 10 days before
taking possession of the firearm.  (Cal. Pen. Code, §§ 26815, 27540.)

The court determined that the law requiring the 10-day waiting period did
not place a substantial burden on the Second Amendment right because it did not
prevent, restrict or place any conditions on how guns were stored or used after a
purchaser took possession, and historically, delivery of weapons took some time;
thus, intermediate scrutiny applied.  (*Silvester*, *supra*, 843 F.3d at p. 827.)  The
court in *Silvester* noted that the burden of waiting 10 days before taking possession
of a firearm is less than the burden imposed by other challenged regulations in
other Ninth Circuit cases applying intermediate scrutiny and that the burden of
having to wait to take possession is actually "very small."  (*Ibid*.)

The court further noted:  "There is, moreover, nothing new in having to wait
for the delivery of a weapon.  Before the age of superstores and superhighways,
most folks could not expect to take possession of a firearm immediately upon
deciding to purchase one.  As a purely practical matter, delivery took time.  Our
18th and 19th century forebears knew nothing about electronic transmissions.
Delays of a week or more were not the product of governmental regulations, but
such delays had to be routinely accepted as part of doing business."  (*Silvester*,
*supra*, 843 F.3d at p. 827.)

The Stay Well at Home Order in the instant case presents a similarly "very
small" burden on the Second Amendment right.  It does not limit or regulate the
ability of persons to possess firearms or what they may do with those firearms in

their homes.  The Order closes non-essential businesses, which may incidentally delay the ability of a person to purchase a firearm.  The Order is in effect for a finite period of time – first until April 19 and now through May 15.  As such, the delay is comparable to the constitutionally accepted delays resulting from the Cal DOJ background check and the 10-day cooling-off period.  As the court noted in *Silvester*, much more serious limitations on the ability to bear arms have been subjected to intermediate scrutiny.  As such, the application of intermediate scrutiny is appropriate.[10]

### ii.  Preventing the Spread of COVID-19 Is a Compelling Government Interest and the Closure of Non-Essential Businesses, Including Gun Stores, Is Reasonably Suited to Achieve that Objective

Under intermediate scrutiny, courts first look to the government's objectives in enacting the regulation and second to whether it is reasonably suited to achieve those objectives.  (*Jackson*, *supra*, 746 F.3d at p. 965.)

Ventura County is experiencing a local health emergency that is part of a global pandemic.  COVID-19 is highly contagious and potentially deadly, especially for older persons and persons with serious chronic health conditions. There is no known anti-viral treatment or immunization available for COVID-19. (RJN, Exhs. 1, 2, 3, & 21.)  The Stay Well at Home Order is intended to slow the spread of COVID-19 by isolating persons in their places of residences as much as possible.  (RJN, Exhs. 12-15.)  COVID-19 presents an imminent and proximate threat to the residents of Ventura County, and it is essential to control the spread of COVID-19 as much as possible to protect the community's most vulnerable persons and prevent the health care system from being overwhelmed.  (RJN, Exhs. 2-6 & 15.)  The compelling government interest in this case is obvious.

---

[10] Plaintiffs' reliance on a North Carolina District Court case for the proposition that strict scrutiny should apply is misplaced.  (See *Bateman v. Perdue* (E.D.N.C. 2012) 881 F.Supp.2d 709.)  The statute at issue in that case allowed the complete prohibition on carrying, possessing and selling guns during the state of emergency.  (*Id.*)  The Stay Well at Home Order does no such thing.

1   The test for whether the Stay Well at Home Order reasonably fits with the

2   stated objectives "is not a strict one."  (*Silvester*, *supra*, 843 F.3d at p. 827.)

3   Intermediate scrutiny does not require the least restrictive means of furthering a

4   given end.  (*Ibid*.)  Instead, it requires only that the law be "substantially related to

5   the important government interest."  (*Ibid*.)  Here, the Health Officer is required to

6   show only that the regulation "promotes a substantial government interest that

7   would be achieved less effectively absent the regulation."  (*Id*. at p. 829.)  The

8   Health Officer easily meets that burden.

9       The stated goal of the Stay Well at Home Order is to keep as many people in

10  their homes as possible.  Even social distancing is not as effective in controlling

11  the spread of the disease as isolating at home.  The essential nature of essential

12  businesses, such as grocery stores, justifies their continued operation subject to

13  social distancing practices.  But a gun store is not an essential business and

14  allowing any non-essential businesses to remain open diminishes the effectiveness

15  of the Stay Well at Home Order.  Keeping gun stores and other non-essential

16  businesses closed to the public for a limited time easily passes intermediate

17  scrutiny.

18      **3.  <u>Plaintiffs Are Unlikely to Prevail on Their Right-to-Travel Claim</u>**

19      Plaintiffs complain they and their members have suffered a violation of their

20  fundamental right to travel because the Stay Well at Home Order prevents them

21  from traveling outside Ventura County to purchase a firearm elsewhere.  (ECF 27,

22  pg. ID 203, ECF 27-1, pg. ID 230-231.)  The Stay Well at Home Order, however,

23  expressly allows intercounty travel and interstate travel.  (RJN, Exh. 15, p. 3, ¶ 6, &

24  p. 18, ¶ g(7).)  And, while it is true that the right to travel has long been recognized

25  as a fundamental right, that right arises out of an individual's *interstate* travel.

26  (*Saenz, supra*, 526 U.S. at pp. 489-490 [detailing three components of right to

27  travel, all stemming from *interstate* travel]; see also *Hospital v. Maricopa County*

28  (1974) 415 U.S. 250, 256 and *Nunez v. City of San Diego* (9th Cir. 1997) 114 F.3d

935, 944 [declining to opine whether right to travel extends to intrastate travel].) In short, the Stay Well at Home Order does not implicate the fundamental right to travel as claimed by plaintiffs; the Order does not restrain plaintiffs from leaving Ventura County.

Even if the Stay Well at Home Order implicates the right to travel, plaintiffs are unlikely to succeed on the merits of their claim. (See *Shows v. Swain County Sheriff* (W.D.N.C. April 23, 2020) 2020 WL 1953621 [denying TRO to restrain public emergency order's imposition of curfew imposed to curb pandemic, finding plaintiffs unlikely to prevail on merits of claims under Privileges and Immunities Clause and First, Fourth, Fifth and Fourteenth Amendments].) This is because plaintiffs will be unable to show that the Stay Well at Home Order, which is a law of general application, is not narrowly tailored to achieve the compelling government interest to prevent the spread of COVID-19, even assuming that strict scrutiny applies. (See, e.g., *Mohamed v. Holder* (E.D. Va. 2017) 266 F.Supp.3d 868, 879-883 [upholding "no-fly" list register despite its substantial burden on plaintiff's right to interstate travel after strict scrutiny review and declining to recognize that right to travel extends to international travel]; *Lutz v. City of York, PA* (3d Cir. 1990) 899 F.2d 255, 259-70 [dismissing claim that anti-cruise statute violated due process clause of the Fifth Amendment after determining statute survived intermediate scrutiny as a valid time, place manner restriction]); *U.S.A. v. Sears* (C.D. Cal. April 6, 2015) 2015 WL 13359437, *2 [finding law of general applicability that has incidental effect on an individual's ability to travel does not violate the fundamental right to travel.].)

**D.  The Temporary Pause on the Ability to Purchase or Sell Firearms Does Not Amount to Irreparable Harm**

While it is true that "[i]rreparable harm is presumed if plaintiffs are likely to succeed on the merits because a deprivation of constitutional rights always constitutes irreparable harm." (*Fyock*, *supra*, 25 F.Supp.3d at p. 1282, citing *Elrod*

1   *v. Burns* (1976) 427 U.S. 347, 373 [96 S.Ct. 2673]; *Ezell v. Chicago* (7th Cir.

2   2011) 651 F.3d 684, 699-700.)  In this case, there is no constitutional violation,

3   and thus no irreparable harm.  In contrast, if defendants are enjoined from

4   enforcing the Stay Well at Home Order, the irreparable harm to the public is

5   obvious and potentially deadly:  increased likelihood of the spread of a highly

6   contagious and sometime fatal disease without a known cure and further deaths of

7   Ventura County residents caused by the disease.

8   **E.    The Balance of Equities of the Hardships to the Parties and Public**

9   **Interest Tips Sharply in the County's Favor**

10   Plaintiffs cannot meet their burden to show that the balance of equities tips

11   in their favor.  (*Fyock*, *supra*, 25 F.Supp.3d at pp. 1282-1284 [finding hardships

12   balance to be neutral but public interest to weigh in City's favor], citing *Winter*s,

13   *supra*, 555 U.S. at p. 20.)  In evaluating the equities of whether to issue injunctive

14   relief, the court should consider the respective hardships on both parties and the

15   public interests advanced by either determination.  (*Fyock*, *supra*, 25 F.Supp.3d at

16   p. 1282, citing *United States v. Salerno* (1987) 467 U.S. 739, 748-50 [104 S.Ct.

17   2720], and *Schall v. Martin* (1984) 467 U.S. 263, 264 [104 S.Ct. 2403].)  In so

18   doing, "courts of equity should pay particular regard for the public consequences in

19   employing the extraordinary remedy of injunction."  (*Winter*, *supra*, 555 U.S. at p.

20   24, citing *Weinberger v. Romero-Barcelo* (1982) 456 U.S. 305, 312 [102 S.Ct.

21   1798], and *Railroad Comm'n of Tex. v. Pullman Co.* (1941) 312 U.S. 496, 500 [61

22   S.Ct. 643].)  Here, as just noted, the consequences to the public if the relief is

23   granted are obvious and dire:  increased likelihood that more people will get sick

24   and more people will die.

25   In *Winter*, the Supreme Court vacated a preliminary injunction after finding

26   the lower courts did not appropriately assess and balance the hardships and

27   interests implicated by the injunction on the defendant, the United States Navy.

28   (*Winter*, *supra*, 555 U.S. at pp. 25-33 [analyzing hardships asserted by Navy and

1   public interests implicated by those hardships].)  The preliminary injunction at

2   issue in *Winter* imposed a number of conditions on the Navy's "ability to conduct

3   realistic training exercises" at sea involving the use of sonar technology in the

4   interest of national defense.  (*Id*. at p. 24.)  The plaintiffs were several groups

5   dedicated to the protection of marine life and habitats that sought to enjoin the

6   Navy's training exercises in the name of those interests.  (*Id*. at pp. 14, 25.)  The

7   Navy supported its assertion of specific hardships through declarations of several

8   high-ranking officers, whose "professional military judgments" about the impact of

9   the injunction on national security were "complex, subtle, and professional

10  decisions as to the composition, training, equipping, and control of a military

11  force" that are to be given "great deference" by the courts.  (*Id*. at p. 24.)  After

12  balancing the equities of the plaintiffs' interests, i.e., "possible harm to the

13  ecological, scientific, and recreational interests," with the Navy's national security

14  interests, i.e., "forcing the Navy to deploy an inadequately trained antisubmarine

15  force [that would] jeopardize[] the safety of the fleet," the court found that the

16  public interest determination was not a close question.  (*Id*. at p. 26.)

17       As explained above, because plaintiffs cannot show a likelihood of success

18  on the merits, they will be unable to show either that the hardships of a temporary

19  pause on the sale or purchase of firearms or the public interest warrant relief in

20  their favor.  (*Fyock*, *supra*, 25 F.Supp.3d at p. 1282.)  At worst for plaintiffs, their

21  ability to buy or sell firearms is subject to delay during the pendency of the Stay

22  Well at Home Order.

23       In contrast, the Health Officer's compelling interests are to prevent, slow or

24  otherwise curtail the spread of COVID-19, to maintain the integrity and continued

25  operation of the health care system, and to the extent possible, promote the safety

26  and well-being of thousands of health care workers being called to the front lines

27  of a global pandemic at the local level.  (See, e.g., *Jacobson, supra*, 197 U.S. at

28  p. 26 [compelling interest of public health allowed forced smallpox vaccinations].)

That these interests are, and will be, achieved through the Stay Well at Home Order is not subject to reasonable dispute. Similar to the opinions of high-ranking military officers in *Winter,* the Health Officer's determination of how to best stop the spread of COVID-19 and the deaths of potentially hundreds of Ventura County residents, and to prevent the local health care system from being overwhelmed, involves "complex, subtle, and professional decisions" as to the preservation of public health, and such "professional judgment" is entitled to "great deference." Like in *Winter*, the question of where the public interest lies is not even close: the balance of equities tips sharply in defendants' favor. The request for a TRO should be denied.

## IV

## CONCLUSION

Based on the foregoing, defendants respectfully requests that the Court deny the request for a TRO.

LEROY SMITH
County Counsel, County of Ventura

Dated:  April 28, 2020       By_____/s/_____
                                          CHARMAINE H. BUEHNER
                                          Assistant County Counsel

Attorneys for Defendants County of Ventura (also erroneously sued as Ventura County Public Health Care Agency), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin and William T. Foley

25