LEROY SMITH, State Bar No. 107702
County Counsel, County of Ventura
CHARMAINE H. BUEHENER, State Bar No. 220868
Assistant County Counsel
800 South Victoria Avenue, L/C #1830
Ventura, California 93009
Telephone:   (805) 654-2588
Facsimile:   (805) 654-2185
E-mail:       charmaine.buehner@ventura.org

Attorneys for Defendants County of Ventura
(also erroneously sued as Ventura County Public
Health Care Agency), Sheriff William Ayub
(erroneously sued as "Bill Ayub"), Robert Levin
and William T. Foley

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD MCDOUGALL, an individual; JULIANA GARCIA, an individual; SECOND AMENDMENT FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF VENTURA, CALIFORNIA; BILL AYUB, in his official capacity; WILLIAM T. FOLEY, in his official capacity, ROBERT LEVIN, in his official capacity; and VENTURA COUNTY PUBLIC HEALTH CARE AGENCY, <br><br> Defendants. | No. 2:20 cv-029927 CBM(ASX) <br><br> DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION <br><br> Date:  May 19, 2020 <br> Time: 10:00 a.m. <br> Ctrm:  8b <br> Judge: Hon. Consuelo B. Marshall <br><br> Trial:            Not Set <br> Complaint Filed:   March 28, 2020 |

i

# TABLE OF CONTENTS

**Page**

I   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II   RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.   The Emergency and Temporary Orders Are Designed to Prevent the Spread of a Virulent, Highly Contagious Disease with No Known Cure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    A.   Legal Standard for Preliminary Injunctive Relief . . . . . . . . . . . . . . 8

    B.   Plaintiffs Cannot Establish a Likelihood of Success on the Merits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        1.   The Stay Well at Home Order Is a Valid Exercise of the Health Officer's Power Entitled to Minimal Scrutiny and Judicial Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        2.   The Stay Well at Home Order Does Not Violate the Second Amendment under Traditional Scrutiny . . . . . . . . . . . . . . . . . 13

            a.   The Stay Well at Home Order Does Not Impinge on the Second Amendment as It Was Historically Understood . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            b.   The Stay Well at Home Order Is a Presumptively Lawful Regulation of General Applicability that Does Not Infringe the Ability to Possess or Use, and Only Incidentally Delays the Purchase of, Firearms . . . . . . 15

            c.   The Stay Well at Home Order Does Not Substantially Burden Second Amendment Rights and Is Substantially Related to Mitigating the Public Health Crisis Presented by COVID-19 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

               i.   Even if Intermediate Scrutiny Is Applied, the Order Should Stand . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

               ii.   Preventing the Spread of COVID-19 Is a Compelling Government Interest and the Closure of Non-Essential Businesses, Including Gun Stores, Is Reasonably Suited to Achieve that Objective . . . . . . . . . . . . . . . . . . . . . . 19

        3.   Plaintiffs Are Unlikely to Prevail on Their Right-to-Travel Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    C.   The Temporary Pause on the Ability to Purchase or Sell Firearms Does Not Amount to Irreparable Harm . . . . . . . . . . . . . . . . . . . . . 22

ii

**TABLE OF CONTENTS (Cont'd.)**

<u>**Page**</u>

D.    The Balance of Equities Tips Sharply in Defendants' Favor . . . . . . 22

IV    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

iii

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Amoco Production Co. v. Village of Gambell, Alaska* (1987)
    480 U.S. 531 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bateman v. Perdue* (E.D.N.C. 2012)
    881 F.Supp.2d 709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Camara v. Municipal Court of City and County of San Francisco* (1967)
    387 U.S. 523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15

*Community Hospital v. Maricopa County* (1974)
    415 U.S. 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Compagnie Francaise de Navigation a Vapeur v. Louisiana State
    Board of Health* (1902)
    186 U.S. 380 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 15

*District of Columbia v. Heller* (2008)
    554 U.S. 570 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 15, 17

*Dogloo, Inc. v. Doskocil Mfg. Co., Inc.* (C.D.Cal. 1995)
    893 F.Supp. 911 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Elrod v. Burns* (1976)
    427 U.S. 347 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Ezell v. Chicago* (7th Cir. 2011)
    651 F.3d 684 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Fyock v. Sunnyvale* (9th Cir. 2015)
    779 F.3d 991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15, 22, 24

*Gish v. Newsom* (C.D.Cal. April 23, 2020)
    Case No. 5:20-cv-00755-JGB-KK . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

*Jackson v. City & County of San Francisco* (9th Cir. 2014)
    746 F.3d 953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 19

*Jacobson v. Commonwealth of Massachusetts* (1905)
    197 U.S. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Johnson v. City of Cincinnati* (6th Cir. 2002)
    310 F.3d 484 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Kansas v. Hendricks* (1997)
    521 U.S. 346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lutz v. City of York, PA* (3d Cir. 1990)
    899 F.2d 255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 22

iv

**TABLE OF AUTHORITIES (Cont'd.)**

<u>**Page**</u>

*Marilley v. Bonham* (9th Cir. 1996)
844 F.3d 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21

*McDonald v. City of Chicago, Ill.* (2010)
561 U.S. 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Mohamed v. Holder* (E.D. Va. 2017)
266 F.Supp.3d 868 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*North American Cold Storage Co. v. City of Chicago* (1908)
211 U.S. 306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Nunez v. City of San Diego* (9th Cir. 1997)
114 F.3d 935 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Peruta v. California* (1995)
___ U.S. ___ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Peruta v. County of San Diego* (9th Cir. 2016)
824 F.3d 919 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Prince v. Massachusetts* (1944)
321 U.S. 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Railroad Comm'n of Tex. v. Pullman Co.* (1941)
312 U.S. 496 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Saenz v. Roe* (1999)
526 U.S. 489 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 21

*Schall v. Martin* (1984)
467 U.S. 263 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Shows v. Swain County Sheriff* (W.D.N.C. April 23, 2020)
2020 WL 1953621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Silvester v. Harris* (9th Cir. 2016)
843 F.3d 816 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16, 17, 18, 19

*Stanley v. University of Southern Calif.* (9th Cir. 1994)
13 F.3d 1313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Teixiera v. County of Alameda* (9th Cir. 2017)
873 F.3d 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*U.S v. Carpio-Leon* (4th Cir. 2012)
701 F.3d 974 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*U.S. v. Chovan* (9th Cir. 2013)
735 F.3d 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

v

# TABLE OF AUTHORITIES (Cont'd.)

<u>Page</u>

*United Bldg. and Constr. Trades Council v. Camden* (1984)
  465 U.S. 208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Lopez* (1995)
  514 U.S. 549 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Salerno* (1987)
  467 U.S. 739 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Torres* (9th Cir. 2019)
  911 F.3d 1253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Weinberger v. Romero-Barcelo* (1982)
  456 U.S. 305 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 23

*Winter v. National Resources Defense Council, Inc.* (2008)
  555 U.S. 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 22, 23, 24

## FEDERAL STATUTES

<u>Code of Federal Regulations</u>

  tit. 39, § 390.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

## STATE STATUTES

<u>California Code of Regulations</u>

  tit. 7, § 2500 et. seq.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>California Government Code</u>

  § 8558 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>California Health & Safety Code</u>

  § 101040 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  § 101080 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  § 101085 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
  § 120175 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

<u>California Penal Code</u>

  § 26815 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  § 27535 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  § 27540 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
  § 28220, subd. (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

# OTHER

National Firearms Act

26 U.S.C., §§ 5801-5872 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

# I

# INTRODUCTION

The Ventura County Health Officer, defendant Robert Levin, M.D. ("Health Officer"), has issued a series of temporary, specific and emergency "Stay Well at Home" orders, on March 17, 20, and 31, 2020, and April 9, 18 and 20, 2020 (collectively, "Stay Well at Home Order" or "Order"), to slow the spread of the COVID-19 pandemic.[1]  The Order requires the closure of any business the Health Officer deems non-essential, such as gun stores, because such businesses do not support the ability of people to remain sheltered in their homes to the maximum extent possible.  The Order does not prohibit a person from traveling into and out of Ventura County to purchase a firearm, or for any other purpose.  Plaintiffs' request for a preliminary injunction to open the firearm stores should be denied because the Order bears a "real or substantial relation" to the pending public health emergency and does not impose, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  (*Jacobson v. Commonwealth of Massachusetts* (1905) 197 U.S. 11 [25 S.Ct. 358] ("*Jacobson*").)  To the extent the Order has curtailed some individual freedoms for the collective good, the Order's temporary and emergency measures are justified under this applicable *Jacobson* framework.

In addition, as this court recognized in previously denying two prior requests for a temporary restraining order in this action, the Order does not implicate, let alone violate, an individual's right to bear arms under the Second Amendment. Nor does the Order, based on its plain language, implicate an individual's right to travel under the Privileges and Immunities Clause at article IV, section 2, of the Constitution ("P & I Clause").  Consequently, the Order is also lawful under traditional constitutional review.

---

[1] All further dates are in 2020, unless otherwise indicated.

1

**II**

**RELEVANT BACKGROUND**

**A.**   **The Emergency and Temporary Orders Are Designed to Prevent the Spread of a Virulent, Highly Contagious Disease with No Known Cure**

According to the Centers for Disease Control and Prevention, COVID-19 is highly contagious and potentially deadly, especially for older persons and persons with serious chronic health conditions.  The incubation period for COVID-19 is anywhere from one day to 14 days, during which time a person may not experience any symptoms but will be contagious to others.  The virus spreads easily and sustainably through respiratory droplets produced when an infected person coughs or sneezes, person-to-person contact, and surfaces that can remain infectious for several days.  (Request for Judicial Notice ("RJN"), Exh. 1, 2,[2/] & 3.)  Since December 2019, COVID-19 has "swept the globe, infecting millions and killing nearly two-hundred thousand people."  (RJN, Exhs. 2 & 3.)  From early March through May 2, there have been 52,197 confirmed cases and 2,171 deaths in California attributable to COVID-19, with 583 cases and 19 deaths occurring within Ventura County.  (RJN, Exh. 21.)  There are no known treatments or immunizations available for COVID-19.  (RJN, Exh. 1.)  "Without a vaccine, measures limiting physical contact between citizens . . .  are widely recognized as the only way to effectively slow the spread of the virus."  (RJN, Exhs. 2, 3 & 4.)

On March 4, citing an increasing number of confirmed COVID-19 cases in the United States and worldwide, Governor Gavin Newsom declared that a state of emergency existed in the State of California.  (RJN, Exh. 5.)  On March 11, the World Health Organization declared COVID-19 to be a global pandemic.  (RJN, Exh. 5.)  On March 12, based on the confirmation of COVID-19 cases in Ventura County, and the likelihood that the number of cases would increase, Ventura

---

[2/] *Gish v. Newsom* (C.D.Cal. April 23, 2020) Case No. 5:20-cv-00755-JGB-KK, ECF 51, pg. ID 1021 ("*Gish*").

2

1  County Health Officer declared that a local health emergency existed in Ventura

2  County.  (RJN, Exh. 6.)

3      On March 17, the Health Officer issued an order requiring persons living,

4  working and doing business in Ventura County to take a number of precautions to

5  prevent or slow the spread of the disease ("March 17 Order").  Among other

6  provisions, the March 17 Order required the immediate closure of a number of

7  businesses, and restaurants were ordered to close except for take-out and delivery.

8  (RJN, Exh. 7.)

9      On March 19, Governor Newsom issued Executive Order N-33-20, which

10  required all persons living in California to stay at their places of residence except

11  as needed to maintain continuity of operations in "critical infrastructure sectors"

12  specified by the state health officer.  Supplementary guidance from the state health

13  officer identified "critical infrastructure workers" in sectors such as health care,

14  emergency services, food and agriculture, water, energy, transportation,

15  government services, and financial services.  (RJN, Exh. 8.)[3]

16  / / /

17

18  [3] Executive Order N-33-20 defines "critical infrastructure sectors"
consistent with the "March 19, 2020, Memorandum on Identification of Critical
19  Infrastructure Workers During COVID-19 Response" published by the United
States Department of Homeland Security's Cybersecurity and Infrastructure
20  Security Agency ("CISA").  (RJN, Exh. 9 ("March 19 CISA Memo").)  The March
19 CISA Memo does not identify retail gun stores as a component of critical
21  infrastructure.  On March 22, the state health officer issued a list of "Essential
Critical Infrastructure Workers."  (RJN, Exh. 10.)  On March 25, in response to
22  inconsistent local views as to whether gun stores must remain open as an "essential
business" under his order, Governor Newsom expressly deferred to local
23  jurisdictions to make the determination.  (RJN, Exh. 11.)  On March 28, CISA
issued an additional "Advisory Memorandum on Identification of Essential Critical
24  Infrastructure Workers During COVID-19 Response" ("Revised CISA Memo"),
which included "the operation of firearm or ammunition product manufacturers,
25  retailers, importers, distributors, and shooting ranges" as a component of critical
infrastructure.  The Revised CISA Memo expressly declared that it is "*not, nor*
26  *should it be considered, a federal directive or standard. . . .  Individual*
*jurisdictions should add or subtract essential workforce categories based on their*
27  *own requirements and discretion*."  (RJN, Exh. 22, Revised CISA Memo (March
28, 2020), italics added.)  Governor Newsom has not revised Executive Order N-
28  33-20 or issued a new executive order to incorporate the Revised CISA Memo and
its inclusion of gun retailers.

3

On March 20, March 31 and April 9, the Health Officer issued supplemental and restated Stay Well at Home orders to impose further restrictions.  (RJN, Exhs. 12, 13 & 14 ("Further Orders").)  The Further Orders sought to slow the spread of COVID-19 by ensuring, among other things, that all persons living in Ventura County stay at their places of residence, except for the purpose of engaging in essential activities, engaging in essential travel, and working at essential businesses.  In part, the Further Orders defined "Essential Travel" as that which is undertaken to engage "in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution."  (RJN, Exh. 12, p. 6, ¶ 7(g)(vii).)  The Further Orders prohibited public or private gatherings, prohibited non-essential travel, required the closure of "non-essential" businesses, and mandated social distancing protocols for the operation of essential businesses and for persons engaging in essential activities.  (RJN, Exhs. 12-14.)  Under the Further Orders, "essential businesses" were those business activities the Health Officer determined to be necessary to stop the spread of COVID-19 or to enable persons to shelter at home.  Firearm stores were not an essential business under the Further Orders.  The Further Orders were set to expire on April 19.  (RJN, Exhs. 12-14.)

Based on a determination that COVID-19 continued to present an imminent and continuing threat to the residents of Ventura County, the Health Officer issued a new Stay Well at Home Order, effective April 20, that superseded all prior orders and broadly applies to "all persons in the cities and unincorporated area of Ventura County" without regard to a person's state residency ("April 20 Order").  (RJN, Exh. 15, pp. 1 & 2, ¶ 2.)  All provisions of the April 20 Order "shall be interpreted to effectuate" the intent and purpose of the Order:  "to cause persons to stay at their places of residence to the maximum extent feasible with the minimum disruption to their social, emotional and economic well-being consistent with the

/ / /

4

1  overarching goal of eliminating the COVID-19 pandemic." (RJN, Exh. 15, p. 2,

2  ¶ 1.)

3      As with the prior orders, the April 20 Order stated that the Health Officer

4  "will continue to assess the quickly evolving situation [and] may issue additional

5  orders related to COVID-19. . . ." (RJN, Exh. 15, p. 20, ¶ 23.) The April 20 Order

6  is set to expire on May 15, 2020. (RJN, Exh. 15, p. 20, ¶ 22.)

7      The April 20 Order is, in some respects, less restrictive than the prior orders

8  consistent with the intent and purpose of the Order. For example, while "non-

9  essential businesses" are still ordered to close, certain businesses that fall outside

10  of the Stay Well at Home Order's definition of essential businesses but within the

11  state health officer's list of essential critical infrastructure (as incorporated into the

12  Governor's Executive Order N-33-20) may now operate to the extent they can

13  minimize the risk of spreading COVID-19, i.e., the non-essential businesses must

14  be closed to the public, operate with a limited number of employees who follow

15  strict social distancing guidelines, and deliver to the purchaser any goods to be

16  sold. (RJN, Exh. 15, pp. 3-4, ¶ 7.) The April 20 Order also makes a "[s]pecial

17  allowance for completion of firearm sales":

18      "Under California law persons wishing to purchase a

19      firearm must complete a background check and waiting

20      period, and all sales must be completed in-person. It is

21      not feasible, therefore, for the Health Officer to require

22      that firearm sales be conducted on-line only. To

23      accommodate persons who initiated the purchase of a

24      firearm at a store located within the County before March

25      20 . . . , firearm purchasers may engage in the actions

26      necessary to complete firearm purchases initiated before

27      March 20, 2020, provided that: [¶] a. All activities,

28      including the transfer of possession of any firearm, occur

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1        by appointment only, and only the purchaser and one

2        person of behalf of the store shall be present; [¶] b. The

3        firearm store shall remain closed to the general public;

4        and [¶] c. Social Distancing Requirements shall be

5        followed to the greatest extent feasible." (RJN, Exh. 15,

6        p. 7, ¶ 11.)

7    The April 20 Order prohibits "Non-Essential Travel" within Ventura County

8    but *expressly* provides that the Order "allows travel into or out of the County."

9    (RJN, Exh. 15, p. 3, ¶ 6.)  And, like the Further Orders, the April 20 Order

10   expressly provides that "Essential Travel" includes "[t]ravel engaged in interstate

11   commerce and otherwise subject to the provisions of the Commerce Clause of the

12   United States Constitution" and "[t]ravel to return to a place of residence from

13   outside the County."  (RJN, Exh. 12, p. 6, ¶ 7(g)(iv) & (vii) & Exh. 15, p. 18,

14   ¶ 17g(iv) & (vii).)  Within Ventura County, the April 20 Order expressly permits

15   "Essential Activities," to include outdoor activity so long as social distancing is

16   practiced, including "pleasure driving."  (RJN, Exh. 15, p. 11, ¶ 17(a)(vi).)

17   **B**.   <u>**Procedural History**</u>

18   Plaintiff Donald McDougall filed the original complaint in this action on

19   March 28, alleging that the then-operative Stay Well at Home Order prevented him

20   from taking possession of his previously purchased firearm in violation of the

21   Second Amendment.  (ECF 1, pg. ID 5, ¶¶ 31-33.)  McDougall sought a temporary

22   restraining order ("TRO") to enjoin the County from "ordering gun stores closed"

23   under the then-operative Stay Well at Home Order.  (ECF 9, pg. ID 31.)  This court

24   denied the TRO, finding that McDougall would be unlikely to succeed on the

25   merits of his Second Amendment claim.  (ECF 12.)  In particular, the court found

26   that the Stay Well at Home Order survived intermediate scrutiny given that the

27   Order was temporary, did not target handgun ownership, did not prohibit the

28   ownership of a handgun outright, and because of the Health Officer's "compelling"

1    government interest in preventing the spread of COVID-19.  (ECF Doc. No. 12,

2    pg. ID 51.)

3         On April 14, McDougall filed a first amended complaint ("FAC"), restating

4    his allegations, and adding four co-plaintiffs:  Juliana Garcia, the Second

5    Amendment Foundation, California Gun Rights Foundation, and Firearms Policy

6    Coalition, Inc.  The FAC reasserts McDougall's Second Amendment claim and

7    adds a claim that the then-operative Stay Well at Home Order violated the right to

8    travel under the P & I Clause and the due process clauses of the Fifth and

9    Fourteenth Amendments.  (ECF 19.)

10        On April 21, plaintiffs served the FAC on defendants County of Ventura

11   ("County"), the Health Officer, William Ayub, the County Sheriff, and William T.

12   Foley, the director of the County Health Care Agency, together with this motion

13   for a preliminary injunction, set for hearing on May 19.  (ECF 25, 28.)  Plaintiffs

14   seek to enjoin defendants from "closing or compelling the closure of retail firearm

15   and ammunition businesses on the grounds that they are 'non-essential businesses'

16   and preventing individuals from traveling to obtain firearms and ammunition

17   under" the Stay Well at Home Order.  (ECF 27, Pg. ID 203.)

18        Plaintiffs filed their second TRO application requesting the same relief as

19   requested in the MPI on April 24.  (ECF 27.)  Defendants filed an opposition on

20   April 28.  The court again denied plaintiffs' TRO application.  (ECF 30.)  With

21   respect to the merits of plaintiffs' "right to travel" claim under the P & I Clause,

22   the court indicated that resolution of that claim would be decided with reference to

23   whether the "Non-Essential Travel" provisions in the Order:  1) apply to plaintiffs;

24   and 2) violate the right to travel given the exemption for interstate commerce that

25   implicates the Commerce Clause of the United States Constitution.  (ECF 30, pg.

26   ID 445.)  As explained below, the Non-Essential Travel provisions, set forth in the

27   April 20 Order at paragraphs 6 and 17(g), and in the March 20 Order at paragraphs

28   6 and 7(g), do not prohibit the travel plaintiffs propose, nor do these provisions

1  otherwise violate plaintiffs' constitutional right to travel.  (RJN, Exh. 12, p. 2, ¶ 6
2  & p. 6, ¶ 17(g)(vii); Exh. 15, p. 3, ¶ 6 & p. 18, ¶ 17(g)(vii).)

**III**

**ARGUMENT**

3
4
5  **A.    Legal Standard for Preliminary Injunctive Relief**

6        Injunctive relief is an "extraordinary remedy" that requires the moving party
7  to make a clear showing of irreparable injury.  (*Weinberger v. Romero-Barcelo*
8  (1982) 456 U.S. 305, 312 [102 S.Ct. 1798]; *Stanley v. University of Southern Calif.*
9  (9th Cir. 1994) 13 F.3d 1313, 1320.)  The court must "balance the competing
10  claims of injury and must consider the effect on each party of the granting or
11  withholding of the requested relief.  Although particular regard should be given to
12  the public interest . . . 'a federal judge sitting as chancellor is not mechanically
13  obligated to grant an injunction for every violation of law.'"  (*Amoco Production*
14  *Co. v. Village of Gambell, Alaska* (1987) 480 U.S. 531, 542 [107 S.Ct. 1396];
15  *Dogloo, Inc. v. Doskocil Mfg. Co., Inc.* (C.D.Cal. 1995) 893 F.Supp. 911, 917.)  A
16  plaintiff must establish:  (1) a likelihood of success on the merits; (2) that the
17  plaintiff will suffer irreparable harm in the absence of preliminary relief; (3) the
18  balance of equities tips in the plaintiff's favor; and (4) that an injunction is in the
19  public interest.  (*Winter v. National Resources Defense Council, Inc.* (2008)
20  555 U.S. 7, 20 [129 S.Ct. 365] ("*Winter*") [vacating preliminary injunction];
21  *Fyock v. City of Sunnyvale* (N.D.Cal. 2014) 25 F.Supp.3d 1267 ("*Fyock*") [denying
22  preliminary injunction].)  Plaintiffs cannot make such a showing here.

23  **B.    Plaintiffs Cannot Establish a Likelihood of Success on the Merits**
24        **1.    The Stay Well at Home Order Is a Valid Exercise of the Health**
25  **Officer's Power Entitled to Minimal Scrutiny and Judicial Deference**

26        The Supreme Court has long recognized that "a community has the right to
27  protect itself against an epidemic of disease which threatens the safety of its
28  / / /

8

members." (*Jacobson*, *supra*, 197 U.S. at p. 27.)[4/]  During such public emergencies, states and local governments may take action to curb the disease that would otherwise impermissibly burden constitutionally protected liberties.  (*Id.* at p. 19; see also *Prince v. Massachusetts* (1944) 321 U.S. 158, 166-167 [64 S.Ct. 438] [finding that First Amendment "right to practice religion freely does not include liberty to expose the community . . . to communicable disease"].)[5/]  The Health Officer's measures will be lawful so long as they bear "real or substantial relation" to the public health crisis and are not, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  (*Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, ECF 51 at p. 1022, citing *In re Abbott*, *supra*, 2020 WL 1685929 at * 7, and *Jacobson*, *supra*, 197 U.S. at p. 31.)  In other words, under *Jacobson*, the Stay Well at Home Order is subject to "judicial deference and not subject to traditional constitutional scrutiny."  (*Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, RJN, Exh. 2, pg. ID 1021, citing *Jacobson*, *supra*, 197 U.S. at p. 27.)

/ / /

/ / /

/ / /

---

[4/] *Jacobson* has been recognized as precedent by the Supreme Court as recently as 1997, and has been widely cited by federal courts as the framework by which constitutional claims challenging emergency health orders should be analyzed during the current pandemic.  (See *Kansas v. Hendricks* (1997) 521 U.S. 346, 356 [117 S.Ct. 2072] [recognizing that individual's constitutionally protected interest in avoiding physical restraint may be overridden in civil context], citing *Jacobson*, *supra*, 197 U.S. at p. 26; *In re Abbott* (5th Cir. April 7, 2020) 2020 WL 1685929 at * 7; *In re Rutledge* (8th Cir. April 22, 2010) 2020 WL 1933122; see also *Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, ECF 51, pg. ID 1022.)

[5/] See also *Camara v. Municipal Court of City and County of San Francisco* (1967) 387 U.S. 523, 539 [87 S.Ct. 1727] [noting that warrantless searches permitted under Fourth Amendment when conducted to protect public health in emergency situations], citing *North American Cold Storage Co. v. City of Chicago* (1908) 211 U.S. 306 [29 S.Ct. 101] [seizure of unwholesome food]; *Jacobson*, *supra*, 197 U.S. 11 [compulsory smallpox vaccination]; *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health* (1902) 186 U.S. 380 [22 S.Ct. 811] [health quarantine prohibiting disembarkation of healthy passengers and cargo into infected area].

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

The Stay Well at Home Order easily meets the *Jacobson* test.[6]  The Order bears a substantial relation to the public health crisis.  The Order is temporary, specific and tailored to prevent the spread of a highly contagious and potentially deadly disease through a combination of targeted requirements, all of which are aimed at minimizing human-to-human contact by directing Ventura County residents to stay at their places of residence to the maximum extent feasible.  (RJN, Exh. 15.)  The Health Officer is continually monitoring the pandemic's impact on residents and has updated the Order as necessary to meet its goals.  (RJN, Exh. 15.) The Stay Well at Home Order has slowed the spread of the disease, saved lives and prevented the county's health care systems from being overwhelmed, unlike the situation elsewhere around the globe.[7]  The Health Officer's determination of what businesses are deemed "essential" is entitled to "great deference," notwithstanding any federal advisory documents or differing decisions by other jurisdictions.  (See *Winter*, *supra*, 555 U.S. at p. 24; see also *Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, RJN, Exh. 2 at p. 1022.)

Plaintiffs, on the other hand, cannot demonstrate that the Order's imposition of a temporary and emergency pause on their ability to purchase or sell a gun within Ventura County is, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  (*Jacobson*, *supra*, 197 U.S. at p. 31.)  Unlike the right to use, possess, or otherwise keep and bear arms in the name of self-defense

---

[6] Nor can the authority of the Health Officer be reasonably questioned:  The Health Officer has broad, long-standing and well-established powers to make orders necessary to preserve and protect public health.  For example, the California Health and Safety Code provides that "[t]he local health officer may take any preventive measure that may be necessary to protect and preserve the public health from any public health hazard during any 'state of war emergency,' 'state of emergency,' or 'local emergency,' as defined by section 8558 of the [California] Government Code, within his or her jurisdiction."  (Cal. Health & Saf. Code, § 101040; see also Cal. Heath & Saf. Code, §§ 101080, 101085, 120175 & Cal. Code Regs., tit. 7, § 2500 et seq.)

[7] See, e.g., L.A. Times, Social Distancing May Have Helped California Slow the Virus and Avoid New York's Fate (March 31, 2020) (available at https://news.yahoo.com/social-distancing-may-helped-california-120003221.html (visited April 27, 2020).

1   (which rights the Order does not implicate), the law is well-established that any

2   right to purchase or sell firearms is subject to regulation without violating the

3   Second Amendment, as explained below.  In addition, the modifications to the Stay

4   Well at Home Order since this court denied the first TRO application further

5   support denial of plaintiffs' motion for preliminary injunction.[8/]  These

6   modifications evidence the Health Officer's continual assessment of the Stay Well

7   at Home Order, both to prevent the spread of COVID-19 and to provide minimum

8   disruption of the social, emotional and economic well-being of Ventura County

9   residents.  To this end, the Stay Well at Home Order now contains provisions

10  *solicitous* of plaintiffs' claimed Second Amendment rights so long as strict

11  protocols are followed.  (See, e.g., *Legacy Church, Inc. v. Kunkel* (D.N.M.

12  April 17, 2020) 2020 WL 1905586 [upholding orders based, in part, on fact that

13  emergency COVID-19 orders were solicitous of plaintiff's First Amendment

14  rights].)  Plaintiff McDougall is now expressly authorized to take possession of the

15  weapon he alleges he previously purchased, mooting his Second Amendment claim

16  entirely.  (RJN Exh. 15, p. 7.)

17         Similarly, plaintiffs' right-to-travel claim fails because the Non-Essential

18  Travel provisions do not prevent them (or their members) from leaving Ventura

19  County to purchase a gun elsewhere.  (ECF 19, pg. ID 94, ¶ 87; ECF 27, pg. ID

20  203, ln. 6-8.)  Plaintiffs' allegation in this regard is contrary to the express

21  language of the Stay Well at Home Order, which *allows* persons to travel into and

22

23  [8/] Plaintiffs have argued that the global pandemic presents a unique and heightened need for them to purchase firearms because of a perceived increased need for self-defense from violent crime during this time.  (ECF 27-1, Pg. ID 212.)

24  The widely reported facts, however, are that while certain types of property crime have increased, violent crime throughout the country has *dramatically* decreased

25  concurrent with the issuance of shelter-in-place orders, including in Ventura County.  (RJN, Exh. 16 [violent crime down 11 percent, and homicide by 43

26  percent in Los Angeles]; RJN, Exh. 16-17 [crime rate dropped 16.6 percent and homicide rate by 25 percent in New York City]; RJN, Exh. 16 & 18 [Chicago

27  homicides decreased by 29 percent, shootings by 19 percent and sexual assault by 5 percent]; RJN, Exh. 19 [zero homicides recorded in Miami for six-week period

28  for first time since 1964]; RJN, Exh. 20 [violent crime dropped in Ventura County].)

out of Ventura County without regard to the purpose of the travel.  (RJN, Exh. 15, p. 3 ["This Order allows travel into or out of the County"].)  Moreover, the Stay Well at Home Order has, since March 20 (the date non-essential businesses were ordered to close), included in its definition of "Essential Travel" "[t]ravel engaged in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution."  (See, e.g., RJN, Exh. 15, p. 18, ¶ g(7).) The out-of-county travel plaintiffs propose, i.e., inter-county or interstate travel to purchase a firearm, is economic activity that comprises interstate commerce under the Commerce Clause and thus falls within the Order's definition of "Essential Travel."  (See *United States v. Lopez* (1995) 514 U.S. 549, 563-564 [115 S.Ct. 1624, 1626] [economic activity that substantially affects interstate commerce subject to federal regulation under the Commerce clause].[9/])  Put simply, the "Non-Essential Travel" provisions of the Order do not preclude plaintiffs from traveling to purchase firearms.

To the extent plaintiffs complain that the Order otherwise restricts their travel in violation of the Constitution, any such restrictions do not implicate the constitutional right to travel because:  1) the Order does not impose restrictions on interstate travel, and 2) the Order applies broadly to anyone within the County generally without regard to their state residency, and thus does not fall within the purview of the P&I Clause.  (See *Saenz v. Roe* (1999) 526 U.S. 489, 490 [119 S.Ct. 1518] ("*Saenz*") [detailing three components of right to travel, all stemming from *interstate* travel]; *Marilley v. Bonham* (9th Cir. 1996) 844 F.3d 841, 846

---

[9/] The transfer, licensing and registration of firearms have long been the subject of federal regulations that derive their authority from the Commerce Clause and authorize Congress to regulate interstate commerce.  (See, e.g., 18 U.S.C. § 922 [defining unlawful acts in connection with purchase, transfer or manufacture of firearms]; 18 U.S.C. § 923 [licensing]; 18 U.S.C. § 931 [prohibiting violent felons from purchasing firearms]; National Firearms Act, 26 U.S.C. §§ 5801-5872 [regulating registration and taxation of firearms]; 39 C.F.R. § 390.5 [broadly defining "interstate commerce" to include intrastate transactions that involve goods that enter from or terminate from out of state for purposes of federal motor safety carrier regulations].)

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

[challenged law does not fall within purview of P&I Clause if it does not treat residents of two or more states differently].)  And, even if the Order did implicate plaintiffs' right to travel, the Order would withstand constitutional scrutiny, whether under the *Jacobson* framework, as discussed above, or traditional scrutiny, as explained in more detail in section III.B.3, *infra*.

## 2. The Stay Well at Home Order Does Not Violate the Second Amendment under Traditional Scrutiny

The Second Amendment protects the right of law-abiding, responsible citizens to use arms in defense of hearth and home.  (*District of Columbia v. Heller* (2008) 554 U.S. 570, 635 [128 S.Ct. 2783] ("*Heller*").)  That right, however, is not unlimited.  (*Id*. at p. 626.)  The government may place certain limits on where the right is exercised, how the right is exercised and who may exercise the right.  (*Id*. at pp. 626-627; *U.S. v. Carpio-Leon* (4th Cir. 2012) 701 F.3d 974, 977 ["the Second Amendment does not guarantee the right to possess for *every purpose*, to possess *every type of weapon*, to possess at *every place*, or to possess by *every person*"]); *U.S. v. Huitron-Guizar* (10th Cir. 2012) 678 F.3d 1164, 1166 ["The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why'"].)

In *U.S. v. Chovan* (9th Cir. 2013) 735 F.3d 1127, 1136 ("*Chovan*"), the court adopted a two-step inquiry to analyze claims that a law violates the Second Amendment.  This test "(1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny."  (*Ibid*.)

### a. The Stay Well at Home Order Does Not Impinge on the Second Amendment as It Was Historically Understood

Under the first *Chovan* step, a court cannot "apply the Second Amendment to protect a right that does not exist under the Amendment."  (*Peruta v. County of San Diego* (9th Cir. 2016) 824 F.3d 919, 942 (en banc) ("*Peruta*"), cert. denied *sub*

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

1     *nom*.; *Peruta v. California* (1995) ___ U.S. ___ [137 S.Ct. 1995 (Mem),

2     198 L.Ed.2d 746].)  Therefore, the first step of the analysis requires the court to

3     explore the amendment's reach "based on a 'historical understanding of the scope

4     of the [Second Amendment] right.'" (*Jackson v. City & County of San*

5     *Francisco* (9th Cir. 2014) 746 F.3d 953, 960 ("*Jackson*"), quoting *Heller*, *supra*,

6     554 U.S. at p. 625.)

7         Whether the challenged law falls outside the scope of the Second

8     Amendment involves examining whether there is persuasive historical evidence

9     showing that the regulation does not impinge on the Second Amendment right as it

10    was historically understood.  (*Jackson*, *supra*, 554 U.S. at p. 625.)  Laws restricting

11    conduct that can be traced to the founding era and are historically understood to

12    fall outside of the Second Amendment's scope may be upheld without further

13    analysis.  (See *Peruta*, *supra*, 824 F.3d at p. 919.)

14         The Stay Well at Home Order requires the closure of non-essential

15    businesses, including gun stores.  Plaintiffs argue that the temporary closure

16    hinders the ability of certain persons to finalize gun purchases during the pendency

17    of the Stay Well at Home Order or prevents would-be gun purchasers from buying

18    a firearm.  As an initial matter, the Stay Well at Home Order now allows the

19    completion of gun purchases initiated before March 20.  To the extent would-be

20    gun purchasers are unable to temporarily buy guns within Ventura County,

21    however, California has a long history of delaying possession of firearms without

22    impinging on the Second Amendment.  California has had some kind of waiting

23    period statute for firearm purchases continuously since 1923.  (*Silvester v. Harris*

24    (9th Cir. 2016) 843 F.3d 816, 823 ("*Silvester*").)  The waiting periods

25    encompassed both time for the California Department of Justice ("Cal DOJ") to

26    conduct a background check and time for a cooling-off period (so that guns were

27    not purchased in the heat of a conflict).  (*Id*. at pp. 823-824.)  The Cal DOJ has up

28    to 30 days to complete a background check, and the cooling-off period extends

10 days beyond that.  As such, the Second Amendment has never protected immediate or convenient purchase and sale of guns.

Moreover, in times of emergency such as war, pandemic or natural disaster, federal, state and local governments have historically issued temporary, general regulations that overrode the convenience of purchasers of various goods and services.  (See, e.g., *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health*, *supra*, 186 U.S. 380 [health quarantine prohibiting disembarkation of healthy passengers and cargo into infected area], cited with approval in *Camara v. Municipal Court of City and County of San Francisco*, *supra*, 387 U.S. at p. 539 [recognizing that warrantless search may be permissible under Fourth Amendment in public health emergency].)  As such, the temporary delay in a person's ability to purchase a firearm as a result of the Stay Well at Home Order does not impinge on the Second Amendment right as it was historically understood.

**b.  The Stay Well at Home Order Is a Presumptively Lawful Regulation of General Applicability that Does Not Infringe the Ability to Possess or Use, and Only Incidentally Delays the Purchase of, Firearms**

A law also does not burden Second Amendment rights if it falls within "one of the 'presumptively lawful regulatory measures' identified" in *Heller*, *supra*, 554 U.S. 570.  (*Jackson*, *supra*, 746 F.3d at p. 960; see also *Fyock v. Sunnyvale* (9th Cir. 2015) 779 F.3d 991, 996-997.)

*Heller* made explicit that "nothing in [its] opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  (*Heller, supra,* 554 U.S. 570 at pp. 626-627.)  Such measures are "presumptively lawful."  (*Id*. at p. 627, n. 26.)  The Supreme Court reiterated, two years later, that *Heller* does not undermine the

15

1    validity of regulations on the commercial sale of firearms.  (*McDonald v. City of*
2    *Chicago, Ill.* (2010) 561 U.S. 742, 786 [130 S.Ct. 3020].)

3         In that regard, the Ninth Circuit has held that the Constitution provides "no
4    freestanding right on commercial proprietors to sell firearms" and gun buyers have
5    no right to particular seller locations "so long as their access is not meaningfully
6    constrained."  (*Teixiera v. County of Alameda* (9th Cir. 2017) 873 F.3d 670, 673,
7    680.)  Here, the Stay Well at Home Order only incidentally regulates the
8    commercial sale of firearms.  The Order does nothing to regulate or limit the ability
9    of persons to keep or bear arms.  Rather, the Order requires, among other things,
10   the temporary closure of businesses that are non-essential to the purposes of
11   keeping persons isolated at their places of residence as determined by the Health
12   Officer.  (RJN, Exhs. 12-15.)  Gun stores, and all other retail operations that are not
13   necessary to stop the spread of COVID-19 or otherwise enable persons to shelter in
14   their places of residence, are required by the Stay Well at Home Order to be closed
15   to the public.  (RJN, Exhs. 12-15.)  On its face, the Stay Well at Home Order does
16   not prohibit persons from possessing firearms and does not regulate what persons
17   may do with firearms in their own home.  To the extent that the Stay Well at Home
18   Order delays the ability of some persons to purchase a firearm, the immediate and
19   convenient acquisition of firearms has never been protected under the Second
20   Amendment.  (See § III.3.B.2.a, *supra*; *Silvester*, *supra*, 843 F.3d at pp. 823-824.)

21        **c.  The Stay Well at Home Order Does Not Substantially Burden**
22   **Second Amendment Rights and Is Substantially Related to Mitigating the**
23   **Public Health Crisis Presented by COVID-19**

24        Even if the Stay Well at Home Order has burdened plaintiffs' Second
25   Amendment rights, the Order easily survives intermediate scrutiny as this court
26   previously determined (ECF 12 & 30), in accordance with the other COVID-19-
27   / / /

28

16

related Second Amendment decision in the Central District.  (*Brandy v. Villanueva* (C.D.Cal. April 6, 2020) Case No. 2:20-cv-02874-AB-SK, ECF 20.)

### i.  Even if Intermediate Scrutiny Is Applied, the Order Should Stand

In the absence of an emergency such as a pandemic, courts determine the appropriate level of scrutiny to apply in a Second Amendment challenge by considering (1) how close the challenged law comes to the core of the Second Amendment right; and (2) the severity of the law's burden on that right.  (*United States v. Torres* (9th Cir. 2019) 911 F.3d 1253, 1262.)  The core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home (i.e., self-defense).  (*Ibid*.; *Heller*, *supra*, 554 U.S. at p. 628.)  Only laws that implicate the core of the Second Amendment right and severely burden that right will be subjected to strict scrutiny.  (*Silvester*, *supra*, 843 F.3d at p. 821.)  Intermediate scrutiny is the appropriate level of scrutiny for all other laws. (*Ibid*.)  There has been "near unanimity in the post-*Heller* case law that when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate."  (*Id*. at p. 823.)

In *Silvester*, the Ninth Circuit examined the constitutionality of California's 10-day waiting period between the purchase and delivery of a firearm.  In California, most citizens who want to purchase a firearm must pass a background check.  (*Id*. at pp. 824-825.)  The background check is conducted by the Cal DOJ, which has the authority to delay the delivery of a firearm for up to 30 days  to complete the background check.  (*Id*. at p. 825, citing Cal. Pen. Code, § 28220, subd. (f).)  Additionally, a person cannot purchase more than one firearm within a 30-day period.  (*Id*., citing Cal. Pen. Code, § 27535.)  After passing the Cal DOJ background check, a person may purchase a firearm but must wait 10 days before taking possession of the firearm.  (Cal. Pen. Code, §§ 26815, 27540.)

/ / /

The *Silvester* court applied intermediate scrutiny based on its determination that the law requiring the 10-day waiting period did not place a substantial burden on the Second Amendment right because it did not prevent, restrict or place any conditions on how guns were stored or used after a purchaser took possession. (*Silvester*, *supra*, 843 F.3d at p. 827.)  The court also noted that historically, the delivery of weapons took time, and that the "very small" burden of waiting 10 days before taking possession is less than the burden imposed by other challenged regulations to which Ninth Circuit courts have applied intermediate scrutiny:

"There is, moreover, nothing new in having to wait for the delivery of a weapon.  Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time.  Our 18th and 19th century forebears knew nothing about electronic transmissions.  Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business." (*Silvester*, *supra*, 843 F.3d at p. 827.)

The Stay Well at Home Order here presents a similarly "very small" burden on the Second Amendment right.  It does not limit or regulate the ability of persons to possess firearms or what they may do with those firearms in their homes.  The Order closes non-essential businesses, which may incidentally delay the ability of a person to purchase a firearm.  The Order is in effect for a finite period of time – first until April 19 and now through May 15.  As such, the delay is comparable to the constitutionally accepted delays resulting from the Cal DOJ background check and the 10-day cooling-off period.  As the court noted in *Silvester*, much more serious limitations on the ability to bear arms have been

/ / /

/ / /

/ / /

18

1    subjected to intermediate scrutiny.  As such, the application of intermediate

2    scrutiny is appropriate.[10/]

### ii.  Preventing the Spread of COVID-19 Is a Compelling Government Interest and the Closure of Non-Essential Businesses, Including Gun Stores, Is Reasonably Suited to Achieve that Objective

6    Under intermediate scrutiny, courts first look to the government's objectives

7    in enacting the regulation and second to whether it is reasonably suited to achieve

8    those objectives.  (*Jackson*, *supra*, 746 F.3d at p. 965.)

9    Ventura County is experiencing a local health emergency that is part of a

10   global pandemic.  COVID-19 is highly contagious and potentially deadly,

11   especially for older persons and persons with serious chronic health conditions.

12   There is no known anti-viral treatment or immunization available for COVID-19.

13   (RJN, Exhs. 1, 2, 3, & 21.)  The Stay Well at Home Order is intended to slow the

14   spread of COVID-19 by isolating persons in their places of residences as much as

15   possible.  (RJN, Exhs. 12-15.)  COVID-19 presents an imminent and proximate

16   threat to the residents of Ventura County, and it is essential to control the spread of

17   COVID-19 as much as possible to protect the community's most vulnerable

18   persons and prevent the health care system from being overwhelmed.  (RJN,

19   Exhs. 2-6 & 15.)  The compelling government interest in this case is obvious.

20   The test for whether the Stay Well at Home Order reasonably fits with the

21   stated objectives "is not a strict one."  (*Silvester*, *supra*, 843 F.3d at p. 827.)

22   Intermediate scrutiny does not require the least restrictive means of furthering a

23   given end.  (*Ibid*.)  Instead, it requires only that the law be "substantially related to

24   the important government interest."  (*Ibid*.)  Here, the Health Officer is required to

25

26   _____

[10/] Plaintiffs' reliance on a North Carolina District Court case for the proposition that strict scrutiny should apply is misplaced.  (See *Bateman v. Perdue* (E.D.N.C. 2012) 881 F.Supp.2d 709.)  The statute at issue in that case imposed a complete prohibition on carrying, possessing and selling guns during the state of emergency, regardless the type of emergency at issue.  (*Id*.)  The Stay Well at Home Order does no such thing.

DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

1    show only that the regulation "promotes a substantial government interest that

2    would be achieved less effectively absent the regulation." (*Id*. at p. 829.)  The

3    Health Officer easily meets that burden.

4         The stated goal of the Stay Well at Home Order is to keep as many people in

5    their homes as possible.  Even social distancing is not as effective in controlling

6    the spread of the disease as isolating at home.  The essential nature of essential

7    businesses, such as grocery stores, justifies their continued operation subject to

8    social distancing practices.  But a gun store is not an essential business and

9    allowing any non-essential businesses to remain open diminishes the effectiveness

10   of the Stay Well at Home Order.  Keeping gun stores and other non-essential

11   businesses closed to the public for a limited time easily passes intermediate

12   scrutiny.

13        **3.  <u>Plaintiffs Are Unlikely to Prevail on Their Right-to-Travel Claim</u>**

14        Plaintiffs assert a right to travel claim under the P & I Clause, which right

15   they claim is guaranteed by the due process protections under the Fifth and

16   Fourteenth Amendments of the Constitution.  (ECF 20-1, Pg. ID 125.)  This claim

17   fails.  As an initial matter, no court in this jurisdiction has ever extended the

18   constitutional right to travel to protect a citizen's *intrastate* travel.  (*Sears v. United*

19   *States* (C.D. Cal. April 16, 2015) 2015 WL 13359437[11/] aff'd (9th Cir. 2016) 652

20   Fed.Appx. 553.)  Rather, the three components of the right to travel all arise out of

21   and concern constitutional provisions that relate to *interstate* activities: 1) the right

22   to freely enter one state and leave another; 2) the right to be treated as a "welcome

23   visitor rather than an unfriendly alien when temporarily visiting another state;" and

24

---

25        [11/] Comparing *Community Hospital v. Maricopa County* (1974) 415 U.S.
      250, 256 [declining to opine whether right to travel extends to intrastate travel],
26    and *Nunez v. City of San Diego* (9th Cir. 1997) 114 F.3d 935, 944 [declining to
      opine whether right to travel extends to intrastate travel], with *Lutz v. City of York,*
27    *PA* (3d Cir. 1990) 899 F.2d 255 [deciding that right to intrastate travel is not
      protected under P & I Clause but may be protected under due process clauses of
28    Fifth Amendment]; and *Johnson v. City of Cincinnati* (6th Cir. 2002) 310 F.3d 484,
      498.

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

3) the right to be treated like other residents when a traveler decides to become a permanent resident in a new state.  (*Saenz, supra*, 526 U.S. at pp. 489-490.)  The P & I Clause protects components of the right to travel only insofar as the "challenged law falls within the purview" of the clause, which requires plaintiffs to show that the Order "treats nonresidents differently from residents and impinges upon a 'fundamental' privilege or immunity protected by the clause."  (*Marilley v. Bonham* (9th Cir. 1996) 844 F.3d 841, 846) [finding law that imposes higher license fee for non-residents to fall within purview of the P & I Clause], quoting *United Bldg. and Constr. Trades Council v. Camden* (1984) 465 U.S. 208, 218 [104 S.Ct. 1020].)

Here, plaintiffs do not allege, nor could they, that the Stay Well at Home Order treats residents from other states differently than California residents.  As explained above, the Order broadly applies to "all persons in the cities and the entire unincorporated area of Ventura County" without regard to a person's residency or citizenship.  (RJN, Exh. 15, p. 2.)  In addition, the Order only concerns intra-county travel, and does not impose any sort of restriction beyond Ventura County borders.  Thus, plaintiffs' claim does not fall within the purview of the P & I Clause and does not implicate a fundamental right under the Constitution.

Even if the Stay Well at Home Order implicated the right to travel, plaintiffs are unlikely to succeed on the merits of their claim.  (See *Shows v. Swain County Sheriff* (W.D.N.C. April 23, 2020) 2020 WL 1953621 [denying TRO to restrain public emergency order's imposition of curfew imposed to curb pandemic, finding plaintiffs unlikely to prevail on merits of claims under P & I Clause and First, Fourth, Fifth and Fourteenth Amendments].)  To the extent the Order creates barriers to movement – whether interstate or intrastate – such restrictions are narrowly tailored to achieve the compelling government interest to prevent the spread of COVID-19, even assuming that strict scrutiny applies.  (See, e.g., *Mohamed v. Holder* (E.D. Va. 2017) 266 F.Supp.3d 868, 879-883 [upholding "no-

fly" list register despite its substantial burden on plaintiff's right to interstate travel after strict scrutiny review and declining to recognize that right to travel extends to international travel]; *Lutz v. City of York, PA, supra,* 899 F.2d at pp. 259-270 [dismissing claim that anti-cruise statute violated due process clause of Fifth Amendment after determining statute survived intermediate scrutiny as valid time, place and manner restriction]); *U.S.A. v. Sears* (C.D.Cal. April 6, 2015) 2015 WL 13359437, *2 [finding law of general applicability that has incidental effect on individual's ability to travel does not violate fundamental right to travel under rational basis scrutiny].) Plaintiffs will not prevail on this claim.

## C. The Temporary Pause on the Ability to Purchase or Sell Firearms Does Not Amount to Irreparable Harm

While it is true that "[i]rreparable harm is presumed if plaintiffs are likely to succeed on the merits because a deprivation of constitutional rights always constitutes irreparable harm" (*Fyock*, *supra*, 25 F.Supp.3d at p. 1282, citing *Elrod v. Burns* (1976) 427 U.S. 347, 373 [96 S.Ct. 2673]; *Ezell v. Chicago* (7th Cir. 2011) 651 F.3d 684, 699-700), in this case, there is no constitutional violation, and thus no irreparable harm. In contrast, if defendants are enjoined from enforcing the Stay Well at Home Order, the irreparable harm to the public is obvious and potentially deadly: increased likelihood of the spread of a highly contagious and sometime fatal disease without a known cure and further deaths of County residents caused by the disease.

## D. The Balance of Equities Tips Sharply in Defendants' Favor

Plaintiffs cannot meet their burden to show that the balance of equities tips in their favor. (*Fyock*, *supra*, 25 F.Supp.3d at pp. 1282-1284 [finding hardships balance to be neutral but public interest to weigh in city's favor], citing *Winter*s, *supra*, 555 U.S. at p. 20.) In evaluating the equities of whether to issue injunctive relief, the court should consider the respective hardships on both parties and the public interests advanced by either determination. (*Fyock*, *supra*, 25 F.Supp.3d at

22

p. 1282, citing *United States v. Salerno* (1987) 467 U.S. 739, 748-50 [104 S.Ct. 2720], and *Schall v. Martin* (1984) 467 U.S. 263, 264 [104 S.Ct. 2403].)  In so doing, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  (*Winter*, *supra*, 555 U.S. at p. 24, citing *Weinberger v. Romero-Barcelo* (1982) 456 U.S. 305, 312 [102 S.Ct. 1798], and *Railroad Comm'n of Tex. v. Pullman Co.* (1941) 312 U.S. 496, 500 [61 S.Ct. 643].)  Here the consequences to the public if the relief is granted are obvious and dire:  increased likelihood that more people will get sick and more people will die.

In *Winter*, the Supreme Court vacated a preliminary injunction after finding the lower courts did not appropriately assess and balance the hardships and interests implicated by the injunction on the defendant, the United States Navy.  (*Winter*, *supra*, 555 U.S. at pp. 25-33 [analyzing hardships asserted by Navy and public interests implicated by those hardships].)  The preliminary injunction at issue in *Winter* imposed a number of conditions on the Navy's "ability to conduct realistic training exercises" at sea involving the use of sonar technology in the interest of national defense.  (*Id*. at p. 24.)  The plaintiffs were several groups dedicated to the protection of marine life and habitats that sought to enjoin the Navy's training exercises in the name of those interests.  (*Id*. at pp. 14, 25.)  The Navy supported its assertion of specific hardships through declarations of several high-ranking officers, whose "professional military judgments" about the impact of the injunction on national security were "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force" that are to be given "great deference" by the courts.  (*Id*. at p. 24.)  After balancing the equities of the plaintiffs' interests, i.e., "possible harm to the ecological, scientific, and recreational interests," with the Navy's national security interests, i.e., "forcing the Navy to deploy an inadequately trained antisubmarine force [that would] jeopardize[] the safety of the fleet," the court found that the

23

public interest determination was not a close question.  (*Id*. at p. 26.)

Because plaintiffs cannot show a likelihood of success on the merits, they will be unable to show either that the hardships of a temporary pause on the sale or purchase of firearms or the public interest warrant relief in their favor.  (*Fyock*, *supra*, 25 F.Supp.3d at p. 1282.)  At worst for plaintiffs, their ability to buy or sell firearms is subject to delay during the pendency of the Stay Well at Home Order.

In contrast, the Health Officer's compelling interests are to prevent, slow or otherwise curtail the spread of COVID-19, to maintain the integrity and continued operation of the health care system, and to promote the safety and well-being of thousands of health care workers being called to the front lines of a global pandemic at the local level.  (See, e.g., *Jacobson, supra*, 197 U.S. at p. 26 [compelling interest of public health allowed forced smallpox vaccinations].)  That these interests are, and will be, achieved through the Stay Well at Home Order is not subject to reasonable dispute.  Similar to the opinions of high-ranking military officers in *Winter,* the Health Officer's determination of how to best stop the spread of COVID-19 and the deaths of potentially hundreds of Ventura County residents, and to prevent the local health care system from being overwhelmed, involves "complex, subtle, and professional decisions" as to the preservation of public health, and such "professional judgment" is entitled to "great deference." Like in *Winter*, the question of where the public interest lies is not even close:  the balance of equities tips sharply in defendants' favor.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

24

IV

**CONCLUSION**

Based on the foregoing, defendants respectfully requests that the Court deny the motion for a preliminary injunction.

LEROY SMITH
County Counsel, County of Ventura

Dated:  May 5, 2020            By                /s/
                                CHARMAINE H. BUEHNER
                                Assistant County Counsel

Attorneys for Defendants County of Ventura (also erroneously sued as Ventura County Public Health Care Agency), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin and William T. Foley

25