1

2   Ronda Baldwin-Kennedy, Esq. (SB #302813)
    Jerome A. Clay, Esq. (SB #327175)
3   **LAW OFFICE OF RONDA BALDWIN-KENNEDY**
    5627 Kanan Rd. #614
4   Agoura Hills, CA 91301
    Phone: (951) 268-8977
5   Fax: (702) 974-0147
6   Email: ronda@lorbk.com

7

8   Raymond M. DiGuiseppe (SB #228457)
    **THE DIGUISEPPE LAW FIRM, P.C.**
9   4320 Southport-Supply Road, Suite 300
10  Southport, North Carolina 28461
    Phone: 910-713-8804
11  Fax: 910-672-7705
12  Email: law.rmd@gmail.com

13
    Attorneys for Plaintiffs
14

15              **UNITED STATES DISTRICT COURT**

16         **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

17  DONALD MCDOUGALL, *et al*.,          Case No. 2:20-cv-02927-CBM
18
                    Plaintiffs,
19                                       **MEMORANDUM OF POINTS AND**
        vs.                              **AUTHORITIES IN SUPPORT OF**
20                                       **PLAINTIFFS' REPLY TO**
    COUNTY OF VENTURA,                   **DEFENDANTS' OPPOSITION TO**
21  CALIFORNIA, *et al*.,                **PLAINTIFFS' MOTION FOR**
22                                       **PRELIMINARY INJUNCTION**
23                  Defendants.
24
25
26                                       First Amended Complaint Filed Apr. 14, 2020
27
28

1

## TABLE OF CONTENTS

2

3      **INTRODUCTION** ....................................................................................... 1

4      **ARGUMENT** ............................................................................................ 4

5
       **A.  The Defendants' Series of Unconstitutional Orders Effectively Banning**
6      **All Legal Firearm and Ammunition Transfers County-wide** ................. 4

7          **1.  The March 17th Order** ................................................. 4

8          **2.  The March 20th Order** ................................................. 4

9          **3.  The March 31st Order** ................................................. 5

10         **4.  The April 20th Order** ................................................. 6

11         **5.  The May 7th Order** ..................................................... 7

12     **B.  Categorical, or At Least Heightened, Constitutional Scrutiny Applies to**
       **Defendants' Orders and Enforcement Practices** ...................................... 10
13
14     **C.  Plaintiffs Demonstrate a Strong Likelihood of Success** ........................ 15

15         **1.  Defendants' Orders Fail the Controlling *Heller* and Strict Scrutiny**
               ..................................................................................... 15
16
17         **2.  Defendants Fail to Show *Any* Tailoring of the Means to Their End**
               ..................................................................................... 19
18
19     **D. The Public Interests and Balance of Equities All Lean in Plaintiff's Favor**
           ..................................................................................... 23

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

### CASES

3

*Adams & Boyle, P.C. v. Slatery*, ___ F.3d ___, 2020 WL 1982210 (6th Cir. Apr. 24, 2020)......................................................................................... 11, 14, 23

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ............................................... 19

*Bauer v. Becerra*, 858 F.3d 1216 (9th Cir. 2017)................................... 19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520 (1993) .... 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........................... passim

*Duncan v. Becerra*, 265 F.Supp.3d 1106, 1136 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018)................................................................. 23

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ...................... 18, 19

*First Baptist Church v. Kelly*, ___ F.3d.Supp ___, 2020 WL 1910021 (D. Kan. Apr. 18, 2020) ......................................................................... 13

*Gish v. Newsom* (C.D.Cal. April 23, 2020), case No. 5:20-cv-00755-JGBKK ...... 13

*In re Abbott*, 954 F.3d 772 (5th Cir. 2020)............................................ 14

*In re Salon A La Mode*, __ S.W.3d ___, 2020 WL 2125844 (Tex. May 5, 2020)..24

*Jackson v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) 18, 19

*Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905)..................... 1, 2

*Maryville Baptist Church, Inc. v. Beshear*, ___ F.3d ___, 2020 WL 2111310 (6th Cir. May 2, 2020) ........................................................................... 12

*McCarthy v. Gov. Baker*, D. Mass. No. 1:20-cv-10701-DPW, 2020 WL 229727 24

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) .................................. 15, 17, 18

*Rhode v. Becerra*, 2020 U.S. Dist. LEXIS 71893 ...................................... 25

*Robinson v. Attorney General*, ___ F.3d ___, 2020 WL 1952370 (11th Cir. 2020) ............................................................................................ 11

*United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) ........................ 15, 18, 19

*Walsh v. City and County of Honolulu*, 423 F.Supp.2d 1094 (D. Hawaii 2006) .... 22

*Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989)................................ 20, 22

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)................ 24

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

– iii –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' REPLY TO
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:20-cv-02927

1

O<small>THER</small> A<small>UTHORITIES</small>

2

*Toward a Twenty-First Century Jacobson v. Massachusetts*, 121 Harv. L. Rev.

3
  1820 (2008); Goston, *Jacobson v. Massachusetts at 100 Years: Police Power
  and Civil Liberties in Tension*, 95 Am. J. Pub. Health 576, 580 (2005).............. 10

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Defendants claim their litany of COVID-19 "Stay Well at Home" orders are entitled to "great deference" under the framework of *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), and epidemiological pragmatism, Opp. to MPI ("Opp.") at 8, 10, 24. They portray the orders as the product of the "presumptively lawful" "professional judgment" of the County Health Officer (Defendant Robert Levin, M.D.), *id.* at 15, which, according to them, cannot "be reasonably questioned," *id.* at 10, n. 6, because they are "temporary, specific and tailored" emergency measures "for the collective good," *id.* at 1, 10—especially the now-*repealed* order of April 20th. But the reality is that Defendants have issued and enforced a series of seven unconstitutional directives—its latest one issued just days ago on May 7th which repealed the April 20th Order that Defendants relied upon for their anemic opposition—without any legislative process. And, after usurping the legislative branch and process, Defendants now seek to preclude the judicial branch from properly scrutinizing their orders and enforcement actions that violate Plaintiffs' enumerated fundamental rights.

Defendants characterize Plaintiffs' motion as a "request for a preliminary injunction to open the firearm stores" Defendants closed. But that purposefully walks past the fact that Defendants did not merely shutter firearm retailers; they did that, and more, by broadly and completely prohibiting through criminal sanctions all

constitutionally protected conduct necessary to the exercise of enumerated rights. The preliminary injunctive relief Plaintiffs seek in the instant motion is vital to protecting and restoring fundamental rights, and to upholding the one fundamental rule of the *Jacobson* case that has direct bearing here: "[a] local enactment or regulation, even if based on the acknowledged police powers of a state, must always yield in case of conflict with the exercise by the general government of any power it possesses under the Constitution, or with any right which that instrument gives or secures." *Jacobson*, 197 U.S. at 25.

Defendants cannot escape two truths about their policies and the realities of their continuing enforcement thereof: First, they completely closed all firearm and ammunition retailers, through which plaintiffs and others like them must conduct firearm and ammunition transfers, deeming them *non*-essential. Defendants have maintained a total ban on the exercise of fundamental, enumerated rights under their misguided policy and preference that firearms and ammunition transactions are non-essential, rather than even trying to fulfill their minimum obligation to employ less restrictive means—just like they did with other politically-favored conduct. And second, Defendants have banned all travel inside or outside the County's borders for the purpose of acquiring firearms or ammunition, conduct protected under the Second and Fourteenth Amendments.

Defendants fully admit the first of these realities, hanging their hats on the

claim that this Court is powerless to question the judgment of the all-powerful autocracy under Defendant Levine's orders, and Defendant Sheriff Ayub's enforcement of them, that firearm and ammunition retailers must be closed entirely for "the collective good," unlike hardware stores and other open places of commerce which already have the freedom to provide goods that can be ordered online and delivered directly to one's home. They resist accepting their self-created second truth—at least as of their last word on May 5th, when they filed their opposition to Plaintiffs' motion. But their resistance to it has been disingenuous, and now, with the issuance of their May 7th Order, they are forced to yield the last of it.

Defendants have and continue to violate their residents' enumerated rights, including those of Plaintiffs' and Plaintiffs' members. Defendants' violations of the fundamental rights at stake are clear, continuing, and inflicting irreparable harm each day their orders and enforcement practices are allowed to continue. And Defendants' policies and enforcement practices fail all forms of heightened scrutiny. To be sure, "[t]he very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008).

Under *Jacobson* and the *applicable* prevailing Supreme Court precedents, this Court should grant Plaintiff's motion and issue a preliminary injunction.

# ARGUMENT

**A.  The Defendants' Series of Unconstitutional Orders Effectively Banning All Legal Firearm and Ammunition Transfers County-wide**

### 1.    The March 17th Order

On March 17, 2020, Defendants County of Ventura, Foley, and Levine ( "County Defendants") issued an order—enforced, like all the order since, by Defendant Sheriff William "Bill" Ayub (*see, e.g.,* First Amended Complaint at pp. 15–17)—essentially implementing the initial State-wide directives and recommendations responding to COVID-19, supplemented by their directives that people over a certain age shelter in place and that some types of businesses (i.e., bars, wineries, breweries, large entertainment venues, and fitness centers) close. Def. Req. for Jud. Notice ("RJN"), Ex. 7, pp. 1–2.

### 2.    The March 20th Order

On March 19th, Governor Newsom issued Executive Order N-33-20, ordering "all individuals residing in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure." RJN, Ex. 8. This "critical infrastructure" was defined by the United States Department of Homeland Security, Cybersecurity and Infrastructure Security Agency ("CISA") to include 16 types of industries, which at the time did not include firearms or ammunition retailers. *Id.*; https://www.cisa.gov/identifying_critical-infrastructure-during-covid-19. The next day, County Defendants issued an order

"supplement[ing]" their March 17th order and the Governor's March 19th Order.

County Defendants' March 20th Order extended the shelter-in-place directive to all residents of the County and precluded, on pain of criminal liability, all forms of activity, business operation, and travel not deemed "essential." The order promulgated a list of activities and businesses deemed "essential." RJN, Ex. 12, § 7(a) & (e), pp. 2–4. Firearms and ammunition retailers were not included by County Defendants among their "essential" businesses. *Id.* The order also expressly limited the forms of permissible travel outside the home—stating that travel was only allowed for purposes related to "essential" activities and businesses, caring for certain vulnerable persons, obtaining services from educational institutions, residents returning from outside the County, non-residents returning to their homes outside the County, complying with court or law enforcement orders, and "engag[ing] in interstate commerce." *Id.* at § 7(g), p. 6.

### 3.    The March 31st Order

On March 31st, County Defendants issued a new order for the purposes of "impos[ing] new and additional limitations on the activities of persons and entities." RJN, Exh. 13, §§ 1, pp. 1, 13. This order further limited the definition of "essential" businesses so as to include only a specifically-enumerated list of businesses, and those "whose primary business is the sale of food, beverages, pet supplies or household products." It did not include firearms or ammunition retailers. *Id.* § 4, p.

2. On April 9th, County Defendants modified the list again with another order adding certain products and service providers, like bicycle shops, real estate firms, and automotive dealers—but not firearm or ammunition retailers. RJN, Ex. 14, § 4, p. 2.

### 4.    The April 20th Order

Then, just over three weeks after this lawsuit was first filed, on April 20th, County Defendants issued an order "amend[ing] and restat[ing]" their prior orders. RJN, Ex. 15, p. 1. This order specifically listed "Gun stores" as among the list of *non-essential* businesses that must continue to be shuttered, *id.* at § 12, p. 8, expressly stating that such retailers were already required to cease operations as of March 20th based on the order of that date, *id.* at § 11, p. 7 (stating that March 20, 2020 was "the day firearm stores were ordered to be closed by the Health Officer"). The April 20th order created a "special allowance for completion of firearms sales" such that those who had initiated a firearm (but not ammunition) purchase before March 20th could complete the transactions at the retailer on an individual appointment basis. *Id.* While conceding that less restrictive alternatives were available, it doubled down on the total ban and mandated that firearm and ammunition retailers and transferors "shall remain closed to the general public." *Id.*

The April 20th Order also continued to expressly "prohibit" all "non-essential" travel (i.e., banning all travel except that which was related to "essential" activities and businesses). RJN, Ex. 15, § 6, p. 3. Within this provision, the order

stated that it "allow[ed] for travel into or out of the County." *Id.* Simultaneously, it retained the same, separate provision in the previous orders which specifically defined and limited the forms of permissible "essential" travel. *Id.* at § 1, p. 2.

### 5. The May 7th Order

Most recently, on May 7th, the County announced "a new modified Stay Well VC Health Order to align with the State of California's four-stage framework for reopening," by permitting the "reopening of lower-risk businesses" beginning May 8th. Reply to Opp. ("Reply"), Ex. 1. In its public announcement, the County adopted the State's classification of "lower-risk workplaces" for these purposes, as specified in the State's online "roadmap" for reopening (https://covid19.ca.gov/roadmap/). The State's list includes only those retail businesses capable of providing "curbside retail," such as "[b]ookstores, jewelry stores, toy stores, clothing stores, shoe stores, home and furnishing stores, sporting goods stores, antique stores, music stores, florists" and "[s]upply chains supporting the above businesses." *Id.* That same day, County Defendants issued a new order, which became effective on May 8th. Reply, Ex. 2 ("Stay Well VC – Reopening Ventura County"), § 16, p. 9. The order provides that the April 20th is "herebly [*sic*] repealed and replaced," except that all prior violations of previous orders remain prosecutable and all prior closure and cease and desist orders against people and businesses remain in effect. *Id.* It adopts the Governor's Executive Order N-33-20, issued on March 20th ("the State Stay at

Home Order"), as the new baseline for the County's restrictions. *Id.* at p. 2. The May 7th Order "supplements" the State Stay at Home Order to specifically address certain subjects, with the caveat that "[w]here a conflict exists between this Local Order and any State public health order, including the State Stay at Home Order, the more restrictive provision controls." *Id.* at p. 2, and § 14, p. 9.

Among the supplemental provisions are provisions stating that certain "businesses and activities" remain precluded, such as facilities with pools, hot tubs, and saunas, transient campgrounds and RV parks, and that "[o]nly retail businesses whose primary line of business qualifies as critical infrastructure under the State Stay at Home Order may be fully open to the public; e.g., businesses whose primary business is the sale of food, beverages, pet supplies, household cleaning products, etc." Reply, Ex. 2, §§ 8-9. While the CISA guidelines were updated on March 28, 2020, to expressly include "firearm or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges" as part of the "critical infrastructure workforce," Reply Ex. 3, and are maintained in CISA's latest April 17th Guidance Version 3.0, online at https://bit.ly/cisa3, County Defendants' May 7th Order does not adopt *that* classification of "critical infrastructure workforce." Rather, in order to keep firearm and ammunition retailers closed, and to prevent individuals like Plaintiffs and Plaintiffs' members from exercising their fundamental, enumerated rights, County Defendants instead adopted the nearly two-month-old version of the

CISA guidelines—those issued *before* the CISA guidelines were updated to include firearms and ammunition suppliers as "critical" to the basic infrastructure. Notably, and to the same end, County Defendants' removed their so-called "special allowance" for firearms transactions pre-dating March 20 and include no other such provision permitting any such transactions to be completed. Once more, Defendants go forward on many fronts but backward on firearm and ammunition transfers.

Moreover, the May 7th Order completely eliminated the two provisions in the April 20th Order dealing specifically with "travel," including the language that it "allows travel into or out of the county" and all the other provisions defining "essential" forms of travel. Instead, the only provisions concerning the permissible forms of movement outside the home are those defining "activities that the County Health Officer deems to be essential and allowed," which provide that people "may leave their places of residence only to perform" one of a number of specifically-enumerated "essential activities." Reply, Ex. 2, § 11. This list of activities is defined to include tasks "essential to … health and safety" like obtaining medical supplies and healthcare, obtaining "necessary services or supplies" such as food and "products necessary to maintain the safety, sanitation and essential operation of places of residence," and "otherwise carry[ing] out activities specifically permitted in this Local Order," *id.*—but not firearm and ammunition-related travel. Defendants continue to target Plaintiffs' Second Amendment rights for unfavorable treatment.

**B.   Categorical, or At Least Heightened, Constitutional Scrutiny Applies to Defendants' Orders and Enforcement Practices**

It is clear that Defendants necessarily fail in their attempt to evade constitutional scrutiny through their misapplication of *Jacobson*. Indeed, "the fundamental law" of concern in *Jacobson* was far removed from the constitutional principles at stake here. There, the 1905 Supreme Court considered only an inchoate, non-enumerated liberty interest—"the inherent right of every freeman to care for his own body and health in such way as to him seems best," 197 U.S. at 25—long before the evolution of modern constitutional scrutiny applied to enumerated fundamental rights. It effectively applied a rational-basis-like test for *legislatively-enacted* restraints on *general* liberty interests not specifically protected by other provisions of the Constitution. "Supreme Court jurisprudence has progressed markedly from the deferential tone of *Jacobson* and its progressive-era embrace of the social compact." Note, *Toward a Twenty-First Century Jacobson v. Massachusetts*, 121 Harv. L. Rev. 1820 (2008); Goston, *Jacobson v. Massachusetts at 100 Years: Police Power and Civil Liberties in Tension*, 95 Am. J. Pub. Health 576, 580 (2005).

*Jacobson* must be read with its historical limitations in mind. Its approach to evaluating a democratically enacted, acutely focused public health rule affecting a general interest is not a replacement for modern constitutional analysis. Rather, *Jacobson* must be understood as having merely applied the then-applicable constitutional analysis to the generic liberty interest impacted by the legislatively

---

enacted rule. If a specific constitutional right is at stake, then that right's mode of scrutiny applies. The Sixth Circuit just recognized this in *Adams & Boyle, P.C. v. Slatery*, ___ F.3d ___, 2020 WL 1982210 (6th Cir. Apr. 24, 2020). There, the district court issued a preliminary injunction against the Tennessee governor's COVID-19 order temporarily banning certain types of abortions as "elective" surgeries. Upholding the injunction, the Sixth Circuit cautioned that "[a]ffording flexibility [] is not the same as abdicating responsibility, especially when well-established constitutional rights are at stake…" 2020 WL 1982210 at *1. Importantly, it was the nature of the specific constitutional right at stake that drove the analysis. The court held that, "bottom line … even accepting *Jacobson* at face value, it does not substantially alter our reasoning here" because "[a]s of today, a woman's right to a pre-viability abortion is a part of 'the fundamental law.'" *Id.* at *9. The court would "not countenance …the notion that COVID-19 has somehow demoted *Roe* and *Casey* to second-class rights, enforceable against only the most extreme and outlandish violations." *Id.* at *10. "Such a notion is incompatible not only with *Jacobson*, but also with American constitutional law writ large." *Id.*

Similarly, in *Robinson v. Attorney General*, ___ F.3d ___, 2020 WL 1952370 (11th Cir. 2020), both the district court and the Eleventh Circuit rejected Alabama's attempt to wield the *Jacobson* case as somehow dispositive in support of its COVID-19 driven restriction on abortions. Rather, the Eleventh Circuit agreed with the

---

district court that *Jacobson* cannot be employed to supplant *other cases* applying the specific constitutional rights at stake and the framework for protecting that right as defined throughout the decades of jurisprudence since *Jacobson*. 2020 WL 1952370 *8. Notably, the Court specifically employed the modern *Roe-Casey* framework to conclude that Alabama's COVID-19 order "impinge[d] the right to an abortion" a "plain, palpable" fashion as contemplated by *Jacobson*. *Id.*

These contemporaneous cases supporting plaintiffs' arguments and relief extend beyond the abortion context. For instance, in *Maryville Baptist Church, Inc. v. Beshear*, ___ F.3d ___, 2020 WL 2111310 (6th Cir. May 2, 2020), the Sixth Circuit reversed the district court's denial of a TRO to enjoin the Kentucky governor's orders and enforcement actions shutting down worship services, regardless whether they met or exceeded social distancing and hygiene guidelines for permitted non-religious activities during the COVID-19 pandemic. The Sixth Circuit found that the government's orders and actions likely prohibited the free exercise of religion in violation of the First and Fourteenth Amendments, especially with respect to drive-in services. 2020 WL 211310 at *2. Again, what drove the analysis was the nature of the specific constitutional right at stake scrutinized in the manner required under *Supreme Court* precedents since the time of *Jacobson*. *Id.* at *3 (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeh*, 508 U.S. 520, 553 (1993) (applying the rule that "a law that discriminates against religious

practices will usually be invalidated unless the law 'is justified by a compelling interest and is narrowly tailored to advance that interest'"). The Sixth Circuit cited *Jacobson* merely as a historical reference for purposes of recognizing that the governor was well-intentioned in doing his best to lessen the spread of the virus, *id.* at * 4, but the orders were ultimately adjudged under strict scrutiny according to the nature of the right at stake—not any lesser form akin to rational basis.

And in *First Baptist Church v. Kelly*, ___ F.3d.Supp ___, 2020 WL 1910021 (D. Kan. Apr. 18, 2020), the district court ruled that *Jacobson* "d[id] not provide the best framework in which to evaluate the governor's executive orders" restricting First Amendment free exercise rights in response to COVID-19. Instead, the court applied the modern-day jurisprudence on free exercise rights as the proper framework for reviewing the orders' constitutionality. 2020 WL 1910021 at *6.

Defendants cite the opinion in *Gish v. Newsom* (C.D.Cal. April 23, 2020), case No. 5:20-cv-00755-JGBKK, in support of their claim to deference. Opp. at 2, 9-10. There, Judge Bernal applied the *Jacobson* approach to a challenge that COVID-19 restrictions on public gatherings, and in particular, for religious services, violated the right to freely exercise religion. *Id.* *4-5. However, this application of *Jacobson* was grounded on the premise that the executive officials "are entitled to substantial judicial deference and not subject to traditional constitutional scrutiny." *Id.* at *4. That premise is flawed for the reasons stated above. And, while this premise led

1    Judge Bernal to conclude that he "need not determine whether the Orders likewise

2    survive traditional constitutional analysis," he nevertheless went onto to do so, rather

3    extensively, before actually resolving the matter. *Id.* \*5-6.

4

5        Defendants also cite *In re Abbott*, 954 F.3d 772 (5th Cir. 2020), Opp. at 8-9,

6    where the Fifth Circuit found fault with the district court's issuance *in part* because

7    it had failed to give *any* consideration to *Jacobson*. But that case certainly doesn't

8    represent a wholesale adoption of *Jacobson* as the controlling framework to the

9    exclusion of the relevant modern constitutional analysis. Rather, the Fifth Circuit

10   faulted the district court on several grounds, including its more fundamental failure

11   to consider the essential *Casey* undue-burden test. *Abbott* at 790.

12

13       Both recent COVID-19 cases and the Supreme Court's long history of

14   jurisprudence since *Jacobson* roundly support Plaintiffs' position that *Jacobson* is,

15   at most, a general approach for the exercise of legislatively-supported acts of police

16   powers relating to public health that does not (and cannot reasonably be interpreted

17   to) *replace* the high court's jurisprudence on enumerated constitutional rights. Just

18   as we cannot "countenance …the notion that COVID-19 has somehow demoted *Roe*

19   and *Casey* to second-class rights, enforceable against only the most extreme and

20   outlandish violations," *Adams & Boyle*, 2020 WL 1982210 at \*10, we cannot

21   countenance a rule granting defendants the power to demote the fundamental rights

22   at stake here by suspending over a century of Supreme Court jurisprudence

1   inconvenient to their preferred policies.

**C.  Plaintiffs Demonstrate a Strong Likelihood of Success**

     **1.     Defendants' Orders Fail the Controlling *Heller* and Strict Scrutiny**

The question is not, as Defendants say, whether their policies and practices are "beyond all question, a plain, palpable invasion of rights secured by" inchoate notions of "fundamental law" untethered from the individual rights at stake. Opp. at 10. Defendants' call for deferential, rational basis-esque review is a clear invitation to error. Thankfully this isn't a close call, as *Heller* precludes such interest-balancing review. 554 U.S. 570, 628, n. 27; *id*. at 634. The Supreme Court has made clear the Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms as among those fundamental rights *necessary* (i.e., essential) to our system of ordered liberty, *McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010), and as a privilege and immunity of citizenship, *id*. at 805 (Thomas, J., concurring). Even under the Ninth Circuit's two-step test, when a regulation burdens Second Amendment rights, *Heller* requires it must reject rational basis review "and conclude that some sort of heightened scrutiny must apply." *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013) (citing *Heller*, 554 U.S. at 628, n. 27).

Defendants wish to evade scrutiny entirely, arguing their "Stay Well at Home Order" or "Order" (which they define globally to refer to all the orders issued from March 17th through April 20th, and, we must assume, their latest one on May 7th)

"does not implicate, let alone violate, an individual's right to bear arms [*sic*] under the Second Amendment," Opp. at 1, and, even if it were "implicated," any burden imposed is "incidental" or "very small" because their Order "does not limit or regulate the ability of persons to possess firearms or what they may do with those firearms in their homes," Opp. at 16, 18. That argument is shockingly disingenuous.

Defendants *repeatedly* concede that the Order *requires* the closure of all firearm and ammunition retailers throughout the county. Opp. at 1, 4, 14, 16, 20. They also readily concede, as the language of the April 20th Order provides, that firearm retailers are the *only* avenue for the average law-abiding citizen, like the Plaintiffs in this case, to lawfully acquire a firearm (and ammunition). *Id.* at 11 (citing April 20th Order, stating that all firearm "sales must be completed in-person"). The May 7th Order does nothing to change this blanket county-wide closure given that it tellingly adopts a three-generations-old version of the CISA guidelines, and that the order itself expressly permits the operation of only businesses whose primary services involve the sale of food, beverages, pet supplies, and household cleaning products dispensable "curbside." Reply, Ex. 2, §§ 8-9.

It cannot be questioned that Defendants' banning all firearm and ammunition transactions within the County on March 20th—completely, full stop—*does* burden the fundamental right to keep and bear arms. Defendants went out of their way to single out the right to keep and bear arms "for special—and specially unfavorable—

treatment," *McDonald*, 561 U.S. 742, 778-79, from the very first order to their recent repeal of the "special allowance" in the April 20th Order (good *only* for *firearms* transactions initiated *before* March 20th)—what Defendants said was "solicitous of plaintiffs' claimed Second Amendment rights," Opp. at 10, 11. But Plaintiff McDougall and all other similarly situated residents are now and once again burdened with the now-familiar county-wide total ban on all firearm and ammunition transactions. Defendants' policies and practices create the untenable situation of rendering it a crime for legally eligible, law-abiding individuals, like and including Plaintiff Garcia, who does not have a FSC or own an operable firearm, to lawfully acquire a firearm or ammunition anywhere in the County of Ventura.[1]

Defendants' infringements strike at the right *to keep*—this part notably omitted from their characterization of the right, Opp. at 1—*and bear* arms for self-defense "of hearth and home," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008). And "[s]elf-defense is a basic right," to be sure, "the *central component*" of the Second Amendment right, and "the need for defense of self, family, and property

---

[1] Defendants' further attempt to diminish the impact here by claiming it is no more burdensome than the usual delays people face, Opp. at 14, 17-18, is just absurd. First, the waiting period only applies to firearm transactions (not ammunition). Second, *because* a background check and waiting period are *already* imposed by the State, Defendants' criminalizing conduct required to even start the process—now for 7, and going on 8, consecutive orders—unquestionably imposes a significant and severe *additional burden* upon Plaintiffs' core constitutional right.

is most acute" in the home, *McDonald*, 561 U.S. at 767 (quoting *Heller*, 554 U.S. 570 at 571, 599)—where Defendants' own orders are requiring Plaintiffs McDougall, Garcia, and others like them to "shelter in place."

The right "to use arms for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 571, necessarily means that individuals must be able to purchase operable firearms as well as the ammunition necessary to *use* them, *Jackson v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) ("'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them'") (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)). It also extends to protect related conduct, including the right "to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592. All of these rights and protected conduct are *severely* burdened by Defendants' policies and practices that eliminate all law-abiding individuals' right and ability to acquire firearms and ammunition. The "plaintiffs are the 'law-abiding, responsible citizens' whose Second Amendment rights are entitled to full solicitude" under *Heller*. *United States v. Chovan*, 735 F.3d 1127 at 1138 (quoting favorably *Ezell*, *supra*, at 708).

Infringements of their right to keep and bear arms are categorically unconstitutional, but also "fail constitutional muster" "[u]nder any of the standards of scrutiny the Court has applied to enumerated constitutional rights." *Heller*, 554 U.S. at 571. And while Plaintiffs maintain that categorical (and not tiered) scrutiny

should be employed for Defendants' categorical ban, should the Court use tiered scrutiny, strict scrutiny is the most appropriate form given the severe burden Defendants have imposed. A "law that implicates the core of the Second Amendment right and severely burdens that right"—like defendants' policies and practices here—"warrants strict scrutiny." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th Cir. 2017) (quoting *United States v. Chovan*, 735 F.3d 1127 at 1138). Under Ninth Circuit precedent, intermediate scrutiny is only appropriate when, *unlike* here, the government action "does not implicate a core Second Amendment right, or does not place a substantial burden on the Second Amendment right," *Jackson*, 746 F.3d at 961). But Defendants' policies and practices fail intermediate scrutiny, too.

2.      **Defendants Fail to Show *Any* Tailoring of the Means to Their End**

Even intermediate scrutiny demands that the government bear the burden of proving less restrictive alternatives do not exist or would be inadequate. *Ashcroft v. ACLU*, 542 U.S. 656, 669 (2004). "It is not enough for the Government to show that [its chosen action] has some effect." *Id.* It must prove that any substantially less restrictive alternatives would be less effective or ineffective. *Id.* This same evidentiary burden must apply with equal force in Second Amendment cases, where equally fundamental rights are similarly at stake. *See e.g., Ezell*, 651 F.3d at 706–07 ("Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate, and on the strength of that suggestion, we and other circuits have already

– 19 –

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' REPLY TO
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
CASE NO. 2:20-cv-02927

1   begun to adapt First Amendment doctrine to the Second Amendment context")

2   (citing *Heller*, 554 U.S. at 582, 595, 635; *McDonald*, 130 S.Ct. at 3045).

3

4       Here, Defendants have made absolutely no effort to demonstrate they even

5   *considered* less restrictive alternatives, much less that any such alternatives would

6   be ineffective or inadequate. They fail to even *claim* any evidence *exists* that would

7

8   support this *total ban* as necessary, or even useful, in promoting the generic public

9   interest supposedly being pursued. Instead, they entirely bypass the topic, resting

10  their case chiefly on the notion that their orders are "presumptively lawful regulatory

11  measures" subject to virtually total deference under *Jacobson* or, alternatively, on

12

13  the notion that their orders are subject at most to intermediate scrutiny which is

14  equally satisfied because any burden is "very small." Defendants' claims are bunk.

15

16      Even under intermediate scrutiny, a court must ensure that "the means chosen

17  are not substantially broader than necessary to achieve the government's interest."

18

19  *Ward v. Rock Against Racism*, 491 U.S. 781, 800 (1989). Here too, Defendants make

20  no serious attempt to demonstrate any effort at such tailoring was ever made. This is

21

22  not surprising given that primary basis for Defendants' conclusory assertion that the

23  orders are "specific and tailored" to control the spread of COVID-19 is the set of

24

25  now-*repealed* orders containing the provisions about permissible "travel" and a

26  "special allowance" for certain firearms transactions, which Defendants claim had

27

28  the effect of reducing any constitutional burden to little or nothing. But regardless,

the fact remains that Defendants have failed demonstrate the necessary tailoring.

Defendants' attempt to counter Plaintiffs' right-to-travel claim fails, and hard, essentially for all the same reasons. The primary basis for Defendants' argument (that little to no burden exists) is language in the now-*repealed* April 20th Order providing that residents may "travel into or out of the County," travel while "engaged in interstate commerce," and do "pleasure driving." Opp. at 6. Defendants construe this language to mean residents are free to "leav[e] Ventura County to purchase a gun elsewhere," outside the County or the State, arguing *this language* negates any constitutional concerns regarding the right to travel. Opp. at 1, 11-12, 20-21. That(still-insufficient) language is now gone, and with it went Defendants' entire argument; the new May 7th Order specifically restricts residents' mobility, in declaring they "may leave" their homes *only* to perform one of the specifically-enumerated "essential activities." Reply, Ex. 2, § 11. Defendants have *repeatedly* argued firearm and ammunition businesses are *not necessary*, and that their operation would "undermine" the purposes of their orders. See Opp. at 1, 4, 14, 16, 20.

Defendants' orders are designed to and do keep people bound to their homes so as to preclude *any* travel—within the County, between counties, and outside the State—for purposes of acquiring firearms or ammunition. *See* Opp. at 20 ("The stated goal of the Stay Well at Home Order is to keep as many people in their homes as possible.") With *all* firearm and ammunition retailers forced closed by

Defendants, their further restriction compounds the severe burden upon the constitutional right to travel. Such burdens must also be assessed with strict scrutiny. *Walsh v. City and County of Honolulu*, 423 F.Supp.2d 1094, 1101 (D. Hawaii 2006) ("Where a state law sufficiently burdens the right to travel, the court applies a strict scrutiny analysis, requiring the law to be necessary to further a compelling state interest.") The government must bear the burden of proving less restrictive alternatives do not exist or would be inadequate. *Ashcroft*, 542 U.S. at 669. As with the burdens on the right to keep and bear arms, Defendants make no attempt at any such showing, or even that "the means chosen are not substantially broader than necessary," *Ward v. Rock Against Racism*, 491 U.S. at 800.

Defendants simply cannot support their orders, or carry their burden, under any form of real heightened scrutiny. There is no reason why less restrictive alternatives—like those used for retail settings Defendants consider "essential"— cannot be applied to firearm and ammunition retailers. Transactions for firearms and ammunition involves no discernably different or additional risks than those present in the many permissible transactions. Firearm and ammunition transfers can be conducted just as safely with the same basic protocols as with the purchase of food and household supplies. In fact, unlike in other settings Defendants have and continue to allow to operate—like grocery and hardware stores, where the products are on shelves and open to anyone's touch at any time—the primary inventory kept

in firearm retailers (i.e., firearms and ammunition) is required to be kept under strict, limited-access controls that inherently minimize customer contact with the products.

By closing off all sales of and access to firearms and ammunition—especially given the lack of any need to do so in pursuit of their stated goals—Defendants have made an impermissible and unconstitutional policy choice. *See Heller*, 554 U.S. at 636 ("the enshrinement of constitutional rights necessarily takes certain policy choices off the table").

**D. The Public Interests and Balance of Equities All Lean in Plaintiff's Favor**

"[I]t is always in the public interest to prevent violation of a party's constitutional rights," *Adams & Boyle, P.C.*, 2020 WL 1982210 at *12, just as "[t]he public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens," *Duncan v. Becerra*, 265 F.Supp.3d 1106, 1136 (S.D. Cal. 2017), *aff'd*, 742 F. App'x 218 (9th Cir. 2018). Defendants' only argument is another of their conclusory assertions, that "there is no constitutional violation, and thus no irreparable harm," based on their same terminally ill analysis—again, with not one iota of proof as to why this is supposedly the case. Opp. at 22.

It's the essentially the same with Defendants' "balance of equities" argument: they portend "dire" consequences to the public health should firearm and ammunition sales be allowed to ensue. Opp. at 22. Why? Again, no one knows, and defendants don't (or won't) say. The only novel thing Defendants otherwise do here

is butcher and misapply *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008). In *Winter*, the Supreme Court undid a preliminary injunction against the Navy's submarine warfare training practices based on the balance of equities. Opp. at 23-24. In that very different case, "[f]or the plaintiffs [a group of marine mammal researchers], the most serious possible injury would be harm to an unknown number of the marine mammals that they study and observe." *Winter*, at p. 26. "In contrast, forcing the Navy to deploy an inadequately trained antisubmarine force jeopardizes the safety of the fleet." *Id.* The harm to Plaintiffs here is not imaginary; it is real, substantial, and heavily outweighs Defendants' entirely *unsubstantiated* claims.

"Any government that has made the grave decision to suspend the liberties of a free people during a health emergency should welcome the opportunity to demonstrate—both to its citizens and to the courts—that its chosen measures are absolutely necessary to combat a threat of overwhelming severity." *In re Salon A La Mode*, __ S.W.3d ___, 2020 WL 2125844 (Tex. May 5, 2020). "The government should also be expected to demonstrate that less restrictive measures cannot adequately address the threat." *Id.* None of that has been offered here. Notably, Massachusetts' failure to make such a showing in support of its governor's similar COVID-19 order, halting firearms and ammunition retail transactions statewide, led to a preliminary injunction against that order just a few days ago. *McCarthy v. Gov. Baker*, D. Mass. No. 1:20-cv-10701-DPW, 2020 WL 2297278.

Constitutional rights "are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures"—or public health officials, or counties, or county sheriffs—"or (yes) even future judges think that scope too broad." *Heller*, 554 U.S. 570, 634-35. Indeed, the Second Amendment elevates "above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id*. Defendants' remarkably weak and disingenuous arguments in favor of their continuing enforcement of unconstitutional policies ultimately just bolster the case for the necessary and proper injunctive relief Plaintiffs were forced to seek here. "Keeping vigilant is necessary in both bad times and good, for if we let these rights lapse in the good times, they might never be recovered in time to resist the next appearance of criminals, terrorists, or tyrants." *Rhode v. Becerra*, 2020 U.S. Dist. LEXIS 71893 at *107. That vigilance requires restoring the status quo ante pending a decision on the merits in this case. For these reasons, and those set forth in their operative complaint and moving papers, Plaintiffs respectfully request this Court issue a preliminary injunction.

Dated: May 12, 2020

/s/ *Ronda Baldwin-Kennedy*
Ronda Baldwin-Kennedy

/s/ *Raymond DiGuiseppe*
Raymond DiGuiseppe

Attorneys for Plaintiffs