1  LEROY SMITH, State Bar No. 107702
   County Counsel, County of Ventura
2  CHARMAINE H. BUEHENER, State Bar No. 220868
   Assistant County Counsel
3  800 South Victoria Avenue, L/C #1830
   Ventura, California 93009
4  Telephone:  (805) 654-2588
   Facsimile:  (805) 654-2185
5  E-mail:      charmaine.buehner@ventura.org

6  Attorneys for Defendants County of Ventura
   (also erroneously sued as Ventura County Public
7  Health Care Agency), Sheriff William Ayub
   (erroneously sued as "Bill Ayub"), Robert Levin
8  and William T. Foley

9

10                  UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12

13  DONALD MCDOUGALL, an            )  No. 2:20 cv-02927 CBM(ASX)
    individual; JULIANA GARCIA, an   )
14  individual; SECOND AMENDMENT     )  DEFENDANTS' NOTICE OF
    FOUNDATION; CALIFORNIA           )  MOTION AND MOTION TO
15  GUN RIGHTS FOUNDATION; and       )  DISMISS FIRST AMENDED
    FIREARMS POLICY COALITION,       )  COMPLAINT
16  INC.,                            )
                                     )  Date:  June 30, 2020
17              Plaintiffs,          )  Time: 10:00 a.m.
                                     )  Ctrm:  8b
18       vs.                         )  Judge: Hon. Consuelo B. Marshall
                                     )
19  COUNTY OF VENTURA,               )
    CALIFORNIA; BILL AYUB, in his    )  Trial:              Not Set
20  official capacity; WILLIAM T.    )  Complaint Filed:   March 28, 2020
    FOLEY, in his official capacity, )
21  ROBERT LEVIN, in his official    )
    capacity; and VENTURA COUNTY     )
22  PUBLIC HEALTH CARE AGENCY,       )
                                     )
23             Defendants.           )
                                     )
24

25

26

27

28

**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at the above-noted date and time, or as soon thereafter as the matter may be heard in Courtroom 8B, located at 350 West 1st Street, Los Angeles, California, defendants County of Ventura ("County"), County Sheriff William Ayub, Dr. Robert Levin, and William T. Foley (collectively "Defendants") will move, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of the first amended complaint ("FAC") filed by plaintiffs Donald McDougall, Juliana Garcia, Second Amendment Foundation, California Gun Rights Foundation and Firearms Policy Coalition, Inc.  The motion will be made on the grounds that the FAC fails to allege sufficient facts to state any cognizable legal claim.

The County's motion is based on this notice of motion and motion, the attached memorandum of points and authorities, the supporting declaration of Charmaine H. Buehner, and all exhibits attached thereto, the request for judicial notice, the pleadings and papers on file herein, and upon such other matters as may be presented to the court at the time of the hearing.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place by telephone on April 30, 2020, and follow-up communication, which took place on May 21 and 26, 2020.  (Declaration of Charmaine Buehner, ¶ 2.)

LEROY SMITH
County Counsel, County of Ventura

Dated:__ June 2, 2020 __   By_____/s/_____
CHARMAINE H. BUEHNER
Assistant County Counsel

Attorneys for Defendants County of Ventura (also erroneously sued as Ventura County Public Health Care Agency), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin and William T. Foley

i

# TABLE OF CONTENTS

Page

I     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II    RELEVANT BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     A.    The COVID-19 Pandemic . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

     B.    The County and State Issued Emergency, Temporary and Specific Orders to Slow the Spread of COVID-19 . . . . . . . . . . . . . . . 2

     C.    On May 7, the County Repealed the Stay at Home Order to Align with the State's Shelter-in-Place Order and Plan to Reopen the State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     D.    Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

     A.    Legal Standard for Motion to Dismiss . . . . . . . . . . . . . . . . . . . . 10

     B.    The FAC Is Entirely Mooted by the May 7 Order . . . . . . . . . . . . . 10

     C.    The Stay Well at Home Order Is a Valid Exercise of the Health Officer's Power Entitled to Minimal Scrutiny and Judicial Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

     D.    The Stay Well at Home Order Did Not Violate the Second Amendment under Traditional Scrutiny . . . . . . . . . . . . . . . . . . . . . 16

         1. The Stay Well at Home Order Did Not Impinge on the Second Amendment as It Was Historically Understood . . . . . . . . . . 16

         2. The Stay At Home Order Was a Presumptively Lawful Regulation of General Applicability that Did Not Infringe the Ability to Possess or Use, and only Incidentally Delayed the Purchase of, Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

         3. The Stay Well at Home Order Did Not Substantially Burden Second Amendment Rights and Was Substantially Related to Mitigating the Public Health Crisis Presented by COVID-19. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

            a. The Order Withstands Immediate Scrutiny . . . . . . . . . . . 20

            b. Preventing the Spread of COVID-19 Is a Compelling Government Interest and the Closure of Non-Essential Businesses, Including Gun Stores, Is Reasonably Suited to Achieve that Objective . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     E.    Plaintiffs' Right-to-Travel Claim Fails . . . . . . . . . . . . . . . . . . . . . 23

IV   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ii

# TABLE OF AUTHORITIES

**Page**

## FEDERAL STATUTES

*American Cas. Co. of Reading, Penn. v. Baker* (9th Cir. 1994)
  22 F.3d 880 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ashcroft v. Iqbal* (2009)
  556 U.S. 662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Bateman v. Perdue* (E.D.N.C. 2012)
  881 F.Supp.2d 709 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bell Atlantic Corp. v. Twombly* (2007)
  550 U.S. 544 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Brandy v. Villanueva* (C.D.Cal. 2020)
  Case No. 2:20-cv-02874-AB-SK . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Camara v. Municipal Court of City and County of
  San Francisco* (1967)
  387 U.S. 523 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Compagnie Francaise de Navigation a Vapeur v. Louisiana
  State Board of Health* (1902)
  186 U.S. 380 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Comparing Community Hospital v. Maricopa County* (1974)
  415 U.S. 250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*District of Columbia v. Heller* (2008)
  554 U.S. 570 . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 18, 19, 20

*Francisco* (9th Cir. 2014)
  746 F.3d 953 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 22

*Fyock v. Sunnyvale* (9th Cir. 2015)
  779 F.3d 991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Garcia v. San Antonio Metropolitan Transit Authority* (1985)
  469 U.S. 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*Gish v. Newsom* (C.D.Cal. April 23, 2020)
  WL 2687079, Case No. 5:20-cv-00755-JGB-KK . . . . . . . . . . . 2, 11, 12, 13

*In re Abbott* (5th Cir. 2020)
  2020 WL 1685929 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*Jacobson v. Massachusetts* (1905)
  197 U.S. 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11, 12

*Johnson v. City of Cincinnati* (6th Cir. 2002)
  310 F.3d 484 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kansas v. Hendricks* (1997)
  521 U.S. 346 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

iii

# TABLE OF AUTHORITIES

**Page**

*Lutz v. City of York, PA* (3d Cir. 1990)
  899 F.2d 255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Marilley v. Bonham* (9th Cir. 1996)
  844 F.3d 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Marilley v. Bonham* (9th Cir. 1996)
  844 F.3d 841 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Marshall v. United States* (1974)
  414 U.S. 417 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 12

*McDonald v. City of Chicago, Ill.* (2010)
  561 U.S. 742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*New York State Rifle & Pistol Association, Inc. v. City
  of New York, New York* (April 27, 2020)
  ___ U.S. ___ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*North American Cold Storage Co. v. City of Chicago* (1908)
  211 U.S. 306 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Nunez v. City of San Diego* (9th Cir. 1997)
  114 F.3d 935 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Peruta v. California* (1995)
  ___ U.S. ___ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Peruta v. County of San Diego* (9th Cir. 2016)
  824 F.3d 919 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Prince v. Massachusetts* (1944)
  321 U.S. 158 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Saenz v. Roe* (1999)
  526 U.S. 489 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23

*Silvester v. Harris* (9th Cir. 2016)
  843 F.3d 816 . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19, 20, 21, 22, 23

*South Bay United Pentecostal v. Newsom* (9th Cir. 2020)
  Case No. 20-55533 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

*Sprewell v. Golden State Warriors* (9th Cir. 2001)
  266 F.3d 979 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Teixiera v. County of Alameda* (9th Cir. 2017)
  873 F.3d 670 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Terminiello v. City of Chicago* (1949)
  337 U.S. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

# TABLE OF AUTHORITIES

**Page**

*U.S. v. Carpio-Leon* (4th Cir. 2012)
 701 F.3d 974 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*U.S. v. Chovan* (9th Cir. 2013)
 735 F.3d 1127 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*U.S. v. Huitron-Guizar* (10th Cir. 2012)
 678 F.3d 1164 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United Bldg. and Constr. Trades Council v. Camden* (1984)
 465 U.S. 208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Lopez* (1995)
 514 U.S. 549 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Sears* (C.D. Cal. April 16, 2015)
 2015 WL 13359437 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

*United States v. Torres* (9th Cir. 2019)
 911 F.3d 1253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Winter v. Natural Resources* (2008)
 555 U.S. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

## STATE CASES

*Ex parte Daniels* (1920)
 183 Cal. 636 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Sherwin-Williams Co. v. City of Los Angeles* (1993)
 4 Cal.4th 893 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 16

## FEDERAL STATUTES

Code of Federal Regulations

 tit. 39, § 390.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

National Firearms Act

 26 U.S.C., §§ 5801-5872 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

United States Code

 tit. 18, § 922 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
 tit. 18, § 923 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
 tit. 18, § 931 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Page**

## STATE STATUTES

California Code of Regulations

    tit. 7, § 2500 et. seq.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

California Government Code

    § 8558. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

California Health & Safety Code

    § 101040. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    § 101080. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    § 101085. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    § 120175. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

California Penal Code

    § 26815. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    §§ 26850-26860 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    § 27535. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    § 27540. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
    § 28220, subd. (f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# I

# INTRODUCTION

The Ventura County Health Officer, defendant Robert Levin, M.D. ("Health Officer"), issued a series of temporary, specific and emergency "Stay Well at Home" orders, on March 17, 20, and 31, 2020, and April 9, 18 and 20, 2020 (collectively, "Stay Well at Home Order" or "Order"), to slow the spread of the COVID-19 pandemic.[1]  The Order, which the Health Officer carefully monitored and amended to preserve the health and safety of persons within Ventura County, required the closure of any business the Health Officer deemed non-essential effective March 20, including gun stores, because such businesses did not support the ability of people to remain sheltered in their homes to the maximum extent possible.  The Order did not prohibit a person from traveling into and out of Ventura County to purchase a firearm, or for any other purpose.  Once the Health Officer determined there was no longer a need for local orders more restrictive than those imposed by the State of California, the Order was repealed.  Thus, effective May 7, firearm stores within Ventura County may be fully re-open.

The First Amended Complaint ("FAC") should be dismissed.  First, claims that the Order violated the right to bear arms under the Second Amendment and right to travel as guaranteed by the Privileges and Immunities Clause at article IV, section 2 ("P & I Clause") of the U.S. Constitution are moot.  Second, even if not moot, the Order passes constitutional muster under the framework first advanced in *Jacobson v. Commonwealth of Massachusetts* (1905) 197 U.S. 11 ("*Jacobson*") and cited by the Supreme Court as recently as May 29.  Third, as this court recognized in denying two prior requests for a temporary restraining order, the Order did not implicate nor violate an individual's right to bear arms.  Similarly, based on its plain language, the Order did not implicate an individual's right to travel.  Thus, the Order was also lawful under traditional constitutional review.

---

[1] All further dates are in 2020, unless otherwise indicated.

1

## II

## RELEVANT BACKGROUND

### A.    The COVID-19 Pandemic

COVID-19 is a global pandemic and "novel severe acute respiratory illness that has killed thousands of people in California and more than 100,000 nationwide."  (Request for Judicial Notice ("RJN"), Exhs. 1[2/] & 2.)  From early March through May 31, there have been 110,583 confirmed cases and 4,213 deaths in California attributable to COVID-19, with 1,116 cases and 33 deaths occurring within Ventura County.  (RJN, Exh. 3.)  The virus spreads easily and sustainably through respiratory droplets produced when an infected person coughs or sneezes, through person-to-person contact, and from surfaces that can remain infectious for several days.  (RJN, Exhs. 4[3/], 5 & 6.)  The incubation period for COVID-19 is anywhere from two days to 13 days, during which time "people may be asymptomatic, . . . [and] unwittingly infect others."  (RJN, Exhs. 1 & 7.)  "At this time, there is no known cure, no effective treatment, and no vaccine."  (RJN, Exhs. 1 & 8.)  "Without a vaccine, measures limiting physical contact between citizens . . .  are widely recognized as the only way to effectively slow the spread of the virus."  (RJN, Exhs. 4, 7 & 8.)

### B.    The County and State Issued Emergency, Temporary and Specific Orders to Slow the Spread of COVID-19

On March 4, citing an increasing number of confirmed COVID-19 cases in the United States and worldwide, Governor Gavin Newsom declared that a state of emergency existed in the State of California.  (RJN, Exh. 9.)  On March 12, based

/ / /

---

[2/] *South Bay United Pentecostal v. Newsom* (May 29, 2020) 590 U.S. ____, Case No. 19A1044 ("*South Bay United*").

[3/] *Gish v. Newsom* (C.D.Cal. April 23, 2020) Case No. 5:20-cv-00755-JGB-KK, ECF 51, pg. ID 1021 ("*Gish*").

2

1  on the confirmation of COVID-19 cases in Ventura County, the Health Officer

2  declared that a local health emergency existed in Ventura County.  (RJN, Exh. 10.)

3     On March 17, the Health Officer issued a local order that required persons

4  living, working and doing business in Ventura County to take a number of

5  precautions to prevent or slow the spread of the disease ("March 17 Order").

6  Among other provisions, the March 17 Order required the immediate closure of

7  businesses that present a higher risk of transmitting COVID-19 among the public,

8  such as bars, nightclubs, movie theaters, gyms, and restaurants except for take-out

9  and delivery.  (RJN, Exh. 11, ¶¶ 2-3.)  On March 19, Governor Newsom issued

10  Executive Order N-33-20, which required all persons living in California to stay at

11  their places of residence except as needed to maintain continuity of operations in

12  "critical infrastructure sectors" specified by the state health officer.  (RJN, Exh. 12

13  ("State Shelter-in-Place Order").)[4/]

14     On March 20, March 31 and April 9, the Health Officer issued supplemental

15  orders that imposed local requirements more restrictive than the State Shelter-in-

16  Place Order tailored to Ventura County public health needs.  (RJN, Exhs. 17, 18 &

17

---

18    [4/] The State Shelter-in-Place Order defines "critical infrastructure sectors"

19  consistent with the "March 19, 2020, Memorandum on Identification of Critical

Infrastructure Workers During COVID-19 Response" published by the United

20  States Department of Homeland Security's Cybersecurity and Infrastructure

Security Agency ("CISA").  (RJN, Exh. 13 ("March 19 CISA Memo").)  The

21  March 19 CISA Memo does not identify retail gun stores as a component of

critical infrastructure.  On March 22, the state health officer issued a list of

22  "Essential Critical Infrastructure Workers."  (RJN, Exh. 14.)  On March 25, in

response to inconsistent local views as to whether gun stores must remain open as

23  an "essential business" under his order, Governor Newsom expressly deferred to

local jurisdictions to make the determination.  (RJN, Exh. 15.)  On March 28,

24  CISA issued an additional "Advisory Memorandum on Identification of Essential

Critical Infrastructure Workers During COVID-19 Response" ("Revised CISA

25  Memo"), which included "the operation of firearm or ammunition product

manufacturers, retailers, importers, distributors, and shooting ranges" as a

26  component of critical infrastructure.  The Revised CISA Memo expressly declared

that it is "*not, nor should it be considered, a federal directive or standard. . . .

27  Individual jurisdictions should add or subtract essential workforce categories

based on their own requirements and discretion*."  (RJN, Exh. 16, Revised CISA

28  Memo (March 28, 2020), italics added.)  Governor Newsom has not revised

Executive Order N-33-20 or issued a new executive order to incorporate the

Revised CISA Memo and its inclusion of gun retailers.

---

19 ("Further Orders").)  The Further Orders sought to slow the spread of
COVID-19 by ensuring, among other things, that all persons living in Ventura
County stay at their places of residence, except for the purpose of engaging in
essential activities, engaging in essential travel, and working at essential
businesses.  The Further Orders defined "Essential Travel," in part, as that which
is undertaken to engage "in interstate commerce and otherwise subject to the
provisions of the Commerce Clause of the United States Constitution."  (RJN,
Exh. 17, p. 6, ¶ 7(g)(vii).)  The Further Orders prohibited public or private
gatherings, prohibited non-essential travel, required the closure of "non-essential"
businesses, and mandated social distancing protocols for the operation of essential
businesses and for persons engaging in essential activities.  (RJN, Exhs. 17.)
Under the Further Orders, "essential businesses" included those deemed "critical
infrastructure" by the State Shelter-in-Place Order, but excluded businesses that
were not necessary to stop the spread of COVID-19 or that did not enable persons
to shelter at home.  Non-essential businesses, including firearm stores, were
ordered to close effective March 20.  The Further Orders were set to expire on
April 19.  (RJN, Exhs. 17.)

On April 20, based on a determination that COVID-19 continued to present
an imminent and continuing threat to Ventura County, the Health Officer issued a
new Stay Well at Home Order.  The April 20 Order superseded all prior orders and
broadly applied to "all persons in the cities and unincorporated area of Ventura
County" without regard to a person's state residency ("April 20 Order").  (RJN,
Exh. 20, pp. 1 & 2, ¶ 2.)  All provisions of the April 20 Order were "interpreted to
effectuate" the intent and purpose of the Order:  "to cause persons to stay at their
places of residence to the maximum extent feasible with the minimum disruption
to their social, emotional and economic well-being consistent with the overarching
goal of eliminating the COVID-19 pandemic."  (RJN, Exh. 20, p. 2, ¶ 1.)  As with
the prior orders, the April 20 Order stated that the Health Officer "will continue to

4

1  assess the quickly evolving situation [and] may issue additional orders related to

2  COVID-19. . . ."  (RJN, Exh. 20, p. 20, ¶ 23.)

3      The April 20 Order was, in some respects, less restrictive than the prior

4  orders.  For example, while "non-essential businesses" were still ordered closed,

5  certain businesses that fell outside of the Stay Well at Home Order's definition of

6  essential businesses within the state health officer's list of essential critical

7  infrastructure were authorized to operate to the extent they could operate in a

8  manner that minimized the risk of spreading COVID-19, i.e., such businesses were

9  required to be closed to the public, operate with a limited number of employees

10 who follow strict social distancing guidelines, and deliver to the purchaser any

11 goods to be sold.  (RJN, Exh. 20, pp. 3-4, ¶ 7.)  While firearm stores could not

12 operate under such constraints while complying with state gun store laws,[5/] the

13 April 20 Order made a "[s]pecial allowance for completion of firearm sales:"

14     "Under California law persons wishing to purchase a

15     firearm must complete a background check and waiting

16     period, and all sales must be completed in-person.  It is

17     not feasible, therefore, for the Health Officer to require

18     that firearm sales be conducted on-line only.  To

19     accommodate persons who initiated the purchase of a

20     firearm at a store located within the County before

21     March 20 . . . , firearm purchasers may engage in the

22     actions necessary to complete firearm purchases initiated

23     before March 20, 2020, provided that:  [¶] a. All

24     activities, including the transfer of possession of any

25     firearm, occur by appointment only, and only the

26     purchaser and one person of behalf of the store shall be

27 _____

28     [5/] See e.g., Penal Code sections 26850-26860 (requiring prospective
   purchasers of firearms must perform a "safe handling demonstration" of proper
   loading and unloading techniques using readily identifiable dummy rounds).

5

present; [¶] b. The firearm store shall remain closed to

the general public; and [¶] c. Social Distancing

Requirements shall be followed to the greatest extent

feasible."  (RJN, Exh. 20, p. 7, ¶ 11.)

The April 20 Order prohibited "Non-Essential Travel" within Ventura County but *expressly* "allow[ed] travel into or out of the County."  (RJN, Exh. 20, p. 3, ¶ 6.)  And, like the Further Orders, the April 20 Order expressly provided that "Essential Travel" included "[t]ravel engaged in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution" and "[t]ravel to return to a place of residence from outside the County."  (RJN, Exh. 17, p. 6, ¶ 7(g)(iv) & (vii), & Exh. 20, p. 18, ¶ 17g(iv) & (vii).)  Within Ventura County, the April 20 Order expressly permitted "Essential Activities" so long as social distancing was practiced, including "pleasure driving."  (RJN, Exh. 20, p. 11, ¶ 17(a)(vi).)  The April 20 Order was set to expire on May 15.  (RJN, Exh. 20.)

**C.    On May 7, the County Repealed the Stay at Home Order to Align with the State's Shelter-in-Place Order and Plan to Reopen the State**

In early May, the Governor and state public health officer cautioned that there was a continuing threat of COVID-19, but recognized there had been significant progress, based on in statewide COVID-19 data, on mitigation efforts, the stabilization of new infections and hospitalizations, and an improved ability to test, contact trace, and support infected individuals.  This progress supported the "gradual movement" toward reopening the state while following the State Shelter-in-Place Order in according with a four-phase plan known as the "Pandemic Roadmap."  (RJN, Exhs. 12, 21, & 22, pp. 1-2 [collectively referred to as the "State Order"].)  The State Order allows for variation in the speed at which local jurisdictions can progress through phases of reopening, and does not restrict local health officers from enacting more stringent measures to the extent local

6

conditions warrant them.  (RJN, Exhs. 21 & 22, pp. 1-2, ¶¶ 1-2).)  The State Order also authorizes Californians to leave their homes to engage in permissible activities and patronize businesses as they reopen.  (RJN, Exh. 22, p. 2, ¶ 3.)

On May 7, the Health Officer issued a new order after determining that "there no longer exists a need for local health orders that are more restrictive than the State Order with respect to many individual and business activities," and that "public health and welfare would be best served by a single set of regulations where reasonable to avoid public confusion between State and local orders." (RJN, Exh. 23; ECF Pg. ID 718, 721-22 ("May 7 Order").)  The May 7 Order repealed the previous Stay At Home Order in favor of aligning with the State Order.  Since May 7, the Health Officer has continued to ease local restrictions in favor of aligning with the State Order, by orders issued on May 12, 20, 22 and 29. (RJN, Exhs. 25-27 (collectively "Local Reopen Order").)  Because neither the State Order nor the Local Reopen Order mentions guns, the Health Officer published a "Frequently Asked Questions" guide to address the issue:

> "With the elimination of the essential business model in the local health order, and reliance on the State health order model for critical infrastructure, the Sheriff and local health officer have determined that the [*sic*] gun stores may fully open to the public provided they implement and register site-specific prevention plans as described www.vcreopens.com."  (RJN, Exh. 24.)

The Local Reopen Order aligns also with the State Order's allowance "for persons to leave their places of residence to engage in essential activities."  (RJN, Exh. 23, pp. 5-8, ¶ 11(a)(2) & (a)(7); see also Exh. 27, ¶ 5(a)(2) & (a)(7).)  Thus, since May 7, firearms stores have been able to fully reopen and persons desiring to engage in firearm transactions have not been restricted from doing so within the County.

DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

### D.   <u>Procedural History</u>

Plaintiff Donald McDougall filed the original complaint in this action on March 28, alleging that the then-operative Stay Well at Home Order prevented him from taking possession of his previously purchased firearm in violation of the Second Amendment.  (ECF 1, pg. ID 5, ¶¶ 31-33.)  McDougall sought a temporary restraining order ("TRO") to enjoin the County from "ordering gun stores closed" under the then-operative Stay Well at Home Order.  (ECF 9, pg. ID 31.)  This court denied the TRO.  (ECF 12.)  This court found that the Stay Well at Home Order survived intermediate scrutiny given that the Order was temporary, did not target handgun ownership, did not prohibit the ownership of a handgun outright, and because of the "compelling" government interest in preventing the spread of COVID-19.  (ECF Doc. No. 12, pg. ID 51.)

On April 14, McDougall filed the FAC, restating his allegations, and adding four co-plaintiffs:  Juliana Garcia, the Second Amendment Foundation, California Gun Rights Foundation and Firearms Policy Coalition, Inc.  The FAC reasserts McDougall's Second Amendment claim and adds a claim that the then-operative Stay Well at Home Order violated the right to travel under the P & I Clause and the due process clauses of the Fifth and Fourteenth Amendments.  (ECF 19.)  The FAC seeks declaratory relief, injunctive relief, and nominal damages.  (ECF 19, pg. ID 96-97.)

On April 21, plaintiffs served the FAC on defendants County of Ventura, the Health Officer, William Ayub, the County Sheriff, and William T. Foley, the director of the County Health Care Agency, together with a motion for a preliminary injunction, set for hearing on May 19 ("MPI").  (ECF 25, 28.)  Plaintiffs sought to enjoin defendants from "closing or compelling the closure of retail firearm and ammunition businesses on the grounds that they are 'non-essential businesses' and preventing individuals from traveling outside the County

/ / /

1  to obtain firearms and ammunition under" the Stay Well at Home Order.  (ECF 27,

2  Pg. ID 203.)

3      On April 24, plaintiffs filed a second TRO application, which this court also

4  denied.  (ECF 27, 29 & 30.)  With respect to the merits of plaintiffs' "right to

5  travel" claim under the P & I Clause, the court indicated that resolution of that

6  claim would be decided with reference to whether the "Non-Essential Travel"

7  provisions in the Order:  1) apply to plaintiffs; and 2) violate the right to travel

8  given the exemption for interstate commerce that implicates the Commerce Clause

9  of the United States Constitution.  (ECF 30, pg. ID 445.)  As explained below, the

10  Non-Essential Travel provisions, set forth in the April 20 Order at paragraphs 6

11  and 17(g) and in the March 20 Order at paragraphs 6 and 7(g), did not prohibit the

12  travel plaintiffs proposed, nor did these provisions otherwise violate plaintiffs'

13  constitutional right to travel.  (RJN, Exh. 17, p. 2, ¶ 6 & p. 6, ¶ 17(g)(vii); Exh. 15,

14  p. 3, ¶ 6 & p. 18, ¶ 17(g)(vii).)  Plaintiffs, no longer restricted from engaging in

15  firearms transactions as of May 7, withdrew their MPI the day before the motion

16  was set to be heard.  (ECF 40.)

17      On May 22, the Ninth Circuit Court of Appeals declined to enjoin

18  enforcement of the State Order, finding the order's restrictions on the number of

19  persons who could attend in-person religious services was not inconsistent with

20  the First Amendment.  (RJN, Exh. 28.[6/])  The Ninth Circuit reasoned that the

21  State's efforts to fight the pandemic required the court to "'temper its doctrinaire

22  logic with a little practical wisdom [or else] it will convert the constitutional Bill

23  of Rights into a suicide pact.'"  (*Ibid*.)  On May 29, the United States Supreme

24  Court denied an application for injunctive relief effectively affirming the Ninth

25  Circuit's decision.  (RJN, Exh. 1.)  In doing so, according to Chief Justice Roberts,

26

27      [6/] *South Bay United, supra,* 2020 WL 2687079, Case No. 20-55533 at *1, quoting
*Terminiello v. City of Chicago* (1949) 337 U.S. 1, 37 [69 S.Ct. 894] (Jackson, J.,
28  dissenting), *aff'd* ____ (2020) 590 U.S. _____, Case No. 19A1044.

9

1  the Supreme Court declined to engage in "judicial second-guessing" into "areas

2  fraught with medical and scientific uncertainties" noting that the "Constitution

3  principally entrusts '[t]he safety and health of the people' to the . . . states 'to

4  guard and protect.'"   (RJN, 1.[7/])

5                                   **III**

6                               **ARGUMENT**

7  **A.    Legal Standard for Motion to Dismiss**

8          The FAC must state facts sufficient to show that a claim for relief is plausible on

9  its face.  (*Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 570 [127 S.Ct. 1955].)

10  Facts that are "merely consistent with" the County's potential liability fall short of

11  establishing plausibility and entitlement to relief.  (*Ashcroft v. Iqbal* (2009) 556 U.S. 662,

12  678 [129 S.Ct. 1937].)  The court need not "accept as true allegations that contradict

13  matters properly subject to judicial notice or by exhibit.  Nor is the court required to

14  accept as true allegations that are merely conclusory, unwarranted deductions of fact, or

15  unreasonable inferences."  (*Sprewell v. Golden State Warriors* (9th Cir. 2001) 266 F.3d

16  979, 988.)

17  **B.    The FAC Is Entirely Mooted by the May 7 Order**

18          Effective May 7, the Health Officer no longer prohibits firearm stores from

19  opening, and no longer restricts intra-county firearms transactions.  (RJN, Exh.

20  23.)  On April 20, the Stay At Home Order was amended to expressly allow gun

21  purchasers such as plaintiff McDougall to complete the purchases of firearms.

22  These actions mooted plaintiffs' claims.  "A case becomes moot when interim

23  relief or events have deprived the court of the ability to redress the party's

24  injuries." (*American Cas. Co. of Reading, Penn. v. Baker* (9th Cir. 1994) 22 F.3d

25  880, 896; see also *New York State Rifle & Pistol Association, Inc. v. City of New*

26

27          [7/] *South Bay United, supra*, 590 U.S. ____, p. 1, quoting *Jacobson v.*
28  *Massachusetts* (1905) 197 U.S. 11, 38 [25 S.Ct. 358] ("*Jacobson*"), *Marshall v.*
    *United States* (1974) 414 U.S. 417, 427 [94 S.Ct. 700], and *Garcia v. San Antonio*
    *Metropolitan Transit Authority* (1985) 469 U.S. 528, 545 [105 S.Ct. 1005].

                                         10

1   *York, New York* (April 27, 2020) __ U.S. __ [140 S.Ct. 1525] [amendments to

2   New York statute mooted plaintiffs' claims].)  Here, even if plaintiffs had stated

3   claims for relief, the court can no longer redress the claimed injuries.

4       To the extent plaintiffs complain their ability to purchase firearms or to

5   travel to purchase firearms continues to be restricted under the Local Reopen

6   Order, their complaint is not with defendants because the Local Reopen Order

7   merely aligns with the State Order.  The law is well settled that the County cannot

8   enact requirements inconsistent with state law.  (*Sherwin-Williams Co. v. City of*

9   *Los Angeles* (1993) 4 Cal.4th 893, 898 [local government cannot enact rules that

10  conflict with state law], citing *Ex parte Daniels* (1920) 183 Cal. 636, 641-648,

11  [finding impermissible contradiction with state law where local legislation

12  purported to fix a lower maximum speed limit for motor vehicles than that which

13  state law fixed].)  The court should dismiss the FAC.

14  **C.   The Stay Well at Home Order Is a Valid Exercise of the Health**

15  **Officer's Power Entitled to Minimal Scrutiny and Judicial Deference**

16      On May 29, the United States Supreme Court recognized that the

17  Constitution "principally entrusts '[t]he safety and health of the people' to the

18  politically accountable officials of the States 'to guard and protect.'"  (*South Bay*

19  *United*, *supra*, 590 U.S. _____ , p. 1, quoting *Jacobson, supra*, 197 U.S. at p. 38.[8/])

20  The court noted that the latitude given to local officials when they "'undertake[] to

21  act in areas fraught with medical and scientific uncertainties'" is "'especially

22  broad,'" and that the unelected judiciary "lacks the background, competence, and

23  expertise to assess public health" to engage in "second-guessing" "[w]here the

24

---

25      [8/] *Jacobson* has been widely cited by federal courts as the framework by
        which constitutional claims challenging emergency health orders should be
26      analyzed during the current pandemic.  (See *Kansas v. Hendricks* (1997) 521 U.S.
        346, 356 [117 S.Ct. 2072] [recognizing that individual's constitutionally protected
27      interest in avoiding physical restraint may be overridden in civil context], citing
        *Jacobson, supra*, 197 U.S. at p. 26; *In re Abbott* (5th Cir. April 7, 2020) 2020 WL
28      1685929 at * 7; *In re Rutledge* (8th Cir. April 22, 2010) 2020 WL 1933122; see
        also *Gish, supra*, Case No. 5:20-cv-00755-JGB-KK, ECF 51, pg. ID 1022.)

---

broad limits" of the local official's authority is not exceeded.  (*South Bay United, supra*, 197 U.S. at p. 2, quoting *Marshall v. United States* (1974) 414 U.S. 417, 427 [94 S.Ct. 700], and *Garcia v. San Antonio Metropolitan Transit Authority* (1985) 469 U.S. 528, 545 [105 S.Ct. 1005].)

Similarly here, the Health Officer's orders are well within the authority granted to his office and "right to protect [the community] against an epidemic of disease which threatens the safety of its members."  (*Jacobson*, *supra*, 197 U.S. at p. 27.)  During public emergencies, states and local governments may take actions to curb disease that would otherwise impermissibly burden constitutionally protected liberties.  (*Id*. at p. 19; see also *Prince v. Massachusetts* (1944) 321 U.S. 158, 166-167 [64 S.Ct. 438] [finding that First Amendment "right to practice religion freely does not include liberty to expose the community . . . to communicable disease"].)[9/]  Under *Jacobson*, the Health Officer's measures are lawful so long as they bear "real or substantial relation" to the public health crisis and are not, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law."  (*Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, ECF 51 at p. 1022, citing *In re Abbott*, *supra*, 2020 WL 1685929 at * 7, and *Jacobson*, *supra*, 197 U.S. at p. 31.)  In other words, under *Jacobson*, the Stay Well at Home Order is subject to "judicial deference and not subject to traditional constitutional scrutiny."  (*Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, RJN, Exh. 2, pg. ID 1021, citing *Jacobson*, *supra*, 197 U.S. at p. 27.)

---

[9/] See also *Camara v. Municipal Court of City and County of San Francisco* (1967) 387 U.S. 523, 539 [87 S.Ct. 1727] (warrantless searches permitted under Fourth Amendment when conducted to protect public health in emergency situations), citing *North American Cold Storage Co. v. City of Chicago* (1908) 211 U.S. 306 [29 S.Ct. 101] (seizure of unwholesome food); *Jacobson*, *supra*, 197 U.S. 11 (compulsory smallpox vaccination); *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health* (1902) 186 U.S. 380 [22 S.Ct. 811] (health quarantine prohibiting disembarkation of healthy passengers and cargo into infected area).

The now-repealed Stay Well at Home Order easily meets the *Jacobson* test.[10]  The Stay Well at Home Order bore a substantial relation to the public health crisis.  The Order was temporary, specific and tailored to prevent the spread of a highly contagious and potentially deadly disease through a combination of targeted requirements, all of which were aimed at minimizing human-to-human contact by directing Ventura County residents to stay at their places of residence to the maximum extent feasible.  (RJN, Exh. 20.)  At all times relevant, the Health Officer has, and continues to, monitor the pandemic's impact on persons within Ventura County and has updated the Local Orders as necessary to address the emergency.  (See e.g., RJN, Exh. 20.)  The Stay Well at Home Order slowed the spread of the disease, saved lives, and prevented the county's health care systems from being overwhelmed, unlike the situation elsewhere around the globe.[11]  The Health Officer's prior determination of what businesses were deemed "essential" is entitled to great deference, notwithstanding any federal advisory documents or differing decisions by other jurisdictions.  (See *South Bay United*, *supra*, 590 U.S. ___ at p. 1; *Winter v. Natural Resources* (2008) 555 U.S. 1, 24; see also *Gish*, *supra*, Case No. 5:20-cv-00755-JGB-KK, RJN, Exh. 2 at p. 1022.)

Plaintiffs, on the other hand, cannot demonstrate that the Stay at Home Order's imposition of a temporary and emergency pause, from March 20 to May 7, on their ability to purchase or sell a gun within Ventura County is, "beyond all

---

[10] Nor can the statutory authority of the Health Officer be reasonably questioned:  The Health Officer has broad, long-standing and well-established powers to make orders necessary to preserve and protect public health.  For example, the California Health and Safety Code provides that "[t]he local health officer may take any preventive measure that may be necessary to protect and preserve the public health from any public health hazard during any 'state of war emergency,' 'state of emergency,' or 'local emergency,' as defined by section 8558 of the [California] Government Code, within his or her jurisdiction."  (Cal. Health & Saf. Code, § 101040; see also Cal. Heath & Saf. Code, §§ 101080, 101085, 120175 & Cal. Code Regs., tit. 7, § 2500 et seq.)

[11] See, e.g., L.A. Times, Social Distancing May Have Helped California Slow the Virus and Avoid New York's Fate (March 31, 2020) (available at https://news.yahoo.com/social-distancing-may-helped-california-120003221.html) (visited April 27, 2020).

13

question, a plain, palpable invasion of rights secured by the fundamental law."
(*Jacobson*, *supra*, 197 U.S. at p. 31.)  Unlike the right to use, possess, or otherwise
keep and bear arms in the name of self-defense (which rights the Order does not
implicate), the law is well-established that any right to purchase or sell firearms is
subject to regulation without violating the Second Amendment, as explained
below.  In addition, the modifications to the Stay Well at Home Order and
subsequent issuance of the Local Reopen Order further support dismissal of the
FAC.  These modifications to the Local Orders evidence the Health Officer's
continual assessment of the Stay Well at Home Order, both to prevent the spread
of COVID-19 and to minimize disruption of the social, emotional and economic
well-being of Ventura County residents.  For example, the April 20 Order
contained provisions *solicitous* of plaintiffs' claimed Second Amendment rights so
long as strict protocols were followed.  (See, e.g., *Legacy Church, Inc. v. Kunkel*
(D.N.M. April 17, 2020) 2020 WL 1905586 [upholding orders based, in part, on
fact that emergency COVID-19 orders were solicitous of plaintiff's First
Amendment rights].)  The April 20 Order expressly authorized plaintiff
McDougall to take possession of the weapon he alleges he previously purchased.
(RJN Exh. 20, p. 7.)  And, with the issuance of the Local Reopen Order, the
Health Officer's imposition of an emergency and temporary pause on plaintiffs'
ability to engage in transactions concerning firearms and ammunition is over.
(RJN, Exhs. 23 & 24.)

Similarly, plaintiffs' right-to-travel claim under the now-repealed Stay at
Home Order fails because the Non-Essential Travel provisions did not prevent
them (or their members) from leaving Ventura County to purchase a gun
elsewhere.  (ECF 19, pg. ID 94, ¶ 87; ECF 27, pg. ID 203, lns. 6-8.)  Plaintiffs'
allegation in this regard is contrary to the express language of the Stay Well at
Home Order, which *allowed* persons to travel into and out of Ventura County
without regard to the purpose of the travel.  (RJN, Exh. 20, p. 3 ["This Order

14

allows travel into or out of the County"].)  Moreover, the Stay Well at Home Order had, since March 20 (the date non-essential businesses were ordered to close), included in its definition of "Essential Travel" "[t]ravel engaged in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution."  (See, e.g., RJN, Exh. 17, p. 18, ¶ g(7).)  The out-of-county travel plaintiffs proposed, i.e., inter-county or interstate travel to purchase a firearm, was economic activity that comprises interstate commerce under the Commerce Clause and thus would fall within the Order's definition of "Essential Travel."  (See *United States v. Lopez* (1995) 514 U.S. 549, 563-564 [115 S.Ct. 1624, 1626] [economic activity that substantially affects interstate commerce subject to federal regulation under the Commerce clause].[12])  Put simply, the "Non-Essential Travel" provisions of the Order did not preclude plaintiffs from traveling to purchase firearms.

To the extent plaintiffs complain that the Stay at Home Order otherwise restricted their travel in violation of the Constitution, any such restrictions do not implicate the constitutional right to travel because:  1) the Order did not impose restrictions on interstate travel, and 2) the Order applied broadly to anyone within Ventura County generally without regard to their state residency, and thus does not fall within the purview of the P & I Clause.  (See *Saenz v. Roe* (1999) 526 U.S. 489, 490 [119 S.Ct. 1518] ("*Saenz*") [detailing three components of right to travel, all stemming from *interstate* travel]; *Marilley v. Bonham* (9th Cir. 1996) 844 F.3d 841, 846 [challenged law does not fall within purview of P & I Clause if it does

---

[12] The transfer, licensing and registration of firearms have long been the subject of federal regulations that derive their authority from the Commerce Clause and authorize Congress to regulate interstate commerce.  (See, e.g., 18 U.S.C. § 922 [defining unlawful acts in connection with purchase, transfer or manufacture of firearms]; 18 U.S.C. § 923 [licensing]; 18 U.S.C. § 931 [prohibiting violent felons from purchasing firearms]; National Firearms Act, 26 U.S.C. §§ 5801-5872 [regulating registration and taxation of firearms]; 39 C.F.R. § 390.5 [broadly defining "interstate commerce" to include intrastate transactions that involve goods that enter from or terminate from out of state for purposes of federal motor safety carrier regulations].)

not treat residents of two or more states differently].)  And, even if the Order did implicate plaintiffs' right to travel, the Order would withstand constitutional scrutiny, whether under the *Jacobson* framework, as discussed above, or traditional scrutiny, as explained in more detail in section III.E, *infra*.  Finally, to the extent plaintiffs complain that the State Order restricts their ability to travel, the County has no authority to countermand or contradict the State Order.  (*Sherwin-Williams, supra,* 4 Cal.4th at p. 898.)

**D.**    **The Stay Well at Home Order Did Not Violate the Second Amendment under Traditional Scrutiny**

The Second Amendment protects the right of law-abiding, responsible citizens to use arms in defense of hearth and home.  (*District of Columbia v. Heller* (2008) 554 U.S. 570, 635 [128 S.Ct. 2783] ("*Heller*").)  That right, however, is not unlimited.  (*Id*. at p. 626.)  The government may place certain limits on where the right is exercised, how the right is exercised and who may exercise the right.  (*Id*. at pp. 626-627; *U.S. v. Carpio-Leon* (4th Cir. 2012) 701 F.3d 974, 977 ["the Second Amendment does not guarantee the right to possess for *every purpose*, to possess *every type of weapon*, to possess at *every place*, or to possess by *every person*"]); *U.S. v. Huitron-Guizar* (10th Cir. 2012) 678 F.3d 1164, 1166 ["The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why'"].)

In *U.S. v. Chovan* (9th Cir. 2013) 735 F.3d 1127, 1136 ("*Chovan*"), the court adopted a two-step inquiry to analyze claims that a law violates the Second Amendment.  This test "(1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny."  (*Ibid*.)

/ / /

/ / /

/ / /

16

1  **1.  The Stay Well at Home Order Did Not Impinge on the Second**
2  **Amendment as It Was Historically Understood**

3      Under the first *Chovan* step, a court cannot "apply the Second Amendment
4  to protect a right that does not exist under the Amendment." (*Peruta v. County of*
5  *San Diego* (9th Cir. 2016) 824 F.3d 919, 942 (en banc) ("*Peruta*"), cert. denied
6  *sub nom*.; *Peruta v. California* (1995) ___ U.S. ___ [137 S.Ct. 1995 (Mem),
7  198 L.Ed.2d 746].)  Therefore, the first step of the analysis requires the court to
8  explore the amendment's reach "based on a 'historical understanding of the scope
9  of the [Second Amendment] right.'" (*Jackson v. City & County of San*
10  *Francisco* (9th Cir. 2014) 746 F.3d 953, 960 ("*Jackson*"), quoting *Heller*, *supra*,
11  554 U.S. at p. 625.)

12      Whether the challenged law falls outside the scope of the Second
13  Amendment involves examining whether there is persuasive historical evidence
14  showing that the regulation does not impinge on the Second Amendment right as it
15  was historically understood.  (*Jackson*, *supra*, 554 U.S. at p. 625.)  Laws
16  restricting conduct that can be traced to the founding era and are historically
17  understood to fall outside of the Second Amendment's scope may be upheld
18  without further analysis.  (See *Peruta*, *supra*, 824 F.3d at p. 919.)

19      The Stay Well at Home Order required the closure of non-essential
20  businesses, including gun stores.  Plaintiffs have argued that the temporary closure
21  hindered the ability of certain persons to finalize gun purchases during the
22  pendency of the Stay Well at Home Order or prevented would-be gun purchasers
23  from buying a firearm.  Since April 20, the Stay Well at Home Order allowed the
24  completion of gun purchases initiated before March 20.  Would-be gun purchasers
25  and firearms retailers were unable to engage in transactions concerning firearms
26  within Ventura County only temporarily, from March 20 to May 7.  This
27  temporary pause occasioned by a public health crisis does not implicate the
28  Second Amendment, as California has a long history of delaying possession of

firearms without impinging on the Second Amendment.  Indeed, California has had some kind of waiting period statute for firearm purchases continuously since 1923.  (*Silvester v. Harris* (9th Cir. 2016) 843 F.3d 816, 823 ("*Silvester*").)  The waiting periods encompassed both time for the California Department of Justice ("Cal DOJ") to conduct a background check and time for a cooling-off period (so that guns were not purchased in the heat of a conflict).  (*Id.* at pp. 823-824.)  Cal DOJ has up to 30 days to complete a background check, and the cooling-off period extends 10 days beyond that.  As such, the Second Amendment has never protected immediate or convenient purchase and sale of guns.

Moreover, in times of emergency such as war, pandemic or natural disaster, federal, state and local governments have historically issued temporary, general regulations that overrode the convenience of purchasers of various goods and services.  (See, e.g., *Compagnie Francaise de Navigation a Vapeur v. Louisiana State Board of Health*, *supra*, 186 U.S. 380 [health quarantine prohibiting disembarkation of healthy passengers and cargo into infected area], cited with approval in *Camara v. Municipal Court of City and County of San Francisco*, *supra*, 387 U.S. at p. 539 [recognizing that warrantless search may be permissible under Fourth Amendment in public health emergency].)  As such, the temporary delay in a person's ability to purchase a firearm as a result of the Stay Well at Home Order did not impinge on the Second Amendment right as it was historically understood.

**2.  <u>The Stay At Home Order Was a Presumptively Lawful Regulation of General Applicability that Did Not Infringe the Ability to Possess or Use, and only Incidentally Delayed the Purchase of, Firearms</u>**

A law also does not burden Second Amendment rights if it falls within "one of the 'presumptively lawful regulatory measures' identified" in *Heller*, *supra*, 554 U.S. 570.  (*Jackson*, *supra*, 746 F.3d at p. 960; see also *Fyock v. Sunnyvale* (9th Cir. 2015) 779 F.3d 991, 996-997.)

18

1    *Heller* made explicit that "nothing in [its] opinion should be taken to cast

2    doubt on the longstanding prohibitions on the possession of firearms by felons and

3    the mentally ill, or laws forbidding the carrying of firearms in sensitive places

4    such as schools and government buildings, or laws imposing conditions and

5    qualifications on the commercial sale of arms." (*Heller, supra,* 554 U.S. 570 at

6    pp. 626-627.)  Such measures are "presumptively lawful."  (*Id*. at p. 627, n. 26.)

7    The Supreme Court reiterated, two years later, that *Heller* does not undermine the

8    validity of regulations on the commercial sale of firearms.  (*McDonald v. City of

9    Chicago, Ill.* (2010) 561 U.S. 742, 786 [130 S.Ct. 3020].)

10        In that regard, the Ninth Circuit has held that the Constitution provides "no

11   freestanding right on commercial proprietors to sell firearms" and gun buyers have

12   no right to particular seller locations "so long as their access is not meaningfully

13   constrained."  (*Teixiera v. County of Alameda* (9th Cir. 2017) 873 F.3d 670, 673,

14   680.)  Here, the Stay Well at Home Order only incidentally regulated the

15   commercial sale of firearms.  The Order did nothing to regulate or limit the ability

16   of persons to keep or bear arms.  Rather, the Order required, among other things,

17   the temporary closure of businesses that were determined to be non-essential to the

18   purposes of keeping persons isolated at their places of residence as determined by

19   the Health Officer.  (RJN, Exhs. 11, 17-20.)  On its face, the Stay Well at Home

20   Order did not prohibit people from possessing firearms nor regulate what people

21   may do with firearms in their own home.  To the extent that the Stay Well at Home

22   Order delayed the ability of some persons to purchase a firearm, the immediate

23   and convenient acquisition of firearms has never been protected under the Second

24   Amendment.  (See § III.D.1, *supra*; *Silvester*, *supra*, 843 F.3d at pp. 823-824.)

25   / / /

26   / / /

27   / / /

28   / / /

19

**3.** **The Stay Well at Home Order Did Not Substantially Burden Second Amendment Rights and Was Substantially Related to Mitigating the Public Health Crisis Presented by COVID-19**

Even if the Stay Well at Home Order had burdened plaintiffs' Second Amendment rights, the Order easily survives intermediate scrutiny as this court previously determined (ECF 12 & 30), and in accordance with the other COVID-19-related Second Amendment decision in the Central District. (*Brandy v. Villanueva* (C.D.Cal. April 6, 2020) Case No. 2:20-cv-02874-AB-SK, ECF 20.)

**a.** **The Order Withstands Intermediate Scrutiny**

In the absence of an emergency such as a pandemic, courts determine the appropriate level of scrutiny to apply in a Second Amendment challenge by considering (1) how close the challenged law comes to the core of the Second Amendment right; and (2) the severity of the law's burden on that right. (*United States v. Torres* (9th Cir. 2019) 911 F.3d 1253, 1262.) The core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of hearth and home (i.e., self-defense). (*Ibid.*; *Heller*, *supra*, 554 U.S. at p. 628.) Only laws that implicate the core of the Second Amendment right and severely burden that right will be subjected to strict scrutiny. (*Silvester*, *supra*, 843 F.3d at p. 821.) Intermediate scrutiny is the appropriate level of scrutiny for all other laws. (*Ibid.*) There has been "near unanimity in the post-*Heller* case law that when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate." (*Id.* at p. 823.)

In *Silvester*, the Ninth Circuit examined the constitutionality of California's 10-day waiting period between the purchase and delivery of a firearm. In California, most citizens who want to purchase a firearm must pass a background check. (*Silvester*, *supra*, 843 F.3d at pp. 824-825.) The background check is conducted by Cal DOJ, which has the authority to delay the delivery of a firearm for up to 30 days to complete the background check. (*Id.* at p. 825, citing Cal.

20

1  Pen. Code, § 28220, subd. (f).)  Additionally, a person cannot purchase more than
2  one firearm within a 30-day period.  (*Id*., citing Cal. Pen. Code, § 27535.)  After
3  passing the Cal DOJ background check, a person may purchase a firearm but must
4  wait 10 days before taking possession of the firearm.  (Cal. Pen. Code, §§ 26815,
5  27540.)

6       The *Silvester* court applied intermediate scrutiny based on its determination
7  that the law requiring the 10-day waiting period did not place a substantial burden
8  on the Second Amendment right because it did not prevent, restrict or place any
9  conditions on how guns were stored or used after a purchaser took possession.
10  (*Silvester*, *supra*, 843 F.3d at p. 827.)  The court also noted that historically, the
11  delivery of weapons took time, and that the "very small" burden of waiting 10
12  days before taking possession is less than the burden imposed by other challenged
13  regulations to which Ninth Circuit courts have applied intermediate scrutiny:

14              "There is, moreover, nothing new in having to
15           wait for the delivery of a weapon.  Before the age of
16           superstores and superhighways, most folks could not
17           expect to take possession of a firearm immediately upon
18           deciding to purchase one.  As a purely practical matter,
19           delivery took time.  Our 18th and 19th century forebears
20           knew nothing about electronic transmissions.  Delays of
21           a week or more were not the product of governmental
22           regulations, but such delays had to be routinely accepted
23           as part of doing business." (*Silvester*, *supra*, 843 F.3d at
24           p. 827.)

25       The Stay Well at Home Order presented a similarly "very small" burden on
26  the Second Amendment right.  It did not limit or regulate the ability of persons to
27  possess firearms or what they may do with those firearms in their homes.  The
28  Order closed non-essential businesses, which may have incidentally delayed the

21

ability of a person to purchase a firearm.  The Order was in effect for a finite period  – from March 20 through May 7.  As such, the delay is comparable to the constitutionally accepted delays resulting from the Cal DOJ background check and the 10-day cooling-off period.  As the court noted in *Silvester*, much more serious limitations on the ability to bear arms have been subjected to intermediate scrutiny.  The application of intermediate scrutiny is appropriate.[13]

**b.  Preventing the Spread of COVID-19 Is a Compelling Government Interest and the Closure of Non-Essential Businesses, Including Gun Stores, Is Reasonably Suited to Achieve that Objective**

Under intermediate scrutiny, courts first look to the government's objectives in enacting the regulation and second to whether it is reasonably suited to achieve those objectives.  (*Jackson*, *supra*, 746 F.3d at p. 965.)

Ventura County continues to experience a local health emergency that is part of a global pandemic.  COVID-19 is highly contagious and potentially deadly, especially for older persons and persons with serious chronic health conditions.  There is no known anti-viral treatment or immunization available for COVID-19.  The Stay Well at Home Order was intended to slow the spread of COVID-19 by isolating persons in their places of residences as much as possible.  COVID-19 presents an imminent and proximate threat to the residents of Ventura County, and it is essential to control the spread of COVID-19 as much as possible to protect the community's most vulnerable persons and prevent the health care system from being overwhelmed.  The compelling government interest is obvious.

The test for whether the Stay Well at Home Order reasonably fit with the stated objectives "is not a strict one."  (*Silvester*, *supra*, 843 F.3d at p. 827.)

---

[13] Plaintiffs' reliance on a North Carolina District Court case for the proposition that strict scrutiny should apply is misplaced.  (See *Bateman v. Perdue* (E.D.N.C. 2012) 881 F.Supp.2d 709.)  The statute at issue in that case imposed a complete prohibition on carrying, possessing and selling guns during the state of emergency, regardless the type of emergency at issue.  (*Id*.)  The Stay Well at Home Order does no such thing.

22

1    Intermediate scrutiny does not require the least restrictive means of furthering a

2    given end.  (*Ibid*.)  Instead, it requires only that the law be "substantially related to

3    the important government interest."  (*Ibid*.)  Here, the Health Officer only need

4    show that the regulation "promotes a substantial government interest that

5    would be achieved less effectively absent the regulation."  (*Id*. at p. 829.)  The

6    Health Officer easily meets that burden.

7         The stated goal of the Stay Well at Home Order was to keep as many people

8    in their homes as possible.  Even social distancing is not as effective in controlling

9    the spread of the disease as isolating at home.  The essential nature of essential

10   businesses, such as grocery stores, justified their continued operation subject to

11   social distancing practices.  But a gun store was not within this category, and

12   allowing any non-essential businesses to remain open would have diminished the

13   effectiveness of the Stay Well at Home Order.  The closure of gun stores and other

14   non-essential businesses to the public for a limited time easily passes intermediate

15   scrutiny.

16   **E.    Plaintiffs' Right-to-Travel Claim Fails**

17         Plaintiffs assert a right to travel claim under the P & I Clause as guaranteed

18   by the due process protections under the Fifth and Fourteenth Amendments of the

19   Constitution.  (ECF 20-1, Pg. ID 125.)  This claim fails.  As an initial matter, no

20   court in this jurisdiction has ever extended the constitutional right to travel to

21   protect a citizen's *intrastate* travel.  (*U.S.A. v. Sears* (C.D. Cal. April 16, 2015)

22   2015 WL 13359437[14/] aff'd (9th Cir. 2016) 652 Fed.Appx. 553.)  Rather, the three

23   components of the right to travel all arise out of and concern constitutional

24

25        [14/] Compare *Community Hospital v. Maricopa County* (1974) 415 U.S. 250,
     256 [94 S.Ct. 1076] (declining to opine whether right to travel extends to intrastate
26   travel), and *Nunez v. City of San Diego* (9th Cir. 1997) 114 F.3d 935, 944
     (declining to opine whether right to travel extends to intrastate travel), with *Lutz v.*
27   *City of York, PA* (3d Cir. 1990) 899 F.2d 255 (deciding that right to intrastate
     travel is not protected under P & I Clause but may be protected under due process
28   clauses of Fifth Amendment); and *Johnson v. City of Cincinnati* (6th Cir. 2002)
     310 F.3d 484, 498.

provisions that relate to *interstate* activities: 1) the right to freely enter one state and leave another; 2) the right to be treated as a "welcome visitor rather than an unfriendly alien when temporarily visiting another state"; and 3) the right to be treated like other residents when a traveler decides to become a permanent resident in a new state. (*Saenz, supra*, 526 U.S. at pp. 489-490.) The P & I Clause protects components of the right to travel only insofar as the "challenged law falls within the purview" of the clause, which requires plaintiffs to show that the Order "treats nonresidents differently from residents and impinges upon a 'fundamental' privilege or immunity protected by the clause." (*Marilley v. Bonham* (9th Cir. 1996) 844 F.3d 841, 846) [finding law that imposes higher license fee for non-residents to fall within purview of the P & I Clause], quoting *United Bldg. and Constr. Trades Council v. Camden* (1984) 465 U.S. 208, 218 [104 S.Ct. 1020].)

Here, plaintiffs do not allege that the Stay Well at Home Order treated residents from other states differently than California residents. As explained above, the Order broadly applied to "all persons in the cities and the entire unincorporated area of Ventura County" without regard to a person's residency or citizenship. (RJN, Exh. 20, p. 2.) In addition, the Order only concerned intra-county travel, and did not impose any sort of restriction beyond Ventura County borders. Thus, plaintiffs' claim does not fall within the purview of the P & I Clause and does not implicate a fundamental right under the Constitution.

Even if the Stay Well at Home Order implicated the right to travel, plaintiffs would not succeed on the merits of their claim. (See *Shows v. Swain County Sheriff* (W.D.N.C. April 23, 2020) 2020 WL 1953621.) To the extent the Order created barriers to movement – whether interstate or intrastate – such restrictions were narrowly tailored to achieve the compelling government interest to prevent the spread of COVID-19, even assuming that strict scrutiny applies. (See, e.g., *Mohamed v. Holder* (E.D. Va. 2017) 266 F.Supp.3d 868, 879-883 [upholding "no-

24

fly" list register despite its substantial burden on plaintiff's right to interstate travel after strict scrutiny review and declining to recognize that right to travel extends to international travel]; *Lutz v. City of York, PA, supra,* 899 F.2d at pp. 259-270 [dismissing claim that anti-cruise statute violated due process clause of Fifth Amendment after determining statute survived intermediate scrutiny as valid time, place and manner restriction]; *U.S.A. v. Sears* (C.D.Cal. 2015) 2015 WL 13359437, *2 [finding law of general applicability that has incidental effect on individual's ability to travel does not violate fundamental right to travel under rational basis scrutiny].)  Plaintiffs cannot prevail on this claim.

## IV

## CONCLUSION

Based on the foregoing, defendants respectfully requests that the court dismiss the First Amended Complaint.

LEROY SMITH
County Counsel, County of Ventura

Dated:   June 2, 2020        By_____/s/_____
                               CHARMAINE H. BUEHNER
                               Assistant County Counsel

Attorneys for Defendants County of Ventura (also erroneously sued as Ventura County Public Health Care Agency), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin and William T. Foley

25