LEROY SMITH, State Bar No. 107702
County Counsel, County of Ventura
CHARMAINE H. BUEHENER, State Bar No. 220868
Assistant County Counsel
800 South Victoria Avenue, L/C #1830
Ventura, California 93009
Telephone:   (805) 654-2588
Facsimile:    (805) 654-2185
E-mail:         charmaine.buehner@ventura.org

Attorneys for Defendants County of Ventura
(also erroneously sued as Ventura County Public
Health Care Agency), Sheriff William Ayub
(erroneously sued as "Bill Ayub"), Robert Levin
and William T. Foley

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD MCDOUGALL, an individual; JULIANA GARCIA, an individual; SECOND AMENDMENT FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF VENTURA, CALIFORNIA; BILL AYUB, in his official capacity; WILLIAM T. FOLEY, in his official capacity; ROBERT LEVIN, in his official capacity; and VENTURA COUNTY PUBLIC HEALTH CARE AGENCY, <br><br> Defendants. | No. 2:20 cv-02927 CBM(ASX) <br><br> REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS THE FIRST AMENDED COMPLAINT <br><br> Date:  June 30, 2020 <br> Time: 10:00 a.m. <br> Ctrm:  8b <br> Judge: Hon. Consuelo B. Marshall <br><br> Trial:                    Not Set <br> Complaint Filed:   March 28, 2020 |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Defendants County of Ventura (sued in its own name and erroneously in the name of "Ventura County Public Health Care Agency"), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin and William T. Foley (collectively "Defendants"), pursuant to Federal Rules of Evidence, rule 201,

1

request that this court take judicial notice of the following official public documents and newspaper articles, including:

**Exhibit 1**: *South Bay United Pentecostal v. Newsom* (May 29, 2020, No. 19A1044), 590 U.S. ___ [2020 WL 2813056] ("*South Bay United*").

**Exhibit 2:** Centers for Disease Control & Prevention, Coronavirus Disease, *Cases in the U.S.*, at https://tinyurl.com/qqt3aq6 (last visited June 1, 2020).

**Exhibit 3**: California Department of Public Health, California COVID-19 By The Numbers as of May 30, 2020, at https://www.cdph.ca.gov/Programs/CID/ DCDC/Pages/Immunization/ ncov2019.aspx# (last visited June 1, 2020). Statewide Case Statistics, Ventura Case Statistics as of May 31, 2020, at https://public.tableau.com/views/COVID-19PublicDashboard/Covid-19Public?:e mbed=y&:display_count=no&:showVizHome=no (last visited June 1, 2020).

**Exhibit 4:** *Gish v. Newsom* (C.D. Cal. April 23, 2020), 2020 WL 1970070, Case No. 5:20-cv-00755-JGB-KK, ECF 51, pg. ID 1021.

**Exhibit 5**: New England Journal of Medicine, *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1* (April 16, 2020), at https://www. nejm.org/doi/pdf/10.1056/NEJMc2004973?articleTools=true (last visited June 1, 2020).

**Exhibit 6**: Stadnytskyi et al., *The Airborne Lifetime of Small Speech Droplets and their Potential Importance in SARS-CoV-2 Transmission*, Proceedings of the National Academy of Sciences (May 4, 2020) at https://www.pnas.org/content/pnas/early/2020/05/12/2006874117.full.pdf (last visited June 1, 2020.

**Exhibit 7**: Harvard Health Publishing, Harvard Medical School, *COVID-19 Basics, Symptoms, Spread & Other Essential Information About the New Coronavirus and COVID-19* (Published March 2020, updated June 1, 2020) at https://www.health.harvard.edu/diseases-and-conditions/covid-19-basics (last visited June 1, 2020).

**Exhibit 8:**  Stanford Health Care, Frequently Asked Questions about the Novel Coronavirus (COVD-19) at https://stanfordhealthcare.org/stanford-health-care-now/2020/novel-coronavirus/faqs-about-covid-19.html#:~:text=Not%20yet.%20Currently%20there,12%2D15%20months (last visied June 1, 2020).

**Exhibit 9:**  Executive Department of the State of California, Proclamation of a Statewide Emergency, from the Executive Department, State of California, signed by Governor Gavin Newsom (March 4, 2020).

**Exhibit 10**:  County of Ventura, Declaration of Local Emergency by County Health Officer (March 12, 2020).

**Exhibit 11**:  County of Ventura, Health Officer Order for the Control of COVID-19 Directing Vulnerable Individuals Living in the County to Shelter at Their Place of Residence, Restrictions of Certain Businesses, Among other Orders, Date of Order:  March 17, 2020 (March 17, 2020).

**Exhibit 12**:  Executive Department of the State of California, Executive Order No. N-33-20 (March 19, 2020).

**Exhibit 13**:  United States Department of Homeland Security, Cybersecurity and Infrastructure Security Agency ("CISA"), March 19, 2020, Memorandum on Identification of Critical Infrastructure Workers During COVID-19 Response (March 19, 2020) available at:  https://www.cisa.gov/sites/default/files/publications/CISA-Guidance-on-Essential-Critical-Infrastructure-Workers-1-20-508c.pdf (last visited April 1, 2020).

**Exhibit 14**:  Public Health Officer of the State of California, Essential Business List (March 22, 2020) available at https://covid19.ca.gov/img/EssentialCriticalInfrastructureWorkers.pdf (visited April 27, 2020).

**Exhibit 15**:  Mercury News, Coronavirus:  Are Gun Stores Essential? Governor Newsom Sidesteps that Question, Leaves It to the Counties (March 25, 2020) available at https://www.mercurynews.com/2020/03/25/coronavirus-are-

3

gun-stores-essential-governor-sidesteps-that-question-leaves-it-to-the-counties (visited April 26, 2020).

**Exhibit 16**:  United States Department of Homeland Security, Cybersecurity and Infrastructure Security Agency ("CISA"), March 28, 2020, Memorandum on Identification of Critical Infrastructure Workers During COVID-19 Response (March 28, 2020) available at:  https://www.cisa.gov/sites/default/files/ publications/Version_3.0_CISA_Guidance_on_Essential_Critical_Infrastructure_ Workers_1.pdf (last visited June 1, 2020).

**Exhibit 17:**  County of Ventura, Stay Well At Home Order of the Ventura County Health Officer (March 20, 2020).

**Exhibit 18**:  County of Ventura, Stay Well At Home Order of the Ventura County Health Officer (March 31, 2020).

**Exhibit 19**:  County of Ventura, Stay Well At Home Order of the Ventura County Health Officer (April 9, 2020).

**Exhibit 20**:  County of Ventura, Stay Well At Home Order of the Ventura County Health Officer (April 20, 2020).

**Exhibit 21:**  Executive Department of the State of California, Executive Order No. N-60-20 (May 4, 2020).

**Exhibit 22**: California Department of Public Health, Order of the State Public Health Officer (May 7, 2020).

**Exhibit 23:** County of Ventura, Stay Well VC, Safely Reopening Ventura County (May 7, 2020).

**Exhibit 24:** County of Ventura, VC Emergency Coronavirus Information, Frequently Asked Questions, available at https://www.vcemergency.com/ staywellvc/faqs-general (last visited June 1, 2020).

**Exhibit 25:**  County of Ventura, Stay Well VC, Safely Reopening Ventura County (May 22, 2020).

/ / /

4

1  **Exhibit 26:**  County of Ventura, Stay Well VC, Safely Reopening Ventura

2  County (May 20, 2020).

3  **Exhibit 27:**  County of Ventura, Stay Well VC, Safely Reopening Ventura

4  County (May 29, 2020).

5  **Exhibit 28:**  *South Bay United Pentecostal v. Newsom* (9th Cir. May 22,

6  2020) 2020 WL 2687079, Case No. 20-55533 *aff'd* (May 29, 2020, No. 19A1044)

7  590 U.S. ___, at p. 1.

8  Defendants respectfully submit that public documents and newspaper

9  articles (Exhibits 1-22) are proper for judicial notice as well as for consideration

10 by this court with Defendants' opposition to the motion for preliminary injunction

11 filed by plaintiffs Donald McDougall, Juliana Garcia, Second Amendment

12 Foundation, California Gun Rights Foundation and Firearms Policy Coalition

13 (collectively "Plaintiffs").  Courts may take judicial notice of "a fact that is not

14 subject to reasonable dispute because it . . . can be accurately and readily

15 determined from sources whose accuracy cannot reasonably be questioned" and

16 where such judicial notice "is requested by a party and supplied with the necessary

17 information" "at any stage of the proceeding."  (Fed. Rules Evid., rules 201(b)(2),

18 (d) and (f); *Hepting v. AT & T Corp.* (N.D. Cal. 2006) 439 F.Supp.2d 974, 987-

19 989 [taking judicial notice of official reports, newspaper articles, and press

20 releases]; *Pacific Gas & Elec. Co. v. Lynch* (C.D. Cal. May 2, 2001) No.

21 CV 01-1083RSWLSHX, 2001 WL 840611 at *6 [taking judicial notice of

22 California Governor Gray Davis's January 17, 2001, Proclamation of a State of

23 Emergency]; *U.S. ex rel. Modglin v. DJO Global Inc.* (C.D. Cal. 2014)

24 48 F.Supp.3d 1362, 1381 ["Under Rule 201, the court can take judicial notice of

25 '[p]ublic records and government documents available from reliable sources on

26 the Internet,' such as websites run by governmental agencies"]; *County of Santa*

27 *Clara v. Trump* (N.D. Cal. 2017) 250 F.Supp.3d 497, 520 [taking judicial notice of

28 proclamations made by U.S. Attorney General Jeff Sessions]; *Merced Irrigation*

5

1   *Dist. v. County of Mariposa* (E.D.Cal. 2013) 941 F.Supp.2d 1237, 1261–1262

2   [taking judicial notice of Board of Supervisors' resolution as matter of public

3   record]; *Catholic League for Religious & Civil Rights v. City & County of San*

4   *Francisco* (9th Cir. 2009) 567 F.3d 595, 606, on reh'g en banc (9th Cir. 2010)

5   624 F.3d 1043 [judicial notice of county board of supervisors' actions according

6   to its public resolution]; *Elena Selk v. Pioneers Mem'l Healthcare Dist.*, (S.D. Cal.

7   Apr. 7, 2014) No. 13CV0244 DMS (BGS), 2014 WL 12729166 at *2 [taking

8   judicial notice of date entity was established according to board of supervisors'

9   resolution].

10         Here, the attached exhibits are publicly available records whose authenticity

11   is not reasonably questionable.  As a result, Defendants ask that this court take

12   judicial notice of these documents.

13                                         LEROY SMITH
                                           County Counsel, County of Ventura
14

15   Dated: June 2, 2020          By _____/s/_____

16                                         CHARMAINE H. BUEHNER
                                           Assistant County Counsel
17
                                           Attorneys for Defendant County of Ventura
18                                         (also erroneously sued as Ventura County Public
                                           Health Care Agency), Sheriff William Ayub
19                                         (erroneously sued as "Bill Ayub"), Robert Levin
                                           and William T. Foley
20

21

22

23

24

25

26

27

28

# SUPREME COURT OF THE UNITED STATES

————

No. 19A1044

————

SOUTH BAY UNITED PENTECOSTAL CHURCH, ET AL. *v.* GAVIN NEWSOM, GOVERNOR OF CALIFORNIA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[May 29, 2020]

The application for injunctive relief presented to JUSTICE KAGAN and by her referred to the Court is denied.

JUSTICE THOMAS, JUSTICE ALITO, JUSTICE GORSUCH, and JUSTICE KAVANAUGH would grant the application.

CHIEF JUSTICE ROBERTS, concurring in denial of application for injunctive relief.

The Governor of California's Executive Order aims to limit the spread of COVID–19, a novel severe acute respiratory illness that has killed thousands of people in California and more than 100,000 nationwide. At this time, there is no known cure, no effective treatment, and no vaccine. Because people may be infected but asymptomatic, they may unwittingly infect others. The Order places temporary numerical restrictions on public gatherings to address this extraordinary health emergency. State guidelines currently limit attendance at places of worship to 25% of building capacity or a maximum of 100 attendees.

Applicants seek to enjoin enforcement of the Order. "Such a request demands a significantly higher justification than a request for a stay because, unlike a stay, an injunction does not simply suspend judicial alteration of the status quo but grants judicial intervention that has been withheld by lower courts." *Respect Maine PAC* v. *McKee*, 562 U. S. 996 (2010) (internal quotation marks omitted). This

power is used where "the legal rights at issue are indisputably clear" and, even then, "sparingly and only in the most critical and exigent circumstances." S. Shapiro, K. Geller, T. Bishop, E. Hartnett & D. Himmelfarb, Supreme Court Practice §17.4, p. 17-9 (11th ed. 2019) (internal quotation marks omitted) (collecting cases).

Although California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause of the First Amendment. Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement. Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson* v. *Massachusetts*, 197 U. S. 11, 38 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall* v. *United States*, 414 U. S. 417, 427 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people. See *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 545 (1985). That is especially true where, as here, a party seeks

emergency relief in an interlocutory posture, while local of-
ficials are actively shaping their response to changing facts
on the ground.  The notion that it is "indisputably clear"
that the Government's limitations are unconstitutional
seems quite improbable.

# SUPREME COURT OF THE UNITED STATES

———

No. 19A1044

———

SOUTH BAY UNITED PENTECOSTAL CHURCH, ET AL.
*v.* GAVIN NEWSOM, GOVERNOR OF
CALIFORNIA, ET AL.

ON APPLICATION FOR INJUNCTIVE RELIEF

[May 29, 2020]

JUSTICE KAVANAUGH, with whom JUSTICE THOMAS and JUSTICE GORSUCH join, dissenting from denial of application for injunctive relief.

I would grant the Church's requested temporary injunction because California's latest safety guidelines discriminate against places of worship and in favor of comparable secular businesses. Such discrimination violates the First Amendment.

In response to the COVID–19 health crisis, California has now limited attendance at religious worship services to 25% of building capacity or 100 attendees, whichever is lower. The basic constitutional problem is that comparable secular businesses are not subject to a 25% occupancy cap, including factories, offices, supermarkets, restaurants, retail stores, pharmacies, shopping malls, pet grooming shops, bookstores, florists, hair salons, and cannabis dispensaries.

South Bay United Pentecostal Church has applied for temporary injunctive relief from California's 25% occupancy cap on religious worship services. Importantly, the Church is willing to abide by the State's rules that apply to comparable secular businesses, including the rules regarding social distancing and hygiene. But the Church objects to a 25% occupancy cap that is imposed on religious worship services but not imposed on those comparable secular businesses.

In my view, California's discrimination against religious worship services contravenes the Constitution. As a general matter, the "government may not use religion as a basis of classification for the imposition of duties, penalties, privileges or benefits." *McDaniel* v. *Paty*, 435 U. S. 618, 639 (1978) (Brennan, J., concurring in judgment). This Court has stated that discrimination against religion is "odious to our Constitution." *Trinity Lutheran Church of Columbia, Inc.* v. *Comer*, 582 U. S. ___, ___ (2017) (slip op., at 15); see also, *e.g., Good News Club* v. *Milford Central School*, 533 U. S. 98 (2001); *Rosenberger* v. *Rector and Visitors of Univ. of Va.*, 515 U. S. 819 (1995); *Church of Lukumi Babalu Aye, Inc.* v. *Hialeah*, 508 U. S. 520 (1993); *Lamb's Chapel* v. *Center Moriches Union Free School Dist.*, 508 U. S. 384 (1993); *McDaniel*, 435 U. S. 618.

To justify its discriminatory treatment of religious worship services, California must show that its rules are "justified by a compelling governmental interest" and "narrowly tailored to advance that interest." *Lukumi*, 508 U. S., at 531–532. California undoubtedly has a compelling interest in combating the spread of COVID–19 and protecting the health of its citizens. But "restrictions inexplicably applied to one group and exempted from another do little to further these goals and do much to burden religious freedom." *Roberts* v. *Neace*, 958 F. 3d 409, 414 (CA6 2020) (*per curiam*). What California needs is a compelling justification for distinguishing between (i) religious worship services and (ii) the litany of other secular businesses that are not subject to an occupancy cap.

California has not shown such a justification. The Church has agreed to abide by the State's rules that apply to comparable secular businesses. That raises important questions: "Assuming all of the same precautions are taken, why can someone safely walk down a grocery store aisle but not a pew? And why can someone safely interact with a brave deliverywoman but not with a stoic minister?" *Ibid.*

The Church and its congregants simply want to be treated equally to comparable secular businesses. California already trusts its residents and any number of businesses to adhere to proper social distancing and hygiene practices. The State cannot "assume the worst when people go to worship but assume the best when people go to work or go about the rest of their daily lives in permitted social settings." *Ibid.*

California has ample options that would allow it to combat the spread of COVID–19 without discriminating against religion. The State could "insist that the congregants adhere to social-distancing and other health requirements and leave it at that—just as the Governor has done for comparable secular activities." *Id.,* at 415. Or alternatively, the State could impose reasonable occupancy caps across the board. But absent a compelling justification (which the State has not offered), the State may not take a looser approach with, say, supermarkets, restaurants, factories, and offices while imposing stricter requirements on places of worship.

The State also has substantial room to draw lines, especially in an emergency. But as relevant here, the Constitution imposes one key restriction on that line-drawing: The State may not discriminate against religion.

In sum, California's 25% occupancy cap on religious worship services indisputably discriminates against religion, and such discrimination violates the First Amendment. See *Ohio Citizens for Responsible Energy, Inc.* v. *NRC*, 479 U. S. 1312 (1986) (Scalia, J., in chambers). The Church would suffer irreparable harm from not being able to hold services on Pentecost Sunday in a way that comparable secular businesses and persons can conduct their activities. I would therefore grant the Church's request for a temporary injunction. I respectfully dissent.



# Coronavirus Disease 2019 (COVID-19)

# Cases in the U.S.

Last updated on June 1, 2020



| TOTAL CASES | TOTAL DEATHS |
|:---:|:---:|
| **1,787,680** | **104,396** |
| 26,177 New Cases* | 696 New Deaths* |



**Want More Data?**
CDC COVID Data Tracker

## Cases & Deaths by Jurisdiction

31 jurisdictions report more than 10,000 cases of COVID-19.

This map shows COVID-19 cases and deaths reported by U.S. states, the District of Columbia, New York City, and other U.S.-affiliated jurisdictions. Hover over the map to see the number of cases and deaths reported in each jurisdiction. To go to a jurisdiction's health department website, click on the jurisdiction on the map.



Reported Cases

- 0 to 1,000
- 5,001 to 10,000
- 20,001 to 40,000
- 1,001 to 5,000
- 10,001 to 20,000
- 40,001 or more

AS  GU  MH  FM  MP  PW  PR  VI

Jurisdictions

Add U.S. Map to Your Website



## Cases & Deaths by County

Select a state to view the number of cases and deaths by county. This data is courtesy of USAFacts.org

| Select a State | ⌄ |

**View County Data**

## New Cases by Day

The following chart shows the number of new COVID-19 cases reported each day in the U.S. since the beginning of the outbreak. Hover over the bars to see the number of new cases by day.



☐ Cases    Reset

| View Data by Date | − |

| | 01/22/2020 | 01/23/2020 | 01/24/2020 | 01/25/2020 | 01/26/2020 | 01/27/2020 | 01/28/2020 | 01/29/2020 | 01/30/2020 | 01 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cases** | 1 | 0 | 1 | 0 | 3 | 0 | 0 | 0 | 0 | |

Scroll for additional info

## Cases by Age

The following chart shows the age of people with COVID-19. Hover over each bar or click on the plus (+) sign below the chart to see the number of cases in each age group.

Data were collected from 1,439,311 people, and age was available for 1,436,181 (99.8%) people.



| Number of Cases | + |
| --- | --- |

## Cases by Race & Age

The following chart shows the race of people with COVID-19. Hover over each bar or click on the plus (+) sign below the chart to see the percentage for each race group. Select from the "Age" dropdown list to see the percentage for each age group.

Data were collected from 1,439,311 people, but race was only available for 718,254 (49.9%) people.



| Percent of Cases | + |
| --- | --- |

## Cases by Ethnicity & Age

The following chart shows the ethnicity of people with COVID-19. Hover over each bar or click on the plus (+) sign below the chart to see the percentage for Hispanic/Latino. Select from the "Age" dropdown list to see the percentage for each age group.

Data were collected from 1,439,311 people, but ethnicity was only available for 657,200 (45.7%) people.



Percent of Cases                                                                    +

## Cases & Deaths among Healthcare Personnel

Data were collected from 1,439,310 people, but healthcare personnel status was only available for 307,499 (21.4%) people. For the 66,770 cases of COVID-19 among healthcare personnel, death status was only available for 37,750 (56.5%).



Previous Data                                                                        +

CDC has moved the following information to the Previous U.S. COVID-19 Case Data page.

- Level of community transmission by jurisdiction — last updated May 18, 2020
- Total number of cases by day — last updated April 28, 2020
- Number of cases by source of exposure — last updated April 16, 2020
- Number of cases from Wuhan, China and the Diamond Princess cruise — last updated April 16, 2020
- Number of cases by illness start date — last updated April 15, 2020

About the Data                                                                       +

**Updated Daily**

This page is updated daily based on data confirmed at 4:00pm ET the day before.

## Reported by Jurisdiction's Health Department

Data on this page are reported voluntarily by each jurisdiction's health department.

## Number of Jurisdictions

There are currently 56 U.S.-affiliated jurisdictions reporting cases of COVID-19. This includes 50 states, District of Columbia, Guam, New York City, the Northern Mariana Islands, Puerto Rico, and the U.S Virgin Islands.

## Confirmed & Probable Counts

As of April 14, 2020, CDC case counts and death counts include both confirmed and probable cases and deaths. This change was made to reflect an interim COVID-19 position statement 🔗 issued by the Council for State and Territorial Epidemiologists on April 5, 2020. The position statement included a case definition and made COVID-19 a nationally notifiable disease.

A confirmed case or death is defined by meeting confirmatory laboratory evidence for COVID-19.

A probable case or death is defined by one of the following:

- Meeting clinical criteria AND epidemiologic evidence with no confirmatory laboratory testing performed for COVID-19
- Meeting presumptive laboratory evidence AND either clinical criteria OR epidemiologic evidence
- Meeting vital records criteria with no confirmatory laboratory testing performed for COVID19

Not all jurisdictions report confirmed and probable cases and deaths to CDC.  When not available to CDC, it is noted as N/A.

## Accuracy of Data

CDC does not know the exact number of COVID-19 illnesses, hospitalizations, and deaths for a variety of reasons. COVID-19 can cause mild illness, symptoms might not appear immediately, there are delays in reporting and testing, not everyone who is infected gets tested or seeks medical care, and there may be differences in how jurisdictions confirm numbers.

## Changes & Fluctuations in Data

Health departments may update case data over time when they receive more complete and accurate information.

The number of new cases reported each day fluctuates. There is generally less reporting on the weekends and holidays.

## Differences between CDC and Jurisdiction Data

If the number of cases or deaths reported by CDC is different from the number reported by jurisdiction health departments, data reported by jurisdictions should be considered the most up to date. The differences may be due to the timing of the reporting and website updates.

## More Information

COVIDView – A Weekly Surveillance Summary of U.S. COVID-19 Activity

Previous U.S. COVID-19 Case Data

FAQ: COVID-19 Data and Surveillance

Testing Data in the U.S.

World Map

Health Departments

Page last reviewed: June 1, 2020

# California **COVID-19** By The Numbers

May 31, 2020

Numbers as of May 30, 2020

## CALIFORNIA COVID-19 SPREAD

# 110,583

## Total Cases

### Ages of Confirmed Cases
- 0-17: **6,254**
- 18-49: **57,738**
- 50-64: **25,964**
- 65+: **20,455**
- Unknown/Missing: **172**

### Gender of Confirmed Cases
- Female: **54,396**
- Male: **55,627**
- Unknown/Missing: **560**

## Hospitalizations

**Confirmed COVID-19**
# 2,940/1,067
Hospitalized/in ICU

**Suspected COVID-19**
# 1,391/257
Hospitalized/in ICU

# 4,213
## Fatalities

For county-level data:
data.chhs.ca.gov

**Your actions save lives.**

covid19.ca.gov





Case 2:20-cv-02927-CBM-AS Document 42-1 Filed 06/02/20 Page 20 of 212 Page ID #:803



## Positive Cases by County

Sort by    Positive Cases



| County | Positive Cases |
|---|---|
| Los Angeles | 54,925 |
| Riverside | 7,704 |
| San Diego | 7,483 |
| Orange | 6,532 |
| San Bernardino | 5,185 |
| Alameda | 3,362 |
| Santa Clara | 2,785 |
| San Francisco | 2,501 |
| Kern | 2,300 |
| Imperial | 2,197 |
| San Mateo | 2,169 |
| Tulare | 1,884 |
| Fresno | 1,780 |
| Santa Barbara | 1,662 |
| Contra Costa | 1,458 |
| Sacramento | 1,398 |
| Ventura | 1,151 |
| San Joaquin | 888 |
| Stanislaus | 738 |
| Kings | 703 |
| Sonoma | 555 |

## Ventura Case Statistics



Positive Cases

1,151

+35
+3.1%

4 ... 35

3/16  3/30  4/13  4/27  5/11  5/25

Deaths

33

+0
+0.0%

0 ... 0

3/16  3/30  4/13  4/27  5/11  5/25

Note: Any instance of a negative number of cases or deaths reflects a correction to previous reporting.

Lab Tests Reported Statewide

2,012,583

+67,735
+3.5%

11K ... 2,013K

3/16  3/30  4/13  4/27  5/11  5/25

Note: The increase in number of tests conducted on 4/22 is due to the addition of data sources to reflect a more complete count of testing in California.

## Positive Cases by County



© Mapbox © OSM

Positive Cases Demographics

| Gender | | Age | | Race/Ethnicity | |
|---|---|---|---|---|---|
| Female | 49% | 0-17 | 6% | AIAN | 0% |
| Male | 50% | 18-49 | 52% | Asian | 9% |
| Unknown | 1% | 50-64 | 23% | Black | 5% |
| | | 65+ | 18% | Latino | 54% |
| | | Unknown | 0% | NHPI | 1% |
| | | | | White | 20% |
| | | | | Multiracial | 1% |
| | | | | Other | 10% |

Note: Percentages may not add up to 100% due to rounding. Breakdown of deaths is a subset of total deaths as reported by law enforcement.

🏴 KeyCite Blue Flag – Appeal Notification

Appeal Filed by WENDY GISH, ET AL v. GAVIN NEWSOM, ET
AL, 9th Cir., April 28, 2020

2020 WL 1979970
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Wendy GISH, et al.

v.

Gavin NEWSOM, et al.

Case No. EDCV 20-755 JGB (KKx)
|
Filed 04/23/2020

**Attorneys and Law Firms**

Gregory Richard Michael, Harmeet K. Dhillon,
Dhillon Law Group Inc., San Francisco, CA, Mark P.
Meuser, Meuser Law Group Inc, Walnut Creek, CA,
for Wendy Gish, et al.

Todd Grabarsky, Amie L. Medley, CAAG - Office
of Attorney General California Department of Justice,
Deborah J. Fox, Margaret W. Rosequist, Meyers Nave
Riback Silver and Wilson, Los Angeles, CA, Michelle
Danielle Blakemore, Penelope Alexander-Kelley, San
Bernardino County Counsel, San Bernardino, CA,
James E. Brown, Ronak N. Patel, Kelly Anne Moran,
Office of County Counsel, Riverside, CA, for Gavin
Newsom, et al.

**Proceedings: Order DENYING Plaintiffs'
Emergency Request for Temporary Restraining
Order (Dkt. No. 8) (IN CHAMBERS)**

The Honorable JESUS G. BERNAL, UNITED
STATES DISTRICT JUDGE

**\*1** Before the Court is an Emergency Request
for Temporary Restraining Order filed by Plaintiffs
Patrick Scales, Wendy Gish, James Dean Moffatt, and
Brenda Wood. ("Request," Dkt. No. 8.) The Court
held a hearing on the Request on April 22, 2020.
After considering the papers filed in support of and in
opposition to the Request and argument presented at
the hearing, the Court DENIES the Request.

# I. BACKGROUND

On April 13, 2020, Plaintiffs filed their complaint
against Defendants Xavier Becerra and Gavin
Newsom (collectively, "State Defendants"); Chad
Bianco, Jeff Hewitt, Kevin Jeffries, George Johnson,
Cameron Kaiser, V. Manuel Perez, Karen Spiegel,
and Chuck Washington (collectively, "Riverside
Defendants"); Erin Gustafson, John McMahon, Robert
A. Lovingood, Janice Rutherford, Dawn Rowe, Curt
Hagman, and Josie Gonzales (collectively, "San
Bernardino Defendants"). ("Complaint," Dkt. No. 1.)
The Complaint alleges eleven causes of action: (1)
Violation of Free Exercise Clause of First Amendment
to U.S. Constitution; (2) Violation of Establishment
Clause of First Amendment to U.S. Constitution; (3)
Violation of Free Speech Clause of First Amendment
to U.S. Constitution; (4) Violation of First Amendment
Freedom of Assembly Clause; (5) Violation of Due
Process Clause of Fourteenth Amendment to U.S.
Constitution; (6) Violation of Due Process Clause
of Fourteenth Amendment to U.S. Constitution; (7)
Violation of Equal Protection Clause of Fourteenth
Amendment to U.S. Constitution; (8) Right to Liberty
(Cal. Const. Art. 1, § 1); (9) Freedom of Speech
(Cal. Const. Art. 1, § 2); (10) Freedom of Assembly
(Cal. Const. Art. 1, § 3); and (11) Free Exercise
and Enjoyment of Religion (Cal. Const. Art. 1, § 4).

Plaintiffs filed the Request on April 13, 2020, the same
day they filed the Complaint. (Request.) In support of
the Request, Plaintiffs filed:

- Declaration of Mark Meuser ("Meuser
  Declaration," Dkt. No. 8-2);

- Declaration of Wendy Gish ("Gish Declaration,"
  Dkt. No. 8-3);

- Declaration of James Moffatt ("Moffatt
  Declaration," Dkt. No. 8-4);

- Declaration of Patrick Scales ("Scales
  Declaration," Dkt. No. 8-5);

- Declaration of Brenda Wood ("Wood Declaration,"
  Dkt. No. 8-6);

Defendants opposed the Request on April 17, 2020. ("State Opposition," Dkt. No. 13; "Riverside Opposition," Dkt. No. 15; "San Bernardino Opposition," Dkt. No. 18.) In support of the State Opposition, State Defendants filed the Declaration of Todd Grabarsky. (Grabarsky Declaration," Dkt. No. 13-1.) In support of the Riverside Opposition, Riverside Defendants filed:

- Request for Judicial Notice ("Riverside RJN," Dkt. No. 15-1);

- Jason Anderson ("Anderson Declaration," Dkt. No. 15-2);

- Declaration of Kelly A. Moran, ("Moran Declaration," Dkt. No. 15-3);

- Declaration of Dr. Cameron Kaiser ("Kaiser Declaration," Dkt. No. 15-4.)

In support of the San Bernardino Opposition, San Bernardino Defendants filed a request for judicial notice. ("San Bernardino RJN," Dkt. No. 18-1.) The Court held a telephonic hearing on April 22, 2020.

## II. REQUESTS FOR JUDICIAL NOTICE

**\*2** Riverside Defendants and San Bernardino Defendants separately submit unopposed requests for judicial notice. (*See* Riverside RJN; San Bernardino RJN.) A court may take judicial notice of an adjudicative fact not subject to "reasonable dispute," either because it is "generally known within the territorial jurisdiction of the trial court," or it is capable of accurate and ready determination by resort to sources whose "accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Under Federal Rule of Evidence 201, "[a] court must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(c)(2).

Judicial notice is appropriate here. The documents at issue are publicly available and not subject to reasonable dispute. Moreover, Defendants request only that the Court take judicial notice of the contents of the documents, not of the truth of those contents. Accordingly, the Court GRANTS the Riverside RJN and the San Bernardino RJN.

## III. FACTS

On December 31, 2019, China reported incidents of a pneumonia of unknown cause to the World Health Organization. Since then, that infectious disease, which came to be known as coronavirus disease 2019 (COVID-19), has swept the globe, infecting millions and killing nearly two hundred thousand people. [1]

[1]   World Health Organization, Coronavirus Disease 2019 Situation Report, April 23, 2020 https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200423-sitrep-94-covid-19.pdf?sfvrsn=b8304bf0_4

Defendant Newsom, the Governor of California, declared a State of Emergency in California on March 4, 2020. (Complaint ¶ 30; Grabarsky Declaration, Exhibit 1.) On March 19, 2020, the Defendant Newsom issued Executive Order N-33-20, which directed all California residents to heed the State's public health directives relating to COVID-19, including the March 19, 2020 Order of the State Public Health Officer ("State Order"). (Complaint ¶ 31; Grabarsky Declaration, Exhibit 3.) The State Order requires "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." (Grabarsky Declaration, Exhibit 3.) On March 22, 2020, the Public Health Officer designated a list of "Essential Critical Infrastructure Workers," including "[f]aith based services that are provided through streaming or other technology." (Grabarsky Declaration, Exhibit 4.)

Defendant Kaiser, Riverside County's Public Health Officer, issued a Declaration of Local Health Emergency in Riverside County on March 8, 2020. (Kaiser Declaration ¶ 10.) On April 6, 2020, Defendants Kaiser and Johnson issued an Amended Order of the Health Officer for the County of Riverside and of the County Executive Officer as Director of Emergency Services ("Riverside Order"). (Complaint ¶ 62; Kaiser Declaration ¶ 10, Exhibit I.) The Riverside Order prohibits "[a]ll public or

private gatherings ... including, but not limited to an auditorium, ... church, ... or any other indoor or outdoor space used for any non-essential purpose including, but not limited to ... church ...." (Complaint ¶ 63; Kaiser Declaration, Exhibit I.) Consistent with the State Order, the Riverside Order exempts essential business, including "courts of law, medical providers ... daycare and child care ... [and] necessary shopping at fuel stations, stores or malls," provided that a "state and federal guidelines for infection control" are observed. (Complaint ¶ 64; Kaiser Declaration Exhibit I.)

The County of San Bernardino Board of Supervisors declared a Local Health Emergency in San Bernardino County on March 10, 2020. (San Bernardino RJN, Exhibits F and G.) On April 7, 2020, Defendant Gustafson, the San Bernardino Health Officer, signed the of the Health Order of the County of San Bernardino for the Control of COVID-19 ("San Bernardino Order"). (Complaint ¶ 36; San Bernardino RJN, Exhibit I.) The San Bernardino Order "allow[s] faith based services that are provided through streaming or other technology, while individuals remain in their homes, but does not allow individuals to leave their home for driving parades or drive-up services, or for picking up non-essential items." (Complaint ¶ 37; San Bernardino RJN, Exhibit I.)

#### IV. LEGAL STANDARD

 **\*3**  The purpose of a temporary restraining order is to preserve the status quo and prevent irreparable harm until a hearing may be held on the propriety of a preliminary injunction. See Reno Air Racing Ass'n, Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006). The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction. Lockheed Missile & Space Co. v. Hughes Aircraft Co., 887 F. Supp. 1320, 1323 (N.D. Cal. 1995); see Stuhlbarg Intern. Sales Co., Inc. v. John D. Brushy and Co., Inc., 240 F.3d 832, 839 n.7 (9th Cir. 2011).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the

absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The Ninth Circuit employs the "serious questions" test, which states " 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011). "A preliminary injunction is an 'extraordinary and drastic remedy.' It should never be awarded as of right." Munaf v. Geren, 553 U.S. 674, 690 (2008) (citation omitted). When seeking a temporary restraining order through an *ex parte* application, a plaintiff must further show that he is without fault in creating the crisis necessitating the bypass of regular motion procedures. See Mission Power Eng'g Co. v. Cont'l Gas Co., 883 F. Supp. 488, 492–93 (C.D. Cal. 1995). The propriety of a temporary restraining order, in particular, hinges on a significant threat of irreparable injury, Simula, Inc. Autoliv, Inc., 175 F.3d 716, 725 (9th Cir. 1999), that must be imminent in nature, Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).

#### V. DISCUSSION

Plaintiffs request that the Court enjoin enforcement of the State Order, Riverside Order, and San Bernardino Order (collectively, "Orders") to "Plaintiffs' engagement in religious services, practices, or activities at which the Center for Disease Control's social distancing guidelines are followed." (Request at 24.) To succeed, Plaintiffs must demonstrate that they are likely to succeed on their claims that the Orders violate their constitutional rights and demonstrate that the other factors weigh in favor of granting the temporary restraining order.

#### A. Success on the Merits or Serious Questions
Plaintiffs assert that the Orders violate their constitutionally protected rights, including their right to the free exercise of religion. (Request at 9–21.)

In response, Defendants argue that Plaintiffs will not succeed on their constitutional claims for two reasons: First, as acts of the executive in response to a national emergency, the Orders are subject to only minimal scrutiny, which they easily survive.[2] (State Opposition at 7–14.) Second, even absent consideration of greater leeway afforded to executive acts during a state of emergency, the Orders do not violate Plaintiffs' rights under traditional constitutional analysis. (State Opposition at 14–19; Riverside Opposition at 16–34; San Bernardino Opposition at 11–17.)

[2]     Although only the State Defendants advance this argument, the Court will apply it to all three orders.

**1. Exercise of Executive Powers During State of Emergency**

**\*4** State Defendants argue that because the Orders are temporary executive actions taken in response to a national emergency, they are entitled to substantial judicial deference and not subject to traditional constitutional scrutiny. (State Opposition at 7–14.) The Court agrees: Defendants have a right to protect California residents from the spread of COVID-19 —even if those protections temporarily burden constitutional rights to a greater degree than normally permissible.

The Supreme Court held over a century ago that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 27 (1905). The COVID-19 pandemic threatens the lives of all Californians: indeed, nearly 1,500 have already died.[3] The virus has proven to be extremely contagious— it is airborne and can linger on surfaces for days.[4] Because asymptomatic and pre-symptomatic carriers of the virus can infect others, a belief that one "has never had or contracted the coronavirus ... been at any time exposed to the danger of contracting it ... and has never been in close proximity to any locality where said coronavirus has or have existed" is largely meaningless. (See Complaint ¶¶ 58, 79.) Anyone could be an unknowing, undetectable vector for the virus at any time. For these reasons, government and health officials have struggled to contain the virus. Without a vaccine, measures limiting physical contact between citizens, such as the Orders, are widely recognized as the only way to effectively slow the spread of the virus.

[3]     *Tracking Coronavirus in California*, Los Angeles Times https://www.latimes.com/ projects/california-coronavirus-cases-tracking-outbreak/ (last accessed April 23, 2020).

[4]     Neeltje van Doremalen, Ph.D., et al., *Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1*, N. England J. Med. 2020; 382:1564-1567 https://www.nejm.org/doi/ full/10.1056/NEJMc2004973 (last accessed April 23, 2020).

Undoubtedly, the Orders—and the similar orders in effect around the country—restrict the rights and freedoms normally enjoyed by citizens. The residents of California are confined to their homes, unable to gather with friends and family, unable to attend political rallies, unable to enjoy art and recreation, and largely unable to work or go to school. The Orders also prevent Plaintiffs (and all other California residents) from gathering for in-person worship or laying hands upon each other. Because Plaintiffs' religious beliefs compel them to do these things, the Orders do burden Plaintiffs' unrestrained exercise of their religion. But the Constitution does not guarantee "an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." Jacobson, 197 U.S. at 26. Indeed, "[t]he right to practice religion freely does not include liberty to expose the community ... to communicable disease." Prince v. Massachusetts, 321 U.S. 158, 166–67 (1944).

Recognizing that the need to protect the public may trump individual rights during a crisis, the Supreme Court has held that states and municipalities have greater leeway to burden constitutionally protected rights during public emergencies:

> In every well-ordered society charged with the duty of

conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand.

**\*5** Jacobson, 197 U.S. at 29; see also United States v. Caltex, 344 U.S. 149 (1952) (acknowledging that "in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved"). When responding to the COVID-19 pandemic, therefore, Defendants "may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' " In re Abbott, 2020 WL 1685929, at \*7 (5th Cir. Apr. 7, 2020) (quoting Jacobson, 197 U.S. at 31). In other words, during an emergency, traditional constitutional scrutiny does not apply. Instead, any measures that limit or suspend constitutional rights (1) must have a "real or substantial relation" to the crisis and (2) must not represent "plain, palpable" invasions of clearly protected rights. Jacobson, 197 U.S. at 31.

The Orders easily meet that test. First, they have a substantial relation to the COVID-19 crisis: they require the physical distancing that is needed to slow the spread of the virus. Second, there is no "plain, palpable invasion" of Plaintiffs' free exercise of religion. While Plaintiffs are unable to gather together in-person, they are free to gather virtually or over the phone. They are also free to gather in-person with the members of their household. They remain free to practice their religion in whatever way they see fit so long as they remain within the confines of their own homes. Although physical contact with others is curtailed, a wide swath of religious expression remains untouched by the Orders. The Orders, therefore, do not

represent a plain or palpable invasion of the general right to free exercise of religion. Accordingly, the Orders are likely a permissible exercise of executive authority during a national emergency.

### 2. Traditional Constitutional Analysis

Because the Orders survive the minimal scrutiny required where executive action taken in response to an emergency, the Court need not determine whether the Orders likewise survive traditional constitutional analysis. But they do: the Request must also be denied because the Orders likely do not impermissibly infringe on Plaintiffs' constitutional rights even when applying the traditional constitutional scrutiny.

### a. Free Exercise of Religion

Plaintiffs argue that the Orders target religion and must therefore be subjected to a strict scrutiny analysis. (Request at 9–11.) Defendants respond that the Orders are neutral and generally applicable and therefore only rational basis review applies. (State Opposition 15–16; Riverside Opposition at 16–19; San Bernardino Opposition at 11–13.) "In assessing neutrality and general applicability, courts evaluate both 'the text of the challenged law as well as the effect ... in its real operation." Parents for Privacy v. Barr, 949 F.3d 1210, 1234 (9th Cir. 2020).

The Orders are neutral on their faces: they "make no reference to any religious practice, conduct, belief, or motivation." Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1076 (9th Cir. 2015). While they do list faith-based gatherings as a type of in-person gathering that is prohibited, faith-based gatherings are referenced as an example—they are not the target of the Orders. (See e.g., Kaiser Declaration Exhibit I (prohibiting all gatherings including those for "church").) Facial neutrality does not require freedom from any mention of religion, instead "the minimum requirement of neutrality is that a law not *discriminate* on its face." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 533 (1993) (emphasis added). Because the orders apply to both religious and secular gatherings, they do not discriminate, and are therefore facially neutral.

Exhibit 4   Page 5 of 7

**\*6** The Orders are also neutral in operation: they apply to both religious and secular conduct and do not "substantially underinclude nonreligiously motivated conduct that might endanger the same governmental interest that the law is designed to protect." See Stormans, 794 F.3d at 1079. The Supreme Court has long recognized that "[o]fficial action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." Church of the Lukumi Babalu Aye, 508 U.S. at 534. Plaintiffs have presented no evidence that the Orders target religious conduct over secular conduct. And a review of the Orders demonstrates that both secular and religious conduct are prohibited equally. The majority of the prohibited conduct is secular: schools are closed, restaurants are shuttered, concerts and sporting events are canceled; citizens cannot visit public recreation spaces or gather with friends who live outside of their household; non-essential workers fortunate enough to still have jobs must work from home. Far from singling out religious conduct for additional restrictions, the State Order identifies workers preparing religious videoconferences as essential workers—an exception that facilitates religious conduct. Similar exceptions have not been made for sports, concerts, or non-essential work events. The Orders, therefore, are not restrictions against religion in disguise. They are generally applicable restrictions on gatherings of all kinds.

Plaintiffs argue that the Orders are underinclusive of secular activities that may also contribute to the spread of COVID-19 because they allow grocery stores, fast food restaurants, and marijuana dispensaries to remain open. (Request at 10.) But these are all essential services: without access to the food and medicines sold at these locations, more citizens would become ill or die. And despite social distancing the virus is spreading at these locations—grocery store employees are falling ill and dying. [5] If the state applies the same rules to in-person religious gatherings as it does to grocery stores, people will get sick and die from attending religious gatherings just as they are dying from working in grocery stores.

Dalvin Brown, *COVID-19 Claims Lives of 30 Grocery Store Workers, Thousands More May Have It, Union Says*, USA Today, https://www.usatoday.com/story/money/2020/04/14/coronavirus-claims-lives-30-grocery-store-workers-union-says/2987754001/ (last accessed April 23, 2020.)

Moreover, because the risk of transmission increases with every out-of-home contact, it is necessary to suspend non-essential activities so that essential functions can be less dangerous. Many older and immunocompromised people must leave their homes to purchase food and medicine. Grocery store employees, food preparers, delivery drivers, pharmacists, and other essential workers must go to work to ensure that California residents have what they need to survive. These individuals risk contracting the virus when performing these essential tasks. If those that they encounter engage in non-essential contacts, the risk of transmission increases. But if everyone limits their out-of-home contacts to only essential tasks, the risk decreases. When we all reduce our contacts to the minimum possible level, the rates of transmission go down. In sum, Californians need to stay home whenever possible to protect those who cannot.

Finally, as Defendants argued at the hearing, constitutional analysis only requires that the Court compare the prohibited religious conduct with analogous secular conduct when assessing underinclusivity. See Stormans, Inc. v. Wiesman, 794 F.3d 1064, 1079 (9th Cir. 2015) (holding that a law is only fatally underinclusive if it prohibits religious conduct but not "comparable secular conduct"). An in-person religious gathering is not analogous to picking up groceries, food, or medicine, where people enter a building quickly, do not engage directly with others except at points of sale, and leave once the task is complete. Instead, it is more analogous to attending school or a concert—activities where people sit together in an enclosed space to share a communal experience. Those activities are prohibited under the Orders. Because the Orders treat in-person religious gatherings the same as they treat secular in-person communal activities, they are generally applicable.

Because the Orders are facially neutral and generally applicable, they are subject to rational basis review. Stormans, Inc., 794 F.3d at 1075–76. And they easily

survive rational basis: the social distancing measures implemented by the Order are rationally related to slowing the spread of COVID-19—a state interest that is not only legitimate but compelling. Accordingly, the Orders likely do not violate the Free Exercise Clause.

### b. Establishment of Religion

**\*7** A government action violates the Establishment Clause if it lacks a "secular legislative purpose" or endorses religion. Lemon v. Kurtzman, 403 U.S. 602, 612–13 (1971); see also Trunk v. City of San Diego, 629 F.3d 1099, 1106 (9th Cir. 2011) (noting that "the Supreme Court essentially has collapsed the[ ] last two prongs [of the test articulated in Lemon] to ask whether the challenged governmental practice has the effect of endorsing religion.") The Orders do neither. First, they serve the important secular purpose of slowing the spread of COVID-19. Second, they do not endorse any religion: the order bans gatherings for all religions along with secular gatherings.[6] Accordingly, the Orders likely do not violate the Establishment Clause.

[6] Plaintiffs argue that special accommodations were made by the Riverside Defendants and the San Bernardino Defendants for Christians celebrating Easter. (Request at 2.) However, they do not seek to enjoin enforcement of any Easter exception. And they could not: Easter has passed. Accordingly, the Court need not determine whether the Easter exceptions violated the Establishment Clause.

### c. Other Alleged Constitutional Violations

Plaintiffs make several other claims for violations of their rights under the U.S. and California Constitutions. (Request at 12–20.) Each of these, however, is premised on Plaintiffs' argument that the Orders impermissibly restrict their religious exercise. (See, e.g., Request at 13 (arguing that the Orders are an unconstitutional prior restraint on speech because religious worship is protected speech).) Because the Court concludes that the Orders do not impermissibly restrict Plaintiffs' free exercise of religion, Plaintiffs' other claims likely fail as well.

### B. Remaining TRO Factors

Defendants have shown that because the Orders are likely a proper exercise of executive authority in a state of emergency they are entitled to enhanced deference, even where they infringe on typically protected rights. Moreover, even applying a traditional constitutional analysis, Plaintiffs' claims are unlikely to succeed. Accordingly, Plaintiffs are not likely to succeed on the merits of their claims, and the Court need not consider the remaining factors.

### VI. CONCLUSION

For the reasons above, the Court DENIES Plaintiffs' Request.

### IT IS SO ORDERED.

### All Citations

Slip Copy, 2020 WL 1979970

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

Exhibit 4  Page 7 of 7

*The* NEW ENGLAND JOURNAL *of* MEDICINE



---

### CORRESPONDENCE

---

# Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1

**TO THE EDITOR:** A novel human coronavirus that is now named severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) (formerly called HCoV-19) emerged in Wuhan, China, in late 2019 and is now causing a pandemic.[1] We analyzed the aerosol and surface stability of SARS-CoV-2 and compared it with SARS-CoV-1, the most closely related human coronavirus.[2]

We evaluated the stability of SARS-CoV-2 and SARS-CoV-1 in aerosols and on various surfaces and estimated their decay rates using a Bayesian regression model (see the Methods section in the Supplementary Appendix, available with the full text of this letter at NEJM.org). SARS-CoV-2 nCoV-WA1-2020 (MN985325.1) and SARS-CoV-1 Tor2 (AY274119.3) were the strains used. Aerosols (<5 $\mu$m) containing SARS-CoV-2 ($10^{5.25}$ 50% tissue-culture infectious dose [$TCID_{50}$] per milliliter) or SARS-CoV-1 ($10^{6.75-7.00}$ $TCID_{50}$ per milliliter)

were generated with the use of a three-jet Collison nebulizer and fed into a Goldberg drum to create an aerosolized environment. The inoculum resulted in cycle-threshold values between 20 and 22, similar to those observed in samples obtained from the upper and lower respiratory tract in humans.

Our data consisted of 10 experimental conditions involving two viruses (SARS-CoV-2 and SARS-CoV-1) in five environmental conditions (aerosols, plastic, stainless steel, copper, and cardboard). All experimental measurements are reported as means across three replicates.

SARS-CoV-2 remained viable in aerosols throughout the duration of our experiment (3 hours), with a reduction in infectious titer from $10^{3.5}$ to $10^{2.7}$ $TCID_{50}$ per liter of air. This reduction was similar to that observed with SARS-CoV-1, from $10^{4.3}$ to $10^{3.5}$ $TCID_{50}$ per milliliter (Fig. 1A).

SARS-CoV-2 was more stable on plastic and stainless steel than on copper and cardboard, and viable virus was detected up to 72 hours after application to these surfaces (Fig. 1A), although the virus titer was greatly reduced (from $10^{3.7}$ to $10^{0.6}$ $TCID_{50}$ per milliliter of medium after 72 hours on plastic and from $10^{3.7}$ to $10^{0.6}$ $TCID_{50}$ per milliliter after 48 hours on stainless steel). The stability kinetics of SARS-CoV-1 were similar (from $10^{3.4}$ to $10^{0.7}$ $TCID_{50}$ per milliliter after 72 hours on plastic and from $10^{3.6}$ to $10^{0.6}$ $TCID_{50}$ per milliliter after 48 hours on stainless steel). On copper, no viable SARS-CoV-2 was measured after 4 hours and no viable SARS-CoV-1 was measured after 8 hours. On cardboard, no viable SARS-CoV-2 was measured after 24 hours and no viable SARS-CoV-1 was measured after 8 hours (Fig. 1A).

### THIS WEEK'S LETTERS

1564   Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1

1567   Epidemiologic and Survival Trends in Amyloidosis, 1987–2019

1568   Complete Revascularization with Multivessel PCI for Myocardial Infarction

1572   PARP Inhibitors in Ovarian Cancer

1575   Schistosomiasis and the Global Goals

1576   A Trial of M72/AS01$_E$ Vaccine to Prevent Tuberculosis

1577   Baroreflex Dysfunction

Exhibit 5, Page 1 of 4

The New England Journal of Medicine
Downloaded from nejm.org on June 1, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

CORRESPONDENCE



Exhibit 5, Page 2 of 4

The New England Journal of Medicine
Downloaded from nejm.org on June 1, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

THE NEW ENGLAND JOURNAL of MEDICINE

**Figure 1 (previous page). Viability of SARS-CoV-1 and SARS-CoV-2 in Aerosols and on Various Surfaces.**

As shown in Panel A, the titer of aerosolized viable virus is expressed in 50% tissue-culture infectious dose ($TCID_{50}$) per liter of air. Viruses were applied to copper, cardboard, stainless steel, and plastic maintained at 21 to 23°C and 40% relative humidity over 7 days. The titer of viable virus is expressed as $TCID_{50}$ per milliliter of collection medium. All samples were quantified by end-point titration on Vero E6 cells. Plots show the means and standard errors (I bars) across three replicates. As shown in Panel B, regression plots indicate the predicted decay of virus titer over time; the titer is plotted on a logarithmic scale. Points show measured titers and are slightly jittered (i.e., their horizontal positions are modified by a small random amount to reduce overlap) along the time axis to avoid overplotting. Lines are random draws from the joint posterior distribution of the exponential decay rate (negative of the slope) and intercept (initial virus titer) to show the range of possible decay patterns for each experimental condition. There were 150 lines per panel, including 50 lines from each plotted replicate. As shown in Panel C, violin plots indicate posterior distribution for the half-life of viable virus based on the estimated exponential decay rates of the virus titer. The dots indicate the posterior median estimates, and the black lines indicate a 95% credible interval. Experimental conditions are ordered according to the posterior median half-life of SARS-CoV-2. The dashed lines indicate the limit of detection, which was $3.33 \times 10^{0.5}$ $TCID_{50}$ per liter of air for aerosols, $10^{0.5}$ $TCID_{50}$ per milliliter of medium for plastic, steel, and cardboard, and $10^{1.5}$ $TCID_{50}$ per milliliter of medium for copper.

Both viruses had an exponential decay in virus titer across all experimental conditions, as indicated by a linear decrease in the $log_{10}TCID_{50}$ per liter of air or milliliter of medium over time (Fig. 1B). The half-lives of SARS-CoV-2 and SARS-CoV-1 were similar in aerosols, with median estimates of approximately 1.1 to 1.2 hours and 95% credible intervals of 0.64 to 2.64 for SARS-CoV-2 and 0.78 to 2.43 for SARS-CoV-1 (Fig. 1C, and Table S1 in the Supplementary Appendix). The half-lives of the two viruses were also similar on copper. On cardboard, the half-life of SARS-CoV-2 was longer than that of SARS-CoV-1. The longest viability of both viruses was on stainless steel and plastic; the estimated median half-life of SARS-CoV-2 was approximately 5.6 hours on stainless steel and 6.8 hours on plastic (Fig. 1C). Estimated differences in the half-lives of the two viruses were small except for those on cardboard (Fig. 1C). Individual replicate data were noticeably "noisier" (i.e., there was more varia-

tion in the experiment, resulting in a larger standard error) for cardboard than for other surfaces (Fig. S1 through S5), so we advise caution in interpreting this result.

We found that the stability of SARS-CoV-2 was similar to that of SARS-CoV-1 under the experimental circumstances tested. This indicates that differences in the epidemiologic characteristics of these viruses probably arise from other factors, including high viral loads in the upper respiratory tract and the potential for persons infected with SARS-CoV-2 to shed and transmit the virus while asymptomatic.[3,4] Our results indicate that aerosol and fomite transmission of SARS-CoV-2 is plausible, since the virus can remain viable and infectious in aerosols for hours and on surfaces up to days (depending on the inoculum shed). These findings echo those with SARS-CoV-1, in which these forms of transmission were associated with nosocomial spread and super-spreading events,[5] and they provide information for pandemic mitigation efforts.

Neeltje van Doremalen, Ph.D.
Trenton Bushmaker, B.Sc.
National Institute of Allergy and Infectious Diseases
Hamilton, MT

Dylan H. Morris, M.Phil.
Princeton University
Princeton, NJ

Myndi G. Holbrook, B.Sc.
National Institute of Allergy and Infectious Diseases
Hamilton, MT

Amandine Gamble, Ph.D.
University of California, Los Angeles
Los Angeles, CA

Brandi N. Williamson, M.P.H.
National Institute of Allergy and Infectious Diseases
Hamilton, MT

Azaibi Tamin, Ph.D.
Jennifer L. Harcourt, Ph.D.
Natalie J. Thornburg, Ph.D.
Susan I. Gerber, M.D.
Centers for Disease Control and Prevention
Atlanta, GA

James O. Lloyd-Smith, Ph.D.
University of California, Los Angeles
Los Angeles, CA
Bethesda, MD

Emmie de Wit, Ph.D.
Vincent J. Munster, Ph.D.
National Institute of Allergy and Infectious Diseases
Hamilton, MT
vincent.munster@nih.gov

Exhibit 5, Page 3 of 4

The New England Journal of Medicine
Downloaded from nejm.org on June 1, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

CORRESPONDENCE

Dr. van Doremalen, Mr. Bushmaker, and Mr. Morris contributed equally to this letter.

The findings and conclusions in this letter are those of the authors and do not necessarily represent the official position of the Centers for Disease Control and Prevention (CDC). Names of specific vendors, manufacturers, or products are included for public health and informational purposes; inclusion does not imply endorsement of the vendors, manufacturers, or products by the CDC or the Department of Health and Human Services.

Supported by the Intramural Research Program of the National Institute of Allergy and Infectious Diseases, National Institutes of Health, and by contracts from the Defense Advanced Research Projects Agency (DARPA PREEMPT No. D18AC00031, to Drs. Lloyd-Smith and Gamble), from the National Science Foundation (DEB-1557022, to Dr. Lloyd-Smith), and from the Strategic Environmental Research and Development Program of the Department of Defense (SERDP, RC-2635, to Dr. Lloyd-Smith).

Disclosure forms provided by the authors are available with the full text of this letter at NEJM.org.

This letter was published on March 17, 2020, at NEJM.org.

1. Coronavirus disease (COVID-2019) situation reports. Geneva: World Health Organization, 2020 (https://www.who.int/emergencies/diseases/novel-coronavirus-2019/situation-reports/).
2. Wu A, Peng Y, Huang B, et al. Genome composition and divergence of the novel coronavirus (2019-nCoV) originating in China. Cell Host Microbe 2020;27:325-8.
3. Bai Y, Yao L, Wei T, et al. Presumed asymptomatic carrier transmission of COVID-19. JAMA 2020 February 21 (Epub ahead of print).
4. Zou L, Ruan F, Huang M, et al. SARS-CoV-2 viral load in upper respiratory specimens of infected patients. N Engl J Med 2020;382:1177-9.
5. Chen YC, Huang LM, Chan CC, et al. SARS in hospital emergency room. Emerg Infect Dis 2004;10:782-8.

DOI: 10.1056/NEJMc2004973

# Epidemiologic and Survival Trends in Amyloidosis, 1987–2019

**TO THE EDITOR:** Amyloidosis is a group of rare disorders caused by deposition of misfolded proteins as insoluble fibrils, which leads to progressive multiorgan failure and death.[1] The past 30 years have seen remarkable advances in diagnostic imaging, more accurate identification of fibrils, and (in recent years) the first approved treatments.[2,3]

We report here data on 11,006 patients who received a diagnosis of amyloidosis during the period from 1987 through October 2019. All data were obtained from the United Kingdom National Amyloidosis Centre database. The number of cases increased by 670% from the period 1987–1999 to the period 2010–2019 (Fig. 1A). Systemic light-chain (AL) amyloidosis remained the most common type and accounted for 55% of all cases (Fig. 1B). With the advances in therapies that target plasma cells, overall survival among patients with AL amyloidosis increased from a median of 18 months among patients who received a diagnosis before 2005 to



**Figure 1. Diagnoses of Amyloidosis over Three Decades and Amyloidosis Types.**

Panel A shows data for 11,006 cases of amyloidosis diagnosed from 1987 to 2019. Panel B shows data for the 10,755 cases for which fibril type could be determined accurately. AA denotes amyloid A, AApo1 amyloid apolipoprotein A-I, Aβ2M amyloid beta₂-microglobulin, AFib amyloid fibrinogen, ALect2 amyloid leukocyte chemotactic factor 2, AL light chain, ALys amyloid lysozyme, ATTR transthyretin-associated, and ATTRwt wild-type ATTR.

Exhibit 5, Page 4 of 4

The New England Journal of Medicine
Downloaded from nejm.org on June 1, 2020. For personal use only. No other uses without permission.
Copyright © 2020 Massachusetts Medical Society. All rights reserved.

BRIEF REPORT

# The airborne lifetime of small speech droplets and their potential importance in SARS-CoV-2 transmission

Valentyn Stadnytskyi[a], Christina E. Bax[b], Adriaan Bax[a,1], and Philip Anfinrud[a,1]

[a]Laboratory of Chemical Physics, National Institute of Diabetes and Digestive and Kidney Diseases, National Institutes of Health, Bethesda, MD 20892-0520; and [b]Perelman School of Medicine, University of Pennsylvania, Philadelphia, PA 19104

Edited by Axel T. Brunger, Stanford University, Stanford, CA, and approved May 4, 2020 (received for review April 10, 2020)

Speech droplets generated by asymptomatic carriers of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) are increasingly considered to be a likely mode of disease transmission. Highly sensitive laser light scattering observations have revealed that loud speech can emit thousands of oral fluid droplets per second. In a closed, stagnant air environment, they disappear from the window of view with time constants in the range of 8 to 14 min, which corresponds to droplet nuclei of ca. 4 μm diameter, or 12- to 21-μm droplets prior to dehydration. These observations confirm that there is a substantial probability that normal speaking causes airborne virus transmission in confined environments.

COVID-19 | speech droplet | independent action hypothesis | respiratory disease | disease transmission

It has long been recognized that respiratory viruses can be transmitted via droplets that are generated by coughing or sneezing. It is less widely known that normal speaking also produces thousands of oral fluid droplets with a broad size distribution (ca. 1 μm to 500 μm) (1, 2). Droplets can harbor a variety of respiratory pathogens, including measles (3) and influenza virus (4) as well as *Mycobacterium tuberculosis* (5). High viral loads of severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) have been detected in oral fluids of coronavirus disease 2019 (COVID-19)–positive patients (6), including asymptomatic ones (7). However, the possible role of small speech droplet nuclei with diameters of less than 30 μm, which potentially could remain airborne for extended periods of time (1, 2, 8, 9), has not been widely appreciated.

In a recent report (10), we used an intense sheet of laser light to visualize bursts of speech droplets produced during repeated spoken phrases. This method revealed average droplet emission rates of ca. 1,000 s$^{-1}$ with peak emission rates as high as 10,000 s$^{-1}$, with a total integrated volume far higher than in previous reports (1, 2, 8, 9). The high sensitivity of the light scattering method in observing medium-sized (10 μm to 100 μm) droplets, a fraction of which remain airborne for at least 30 s, likely accounts for the large increase in the number of observed droplets. Here, we derive quantitative estimates for both the number and size of the droplets that remain airborne. Larger droplets, which are also abundant but associated with close-proximity direct virus transfer or fomite transmission (11), or which can become resuspended in air at a later point in time (12), are not considered here.

According to Stokes' law, the terminal velocity of a falling droplet scales as the square of its diameter. Once airborne, speech-generated droplets rapidly dehydrate due to evaporation, thereby decreasing in size (13) and slowing their fall. The probability that a droplet contains one or more virions scales with its initial hydrated volume, that is, as the cube of its diameter, d. Therefore, the probability that speech droplets pass on an infection when emitted by a virus carrier must take into account how long droplet nuclei remain airborne (proportional to d$^{-2}$) and the probability that droplets encapsulate at least one virion (proportional to d$^3$), the product of which is proportional to d.

The amount by which a droplet shrinks upon dehydration depends on the fraction of nonvolatile matter in the oral fluid, which includes electrolytes, sugars, enzymes, DNA, and remnants of dehydrated epithelial and white blood cells. Whereas pure saliva contains 99.5% water when exiting the salivary glands, the weight fraction of nonvolatile matter in oral fluid falls in the 1 to 5% range. Presumably, this wide range results from differential degrees of dehydration of the oral cavity during normal breathing and speaking and from decreased salivary gland activity with age. Given a nonvolatile weight fraction in the 1 to 5% range and an assumed density of 1.3 g·mL$^{-1}$ for that fraction, dehydration causes the diameter of an emitted droplet to shrink to about 20 to 34% of its original size, thereby slowing down the speed at which it falls (1, 13). For example, if a droplet with an initial diameter of 50 μm shrinks to 10 μm, the speed at which it falls decreases from 6.8 cm·s$^{-1}$ to about 0.35 cm·s$^{-1}$. The distance over which droplets travel laterally from the speaker's mouth during their downward trajectory is dominated by the total volume and flow velocity of exhaled air (8). The flow velocity varies with phonation (14), while the total volume and droplet count increase with loudness (9). Therefore, in an environment of stagnant air, droplet nuclei generated by speaking will persist as a slowly descending cloud emanating from the speaker's mouth, with the rate of descent determined by the diameter of the dehydrated speech droplet nuclei.

The independent action hypothesis (IAH) states that each virion has an equal, nonzero probability of causing an infection. Validity of IAH was demonstrated for infection of insect larvae by baculovirus (15), and of plants by Tobacco etch virus variants that carried green fluorescent protein markers (16). IAH applies to systems where the host is highly susceptible, but the extent to which IAH is valid for humans and SARS-CoV-2 has not been firmly established. For COVID-19, with an oral fluid average virus RNA load of $7 \times 10^6$ copies per milliliter (maximum of $2.35 \times 10^9$ copies per milliliter) (7), the probability that a 50-μm-diameter droplet, prior to dehydration, contains at least one virion is ~37%. For a 10-μm droplet, this probability drops to 0.37%, and the probability that it contains more than one virion, if generated from a homogeneous distribution of oral fluid, is negligible. Therefore, airborne droplets pose a significant risk only if IAH applies to human virus transmission. Considering that frequent person-to-person transmission has been reported in community and health care settings, it appears likely that IAH

Author contributions: C.E.B., A.B., and P.A. designed research; V.S., A.B., and P.A. performed research; V.S. analyzed data; and C.E.B., A.B., and P.A. wrote the paper.

The authors declare no competing interest.

This open access article is distributed under Creative Commons Attribution License 4.0 (CC BY).

Data deposition: Movies that show the experimental setup and the full 85-minute observation of speech droplet nuclei have been deposited at Zenodo and can be accessed at https://doi.org/10.5281/zenodo.3770559.

[1]To whom correspondence may be addressed. Email: bax@nih.gov or philip.anfinrud@nih.gov.

MEDICAL SCIENCES

Exhibit 6, Page 1 of 3

Downloaded from https://www.pnas.org by guest on June 1, 2020

applies to COVID-19 and other highly contagious airborne respiratory diseases, such as influenza and measles.

## Results and Discussion

The output from a green (532 nm) Coherent Verdi laser operating at 4-W optical power was transformed with spherical and cylindrical optics into a light sheet that is ~1 mm thick and 150 mm tall. This light sheet passed through slits centered on opposite sides of a cubic 226-L enclosure. When activated, a 40-mm, 12-V muffin fan inside the enclosure spatially homogenizes the distribution of particles in the enclosure. A movie showing the arrangement is available (17). Movie clips of speech droplet nuclei were recorded at a frame rate of 24 Hz with high-definition resolution (1,920 × 1,080 pixels). The camera lens provided a horizontal field of view of ~20 cm. Therefore, the volume intercepted by the light sheet and viewed by the camera is ~30 cm$^3$. The total number of particles in the enclosure can be approximated by multiplying the average number of particles detected in a single movie frame by the volume ratio of the enclosure to the visualized sheet, which is ~7,300. Slow convection currents, at speeds of a few centimeters per second, remained for the duration of the recording. These convection currents are attributed to a 0.5 °C temperature gradient in the enclosure (bottom to top) that presumably is due to heat dissipated by the iPhone11 camera, which was attached to the front side of the enclosure. Since the net air flux across any horizontal plane of the enclosure is zero, this convection does not impact the average rate at which droplet nuclei fall to the bottom of the enclosure.

With the internal circulation fan turned on, the enclosure was purged with HEPA-filtered air for several minutes. Then, the purge shutter was closed, the movie clip was started, the speaker port was opened, and the enclosure was "filled" with speech droplets by someone repeating the phrase "stay healthy" for 25 s. This phrase was chosen because the "th" phonation in the word "healthy" was found to be an efficient generator of oral fluid speech droplets. The internal fan was turned off 10 s after speech was terminated, and the camera continued recording for 80 min. The movie clip was analyzed frame by frame to determine the number of spots/streaks whose maximum single-pixel intensity exceeded a threshold value of 30. Fig. 1 charts the time-dependent decrease in the number of scattering particles detected. We are not yet able to quantitatively link the observed scattered light intensity to the size of the scattering particle because the light intensity varies across the sheet. However, the brightest 25% were found to decay more quickly than the dimmer fraction, with the two curves reasonably well described by exponential decay times of 8 and 14 min, respectively (Fig. 1A). These fits indicate that, near time 0, there were, on average, approximately nine droplet nuclei in the 30-cm$^3$ observation window, with the larger and brighter nuclei (on average) falling to the bottom of the enclosure at faster speeds than the smaller and dimmer ones.

With the assumption that the contents of the box are homogenized by the muffin fan at time 0, the average number of droplets found in a single frame near time 0 corresponds to ca. 66,000 small droplets emitted into the 226-L enclosure, or ca. 2,600 small droplet nuclei per second of speaking. If the particle size distribution were a delta function and the particles were uniformly distributed in the enclosure, the particle count would be expected to remain constant until particles from the top of the enclosure descend to the top of the light sheet, after which the particle count would decay linearly to background level. The observation that the decay profiles are approximately exponential points to a substantial heterogeneity in particle sizes, even after binning them into two separate groups.

The weighted average decay rate (0.085 min$^{-1}$) of the bright and dim fractions of particles (Fig. 1A) translates into a half-life in the enclosure of ca. 8 min. Assuming this half-life corresponds to the time required for a particle to fall 30 cm (half the height of the box), its terminal velocity is only 0.06 cm·s$^{-1}$, which corresponds to a droplet nucleus diameter of ~4 μm. At the relative humidity (27%) and temperature (23 °C) of our experiment, we expect the droplets to dehydrate within a few seconds. A dehydrated particle of 4 μm corresponds to a hydrated droplet of ca. 12- to 21-μm diameter, or a total hydrated volume of ~60 nL to 320 nL for 25 s of loud speaking. At an average viral load of 7 × 10$^6$ per milliliter (7), we estimate that 1 min of loud speaking generates at least 1,000 virion-containing droplet nuclei that remain airborne for more than 8 min. These therefore could be inhaled by others and, according to IAH, trigger a new SARS-CoV-2 infection.

The longest decay constant observed by us corresponds to droplets with a hydrated diameter of ≥12 μm when exiting the mouth. The existence of even smaller droplets has been



**Fig. 1.** Light scattering observation of airborne speech droplet nuclei, generated by a 25-s burst of repeatedly speaking the phrase "stay healthy" in a loud voice (maximum 85 dB$_B$; average 59 dB$_B$). (A) Chart of particle count per frame versus time (smoothed with a 24-s moving average), with the red curve representing the top 25% in scattering brightness and the green curve representing the rest. The bright fraction (red) decays with a time constant of 8 min, and the dimmer fraction (green) decays with a time constant of 14 min. Both exponential decay curves return to their respective background level of ca. 0 (red horizontal dashed line) and 0.4 (green dashed line) counts per frame. Time "0" corresponds to the time the stirring fan was turned off. The 25-s burst of speaking started 36 s before time 0. The black arrow (at 0.5 min) marks the start of the exponential fits. (B) Image of the sum of 144 consecutive frames (spanning 6 s) extracted shortly after the end of the 25-s burst of speaking. The dashed circle marks the needle tip used for focusing the camera. The full movie recording is available in ref. 17, with time "0" in the graph at time point 3:38 in the movie.

Exhibit 6, Page 2 of 3 Stadnytskyi et al.

Downloaded by guest on June 1, 2020

BRIEF REPORT

established by aerodynamic particle sizer (APS) measurements (2). APS is widely used for detecting aerosol particulates and is best suited for particles in the 0.5- to 5-μm range. Morawska et al. (2) detected as many as 330 particles per second in the 0.8- to 5.5-μm range upon sustained "aah" vocalization. Considering the short travel time (0.7 s) between exiting the mouth and the APS detector, and the high relative humidity (59%) used in that study, droplet dehydration may have been incomplete. If it were 75% dehydrated at the detector, an observed 5.5-μm particle would have started as an 8.7-μm droplet when exiting the mouth, well outside the 12- to 21-μm range observed above by light scattering. This result suggests that APS and light scattering measurements form a perfect complement. However, we also note that, even while the smallest droplet nuclei effectively remain airborne indefinitely and have half-lives that are dominated by the ventilation rate, at a saliva viral load of $7 \times 10^6$ copies per milliliter, the probability that a 1-μm droplet nucleus (scaled back to its originally hydrated 3-μm size) contains a virion is only 0.01%.

Our current setup does not detect every small particle in each frame of the movie, and our reported values are therefore conservative lower limit estimates. We also note that the saliva viral load shows large patient-to-patient variation. Some patients have viral titers that exceed the average titer of Wölfel et al. by more than two orders of magnitude (7, 18), thereby increasing the number of virions in the emitted droplets to well over 100,000 per minute of speaking. The droplet nuclei observed in our present study and previously by APS (2, 9) are sufficiently small to reach the lower respiratory tract, which is associated with an increased adverse disease outcome (19, 20).

Our laser light scattering method not only provides real-time visual evidence for speech droplet emission, but also assesses their airborne lifetime. This direct visualization demonstrates how normal speech generates airborne droplets that can remain suspended for tens of minutes or longer and are eminently capable of transmitting disease in confined spaces.

**Data Availability Statement.** All raw data used for analysis are available in ref. 17.

**ACKNOWLEDGMENTS.** We thank Bernhard Howder for technical support, Clemens Wendtner, William A. Eaton, Roland Netz, and Steven Chu for insightful comments. This work was supported by the Intramural Research Program of the National Institute of Diabetes and Digestive and Kidney Diseases.

1. J. P. Duguid, The size and the duration of air-carriage of respiratory droplets and droplet-nuclei. *J. Hyg. (Lond.)* **44**, 471–479 (1946).

2. L. Morawska *et al.*, Size distribution and sites of origin of droplets expelled from the human respiratory tract during expiratory activities. *J. Aerosol Sci.* **40**, 256–269 (2009).

3. L. Liljeroos, J. T. Huiskonen, A. Ora, P. Susi, S. J. Butcher, Electron cryotomography of measles virus reveals how matrix protein coats the ribonucleocapsid within intact virions. *Proc. Natl. Acad. Sci. U.S.A.* **108**, 18085–18090 (2011).

4. J. Yan *et al.*; EMIT Consortium, Infectious virus in exhaled breath of symptomatic seasonal influenza cases from a college community. *Proc. Natl. Acad. Sci. U.S.A.* **115**, 1081–1086 (2018).

5. K. P. Fennelly *et al.*, Variability of infectious aerosols produced during coughing by patients with pulmonary tuberculosis. *Am. J. Respir. Crit. Care Med.* **186**, 450–457 (2012).

6. J. F.-W. Chan *et al.*, Improved molecular diagnosis of COVID-19 by the novel, highly sensitive and specific COVID-19-RdRp/Hel real-time reverse transcription-polymerase chain reaction assay validated in vitro and with clinical specimens. *J. Clin. Microbiol.* **58**, e00310-20 (2020).

7. R. Wölfel *et al.*, Virological assessment of hospitalized patients with COVID-2019. *Nature*, 10.1038/s41586-020-2196-x (2020).

8. C. Y. H. Chao *et al.*, Characterization of expiration air jets and droplet size distributions immediately at the mouth opening. *J. Aerosol Sci.* **40**, 122–133 (2009).

9. S. Asadi *et al.*, Aerosol emission and superemission during human speech increase with voice loudness. *Sci. Rep.* **9**, 2348 (2019).

10. P. Anfinrud, V. Stadnytskyi, C. E. Bax, A. Bax, Visualizing speech-generated oral fluid droplets with laser light scattering. *N. Engl. J. Med.*, 10.1056/NEJMc2007800 (2020).

11. T. Raymond, Review of aerosol transmission of Influenza A virus. *Emerging Infect. Dis. J.* **12**, 1657–1662 (2006).

12. Y. Liu *et al.*, Aerodynamic analysis of SARS-CoV-2 in two Wuhan hospitals. *Nature*, 10.1038/s41586-020-2271-3 (2020).

13. W. F. Wells, On air-borne infection—Study II droplets and droplet nuclei. *Am. J. Hyg.* **20**, 611–618 (1934).

14. H. Traunmüller, A. Eriksson, Acoustic effects of variation in vocal effort by men, women, and children. *J. Acoust. Soc. Am.* **107**, 3438–3451 (2000).

15. M. P. Zwart *et al.*, An experimental test of the independent action hypothesis in virus–insect pathosystems. *Proc. Biol. Sci.* **276**, 2233–2242 (2009).

16. M. P. Zwart, J. A. Daròs, S. F. Elena, One is enough: In vivo effective population size is dose-dependent for a plant RNA virus. *PLoS Pathog.* **7**, e1002122 (2011).

17. V. Stadnytskyi, P. Anfinrud, C. E. Bax, A. Bax, The airborne lifetime of small speech droplets and their potential importance to SARS-CoV-2 transmission. Zenodo. https://doi.org/10.5281/zenodo.3770559. Deposited 10 April 2020.

18. C. Rothe *et al.*, Transmission of 2019-nCoV infection from an asymptomatic contact in Germany. *N. Engl. J. Med.* **382**, 970–971 (2020).

19. R. Tellier, Y. Li, B. J. Cowling, J. W. Tang, Recognition of aerosol transmission of infectious agents: A commentary. *BMC Infect. Dis.* **19**, 101 (2019).

20. R. J. Thomas, Particle size and pathogenicity in the respiratory tract. *Virulence* **4**, 847–858 (2013).

MEDICAL SCIENCES

Downloaded by guest on June 1, 2020

**Harvard Health Publishing**

**HARVARD MEDICAL SCHOOL**

*Trusted advice for a healthier life*

🛒 CART | FREE HEALTHBEAT SIGNUP | SHOP ▾ | SIGN IN

Pay My Bill »

What can we help you find? 🔍

| HEART HEALTH | MIND & MOOD | PAIN | STAYING HEALTHY | CANCER | DISEASES & CONDITIONS | MEN'S HEALTH | WOMEN'S HEALTH | LICENSING |

# COVID-19 basics

### Symptoms, spread and other essential information about the new coronavirus and COVID-19



**Updated: June 1, 2020    Published: March, 2020**

As we continually learn more about coronavirus and COVID-19, it can help to reacquaint yourself with some basic information. For example, understanding how the virus spreads reinforces the importance of social distancing and other health-promoting behaviors. Knowing how long the virus survives on surfaces can guide how you clean your home and handle deliveries. And reviewing the common symptoms of COVID-19 can help you know if it's time to self-isolate.

### What is coronavirus?

Coronaviruses are an extremely common cause of colds and other upper respiratory infections.

### What is COVID-19?

COVID-19, short for "coronavirus disease 2019," is the official name given by the World Health Organization to the disease caused by this newly identified coronavirus.

### How many people have COVID-19?

The numbers are changing rapidly.

The most up-to-date information is available from the World Health Organization, the US Centers for Disease Control and Prevention, and Johns Hopkins University.

It has spread so rapidly and to so many countries that the World Health Organization has declared it a pandemic (a term indicating that it has affected a large population, region, country, or continent).

### Do adults younger than 65 who are otherwise healthy need to worry about COVID-19?

Yes, they do. Although you're young and healthy, such illnesses can put you at a greater risk of illness that may require hospitalization. According to a report published in the CDC's *Morbidity and Mortality Weekly Report* (MMWR) in late March, nearly 40% of people hospitalized for COVID-19 between mid-February and mid-March were between the ages of 20 and 54. Drilling further down by age, *MMWR* reported that 20% of hospitalized patients and 12% of COVID-19 patients in ICUs were between the ages of 20 and 44.

People of any age should take preventive health measures like frequent hand washing, physical distancing, and wearing a mask when going out in public, to help protect themselves and to reduce the chances of spreading the infection to others.

## What are the symptoms of COVID-19?

Some people infected with the virus have no symptoms. When the virus does cause symptoms, common ones include fever, body ache, dry cough, fatigue, chills, headache, sore throat, loss of appetite, and loss of smell. In some people, COVID-19 causes more severe symptoms like high fever, severe cough, and shortness of breath, which often indicates pneumonia.

People with COVID-19 are also experiencing neurological symptoms, gastrointestinal (GI) symptoms, or both. These may occur with or without respiratory symptoms.

For example, COVID-19 affects brain function in some people. Specific neurological symptoms seen in people with COVID-19 include loss of smell, inability to taste, muscle weakness, tingling or numbness in the hands and feet, dizziness, confusion, delirium, seizures, and stroke.

In addition, some people have gastrointestinal (GI) symptoms, such as loss of appetite, nausea, vomiting, diarrhea, and abdominal pain or discomfort associated with COVID-19. These symptoms might start before other symptoms such as fever, body ache, and cough. The virus that causes COVID-19 has also been detected in stool, which reinforces the importance of hand washing after every visit to the bathroom and regularly disinfecting bathroom fixtures.

## Can COVID-19 symptoms worsen rapidly after several days of illness?

Common symptoms of COVID-19 include fever, dry cough, fatigue, loss of appetite, loss of smell, and body ache. In some people, COVID-19 causes more severe symptoms like high fever, severe cough, and shortness of breath, which often indicates pneumonia.

A person may have mild symptoms for about one week, then worsen rapidly. Let your doctor know if your symptoms quickly worsen over a short period of time. Also call the doctor right away if you or a loved one with COVID-19 experience any of the following emergency symptoms: trouble breathing, persistent pain or pressure in the chest, confusion or inability to arouse the person, or bluish lips or face.

## What are cytokine storms and what do they have to do with COVID-19?

A cytokine storm is an overreaction of the body's immune system. In some people with COVID-19, the immune system releases immune messengers, called cytokines, into the bloodstream out of proportion to the threat or long after the virus is no longer a threat.

When this happens, the immune system attacks the body's own tissues, potentially causing significant harm. A cytokine storm triggers an exaggerated inflammatory response that may damage the liver, blood vessels, kidneys, and lungs, and increase formation of blood clots throughout the body. Ultimately, the cytokine storm may cause more harm than the coronavirus itself.

A simple blood test can help determine whether someone with COVID-19 may be experiencing a cytokine storm. Trials in countries around the world are investigating whether drugs that have been used to treat cytokine storms in people with other, non-COVID conditions could be effective in people with COVID-19.

## One of the symptoms of COVID-19 is shortness of breath. What does that mean?

Shortness of breath refers to unexpectedly feeling out of breath, or winded. But when should you worry about shortness of breath? There are many examples of temporary shortness of breath that are not worrisome. For example, if you feel very anxious, it's common to get short of breath and then it goes away when you calm down.

However, if you find that you are ever breathing harder or having trouble getting air each time you exert yourself, you always need to call your doctor. That was true before we had the recent outbreak of COVID-19, and it will still be true after it is over.

Meanwhile, it's important to remember that if shortness of breath is your only symptom, without a cough or fever, something other than COVID-19 is the likely problem.

## Does COVID-19 cause strokes? What about blood clots in other parts of the body?

Strokes occurring in coronavirus patients may disrupt usually well-coordinated body functions. Doctors report a greater than expected number of younger patients being hospitalized for, and sometimes dying from, serious strokes. These strokes are happening in patients who test positive for coronavirus but who do not have any traditional risk factors for stroke. They tend to have no COVID-19 symptoms, or only mild symptoms. The type of stroke occurring in these patients typically occurs in much older patients.

COVID-related strokes occur because of a bodywide increase in blood clot formation, which can damage any organ, not just the brain. A blood clot in the lungs is called pulmonary embolism and can cause shortness of breath, chest pain, or death; a blood clot in or near the heart can cause a heart attack; and blood clots in the kidneys can cause kidney damage requiring dialysis.

We don't yet know if the coronavirus itself stimulates blood clots to form, or if they are a result of an overactive immune response to the virus.

## Can COVID-19 affect brain function?

COVID-19 does appear to affect brain function in some people. Specific neurological symptoms seen in people with COVID-19 include loss of smell, inability to taste, muscle weakness, tingling or numbness in the hands and feet, dizziness, confusion, delirium, seizures, and stroke.

One study that looked at 214 people with moderate to severe COVID-19 in Wuhan, China found that about one-third of those patients had one or more neurological symptoms. Neurological symptoms were more common in people with more severe disease.

Neurological symptoms have also been seen in COVID-19 patients in the US and around the world. Some people with neurological symptoms tested positive for COVID-19 but did not have any respiratory symptoms like coughing or difficulty breathing; others experienced both neurological and respiratory symptoms.

Experts do not know how the coronavirus causes neurological symptoms. They may be a direct result of infection or an indirect consequence of inflammation or altered oxygen and carbon dioxide levels caused by the virus.

The CDC has added "new confusion or inability to rouse" to its list of emergency warning signs that should prompt you to get immediate medical attention.

## Is a lost sense of smell a symptom of COVID-19? What should I do if I lose my sense of smell?

Increasing evidence suggests that a lost sense of smell, known medically as anosmia, may be a symptom of COVID-19. This is not surprising, because viral infections are a leading cause of loss of sense of smell, and COVID-19 is a caused by a virus. Still, loss of smell might help doctors identify people who do not have other symptoms, but who might be infected with the COVID-19 virus — and who might be unwittingly infecting others.

A statement written by a group of ear, nose and throat specialists (otolaryngologists) in the United Kingdom reported that in Germany, two out of three confirmed COVID-19 cases had a loss of sense of smell; in South Korea, 30% of people with mild symptoms who tested positive for COVID-19 reported anosmia as their main symptom.

On March 22nd, the American Academy of Otolaryngology–Head and Neck Surgery recommended that anosmia be added to the list of COVID-19 symptoms used to screen people for possible testing or self-isolation.

In addition to COVID-19, loss of smell can also result from allergies as well as other viruses, including rhinoviruses that cause the common cold. So anosmia alone does not mean you have COVID-19. Studies are being done to get more definitive answers about how common anosmia is in people with COVID-19, at what point after infection loss of smell occurs, and how to distinguish loss of smell caused by COVID-19 from loss of smell caused by allergies, other viruses, or other causes altogether.

Until we know more, tell your doctor right away if you find yourself newly unable to smell. He or she may prompt you to get tested and to self-isolate.

## How long is it between when a person is exposed to the virus and when they start showing symptoms?

Recently published research found that on average, the time from exposure to symptom onset (known as the incubation period) is about five to six days. However, studies have shown that symptoms could appear as soon as three days after exposure to as long as 13 days later. These findings continue to support the CDC recommendation of self-quarantine and monitoring of symptoms for 14 days post exposure.

## How does coronavirus spread?

The coronavirus mainly spreads from person to person. When an infected person coughs, sneezes, or talks, they can spread droplets containing the virus from one person to another. Droplets that are produced when an infected person coughs or sneezes may land in the mouths or noses of people who are nearby, or possibly be inhaled into their lungs.

A person infected with coronavirus — even one with no symptoms — may emit aerosols when they talk or breathe. Aerosols are infectious viral particles that can float or drift around in the air for up to three hours. Another person can breathe in these aerosols and become infected with the coronavirus. This is why everyone should cover their nose and mouth when they go out in public.

Coronavirus can also spread from contact with infected surfaces or objects. For example, a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes.

The virus may be shed in saliva, semen, and feces; whether it is shed in vaginal fluids isn't known. Kissing can transmit the virus. Transmission of the virus through feces, or during vaginal or anal intercourse or oral sex, appears to be extremely unlikely at this time.

### How could contact tracing help slow the spread of COVID-19?

Anyone who comes into close contact with someone who has COVID-19 is at increased risk of becoming infected themselves, and of potentially infecting others. Contact tracing can help prevent further transmission of the virus by quickly identifying and informing people who may be infected and contagious, so they can take steps to not infect others.

Contact tracing begins with identifying everyone that a person recently diagnosed with COVID-19 has been in contact with since they became contagious. In the case of COVID-19, a person may be contagious 48 to 72 hours before they started to experience symptoms.

The contacts are notified about their exposure. They may be told what symptoms to look out for, advised to isolate themselves for a period of time, and to seek medical attention as needed if they start to experience symptoms.

### How deadly is COVID-19?

The answer depends on whether you're looking at the fatality rate (the risk of death among those who are infected) or the total number of deaths. So far, influenza has caused far more total deaths this flu season, both in the US and worldwide, than COVID-19. This is why you may have heard it said that the flu is a bigger threat.

Regarding the fatality rate, it appears that the risk of death with the pandemic coronavirus infection (commonly estimated at about 1%) is far less than it was for SARS (approximately 11%) and MERS (about 35%), but will likely be higher than the risk from seasonal flu (which averages about 0.1%). We will have a more accurate estimate of fatality rate for this coronavirus infection once testing becomes more available.

What we do know so far is the risk of death very much depends on your age and your overall health. Children appear to be at very low risk of severe disease and death. Older adults and those who smoke or have chronic diseases such as diabetes, heart disease, or lung disease have a higher chance of developing complications like pneumonia, which could be deadly.

### Will warm weather slow or stop the spread of COVID-19?

Some viruses, like the common cold and flu, spread more when the weather is colder. But it is still possible to become sick with these viruses during warmer months.

At this time, we do not know for certain whether the spread of COVID-19 will decrease when the weather warms up. But a new report suggests that warmer weather may not have much of an impact.

The report, published in early April by the National Academies of Sciences, Engineering and Medicine, summarized research that looked at how well the COVID-19 coronavirus survives in varying temperatures and humidity levels, and whether the spread of this coronavirus may slow in warmer and more humid weather.

The report found that in laboratory settings, higher temperatures and higher levels of humidity decreased survival of the COVID-19 coronavirus. However, studies looking at viral spread in varying climate conditions in the natural environment had inconsistent results.

The researchers concluded that conditions of increased heat and humidity alone may not significantly slow the spread of the COVID-19 virus.

### How long can the coronavirus stay airborne? I have read different estimates.

A study done by the National Institutes of Allergy and Infectious Diseases' Laboratory of Virology in the Division of Intramural Research in Hamilton, Montana helps to answer this question. The researchers used a nebulizer to blow coronaviruses into the air. They found that infectious viruses could remain in the air for up to three hours. The results of the study were published in the *New England Journal of Medicine* on March 17, 2020.

## How long can the coronavirus that causes COVID-19 survive on surfaces?

A recent study found that the COVID-19 coronavirus can survive up to four hours on copper, up to 24 hours on cardboard, and up to two to three days on plastic and stainless steel. The researchers also found that this virus can hang out as droplets in the air for up to three hours before they fall. But most often they will fall more quickly.

There's a lot we still don't know, such as how different conditions, such as exposure to sunlight, heat, or cold, can affect these survival times.

As we learn more, continue to follow the CDC's recommendations for cleaning frequently touched surfaces and objects every day. These include counters, tabletops, doorknobs, bathroom fixtures, toilets, phones, keyboards, tablets, and bedside tables.

If surfaces are dirty, first clean them using a detergent and water, then disinfect them. A list of products suitable for use against COVID-19 is available here. This list has been pre-approved by the U.S. Environmental Protection Agency (EPA) for use during the COVID-19 outbreak.

In addition, wash your hands for 20 seconds with soap and water after bringing in packages, or after trips to the grocery store or other places where you may have come into contact with infected surfaces.

## Should I accept packages from China?

There is no reason to suspect that packages from China harbor coronavirus. Remember, this is a respiratory virus similar to the flu. We don't stop receiving packages from China during their flu season. We should follow that same logic for the virus that causes COVID-19.

## Can I catch the coronavirus by eating food handled or prepared by others?

We are still learning about transmission of the new coronavirus. It's not clear if it can be spread by an infected person through food they have handled or prepared, but if so it would more likely be the exception than the rule.

That said, the new coronavirus is a respiratory virus known to spread by upper respiratory secretions, including airborne droplets after coughing or sneezing. The virus that causes COVID-19 has also been detected in the stool of certain people. So we currently cannot rule out the possibility of the infection being transmitted through food by an infected person who has not thoroughly washed their hands. In the case of hot food, the virus would likely be killed by cooking. This may not be the case with uncooked foods like salads or sandwiches.

## The flu kills more people than COVID-19, at least so far. Why are we so worried about COVID-19? Shouldn't we be more focused on preventing deaths from the flu?

You're right to be concerned about the flu. Fortunately, the same measures that help prevent the spread of the COVID-19 virus — frequent and thorough handwashing, not touching your face, coughing and sneezing into a tissue or your elbow, avoiding people who are sick, and staying away from people if you're sick — also help to protect against spread of the flu.

If you do get sick with the flu, your doctor can prescribe an antiviral drug that can reduce the severity of your illness and shorten its duration. There are currently no antiviral drugs available to treat COVID-19.

## Should I get a flu shot?

While the flu shot won't protect you from developing COVID-19, it's still a good idea. Most people older than six months can and should get the flu vaccine. Doing so reduces the chances of getting seasonal flu. Even if the vaccine doesn't prevent you from getting the flu, it can decrease the chance of severe symptoms. But again, the flu vaccine will not protect you against this coronavirus.

## Is it safe to use steroids to control allergy and asthma symptoms during the COVID-19 pandemic?

Yes, it is safe to use corticosteroid nasal sprays to control nasal allergies or inhaled corticosteroids to control asthma symptoms during the COVID-19 pandemic.

The American College of Allergy, Asthma and Immunology (ACAAI) recently issued a statement emphasizing the importance of controlling allergy and asthma symptoms during the pandemic. They said there is no evidence that intranasal or inhaled corticosteroids increase the risk of getting the COVID-19 infection or lead to a worse outcome if you do get infected.

Sign up for HEALTHbeat | Digital Subscriptions | Special Health Reports | Print Subscriptions | Customer Service | About Us | Permissions

Do Not Sell My Personal Information | Privacy Policy

© 2010 - 2020 Harvard University. All rights reserved.

The ACAAI statement covers severe COVID-19 cases that require aggressive treatment of intubated COVID-19 patients with specific respiratory complications. However, those reports do not refer to healthy individuals using corticosteroid nasal sprays or inhalers to manage allergies or asthma.

## Blog posts

- Bracing for contact tracing
- Some healthcare can safely wait (and some can't)
- Go to the hospital if you need emergency care, even in the era of COVID-19
- Get your affairs in order, COVID-19 won't wait
- Be careful where you get your news about coronavirus
- Is there *any* good news about the coronavirus pandemic?
- Allergies? Common cold? Flu? Or COVID-19?

## Podcasts

### A Harvard infectious diseases doctor looks at COVID-19 (recorded 3/3/20)

Dr. Todd Ellerin is on the front lines of infectious disease containment and mitigation as the director of infectious diseases at South Shore Health in Weymouth, Massachusetts. He's an instructor at Harvard-affiliated Brigham and Women's Hospital. We spoke to him this week to get an update on the rapidly developing story surrounding the coronavirus Covid-19.



### Coronavirus status report: Harvard public health expert Dr. Ashish K. Jha fills us in on where we are headed (recorded 3/19/20)

The COVID-19 outbreak has caused markets to collapse and worldwide health systems to become overwhelmed. When there's a global pandemic, it's nice to hear from the steady, transparent and yes even reassuring voice of experts on the front lines. We spoke to Dr. Ashish K. Jha, faculty director of the Harvard Global Health Institute. Dr. Jha's recent appearance on the PBS Newshour caused reverberations throughout the federal and state response system. Here's his update.





**For more information on coronavirus and COVID-19, see the Harvard Health Publishing Coronavirus Resource Center.**

**Image: gemphotography/Getty Images**

| Share this page: | | Print this page: |
|---|---|---|

**Disclaimer:**

*As a service to our readers, Harvard Health Publishing provides access to our library of archived content. Please note the date of last review or update on all articles. No content on this site, regardless of date, should ever be used as a substitute for direct medical advice from your doctor or other qualified clinician.*



## Latest on Patient Care

**Learn More »**
**COVID-19 Updates »**

# Frequently Asked Questions about the Novel Coronavirus (COVID-19)

As the world copes with the impact of the novel coronavirus (COVID-19) pandemic, we know that you have a lot of questions about what it means for you and the people you care about. At Stanford Medicine, our highest priority is the safety of our patients, health care workers and our community. We follow all protocols recommended by the Centers for Disease Control and Prevention (CDC), and we will continue to update our guidelines, information, and processes to respond to this evolving situation.

### PROTECTING YOURSELF AND OTHERS FROM COVID-19

⌄ How can I protect myself from getting COVID-19?

The CDC recommends these general practices to help prevent spreading viruses:

- Avoid close contact with people who are sick.
- Avoid touching your eyes, nose and mouth.
- Stay home when you are sick.
- Cover your cough or sneeze with a tissue, then throw the tissue in the trash and wash your hands.
- Clean and disinfect frequently touched objects and surfaces using a regular household cleaning spray or wipes.
- Wash your hands often with soap and water for at least 20 seconds, especially after going to the bathroom; before eating; and after blowing your nose, coughing or sneezing.
- If soap and water are not readily available, use an alcohol-based hand sanitizer with at least 60% alcohol. Always wash your hands with soap and water if hands are visibly dirty.

› Should I wear a mask?

› Are masks required in the hospital?

› If I have the COVID-19 virus, what can I do to keep from infecting others?

› If I'm sick and I'm not sure if I have COVID-19, should I go see a doctor?

### WHAT IS COVID-19 AND HOW DOES IT SPREAD?

› What is a coronavirus?

› What is COVID-19?

› What is the source of the virus now affecting people?

⌄ How does the virus spread?

Officials are still learning about how COVID-19 spreads, but the CDC believes it spreads between people in three ways:

- From close contact with people who have it.
- From respiratory droplets that become airborne when someone, who is infected, sneezes or coughs nearby.
- From touching our mouths, noses or eyes after touching a surface that has the virus on it.

› Will warm weather stop the outbreak of COVID-19?

› Where can I find more information about COVID-19?

Exhibit 8, page 1 of 2

## Latest on Patient Care

✕

Learn More »

COVID-19 Updates »

exposure. Someone who has been released from quarantine is not considered a risk for spreading, according to the CDC.

⌄ **Is there a vaccine or treatment for COVID-19?**

Not yet. Currently there is no vaccine or specific antiviral medicine to prevent or treat COVID-19. However, there are vaccines and drugs currently under investigation. The National Institutes of Health has estimated that a large clinical trial for a vaccine may be available in 12-15 months.

People with COVID-19 should receive care to relieve symptoms. Those with serious illness should be hospitalized. Most patients recover through supportive care.

| SYMPTOMS & TESTING |
|---|

> What are the symptoms of COVID-19?

> How can I get tested for COVID-19 at Stanford Health Care?

> What should I do if I have symptoms?

---

The CDC website has additional FAQs on the topics of Travel, Pregnant Women and COVID-19, and COVID-19 and animals.

This page includes information from CDC.gov: https://www.cdc.gov/coronavirus/2019-ncov/faq.html#

Exhibit 8, page 2 of 2

### EXECUTIVE DEPARTMENT
### STATE OF CALIFORNIA

## PROCLAMATION OF A STATE OF EMERGENCY

**WHEREAS** in December 2019, an outbreak of respiratory illness due to a novel coronavirus (a disease now known as COVID-19), was first identified in Wuhan City, Hubei Province, China, and has spread outside of China, impacting more than 75 countries, including the United States; and

**WHEREAS** the State of California has been working in close collaboration with the national Centers for Disease Control and Prevention (CDC), with the United States Health and Human Services Agency, and with local health departments since December 2019 to monitor and plan for the potential spread of COVID-19 to the United States; and

**WHEREAS** on January 23, 2020, the CDC activated its Emergency Response System to provide ongoing support for the response to COVID-19 across the country; and

**WHEREAS** on January 24, 2020, the California Department of Public Health activated its Medical and Health Coordination Center and on March 2, 2020, the Office of Emergency Services activated the State Operations Center to support and guide state and local actions to preserve public health; and

**WHEREAS** the California Department of Public Health has been in regular communication with hospitals, clinics and other health providers and has provided guidance to health facilities and providers regarding COVID-19; and

**WHEREAS** as of March 4, 2020, across the globe, there are more than 94,000 confirmed cases of COVID-19, tragically resulting in more than 3,000 deaths worldwide; and

**WHEREAS** as of March 4, 2020, there are 129 confirmed cases of COVID-19 in the United States, including 53 in California, and more than 9,400 Californians across 49 counties are in home monitoring based on possible travel-based exposure to the virus, and officials expect the number of cases in California, the United States, and worldwide to increase; and

**WHEREAS** for more than a decade California has had a robust pandemic influenza plan, supported local governments in the development of local plans, and required that state and local plans be regularly updated and exercised; and

**WHEREAS** California has a strong federal, state and local public health and health care delivery system that has effectively responded to prior events including the H1N1 influenza virus in 2009, and most recently Ebola; and

**WHEREAS** experts anticipate that while a high percentage of individuals affected by COVID-19 will experience mild flu-like symptoms, some will have more serious symptoms and require hospitalization, particularly individuals who are elderly or already have underlying chronic health conditions; and

**WHEREAS** it is imperative to prepare for and respond to suspected or confirmed COVID-19 cases in California, to implement measures to mitigate the spread of COVID-19, and to prepare to respond to an increasing number of individuals requiring medical care and hospitalization; and

**WHEREAS** if COVID-19 spreads in California at a rate comparable to the rate of spread in other countries, the number of persons requiring medical care may exceed locally available resources, and controlling outbreaks minimizes the risk to the public, maintains the health and safety of the people of California, and limits the spread of infection in our communities and within the healthcare delivery system; and

**WHEREAS** personal protective equipment (PPE) is not necessary for use by the general population but appropriate PPE is one of the most effective ways to preserve and protect California's healthcare workforce at this critical time and to prevent the spread of COVID-19 broadly; and

**WHEREAS** state and local health departments must use all available preventative measures to combat the spread of COVID-19, which will require access to services, personnel, equipment, facilities, and other resources, potentially including resources beyond those currently available, to prepare for and respond to any potential cases and the spread of the virus; and

**WHEREAS** I find that conditions of Government Code section 8558(b), relating to the declaration of a State of Emergency, have been met; and

**WHEREAS** I find that the conditions caused by COVID-19 are likely to require the combined forces of a mutual aid region or regions to appropriately respond; and

**WHEREAS** under the provisions of Government Code section 8625(c), I find that local authority is inadequate to cope with the threat posed by COVID-19; and

**WHEREAS** under the provisions of Government Code section 8571, I find that strict compliance with various statutes and regulations specified in this order would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes, including the California Emergency Services Act, and in particular, Government Code section 8625, **HEREBY PROCLAIM A STATE OF EMERGENCY** to exist in California.

**IT IS HEREBY ORDERED THAT:**

1. In preparing for and responding to COVID-19, all agencies of the state government use and employ state personnel, equipment, and facilities or perform any and all activities consistent with the direction of the Office of Emergency Services and the State Emergency Plan, as well as the California Department of Public Health and the Emergency Medical Services Authority. Also, all residents are to heed the advice of emergency officials with regard to this emergency in order to protect their safety.

2. As necessary to assist local governments and for the protection of public health, state agencies shall enter into contracts to arrange for the procurement of materials, goods, and services needed to assist in preparing for, containing, responding to, mitigating the effects of, and recovering from the spread of COVID-19. Applicable provisions of the Government Code and the Public Contract Code, including but not limited to travel, advertising, and competitive bidding requirements, are suspended to the extent necessary to address the effects of COVID-19.

3. Any out-of-state personnel, including, but not limited to, medical personnel, entering California to assist in preparing for, responding to, mitigating the effects of, and recovering from COVID-19 shall be permitted to provide services in the same manner as prescribed in Government Code section 179.5, with respect to licensing and certification. Permission for any such individual rendering service is subject to the approval of the Director of the Emergency Medical Services Authority for medical personnel and the Director of the Office of Emergency Services for non-medical personnel and shall be in effect for a period of time not to exceed the duration of this emergency.

4. The time limitation set forth in Penal Code section 396, subdivision (b), prohibiting price gouging in time of emergency is hereby waived as it relates to emergency supplies and medical supplies. These price gouging protections shall be in effect through September 4, 2020.

5. Any state-owned properties that the Office of Emergency Services determines are suitable for use to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services for this purpose, notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

6. Any fairgrounds that the Office of Emergency Services determines are suitable to assist in preparing for, responding to, mitigating the effects of, or recovering from COVID-19 shall be made available to the Office of Emergency Services pursuant to the Emergency Services Act, Government Code section 8589. The Office of Emergency Services shall notify the fairgrounds of the intended use and can immediately use the fairgrounds without the fairground board of directors' approval, and

notwithstanding any state or local law that would restrict, delay, or otherwise inhibit such use.

7. The 30-day time period in Health and Safety Code section 101080, within which a local governing authority must renew a local health emergency, is hereby waived for the duration of this statewide emergency. Any such local health emergency will remain in effect until each local governing authority terminates its respective local health emergency.

8. The 60-day time period in Government Code section 8630, within which local government authorities must renew a local emergency, is hereby waived for the duration of this statewide emergency. Any local emergency proclaimed will remain in effect until each local governing authority terminates its respective local emergency.

9. The Office of Emergency Services shall provide assistance to local governments that have demonstrated extraordinary or disproportionate impacts from COVID-19, if appropriate and necessary, under the authority of the California Disaster Assistance Act, Government Code section 8680 et seq., and California Code of Regulations, Title 19, section 2900 et seq.

10. To ensure hospitals and other health facilities are able to adequately treat patients legally isolated as a result of COVID-19, the Director of the California Department of Public Health may waive any of the licensing requirements of Chapter 2 of Division 2 of the Health and Safety Code and accompanying regulations with respect to any hospital or health facility identified in Health and Safety Code section 1250. Any waiver shall include alternative measures that, under the circumstances, will allow the facilities to treat legally isolated patients while protecting public health and safety. Any facilities being granted a waiver shall be established and operated in accordance with the facility's required disaster and mass casualty plan. Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

11. To support consistent practices across California, state departments, in coordination with the Office of Emergency Services, shall provide updated and specific guidance relating to preventing and mitigating COVID-19 to schools, employers, employees, first responders and community care facilities by no later than March 10, 2020.

12. To promptly respond for the protection of public health, state entities are, notwithstanding any other state or local law, authorized to share relevant medical information, limited to the patient's underlying health conditions, age, current condition, date of exposure, and possible contact tracing, as necessary to address the effect of the COVID-19 outbreak with state, local, federal, and nongovernmental partners, with such information to be used for the limited purposes of monitoring, investigation and control, and treatment and coordination of care. The

Exhibit 9, Page 4 of 5

notification requirement of Civil Code section 1798.24, subdivision (i), is suspended.

13. Notwithstanding Health and Safety Code sections 1797.52 and 1797.218, during the course of this emergency, any EMT-P licensees shall have the authority to transport patients to medical facilities other than acute care hospitals when approved by the California EMS Authority. In order to carry out this order, to the extent that the provisions of Health and Safety Code sections 1797.52 and 1797.218 may prohibit EMT-P licensees from transporting patients to facilities other than acute care hospitals, those statutes are hereby suspended until the termination of this State of Emergency.

14. The Department of Social Services may, to the extent the Department deems necessary to respond to the threat of COVID-19, waive any provisions of the Health and Safety Code or Welfare and Institutions Code, and accompanying regulations, interim licensing standards, or other written policies or procedures with respect to the use, licensing, or approval of facilities or homes within the Department's jurisdiction set forth in the California Community Care Facilities Act (Health and Safety Code section 1500 et seq.), the California Child Day Care Facilities Act (Health and Safety Code section 1596.70 et seq.), and the California Residential Care Facilities for the Elderly Act (Health and Safety Code section 1569 et seq.). Any waivers granted pursuant to this paragraph shall be posted on the Department's website.

**I FURTHER DIRECT** that as soon as hereafter possible, this proclamation be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this proclamation.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of March 2020.

GAVIN NEWSOM
Governor of California

**ATTEST:**

ALEX PADILLA
Secretary of State

# DECLARATION OF LOCAL HEALTH EMERGENCY

**WHEREAS**, California Health and Safety Code section 101080 authorizes a local health officer to declare a local health emergency in the health officer's jurisdiction, or any part thereof, whenever the health officer reasonably determines that there is an imminent and proximate threat of the introduction of any contagious, infectious, or communicable disease, chemical agent, noncommunicable biologic agent, toxin, or radioactive agent; and

**WHEREAS**, the Centers for Disease Control and Prevention (CDC) announced on February *25, 2020* that community spread of COVID-19 is likely to occur in the United States; and on March 11, 2020, World Health Organization (WHO) declared COVID-19 as a pandemic; and

**WHEREAS**, three COVID-19 positive travel-related cases have been identified in Ventura County and one case of community transmission has been identified in a neighboring county; and

**WHEREAS**, based on the foregoing, there is an imminent and proximate threat of COVID-19 spread in the County of Ventura and a threat to the public health of the County residents; and

**WHEREAS**, COVID-19 has already demonstrated its deleterious impact on human health in other counties in the State of California; and

**WHEREAS**, there is neither known specific anti-viral treatment nor immunization for COVID-19; and

**WHEREAS**, social isolation is considered useful as a tool to control the spread of pandemic viral infections; and

**WHEREAS**, social isolation is the shared responsibility of a multitude of organizations, agencies, businesses, educational sectors and health care providers throughout the County; and

**WHEREAS**, early and widespread social isolation actions can spare lives;

**NOW, THEREFORE, IT IS HEREBY PROCLAIMED AND ORDERED** by the Ventura County Health Officer, that a local health emergency exists in the County of Ventura and shall be deemed to continue to exist until its termination is proclaimed by the Ventura County Board of Supervisors.

This declaration shall also apply to all public schools in Ventura County allowing for their closure as necessary due to this pandemic.

Dated: 3/12/2020

Time: 5:05 PM

Robert Levin, M.D.,
Ventura County Health Officer

Exhibit 10, Page 1 of 1

**HEALTH OFFICER ORDER FOR THE CONTROL OF COVID-19
DIRECTING VULNERABLE INDIVIDUALS LIVING IN
THE COUNTY TO SHELTER AT THEIR PLACE OF RESIDENCE,
RESTRICTIONS OF CERTAIN BUSINESSES, AMONG OTHER ORDERS
DATE OF ORDER: <u>MARCH 17, 2020</u>**

**Please read this Order carefully. Violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both, pursuant to Health and Safety Code section 120295 et seq.**

**WHEREAS**, the intent of this Order is to strengthen the steps the County of Ventura has already taken to protect our residents and particularly the most vulnerable in our population from COVID-19; and

**WHEREAS**, on March 15, 2020 Governor Gavin Newsom announced that California is taking additional measures to protect those most at risk of serious, life-threatening complications from COVID-19, including urging those most vulnerable to COVID-19 to socially isolate at home, such as people age 65 and older and those with underlying medical conditions that make them more susceptible to serious illness from the coronavirus; and

**WHEREAS**, the intent of this Order is to ensure that specified individuals self-isolate in their places of residence to the maximum extent feasible to slow the spread of COVID-19 to the maximum extent possible, and all provisions of this Order should be interpreted to effectuate this intent; and

**WHEREAS**, social isolation is considered useful as a tool to control the spread of pandemic viral infections; and

**WHEREAS**, social isolation is the shared responsibility of all individuals in the County; and

**WHEREAS**, this Order is issued based on evidence of increasing occurrence of COVID-19 within the County and scientific evidence that the age, condition, and health of a significant portion of the population of the County places it at risk for serious health complications, including death, from COVID-19; and

**WHEREAS,** the scientific evidence shows that at this stage of the emergency, it is essential to slow virus transmission as much as possible to protect the most vulnerable and to prevent the health care system from being overwhelmed and that one proven way to slow the transmission is to limit interactions among people to the greatest extent practicable;

**WHEREAS,** by reducing the spread of the COVID-19 virus, this Order also helps preserve critical and limited healthcare capacity in the County; and

**WHEREAS,** this Order comes after the release of substantial guidance from the Centers for Disease Control and Prevention, the California Department of Public Health, and other public

health officials throughout the United States and around the world, including a variety of prior orders to combat the spread and harms of COVID-19;

       **NOW, THEREFORE,** PURSUANT TO  SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, IT IS HEREBY ORDERED AS FOLLOWS:

1. All individuals currently living within Ventura County, equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to shelter at their place of residence from March 18, 2020 to April 1, 2020.  To the extent such individuals are using shared or outdoor spaces, they must at all times as reasonably possible maintain physical distancing of at least six feet from any other person.  Exceptions shall only exist as necessary to seek medical care, nutrition, or to perform essential work in healthcare or government.

2. All permanent food facilities, as defined by Health and Safety Code § 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. Bars and nightclubs that offer food to consumers may remain open only for purposes of continuing to prepare and offer food to consumers via delivery service, via pick-up, or via drive-thru. Permanent food facilities that provide and offer food to consumers for pick up must require patrons or groups of patrons who are ordering food and beverages to be and remain at least six (6) feet apart from each other while inside the facility.

3. The following types of businesses are ordered to close (March 18, 2020 to April 1, 2020):
    a. Bars and nightclubs that do not serve food.
    b. Movie theaters, live performance venues, bowling alleys, and arcades.
    c. Gyms, and fitness centers, and aquatic centers.
    d. Wineries, breweries, and tap rooms that provide tastings.

4. This Order is issued in accordance with, and incorporates by reference, the March 4, 2020 Proclamation of a State of Emergency issued by Governor Newsom, the March 12, 2020 Declaration of Local Health Emergency issued by the Health Officer, the March 17, 2020 Resolution of the Board of Supervisors of the County of Ventura Proclaiming a Local Emergency and Ratifying and Extending the Declaration of a Local Health Emergency, the March 12, 2020 State of California Executive Order N-25-20, and the March 16, 2020 California Department of Public Health guidance on Retail Food, Beverage, and Other Related Service Venues.

5. The violation of any provision of this Order constitutes a threat to public health.  Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

6. This Order shall become effective at 12:01 a.m. on March 18, 2020 and will continue to be in effect until 11:59 p.m. on April 1, 2020, or until it is extended, rescinded, superseded, or amended in writing by the Health Officer.

7. The Health Officer will continue to assess the quickly evolving situation and may issue additional Orders related to COVID-19.

8. Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office at 2240 East Gonzalez Road, ste. 210, Oxnard, California 93036; (2) posted on the County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

9. If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the reminder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

Dated: March 17, 2020

Robert Levin, M.D.
Ventura County Health Officer

# EXECUTIVE DEPARTMENT
# STATE OF CALIFORNIA

### EXECUTIVE ORDER N-33-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

   ORDER OF THE STATE PUBLIC HEALTH OFFICER
   March 19, 2020

   To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

   Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

   The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or

destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2)  The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3)  The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4)  This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

_____
GAVIN NEWSOM
Governor of California

**ATTEST:**

_____
ALEX PADILLA
Secretary of State



**U.S. Department of Homeland Security**
Cybersecurity & Infrastructure Security Agency
*Office of the Director*
Washington, DC  20528

March 19, 2020

## MEMORANDUM ON IDENTIFICATION OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS DURING COVID-19 RESPONSE

FROM:     Christopher C. Krebs
          Director
          Cybersecurity and Infrastructure Security Agency (CISA)

---

As the Nation comes together to slow the spread of COVID-19, on March 16th, the President issued updated Coronavirus Guidance for America. This guidance states that:

> *"If you work in a critical infrastructure industry, as defined by the Department of Homeland Security, such as healthcare services and pharmaceutical and food supply, you have a special responsibility to maintain your normal work schedule."*

The Cybersecurity and Infrastructure Security Agency (CISA) executes the Secretary of Homeland Security's responsibilities as assigned under the Homeland Security Act of 2002 to provide strategic guidance, promote a national unity of effort, and coordinate the overall federal effort to ensure the security and resilience of the Nation's critical infrastructure. CISA uses trusted partnerships with both the public and private sectors to deliver infrastructure resilience assistance and guidance to a broad range of partners.

In accordance with this mandate, and in collaboration with other federal agencies and the private sector, CISA developed an initial list of "Essential Critical Infrastructure Workers" to help State and local officials as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security. The list can also inform critical infrastructure community decision-making to determine the sectors, sub-sectors, segments, or critical functions that should continue normal operations, appropriately modified to account for Centers for Disease Control (CDC) workforce and customer protection guidance.

The attached list identifies workers who conduct a range of operations and services that are essential to continued critical infrastructure viability, including staffing operations centers, maintaining and repairing critical infrastructure, operating call centers, working construction, and performing management functions, among others. The industries they support represent, but are not necessarily limited to, medical and healthcare, telecommunications, information technology systems, defense, food and agriculture, transportation and logistics, energy, water and wastewater, law enforcement, and public works.

We recognize that State, local, tribal, and territorial governments are ultimately in charge of implementing and executing response activities in communities under their jurisdiction, while the Federal Government is in a supporting role. As State and local communities consider COVID-19-related restrictions, CISA is offering this list to assist prioritizing activities related to continuity of operations and incident response, including the appropriate movement of critical infrastructure workers within and between jurisdictions.

**Accordingly, this list is advisory in nature. It is not, nor should it be considered to be, a federal directive or standard in and of itself.**

In addition, these identified sectors and workers are not intended to be the authoritative or exhaustive list of critical infrastructure sectors and functions that should continue during the COVID-19 response. Instead, State and local officials should use their own judgment in using their authorities and issuing implementation directives and guidance. Similarly, critical infrastructure industry partners will use their own judgment, informed by this list, to ensure continued operations of critical infrastructure services and functions. All decisions should appropriately balance public safety while ensuring the continued delivery of critical infrastructure services and functions.

CISA will continue to work with you and our partners in the critical infrastructure community to update this list as the Nation's response to COVID-19 evolves. We also encourage you to submit how you might use this list so that we can develop a repository of use cases for broad sharing across the country.

Should you have questions about this list, please contact CISA at CISA.CAT@cisa.dhs.gov.

**Attachment:** "Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response"



# Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response

Version 1.0 (March 19, 2020)

## THE IMPORTANCE OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and safety as well as community well-being. Certain critical infrastructure industries have a special responsibility in these times to continue operations.

This guidance and accompanying list are intended to support State, Local, and industry partners in identifying the critical infrastructure sectors and the essential workers needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response.

This document gives guidance to State, local, tribal, and territorial jurisdictions and the private sector on defining essential critical infrastructure workers. Promoting the ability of such workers to continue to work during periods of community restriction, access management, social distancing, or closure orders/directives is crucial to community resilience and continuity of essential functions.

## CONSIDERATIONS FOR GOVERNMENT AND BUSINESS

This list was developed in consultation with federal agency partners, industry experts, and State and local officials, and is based on several key principles:

1. Response efforts to the COVID-19 pandemic are locally executed, State managed, and federally supported

2. Everyone should follow guidance from the CDC, as well as State and local government officials, regarding strategies to limit disease spread.

3. Workers should be encouraged to work remotely when possible and focus on core business activities. In-person, non-mandatory activities should be delayed until the resumption of normal operations.

4. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not necessarily limited to, separating staff by off-setting shift hours or days and/or social distancing. These steps can preserve the workforce and allow operations to continue.

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 LinkedIn.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

5. All organizations should implement their business continuity and pandemic plans, or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the health and safety of the employees.

6. In the modern economy, reliance on technology and just-in-time supply chains means that certain workers must be able to access certain sites, facilities, and assets to ensure continuity of functions.

7. Government employees, such as emergency managers, and the business community need to establish and maintain lines of communication.

8. When government and businesses engage in discussions about critical infrastructure workers, they need to consider the implications of business operations beyond the jurisdiction where the asset or facility is located. Businesses can have sizeable economic and societal impacts as well as supply chain dependencies that are geographically distributed.

9. Whenever possible, jurisdictions should align access and movement control policies related to critical infrastructure workers to lower the burden of workers crossing jurisdictional boundaries.

## IDENTIFYING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

The following list of sectors and identified essential critical infrastructure workers are an initial recommended set and are intended to be overly inclusive reflecting the diversity of industries across the United States. CISA will continually solicit and accept feedback on the list (both sectors/sub sectors and identified essential workers) and will evolve the list in response to stakeholder feedback. We will also use our various stakeholder engagement mechanisms to work with partners on how they are using this list and share those lessons learned and best practices broadly. We ask that you share your feedback, both positive and negative on this list so we can provide the most useful guidance to our critical infrastructure partners. **Feedback can be sent to CISA.CAT@CISA.DHS.GOV.**



**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

Exhibit 13, Page 4 of 11

**Essential Critical Infrastructure Workforce**

## HEALTHCARE / PUBLIC HEALTH

- Workers providing COVID-19 testing; Workers that perform critical clinical research needed for COVID-19 response
- Caregivers (e.g., physicians, dentists, psychologists, mid-level practitioners, nurses and assistants, infection control and quality assurance personnel, pharmacists, physical and occupational therapists and assistants, social workers, speech pathologists and diagnostic and therapeutic technicians and technologists)
- Hospital and laboratory personnel (including accounting, administrative, admitting and discharge, engineering, epidemiological, source plasma and blood donation, food service, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.)
- Workers in other medical facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Organ Pharmacies, Procurement Organizations, Psychiatric Residential, Rural Health Clinics and Federally Qualified Health Centers)
- Manufacturers, technicians, logistics and warehouse operators, and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, and tissue and paper towel products
- Public health / community health workers, including those who compile, model, analyze and communicate public health information
- Blood and plasma donors and the employees of the organizations that operate and manage related activities
- Workers that manage health plans, billing, and health information, who cannot practically work remotely
- Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information, who cannot practically work remotely
- Workers performing cybersecurity functions at healthcare and public health facilities, who cannot practically work remotely
- Workers conducting research critical to COVID-19 response
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely
- Workers who support food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, such as those residing in shelters
- Pharmacy employees necessary for filling prescriptions
- Workers performing mortuary services, including funeral homes, crematoriums, and cemetery workers
- Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental/behavioral health services to the family members, responders, and survivors of an incident

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

## LAW ENFORCEMENT, PUBLIC SAFETY, FIRST RESPONDERS

- Personnel in emergency management, law enforcement, Emergency Management Systems, fire, and corrections, including front line and management
- Emergency Medical Technicians
- 911 call center employees
- Fusion Center employees
- Hazardous material responders from government and the private sector.
- Workers – including contracted vendors – who maintain digital systems infrastructure supporting law enforcement and emergency service operations.

## FOOD AND AGRICULTURE

- Workers supporting groceries, pharmacies and other retail that sells food and beverage products
- Restaurant carry-out and quick serve food operations - Carry-out and delivery food employees
- Food manufacturer employees and their supplier employees—to include those employed in food processing (packers, meat processing, cheese plants, milk plants, produce, etc.) facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging
- Farm workers to include those employed in animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically
- Farm workers and support service workers to include those who field crops; commodity inspection; fuel ethanol facilities; storage facilities; and other agricultural inputs
- Employees and firms supporting food, feed, and beverage distribution, including warehouse workers, vendor-managed inventory controllers and blockchain managers
- Workers supporting the sanitation of all food manufacturing processes and operations from wholesale to retail
- Company cafeterias - in-plant cafeterias used to feed employees
- Workers in food testing labs in private industries and in institutions of higher education
- Workers essential for assistance programs and government payments
- Employees of companies engaged in the production of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids
- Animal agriculture workers to include those employed in veterinary health; manufacturing and distribution of animal medical materials, animal vaccines, animal drugs, feed ingredients, feed, and bedding, etc.; transportation of live animals, animal medical materials; transportation of deceased animals for disposal; raising of animals for food; animal production operations; slaughter and packing plants and associated regulatory and government workforce
- Workers who support the manufacture and distribution of forest products, including, but not limited to timber, paper, and other wood products
- Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary to agricultural production and distribution

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

## ENERGY

**Electricity industry:**

- Workers who maintain, ensure, or restore the generation, transmission, and distribution of electric power, including call centers, utility workers, reliability engineers and fleet maintenance technicians
- Workers needed for safe and secure operations at nuclear generation
- Workers at generation, transmission, and electric blackstart facilities
- Workers at Reliability Coordinator (RC), Balancing Authorities (BA), and primary and backup Control Centers (CC), including but not limited to independent system operators, regional transmission organizations, and balancing authorities
- Mutual assistance personnel
- IT and OT technology staff – for EMS (Energy Management Systems) and Supervisory Control and Data Acquisition (SCADA) systems, and utility data centers; Cybersecurity engineers; cybersecurity risk management
- Vegetation management crews and traffic workers who support
- Environmental remediation/monitoring technicians
- Instrumentation, protection, and control technicians

**Petroleum workers:**

- Petroleum product storage, pipeline, marine transport, terminals, rail transport, road transport
- Crude oil storage facilities, pipeline, and marine transport
- Petroleum refinery facilities
- Petroleum security operations center employees and workers who support emergency response services
- Petroleum operations control rooms/centers
- Petroleum drilling, extraction, production, processing, refining, terminal operations, transporting, and retail for use as end-use fuels or feedstocks for chemical manufacturing
- Onshore and offshore operations for maintenance and emergency response
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them

**Natural and propane gas workers:**

- Natural gas transmission and distribution pipelines, including compressor stations
- Underground storage of natural gas
- Natural gas processing plants, and those that deal with natural gas liquids
- Liquefied Natural Gas (LNG) facilities
- Natural gas security operations center, natural gas operations dispatch and control rooms/centers natural gas emergency response and customer emergencies, including natural gas leak calls
- Drilling, production, processing, refining, and transporting natural gas for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation
- Propane gas dispatch and control rooms and emergency response and customer emergencies, including propane leak calls
- Propane gas service maintenance and restoration, including call centers

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

@CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

- Processing, refining, and transporting natural liquids, including propane gas, for use as end-use fuels or feedstocks for chemical manufacturing
- Propane gas storage, transmission, and distribution centers

## WATER AND WASTEWATER

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

- Operational staff at water authorities
- Operational staff at community water systems
- Operational staff at wastewater treatment facilities
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring
- Operational staff for water distribution and testing
- Operational staff at wastewater collection facilities
- Operational staff and technical support for SCADA Control systems
- Chemical disinfectant suppliers for wastewater and personnel protection
- Workers that maintain digital systems infrastructure supporting water and wastewater operations

## TRANSPORTATION AND LOGISTICS

- Employees supporting or enabling transportation functions, including dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, and workers that maintain and inspect infrastructure (including those that require cross-border travel)
- Employees of firms providing services that enable logistics operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use.
- Mass transit workers
- Workers responsible for operating dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment
- Maritime transportation workers - port workers, mariners, equipment operators
- Truck drivers who haul hazardous and waste materials to support critical infrastructure, capabilities, functions, and services
- Automotive repair and maintenance facilities
- Manufacturers and distributors (to include service centers and related operations) of packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations
- Postal and shipping workers, to include private companies
- Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers
- Air transportation employees, including air traffic controllers, ramp personnel, aviation security, and aviation management
- Workers who support the maintenance and operation of cargo by air transportation, including flight crews, maintenance, airport operations, and other on- and off- airport facilities workers

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

 Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

## PUBLIC WORKS

- Workers who support the operation, inspection, and maintenance of essential dams, locks and levees
- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues
- Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences
- Support, such as road and line clearing, to ensure the availability of needed facilities, transportation, energy and communications
- Support to ensure the effective removal, storage, and disposal of residential and commercial solid waste and hazardous waste

## COMMUNICATIONS AND INFORMATION TECHNOLOGY

**Communications:**

- Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call-centers, wireline and wireless providers, cable service providers, satellite operations, undersea cable landing stations, Internet Exchange Points, and manufacturers and distributors of communications equipment
- Workers who support radio, television, and media service, including, but not limited to front line news reporters, studio, and technicians for newsgathering and reporting
- Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and/or technicians to manage the network or operate facilities
- Engineers, technicians and associated personnel responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables
- Installation, maintenance and repair technicians that establish, support or repair service as needed
- Central office personnel to maintain and operate central office, data centers, and other network office facilities
- Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, and troubleshooting
- Dispatchers involved with service repair and restoration

**Information Technology:**

- Workers who support command centers, including, but not limited to Network Operations Command Center, Broadcast Operations Control Center and Security Operations Command Center
- Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers, data transfer solutions engineers, software and hardware engineers, and database administrators
- Client service centers, field engineers, and other technicians supporting critical infrastructure, as well as

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

manufacturers and supply chain vendors that provide hardware and software, and information technology equipment (to include microelectronics and semiconductors) for critical infrastructure

- Workers responding to cyber incidents involving critical infrastructure, including medical facilities, SLTT governments and federal facilities, energy and utilities, and banks and financial institutions, and other critical infrastructure categories and personnel
- Workers supporting the provision of essential global, national and local infrastructure for computing services (incl. cloud computing services), business infrastructure, web-based services, and critical manufacturing
- Workers supporting communications systems and information technology used by law enforcement, public safety, medical, energy and other critical industries
- Support required for continuity of services, including janitorial/cleaning personnel

## OTHER COMMUNITY-BASED GOVERNMENT OPERATIONS AND ESSENTIAL FUNCTIONS

- Workers to ensure continuity of building functions
- Security staff to maintain building access control and physical security measures
- Elections personnel
- Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks
- Trade Officials (FTA negotiators; international data flow administrators)
- Weather forecasters
- Workers that maintain digital systems infrastructure supporting other critical government operations
- Workers at operations centers necessary to maintain other essential functions
- Workers who support necessary credentialing, vetting and licensing operations for transportation workers
- Customs workers who are critical to facilitating trade in support of the national emergency response supply chain
- Educators supporting public and private K-12 schools, colleges, and universities for purposes of facilitating distance learning or performing other essential functions, if operating under rules for social distancing
- Hotel Workers where hotels are used for COVID-19 mitigation and containment measures

## CRITICAL MANUFACTURING

- Workers necessary for the manufacturing of materials and products needed for medical supply chains, transportation, energy, communications, food and agriculture, chemical manufacturing, nuclear facilities, the operation of dams, water and wastewater treatment, emergency services, and the defense industrial base.

## HAZARDOUS MATERIALS

- Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing test kits
- Workers who support hazardous materials response and cleanup
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

**Essential Critical Infrastructure Workforce**

## FINANCIAL SERVICES

- Workers who are needed to process and maintain systems for processing financial transactions and services (e.g., payment, clearing, and settlement; wholesale funding; insurance services; and capital markets activities)
- Workers who are needed to provide consumer access to banking and lending services, including ATMs, and to move currency and payments (e.g., armored cash carriers)
- Workers who support financial operations, such as those staffing data and security operations centers

## CHEMICAL

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, textiles, and paper products.
- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items
- Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, and packaging that prevents the contamination of food, water, medicine, among others essential products
- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections
- Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing

## DEFENSE INDUSTRIAL BASE

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military. These individuals, include but are not limited to, aerospace; mechanical and software engineers, manufacturing/production workers; IT support; security staff; security personnel; intelligence support, aircraft and weapon system mechanics and maintainers
- Personnel working for companies, and their subcontractors, who perform under contract to the Department of Defense providing materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities

**CONNECT WITH US**
www.cisa.gov

**For more information,**
email CISA.CAT@cisa.dhs.gov

 Linkedin.com/company/cybersecurity-and-infrastructure-security-agency

 @CISAgov | @cyber | @uscert_gov

Facebook.com/CISA

Exhibit 13, Page 11 of 11

March 22, 2020

On March 19, 2020, Governor Newsom issued Executive Order N-33-20 directing all residents immediately to heed current State public health directives to stay home, except as needed to maintain continuity of operations of essential critical infrastructure sectors and additional sectors as the State Public Health Officer may designate as critical to protect health and well-being of aall Californians.

In accordance with this order, the State Public Health Officer has designated the following list of "Essential Critical Infrastructure Workers" to help state, local, tribal, and industry partners as they work to protect communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security.

## HEALTHCARE / PUBLIC HEALTH

**Sector Profile**

The Healthcare and Public Health (HPH) Sector is large, diverse, and open, spanning both the public and private sectors. It includes publicly accessible healthcare facilities, research centers, suppliers, manufacturers, and other physical assets and vast, complex public-private information technology systems required for care delivery and to support the rapid, secure transmission and storage of large amounts of HPH data.

**Essential Workforce**

- Workers providing COVID-19 testing; Workers that perform critical clinical research needed for COVID-19 response.
- Health care providers and caregivers (e.g., physicians, dentists, psychologists, mid-level practitioners, nurses and assistants, infection control and quality assurance personnel, pharmacists, physical and occupational therapists and assistants, social workers, speech pathologists and diagnostic and therapeutic technicians and technologists).
- Hospital and laboratory personnel (including accounting, administrative, admitting and discharge, engineering, epidemiological, source plasma and blood donation, food service, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.).
- Workers in other medical facilities (including Ambulatory Health and Surgical, Blood Banks, Clinics, Community Mental Health, Comprehensive Outpatient rehabilitation, End Stage Renal Disease, Health Departments, Home Health care, Hospices, Hospitals, Long Term Care, Organ Pharmacies, Procurement Organizations, Psychiatric, Residential, Rural Health Clinics and Federally Qualified Health Centers, cannabis retailers).
- Manufacturers, technicians, logistics and warehouse operators, and distributors of medical equipment, personal protective equipment (PPE), medical gases, pharmaceuticals, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies, personal care/hygiene products, and tissue and paper towel products.

1

Exhibit 14, Page 1 of 14

March 22, 2020

- Public health / community health workers, including those who compile, model, analyze and communicate public health information.
- Behavioral health workers (including mental and substance use disorder) responsible for coordination, outreach, engagement, and treatment to individuals in need of mental health and/or substance use disorder services.
- Blood and plasma donors and the employees of the organizations that operate and manage related activities.
- Workers that manage health plans, billing, and health information, who cannot practically work remotely.
- Workers who conduct community-based public health functions, conducting epidemiologic surveillance, compiling, analyzing and communicating public health information, who cannot practically work remotely.
- Workers who provide support to vulnerable populations to ensure their health and well-being including family care providers
- Workers performing cybersecurity functions at healthcare and public health facilities, who cannot practically work remotely.
- Workers conducting research critical to COVID-19 response.
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.
- Workers who support food, shelter, and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals, such as those residing in shelters.
- Pharmacy employees necessary for filling prescriptions.
- Workers performing mortuary services, including funeral homes, crematoriums, and cemetery workers.
- Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to behavioral health services to the family members, responders, and survivors of an incident.
- Workers supporting veterinary hospitals and clinics

## EMERGENCY SERVICES SECTOR

**Sector Profile**

The Emergency Services Sector (ESS) is a community of highly-skilled, trained personnel, along with the physical and cyber resources, that provide a wide range of prevention, preparedness, response, and recovery services during both day-to-day operations and incident response. The ESS includes geographically distributed facilities and equipment in both paid and volunteer capacities organized primarily at the federal, state, local, tribal, and territorial levels of government, such as city police departments and fire stations, county sheriff's offices, Department of Defense police and fire departments, and town public works departments. The ESS also includes private sector resources, such

2

Exhibit 14, Page 2 of 14

March 22, 2020

as industrial fire departments, private security organizations, and private emergency medical services providers.

**Essential Workforce - Law Enforcement, Public Safety and First Responders**

- Including front line and management, personnel include emergency management, law enforcement, Emergency Management Systems, fire, and corrections, search and rescue, tactical teams including maritime, aviation, and canine units.
- Emergency Medical Technicians
- Public Safety Answering Points and 911 call center employees
- Fusion Center employees
- Fire Mitigation Activities
- Hazardous material responders and hazardous devices teams, from government and the private sector.
- Workers – including contracted vendors -- who maintain digital systems infrastructure supporting law enforcement and emergency service operations.
- Private security, private fire departments, and private emergency medical services personnel.
- County workers responding to abuse and neglect of children, elders and dependent adults.
- Animal control officers and humane officers

**Essential Workforce - Public Works**

- Workers who support the operation, inspection, and maintenance of essential dams, locks and levees
- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, construction material suppliers, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues
- Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, and essential operation of residences.
- Support, such as road and line clearing, to ensure the availability of needed facilities, transportation, energy and communications Support to ensure the effective removal, storage, and disposal of residential and commercial solid waste and hazardous waste.

# FOOD AND AGRICULTURE

**Sector Profile**

3

March 22, 2020

The Food and Agricultural (FA) Sector is composed of complex production, processing, and delivery systems and has the capacity to feed people and animals both within and beyond the boundaries of the United States. Beyond domestic food production, the FA Sector also imports many ingredients and finished products, leading to a complex web of growers, processors, suppliers, transporters, distributors, and consumers. This sectors is critical to maintaining and securing our food supply.

**Essential Workforce**

- Workers supporting groceries, pharmacies, and other retail that sells food and beverage products, including but not limited to Grocery stores, Corner stores and convenience stores, including liquor stores that sell food, Farmers' markets, Food banks, Farm and produce stands, Supermarkets, Similar food retail establishments, Big box stores that sell groceries and essentials
- Restaurant carry-out and quick serve food operations – including food preparation, carry-out and delivery food employees
- Food manufacturer employees and their supplier employees—to include those employed in food processing (packers, meat processing, cheese plants, milk plants, produce, etc.) facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging
- Farm workers to include those employed in animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; truck delivery and transport; farm and fishery labor needed to produce our food supply domestically
- Farm workers and support service workers to include those who field crops; commodity inspection; fuel ethanol facilities; storage facilities; and other agricultural inputs
- Employees and firms supporting food, feed, and beverage distribution (including curbside distribution and deliveries), including warehouse workers, vendor-managed inventory controllers, blockchain managers, distribution
- Workers supporting the sanitation of all food manufacturing processes and operations from wholesale to retail
- Company cafeterias - in-plant cafeterias used to feed employees
- Workers in food testing labs in private industries and in institutions of higher education
- Workers essential for assistance programs and government payments
- Workers supporting cannabis retail and dietary supplement retail
- Employees of companies engaged in the production of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids
- Animal agriculture workers to include those employed in veterinary health; manufacturing and distribution of animal medical materials, animal vaccines, animal drugs, feed ingredients, feed, and bedding, etc.; transportation of live animals, animal medical materials; transportation of deceased animals for disposal; raising of animals for food; animal production operations; slaughter and packing plants and associated regulatory and government workforce
- Workers who support the manufacture and distribution of forest products, including, but not limited to timber, paper, and other wood products

4

March 22, 2020

- Employees engaged in the manufacture and maintenance of equipment and other infrastructure necessary to agricultural production and distribution

# ENERGY

**Sector Profile**

The Energy Sector consists of widely-diverse and geographically-dispersed critical assets and systems that are often interdependent of one another. This critical infrastructure is divided into three interrelated segments or subsectors—electricity, oil, and natural gas—to include the production, refining, storage, and distribution of oil, gas, and electric power, except for hydroelectric and commercial nuclear power facilities and pipelines. The Energy Sector supplies fuels to the transportation industry, electricity to households and businesses, and other sources of energy that are integral to growth and production across the Nation. In turn, it depends on the Nation's transportation, information technology, communications, finance, water, and government infrastructures.

**Essential Workforce - Electricity industry:**

- Workers who maintain, ensure, or restore the generation, transmission, and distribution of electric power, including call centers, utility workers, reliability engineers and fleet maintenance technicians
- Workers needed for safe and secure operations at nuclear generation
- Workers at generation, transmission, and electric blackstart facilities
- Workers at Reliability Coordinator (RC), Balancing Authorities (BA), and primary and backup Control Centers (CC), including but not limited to independent system operators, regional transmission organizations, and balancing authorities
- Mutual assistance personnel
- IT and OT technology staff – for EMS (Energy Management Systems) and Supervisory Control and Data
- Acquisition (SCADA) systems, and utility data centers; Cybersecurity engineers; cybersecurity risk management
- Vegetation management crews and traffic workers who support
- Environmental remediation/monitoring technicians
- Instrumentation, protection, and control technicians

**Essential Workforce - Petroleum workers:**

- Petroleum product storage, pipeline, marine transport, terminals, rail transport, road transport
- Crude oil storage facilities, pipeline, and marine transport
- Petroleum refinery facilities
- Petroleum security operations center employees and workers who support emergency response services

5

March 22, 2020

- Petroleum operations control rooms/centers
- Petroleum drilling, extraction, production, processing, refining, terminal operations, transporting, and retail for use as end-use fuels or feedstocks for chemical manufacturing
- Onshore and offshore operations for maintenance and emergency response
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.

**Essential Workforce - Natural and propane gas workers:**

- Natural gas transmission and distribution pipelines, including compressor stations
- Underground storage of natural gas
- Natural gas processing plants, and those that deal with natural gas liquids
- Liquefied Natural Gas (LNG) facilities
- Natural gas security operations center, natural gas operations dispatch and control rooms/centers natural gas emergency response and customer emergencies, including natural gas leak calls
- Drilling, production, processing, refining, and transporting natural gas for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation
- Propane gas dispatch and control rooms and emergency response and customer emergencies, including propane leak calls
- Propane gas service maintenance and restoration, including call centers
- Processing, refining, and transporting natural liquids, including propane gas, for use as end-use fuels or feedstocks for chemical manufacturing
- Propane gas storage, transmission, and distribution centers

# WATER AND WASTEWATER

**Sector Profile**

The Water and Wastewater Sector is a complex sector composed of drinking water and wastewater infrastructure of varying sizes and ownership types. Multiple governing authorities pertaining to the Water and Wastewater Sector provide for public health, environmental protection, and security measures, among others.

**Essential Workforce**

Employees needed to operate and maintain drinking water and wastewater/drainage infrastructure, including:

- Operational staff at water authorities
- Operational staff at community water systems
- Operational staff at wastewater treatment facilities
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring

6

March 22, 2020

- Operational staff for water distribution and testing
- Operational staff at wastewater collection facilities
- Operational staff and technical support for SCADA Control systems
- Chemical disinfectant suppliers for wastewater and personnel protection
- Workers that maintain digital systems infrastructure supporting water and wastewater operations

# TRANSPORTATION AND LOGISTICS

**Sector Profile**

The Transportation Systems Sector consists of seven key subsectors, or modes:

- Aviation includes aircraft, air traffic control systems, and airports, heliports, and landing strips. Commercial aviation services at civil and joint-use military airports, heliports, and sea plane bases.  In addition, the aviation mode includes commercial and recreational aircraft (manned and unmanned) and a wide-variety of support services, such as aircraft repair stations, fueling facilities, navigation aids, and flight schools.

- Highway and Motor Carrier encompasses roadway, bridges, and tunnels. Vehicles include trucks, including those carrying hazardous materials; other commercial vehicles, including commercial motorcoaches and school buses; vehicle and driver licensing systems; taxis, transportation services including Transportation Network Companies, and delivery services including Delivery Network Companies; traffic management systems; AND cyber systems used for operational management.

- Maritime Transportation System consists of coastline, ports, waterways, and intermodal landside connections that allow the various modes of transportation to move people and goods to, from, and on the water.

- Mass Transit and Passenger Rail includes terminals, operational systems, and supporting infrastructure for passenger services by transit buses, trolleybuses, monorail, heavy rail—also known as subways or metros—light rail, passenger rail, and vanpool/rideshare.

- Pipeline Systems consist of pipelines carrying natural gas hazardous liquids, as well as various chemicals. Above-ground assets, such as compressor stations and pumping stations, are also included.

- Freight Rail consists of major carriers, smaller railroads, active railroad, freight cars, and locomotives.

- Postal and Shipping includes large integrated carriers, regional and local courier services, mail services, mail management firms, and chartered and delivery services.

**Essential Workforce**

7

March 22, 2020

- Employees supporting or enabling transportation functions, including dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, and workers that maintain and inspect infrastructure (including those that require cross-border travel)
- Employees of firms providing services that enable logistics operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use.
- Mass transit workers
- Taxis, transportation services including Transportation Network Companies, and delivery services including Delivery Network Companies
- Workers responsible for operating dispatching passenger, commuter and freight trains and maintaining rail infrastructure and equipment
- Maritime transportation workers - port workers, mariners, equipment operators
- Truck drivers who haul hazardous and waste materials to support critical infrastructure, capabilities, functions, and services
- Automotive repair and maintenance facilities
- Manufacturers and distributors (to include service centers and related operations) of packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations
- Postal and shipping workers, to include private companies
- Employees who repair and maintain vehicles, aircraft, rail equipment, marine vessels, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers
- Air transportation employees, including air traffic controllers, ramp personnel, aviation security, and aviation management
- Workers who support the maintenance and operation of cargo by air transportation, including flight crews, maintenance, airport operations, and other on- and off- airport facilities workers

# COMMUNICATIONS AND INFORMATION TECHNOLOGY

**Sector Profile**

The Communications Sector provides products and services that support the efficient operation of today's global information-based society. Communication networks enable people around the world to contact one another, access information instantly, and communicate from remote areas. This involves creating a link between a sender (including voice signals) and one or more recipients using technology (e.g., a telephone system or the Internet) to transmit information from one location to another. Technologies are changing at a rapid pace, increasing the number of products, services, service providers, and communication options. The national communications architecture is a complex collection of networks that are owned and operated by individual service providers. Many of this sector's products and services are foundational or necessary for the operations and services provided by other critical infrastructure sectors. The nature of communication networks involve both physical infrastructure (buildings, switches, towers, antennas, etc.) and cyber infrastructure (routing and

March 22, 2020

switching software, operational support systems, user applications, etc.), representing a holistic challenge to address the entire physical-cyber infrastructure.

The IT Sector provides products and services that support the efficient operation of today's global information-based society and are integral to the operations and services provided by other critical infrastructure Sectors. The IT Sector is comprised of small and medium businesses, as well as large multinational companies. Unlike many critical infrastructure Sectors composed of finite and easily identifiable physical assets, the IT Sector is a functions-based Sector that comprises not only physical assets but also virtual systems and networks that enable key capabilities and services in both the public and private sectors.

**Essential Workforce - Communications:**

- Maintenance of communications infrastructure- including privately owned and maintained communication systems- supported by technicians, operators, call-centers, wireline and wireless providers, cable service providers, satellite operations, undersea cable landing stations, Internet Exchange Points, and manufacturers and distributors of communications equipment
- Workers who support radio, television, and media service, including, but not limited to front line news reporters, studio, and technicians for newsgathering and reporting
- Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and/or technicians to manage the network or operate facilities
- Engineers, technicians and associated personnel responsible for infrastructure construction and restoration, including contractors for construction and engineering of fiber optic cables
- Installation, maintenance and repair technicians that establish, support or repair service as needed
- Central office personnel to maintain and operate central office, data centers, and other network office facilities
- Customer service and support staff, including managed and professional services as well as remote providers of support to transitioning employees to set up and maintain home offices, who interface with customers to manage or support service environments and security issues, including payroll, billing, fraud, and troubleshooting
- Dispatchers involved with service repair and restoration

**Essential Workforce - Information Technology:**

- Workers who support command centers, including, but not limited to Network Operations Command Center, Broadcast Operations Control Center and Security Operations Command Center
- Data center operators, including system administrators, HVAC & electrical engineers, security personnel, IT managers, data transfer solutions engineers, software and hardware engineers, and database administrators
- Client service centers, field engineers, and other technicians supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, and

9

March 22, 2020

information technology equipment (to include microelectronics and semiconductors) for critical infrastructure

- Workers responding to cyber incidents involving critical infrastructure, including medical facilities, SLTT governments and federal facilities, energy and utilities, and banks and financial institutions, and other critical infrastructure categories and personnel
- Workers supporting the provision of essential global, national and local infrastructure for computing services (incl. cloud computing services), business infrastructure, web-based services, and critical manufacturing
- Workers supporting communications systems and information technology used by law enforcement, public safety, medical, energy and other critical industries
- Support required for continuity of services, including janitorial/cleaning personnel

# OTHER COMMUNITY-BASED GOVERNMENT OPERATIONS AND ESSENTIAL FUNCTIONS

**Essential Workforce**

- Critical government workers, as defined by the employer and consistent with Continuity of Operations Plans and Continuity of Government plans.
- County workers responsible for determining eligibility for safety net benefits
- The Courts, consistent with guidance released by the California Chief Justice
- Workers to ensure continuity of building functions
- Security staff to maintain building access control and physical security measures
- Elections personnel
- Federal, State, and Local, Tribal, and Territorial employees who support Mission Essential Functions and communications networks
- Trade Officials (FTA negotiators; international data flow administrators)
- Weather forecasters
- Workers that maintain digital systems infrastructure supporting other critical government operations
- Workers at operations centers necessary to maintain other essential functions
- Workers who support necessary credentialing, vetting and licensing operations for transportation workers
- Workers who are critical to facilitating trade in support of the national, state, and local emergency response supply chain
- Workers supporting public and private childcare establishments, pre-K establishments, K-12 schools, colleges, and universities for purposes of distance learning, provision of school meals, or care and supervision of minors to support essential workforce across all sectors

March 22, 2020

- Workers and instructors supporting academies and training facilities and courses for the purpose of graduating students and cadets that comprise the essential workforce for all identified critical sectors
- Hotel Workers where hotels are used for COVID-19 mitigation and containment measures, including measures to protect homeless populations.
- Construction Workers who support the construction, operation, inspection, and maintenance of construction sites and construction projects (including housing construction)
- Workers such as plumbers, electricians, exterminators, and other service providers who provide services that are necessary to maintaining the safety, sanitation, construction material sources, and essential operation of construction sites and construction projects (including those that support such projects to ensure the availability of needed facilities, transportation, energy and communications; and support to ensure the effective removal, storage, and disposal of solid waste and hazardous waste)
- Commercial Retail Stores, that supply essential sectors, including convenience stores, pet supply stores, auto supplies and repair, hardware and home improvement, and home appliance retailers
- Workers supporting the entertainment industries, studios, and other related establishments, provided they follow covid-19 public health guidance around social distancing.
- Workers critical to operating Rental Car companies that facilitate continuity of operations for essential workforces, and other essential travel
- Workers that provide or determine eligibility for food, shelter, in-home supportive services, child welfare, adult protective services and social services, and other necessities of life for economically disadvantaged or otherwise needy individuals (including family members)
- Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities and critical sector services
- Faith based services that are provided through streaming or other technology
- Laundromats and laundry services
- Workers at animal care facilities that provide food, shelter, veterinary and/or routine care and other necessities of life for animals.

## CRITICAL MANUFACTURING

**Sector Profile**

The Critical Manufacturing Sector identifies several industries to serve as the core of the sector: Primary Metals Manufacturing, Machinery Manufacturing, Electrical Equipment, Appliance, and Component Manufacturing, Transportation Equipment Manufacturing Products made by these manufacturing industries are essential to many other critical infrastructure sectors.

**Essential Workforce**

11

Exhibit 14, Page 11 of 14

March 22, 2020

• Workers necessary for the manufacturing of materials and products needed for medical supply chains, transportation, energy, communications, food and agriculture, chemical manufacturing, nuclear facilities, the operation of dams, water and wastewater treatment, emergency services, and the defense industrial base.

# HAZARDOUS MATERIALS

**Essential Workforce**

- Workers at nuclear facilities, workers managing medical waste, workers managing waste from pharmaceuticals and medical material production, and workers at laboratories processing test kits
- Workers who support hazardous materials response and cleanup
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations

# FINANCIAL SERVICES

**Sector Profile**

The Financial Services Sector includes thousands of depository institutions, providers of investment products, insurance companies, other credit and financing organizations, and the providers of the critical financial utilities and services that support these functions. Financial institutions vary widely in size and presence, ranging from some of the world's largest global companies with thousands of employees and many billions of dollars in assets, to community banks and credit unions with a small number of employees serving individual communities. Whether an individual savings account, financial derivatives, credit extended to a large organization, or investments made to a foreign country, these products allow customers to: Deposit funds and make payments to other parties; Provide credit and liquidity to customers; Invest funds for both long and short periods; Transfer financial risks between customers.

**Essential Workforce**

- Workers who are needed to process and maintain systems for processing financial transactions and services (e.g., payment, clearing, and settlement; wholesale funding; insurance services; and capital markets activities)
- Workers who are needed to provide consumer access to banking and lending services, including ATMs, and to move currency and payments (e.g., armored cash carriers)
- Workers who support financial operations, such as those staffing data and security operations centers

Exhibit 14, Page 12 of 14

March 22, 2020

# CHEMICAL

**Sector Profile**

The Chemical Sector—composed of a complex, global supply chain—converts various raw materials into diverse products that are essential to modern life. Based on the end product produced, the sector can be divided into five main segments, each of which has distinct characteristics, growth dynamics, markets, new developments, and issues: Basic chemicals; Specialty chemicals; Agricultural chemicals; Pharmaceuticals; Consumer products

**Essential Workforce**

- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, workers in laboratories, workers at distribution facilities, workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, textiles, and paper products.
- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items
- Workers supporting the production of protective cleaning and medical solutions, personal protective equipment, and packaging that prevents the contamination of food, water, medicine, among others essential products
- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and/ or sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections
- Workers who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products, including glass container manufacturing

# DEFENSE INDUSTRIAL BASE

**Sector Profile**

The Defense Industrial Base Sector is the worldwide industrial complex that enables research and development, as well as design, production, delivery, and maintenance of military weapons systems, subsystems, and components or parts, to meet U.S. military requirements. The Defense Industrial Base partnership consists of Department of Defense components, Defense Industrial Base companies and their subcontractors who perform under contract to the Department of Defense, companies providing

13

March 22, 2020

incidental materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities. Defense Industrial Base companies include domestic and foreign entities, with production assets located in many countries. The sector provides products and services that are essential to mobilize, deploy, and sustain military operations.

**Essential Workforce**

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military. These individuals, include but are not limited to, aerospace; mechanical and software engineers, manufacturing/production workers; IT support; security staff; security personnel; intelligence support, aircraft and weapon system mechanics and maintainers
- Personnel working for companies, and their subcontractors, who perform under contract to the Department of Defense providing materials and services to the Department of Defense, and government-owned/contractor-operated and government-owned/government-operated facilities

14

News > **Health** • News

# Coronavirus: Are gun stores essential? Governor Newsom sidesteps that question, leaves it to the counties



Many gun shops stayed open, but counties worried about a run on guns will have to take action to close them



TRACY, CA − MARCH 25: Customers wait to be let inside the Elite Armory Plus gun store during California's shelter-in-place order in Tracy, Calif., on Wednesday, March 25, 2020. The shelter-in-place order was put in place to contain the spread of the coronavirus. (Doug Duran/Bay Area News Group)

Exhibit 15, Page 1 of 6

Coronavirus: Gun stores essential? Newsom punts to counties

By **THOMAS PEELE** | tpeele@bayareanewsgroup.com, **ROBERT SALONGA** | rsalonga@bayareanewsgroup.com and **JOSEPH GEHA** | jgeha@bayareanewsgroup.com | Bay Area News Group

PUBLISHED: March 25, 2020 at 4:56 p.m. | UPDATED: March 26, 2020 at 4:08 p.m.

In the interest of public safety, critical coronavirus coverage is being provided free to all readers. Support reporting like this with a subscription to The Mercury News. Only 99¢ for a 3-month trial.

Support local journalism

Gov. Gavin Newsom on Wednesday wouldn't say whether his unprecedented statewide shelter-in-place order means gun stores in California have to close as non-essential businesses, instead leaving that decision to each of the state's 58 counties.

"I believe in people's right to bear arms but I'll defer to the sheriff in this instance, the sheriffs in their respective jurisdictions," said Newsom during a press conference.

That's sure to muddle what some local leaders say is a growing public safety issue: panicked buying of firearms and some stores defying tougher restrictions in Bay Area counties that don't define them as essential businesses during the unprecedented lockdown to stop the spread of the coronavirus.

"We don't want a run on guns," Contra Costa County Supervisor John Gioia said Wednesday. "It's a public safety issue. Law enforcement is well prepared to handle any issues. People don't need to stock up on guns."

Gioia said the joint shelter-in-place order issued on March 16 by Alameda, Contra Costa, Santa Clara, San Mateo, San Francisco, and Marin counties clearly deemed gun stores non-essential.

A check on the status of 75 gun stores in 17 Northern California counties by this news organization found at least 32 were either fully open for business or allowing customers to come in and pick up weapons that had already been ordered. At least 12 were closed. The status of the others was unclear.

Exhibit 15, Page 2 of 6

Stores were open in Pleasant Hill, Antioch, Brentwood and El Cerrito in Contra
Costa County, Fremont in Alameda County, and Pacifica in San Mateo County.
Gioia said the Contra Costa stores would be closed.

In Marin County, the owner of Marin Firearms recorded a phone answering
machine message saying the store was ordered to close: "We were forced to shut
down the store. We tried to stay open."

Early last week San Jose Mayor Sam Liccardo quickly deemed gun stores in that
city to be non-essential after Bullseye Bishop stayed open after the Santa Clara
County had ordered a shelter in place. The police visited the shop and ordered it
to close.

The issue began getting more attention Tuesday when Los Angeles County
Sheriff Alex Villanueva called gun stores non-essential and ordered his deputies
to make sure they closed, citing safety concerns. Shelter-in-place orders were
not permission "for everyone to be panic gun-buying or rushing to stores," the
Associated Press reported.

But late Tuesday, the Los Angeles County Counsel, Mary Wickham, issued a
written opinion that gun stores are essential.

Villanueva then reversed his order to enforce closures, the Los Angeles Daily
News reported. But later Wednesday, after Newsom's news conference, the
sheriff appeared to leave the door open on enforcement, tweeting that the
governor had confirmed that "the sheriff has the authority to enforce his
executive order and keep the public safe during this pandemic."

Kris Brown, president of the gun control group Brady, said pandemic calls for
extraordinary measures.

"They are temporary orders to address an emergency situation. There is no
constitutional right to purchase a firearm immediately and, during this time
where there are legitimate public safety concerns, all rights are balanced against
competing interest in public safety and security," Brown said.

At the Antioch Armory, a small gun store across the street from city hall, on
Wednesday morning, a  sign taped to a window said 10 customers were allowed
in at time.

Staff members were wearing masks and gloves. One was showing a handgun to a
man and woman, racking its slide several times, the gun making a distinct, loud
click each time.

Asked if the store was flouting the county's shelter-in-place order by being
open, the owner, Mike Yow, declined to answer.

Exhibit 15, Page 3 of 6

At the Black Dog Armory in Fremont, owner Chuck Cunningham said he has stayed open because he believes the business is essential, saying "it was my choice to."

People are buying weapons because they want to "protect the family," he said, because of fears of looting. "Some people who don't have heart, or a good soul, tend to do bad things."

Cunningham said he would close the store if ordered, but that he had not heard from city or county officials.

"We just do not have the capacity to go door to door and check on every business. We have thousands of businesses in the city," said Geneva Bosques, Fremont police spokesperson. Black Dog Armory was "not on our radar." She said the city will now investigate.

Last week, the Alameda County sheriff's office closed down a Castro Valley gun store that stayed open after the shelter-in-place order was issued. Sgt. Ray Kelly, a spokesperson for the office said Wednesday that it's up to individual cities like Fremont to enforce the county order.

A Second Amendment advocate called for the stores to stay open.

"There is no doubt that gun shops are an essential business. The right to keep and bear arms is not one relegated for sunny days, it is a hedge against the unthinkable," said Matthew Larosiere, director of legal policy for the Sacramento-based Firearms Policy Coalition.

Kelly disagreed.

"Our interpretation is that they are non-essential," he said. "Is a food store or a pharmacy or a laundry vital to fighting the coronavirus? I think they are. I don't think you can say that about a gun store."

*Staff writer John Woolfolk contributed to this story*

Report an error
Policies and Standards
Contact Us

 The Trust Project

Stay up to date on the latest Coronavirus coverage in your area.

# Sign up for the Coronavirus Update newsletter

Enter your email

**SIGN UP**

By signing up, you agree to our privacy policy and terms of service.

---

Be the first to know.

# Sign up for Breaking News alerts

Enter your email

**SIGN UP**

By signing up, you agree to our privacy policy and terms of service.



**SPONSORED CONTENT**

## Gut Doctor "I Beg Americans To Throw Out This Vegetable Now" ⬈

By *wellnessguide2020*

One Vegetable That Literally Destroys You From The Inside

Tags: **Coronavirus**, **Gavin Newsom**, **Gun Control**, **Guns**, **Regional**



**Thomas Peele** | Investigative reporter Thomas Peele is a Pulitzer Prize winning investigative reporter on the Bay Area News Group's regional team. He has worked at newspapers, including Newsday, for 34 years in California and elsewhere. Peele focuses on government accountability, public records and data, often speaking about transparency laws publicly.

Exhibit 15, Page 5 of 6

4/26/2020                          Coronavirus: Gun stores essential? Newsom punts to counties

tpeele@bayareanewsgroup.com

Follow Thomas Peele **@thomas_peele**



**Robert Salonga** | Criminal Justice and Public Safety Reporter Robert Salonga is a Pulitzer Prize-winning reporter covering criminal justice and public safety for The Mercury News. A San Jose native, he attended UCLA and has a Master's degree in journalism from the University of Maryland. He previously reported in Washington, D.C., Salinas and the East Bay, and is a middling triathlete. Reach him the low-tech way at 408-920-5002.

rsalonga@bayareanewsgroup.com

Follow Robert Salonga **@robertsalonga**

**Joseph Geha** | Reporter Joseph Geha is a multimedia journalist covering Fremont, Milpitas, Union City, and Newark for the Bay Area News Group. His prior work has been seen in multiple Bay Area outlets, including SF Weekly, as well as on KQED and KLIV radio. He is a graduate of California State University, East Bay (Hayward), a Fremont native and a lifelong Oakland Athletics fan.

jgeha@bayareanewsgroup.com

Follow Joseph Geha **josephgeha16**  Follow Joseph Geha **@josephgeha16**

## SUBSCRIBE TODAY!
### ALL ACCESS DIGITAL OFFER FOR JUST 99 CENTS!

Exhibit 15, Page 6 of 6



<mark>March 28, 2020</mark>

**ADVISORY MEMORANDUM ON IDENTIFICATION OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS DURING COVID-19 RESPONSE**

FROM:        Christopher C. Krebs
             Director
             Cybersecurity and Infrastructure Security Agency (CISA)

---

As the Nation comes together to slow the spread of COVID-19, on March 16th the President issued updated Coronavirus Guidance for America that highlighted the importance of the critical infrastructure workforce.

The Cybersecurity and Infrastructure Security Agency (CISA) executes the Secretary of Homeland Security's authorities to secure critical infrastructure. Consistent with these authorities, CISA has developed, in collaboration with other federal agencies, State and local governments, and the private sector, an "Essential Critical Infrastructure Workforce" advisory list. This list is intended to help State, local, tribal and territorial officials as they work to protect their communities, while ensuring continuity of functions critical to public health and safety, as well as economic and national security. Decisions informed by this list should also take into consideration additional public health considerations based on the specific COVID-19-related concerns of particular jurisdictions.

<mark>This list is advisory in nature. It is not, nor should it be considered, a federal directive or standard. Additionally, this advisory list is not intended to be the exclusive list of critical infrastructure sectors, workers, and functions that should continue during the COVID-19 response across all jurisdictions. Individual jurisdictions should add or subtract essential workforce categories based on their own requirements and discretion.</mark>

The advisory list identifies workers who conduct a range of operations and services that are typically essential to continued critical infrastructure viability, including staffing operations centers, maintaining and repairing critical infrastructure, operating call centers, working construction, and performing operational functions, among others. It also includes workers who support crucial supply chains and enable functions for critical infrastructure. The industries they support represent, but are not limited to, medical and healthcare, telecommunications, information technology systems, defense, food and agriculture, transportation and logistics, energy, water and wastewater, law enforcement,

and public works.

State, local, tribal, and territorial governments are responsible for implementing and executing response activities, including decisions about access and reentry, in their communities, while the Federal Government is in a supporting role. Officials should use their own judgment in issuing implementation directives and guidance. Similarly, while adhering to relevant public health guidance, critical infrastructure owners and operators are expected to use their own judgement on issues of the prioritization of business processes and workforce allocation to best ensure continuity of the essential goods and services they support. All decisions should appropriately balance public safety, the health and safety of the workforce, and the continued delivery of essential critical infrastructure services and functions. While this advisory list is meant to help public officials and employers identify essential work functions, it allows for the reality that some workers engaged in activity determined to be essential may be unable to perform those functions because of health-related concerns.

CISA will continue to work with our partners in the critical infrastructure community to update this advisory list if necessary as the Nation's response to COVID-19 evolves.

Should you have questions about this list, please contact CISA at CISA.CAT@cisa.dhs.gov.

**Attachment:** "Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response Version 2.0"

**CISA** CYBER+INFRASTRUCTURE

**DEFEND TODAY,** SECURE TOMORROW

# Guidance on the Essential Critical Infrastructure Workforce: Ensuring Community and National Resilience in COVID-19 Response

## Version 3.0 (April 17, 2020)

## THE IMPORTANCE OF ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

Functioning critical infrastructure is imperative during the response to the COVID-19 emergency for both public health and safety as well as community well-being. Certain critical infrastructure industries have a special responsibility in these times to continue operations.

This advisory guidance and accompanying list are intended to support state, local, tribal, territorial and industry partners in identifying the critical infrastructure sectors and the essential workers needed to maintain the services and functions Americans depend on daily and that need to be able to operate resiliently during the COVID-19 pandemic response.

This document gives advisory guidance on defining essential critical infrastructure workers. Promoting the ability of such workers to continue to work during periods of community restriction, access management, social distancing, or closure orders/directives is crucial to community resilience and continuity of essential functions. The term "workers" as used in this guidance is intended to apply to both employees and contractors performing the described functions.

CISA will continually solicit and accept feedback on the list and will evolve the list in response to stakeholder feedback. We will also use our various stakeholder engagement mechanisms to work with partners on how they are using this list and share those lessons learned and best practices broadly. Feedback can be sent to CISA.CAT@CISA.DHS.GOV.

## CONSIDERATIONS FOR GOVERNMENT AND BUSINESS

This list was developed in consultation with federal agency partners, industry experts, and State and local officials, and is based on several key principles:

1. Response efforts to the COVID-19 pandemic are locally executed, state managed, and federally supported.

2. Everyone should follow guidance from the Centers for Disease Control and Prevention (CDC), as well as state and local government officials, regarding strategies to limit disease spread.

3. Employers must comply with applicable Occupational Safety and Health Administration (OSHA) requirements for protecting critical infrastructure workers who remain on or return to the job during the COVID-19 pandemic. As the nation relies on these workers to protect public health, safety, and community well-being, they must be protected from exposure to and infection with the virus so that they can continue to carry out

their responsibilities. OSHA has guidance and enforcement information for workplaces at www.osha.gov/coronavirus.

4. Businesses and government agencies may continue to implement organization-specific measures, which protect the workforce while meeting mission needs.

5. Workers should be encouraged to work remotely when possible and focus on core business activities. In-person, non-mandatory activities should be delayed until the resumption of normal operations.

6. When continuous remote work is not possible, businesses should enlist strategies to reduce the likelihood of spreading the disease. This includes, but is not limited to, physically separating staff, staggering work shift hours or days, and other social distancing measures. While the CDC recommends that everyone wear a cloth face cover to contain respiratory droplets when around others, critical infrastructure employers must consider how best to implement this public health recommendation for source control in the workplace. For example, employers may provide disposable facemasks (e.g., surgical masks) instead of cloth face coverings when workers would need to wear masks for extended periods of time (e.g., the duration of a work shift) or while performing tasks in which the face covering could become contaminated.

7. Consider the impact of workplace sick leave policies that may contribute to an employee decision to delay reporting medical symptoms. Sick employees should not return to the workplace until they meet the criteria to stop home isolation.

8. Critical infrastructure has an obligation to limit to the extent possible the reintegration of in-person workers who have experienced an exposure to COVID-19 but remain asymptomatic in ways that best protect the health of the worker, their co-workers, and the general public. An analysis of core job tasks and workforce availability at worksites can allow the employer to match core activities to other equally skilled and available in-person workers who have not experienced an exposure. CDC guidance on safety practices for critical infrastructure workers is maintained at https://www.cdc.gov/coronavirus/2019-ncov/community/critical-workers/implementing-safety-practices.html

9. All organizations should implement their business continuity and pandemic plans or put plans in place if they do not exist. Delaying implementation is not advised and puts at risk the viability of the business and the health and safety of the workers.

10. Reliance on technology and just-in-time supply chains means that certain workers must be able to access certain sites, facilities, and assets to ensure continuity of functions. The vast majority of our economy relies on technology and therefore information technology (IT) and operational technology (OT) workers for critical infrastructure operations are essential. This includes workers in many roles, including workers focusing on management systems, control systems, and Supervisory Control and Data Acquisition (SCADA) systems, and data centers; cybersecurity engineering; and cybersecurity risk management.

11. Government workers, such as emergency managers, and the business community need to establish and maintain lines of communication.

12. Essential critical infrastructure workers need continued and unimpeded access to sites, facilities, and equipment within quarantine zones, containment areas, or other areas where access or movement is limited to perform functions for community relief and stability; for public safety, security and health; for maintaining essential supply chains and preserving local, regional, and national economic well-being.

13. Essential critical infrastructure workers need sustained access to designated quarantine, containment, or

**Essential Critical Infrastructure Workforce**

restricted areas; and should be exempted from curfews, shelter-in-place orders, and transportation restrictions or restrictions on movement.

14. Whenever possible, local governments should consider adopting specific state guidance on essential workers to reduce potential complications of workers crossing jurisdictional boundaries. When this is not possible, local jurisdictions should consider aligning access and movement control policies with neighboring jurisdictions to reduce the burden of cross-jurisdictional movement of essential critical infrastructure workers.

## IDENTIFYING ESSENTIAL CRITICAL INFRASTRUCTURE WORKERS

The following list of identified essential critical infrastructure workers is intended to be overly inclusive reflecting the diversity of industries across the United States.



## HEALTHCARE / PUBLIC HEALTH

- Workers, including laboratory personnel, that perform critical clinical, biomedical and other research, development, and testing needed for COVID-19 or other diseases.
- Healthcare providers including, but not limited to, physicians; dentists; psychologists; mid-level practitioners; nurses; assistants and aids; infection control and quality assurance personnel; pharmacists; physical, respiratory, speech and occupational therapists and assistants; social workers; optometrists; speech pathologists; chiropractors; diagnostic and therapeutic technicians; and radiology technologists.
- Workers required for effective clinical, command, infrastructure, support service, administrative, security, and intelligence operations across the direct patient care and full healthcare and public health spectrum. Personnel examples may include, but are not limited, to accounting, administrative, admitting and discharge, engineering, accrediting, certification, licensing, credentialing, epidemiological, source plasma and blood donation, food service, environmental services, housekeeping, medical records, information technology and operational technology, nutritionists, sanitarians, respiratory therapists, etc.
  - Emergency medical services workers.
  - Prehospital workers included but not limited to urgent care workers.
  - Inpatient & hospital workers (e.g. hospitals, critical access hospitals, long-term acute care

**Essential Critical Infrastructure Workforce**

- hospitals, long-term care facilities, inpatient hospice, ambulatory surgical centers, etc.).
  - o Outpatient care workers (e.g. end-stage-renal disease, Federally Qualified Health Centers, Rural Health Clinics, community mental health clinics, organ transplant/procurement centers, and other ambulatory care settings/providers, comprehensive outpatient rehabilitation facilities, etc.).
  - o Home care workers (e.g. home health care, at-home hospice, home dialysis, home infusion, etc.).
  - o Workers at Long-term care facilities, residential and community-based providers (e.g. Programs of All-Inclusive Care for the Elderly (PACE), Intermediate Care Facilities for Individuals with Intellectual Disabilities, Psychiatric Residential Treatment Facilities, Religious Nonmedical Health Care Institutions, etc.).
  - o Workplace safety workers (i.e., workers who anticipate, recognize, evaluate, and control workplace conditions that may cause workers' illness or injury).
- Workers needed to support transportation to and from healthcare facility and provider appointments.
- Workers needed to provide laundry services, food services, reprocessing of medical equipment, and waste management.
- Workers that manage health plans, billing, and health information and who cannot work remotely.
- Workers performing cybersecurity functions at healthcare and public health facilities and who cannot work remotely.
- Workers performing security, incident management, and emergency operations functions at or on behalf of healthcare entities including healthcare coalitions, who cannot practically work remotely.
- Childcare, eldercare, and other service providers for essential healthcare personnel.
- Vendors and suppliers (e.g. imaging, pharmacy, oxygen services, durable medical equipment, etc.).
- Workers at manufacturers (including biotechnology companies and those companies that have shifted production to medical supplies), materials and parts suppliers, technicians, logistics and warehouse operators, printers, packagers, distributors of medical products and equipment (including third party logistics providers, and those who test and repair), personal protective equipment (PPE), isolation barriers, medical gases, pharmaceuticals (including materials used in radioactive drugs), dietary supplements, blood and blood products, vaccines, testing materials, laboratory supplies, cleaning, sanitizing, disinfecting or sterilization supplies (including dispensers), sanitary goods, personal care products, pest control products, and tissue and paper towel products.
- Donors of blood, bone marrow, blood stem cell, or plasma, and the workers of the organizations that operate and manage related activities.
- Pharmacy staff, including workers necessary to maintain uninterrupted prescription, and other workers for pharmacy operations.
- Workers in retail facilities specializing in medical good and supplies.
- Public health and environmental health workers, such as:
  - o Workers specializing in environmental health that focus on implementing environmental controls, sanitary and infection control interventions, healthcare facility safety and emergency preparedness planning, engineered work practices, and developing guidance and protocols for appropriate PPE to prevent COVID-19 disease transmission.
  - o Public health/ community health workers (including call center workers) who conduct community-based public health functions, conducting epidemiologic surveillance and compiling, analyzing, and communicating public health information, who cannot work remotely.
- Human services providers, especially for at risk populations such as:
  - o Home delivered meal providers for older adults, people with disabilities, and others with chronic

**Essential Critical Infrastructure Workforce**

health conditions.
- o Home-maker services for frail, homebound, older adults.
- o Personal assistance services providers to support activities of daily living for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
- o Home health providers who deliver health care services for older adults, people with disabilities, and others with chronic health conditions who live independently in the community with supports and services.
- Government entities, and contractors that work in support of local, state, and federal public health and medical mission sets, including but not limited to supporting access to healthcare and associated payment functions, conducting public health functions, providing medical care, supporting emergency management, or other services necessary for supporting the COVID-19 response.
- Mortuary service providers, such as:
  - o Workers performing mortuary funeral, cremation, burial, cemetery, and related services, including funeral homes, crematoriums, cemetery workers, and coffin makers.
  - o Workers who coordinate with other organizations to ensure the proper recovery, handling, identification, transportation, tracking, storage, and disposal of human remains and personal effects; certify cause of death; and facilitate access to mental and behavioral health services to the family members, responders, and survivors of an incident.

## LAW ENFORCEMENT, PUBLIC SAFETY, AND OTHER FIRST RESPONDERS

- Public, private, and voluntary personnel (front-line and management, civilian and sworn) in emergency management, law enforcement, fire and rescue services, emergency medical services (EMS), and security, public and private hazardous material responders, air medical service providers (pilots and supporting technicians), corrections, and search and rescue personnel.
- Personnel involved in provisioning of access to emergency services, including the provisioning of real-time text, text-to-911, and dialing 911 via relay.
- Personnel that are involved in the emergency alert system (EAS) ((broadcasters, satellite radio and television, cable, and wireline video) and wireless emergency alerts (WEA).
- Workers at Independent System Operators and Regional Transmission Organizations, and Network Operations staff, engineers and technicians to manage the network or operate facilities.
- Workers at emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, and 911 call centers.
- Fusion Center workers.
- Workers, including contracted vendors, who maintain, manufacture, or supply equipment and services supporting law enforcement, fire, EMS, and response operations (to include electronic security and life safety security personnel).
- Workers and contracted vendors who maintain and provide services and supplies to public safety facilities, including emergency communication center, public safety answering points, public safety communications centers, emergency operation centers, fire and emergency medical services stations, police and law enforcement stations and facilities.
- Workers supporting the manufacturing, distribution, and maintenance of necessary safety equipment and uniforms for law enforcement and all public safety personnel.

**Essential Critical Infrastructure Workforce**

- Workers supporting the operation of firearm, or ammunition product manufacturers, retailers, importers, distributors, and shooting ranges.
- Public agency workers responding to abuse and neglect of children, spouses, elders, and dependent adults.
- Workers who support weather disaster and natural hazard mitigation and prevention activities.
- Security staff to maintain building access control and physical security measures.

## FOOD AND AGRICULTURE

- Workers supporting groceries, pharmacies, convenience stores, and other retail (including unattended and vending) that sells human food, animal and pet food and pet supply, and beverage products, including retail customer support service and information technology support staff necessary for online orders, pickup, and delivery.
- Restaurant carry-out and quick serve food operations, including dark kitchen and food prep centers, carry-out, and delivery food workers.
- Food manufacturer workers and their supplier workers including those employed at food ingredient production and processing facilities; aquaculture and seafood harvesting facilities; livestock, poultry, seafood slaughter facilities; pet and animal feed processing facilities; human food facilities producing by-products for animal food; beverage production facilities; and the production of food packaging.
- Farmers, farm and ranch workers, and agribusiness support services to include those employed in auction and sales; grain and oilseed handling, storage, processing, and distribution; animal food, feed, and ingredient production, packaging, and distribution; manufacturing, packaging, and distribution of veterinary drugs; and truck delivery and transport.
- Farmers, farm and ranch workers, and support service and supplier workers producing food supply domestically and for export, to include those engaged in raising, cultivating, harvesting, packing, storing, or delivering to storage or to market or to a carrier for transportation to market any agricultural or horticultural commodity for human consumption; agricultural inspection; fuel ethanol facilities; biodiesel and renewable diesel facilities; storage facilities; and other agricultural inputs.
- Workers and firms supporting the distribution of food, feed, and beverage and ingredients used in these products, including warehouse workers, vendor-managed inventory controllers, and blockchain managers.
- Workers supporting the sanitation and pest control of all food manufacturing processes and operations from wholesale to retail.
- Workers supporting the growth and distribution of plants and associated products for home gardens.
- Workers in cafeterias used to feed workers, particularly worker populations sheltered against COVID-19.
- Workers in animal diagnostic and food testing laboratories.
- Government, private, and non-governmental organizations' workers essential for food assistance programs (including school lunch programs) and government payments.
- Workers of companies engaged in the production, storage, transport, and distribution of chemicals, medicines, vaccines, and other substances used by the food and agriculture industry, including seeds, pesticides, herbicides, fertilizers, minerals, enrichments, and other agricultural production aids.
- Animal agriculture workers to include those employed in veterinary health (including those involved in supporting emergency veterinary or livestock services); raising, caring for and management of animals for food; animal production operations; livestock markets; slaughter and packing plants, manufacturers, renderers, and associated regulatory and government workforce.

- Transportation supporting animal agricultural industries, including movement of animal medical and reproductive supplies and materials, animal vaccines, animal drugs, feed ingredients, feed and bedding, live animals, animal by-products, and deceased animals for disposal.
- Workers who support sawmills and the manufacture and distribution of fiber and forest products, including, but not limited to timber, paper, and other wood and fiber products, as well as manufacture and distribution of products using agricultural commodities.
- Workers engaged in the manufacture and maintenance of equipment and other infrastructure necessary for agricultural production and distribution.

## ENERGY

- Workers supporting the energy sector, regardless of the energy source (including, but not limited to, nuclear, fossil, hydroelectric, or renewable), segment of the system, or infrastructure the worker is involved in, who are needed to construct, manufacture, repair, transport, permit, monitor, operate engineer, and maintain the reliability, safety, security, environmental health, and physical and cyber security of the energy system, including those who support construction, manufacturing, transportation, permitting, and logistics.
- Workers and contractors supporting energy facilities that provide steam, hot water or chilled water from central power plants to connected customers.
- Workers conducting energy/commodity trading/scheduling/marketing functions who can't perform their duties remotely.
- Workers supporting the energy sector through renewable energy infrastructure (including, but not limited to, wind, solar, biomass, hydrogen, ocean, geothermal, and hydroelectric) and microgrids, including those supporting construction, manufacturing, transportation, permitting, operation and maintenance, monitoring, and logistics.
- Workers and security staff involved in nuclear re-fueling operations.
- Workers providing services related to energy sector fuels (including, but not limited to, petroleum (crude oil), natural gas, propane, liquefied natural gas (LNG), compressed natural gas (CNG), natural gas liquids (NGL), other liquid fuels, nuclear, and coal) and supporting the mining, processing, manufacturing, construction, logistics, transportation, permitting, operation, maintenance, security, waste disposal, storage, and monitoring of support for resources.
- Workers providing environmental remediation and monitoring, limited to immediate critical needs technicians.
- Workers involved in the manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service at energy sector facilities across all energy sector segments.

### Electricity Industry

- Workers who maintain, ensure, restore, or who are involved in the development, transportation, fuel procurement, expansion, or operation of, the generation, transmission, and distribution of electric power, including call centers, utility workers, engineers, retail electricity, construction, maintenance, utility telecommunications, relaying, and fleet maintenance technicians who cannot perform their duties remotely.
- Workers at coal mines, production facilities, and those involved in manufacturing, transportation,

**Essential Critical Infrastructure Workforce**

    permitting, operation, maintenance, and monitoring at coal sites.
- Workers who produce, process, ship, and handle coal used for power generation and manufacturing.
- Workers in the electricity industry including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics
- Workers needed for safe and secure operations at nuclear generation including, but not limited to, those critical to the broader nuclear supply chain, the manufacture and delivery of parts needed to maintain nuclear equipment, the operations of fuel manufacturers, and the production and processing of fuel components used in the manufacturing of fuel.
- Workers at fossil fuel (including but not limited to natural gas, refined, distillate, and/or coal), nuclear, and renewable energy infrastructure (including, but not limited to wind, solar, biomass, hydrogen, geothermal, and hydroelectric), and microgrids, including those supporting safety, construction, manufacturing, transportation, permitting, operation, maintenance, monitoring, and logistics.
- Workers at generation, transmission, and electric black start facilities.
- Workers at Reliability Coordinator, Balancing Authority, local distribution control centers, and primary and backup Control Centers, including, but not limited to, independent system operators, regional transmission organizations, and local distribution control centers.
- Workers that are mutual assistance/aid personnel, which may include workers from outside of the state or local jurisdiction.
- Vegetation management and traffic control for supporting those crews.
- Instrumentation, protection, and control technicians.
- Essential support personnel for electricity operations.
- Generator set support workers, such as diesel engineers used in power generation, including those providing fuel.

**Petroleum Industry**
- Workers who support onshore and offshore petroleum drilling operations; platform and drilling construction and maintenance; transportation (including helicopter operations), maritime transportation, supply, and dredging operations; maritime navigation; well stimulation, intervention, monitoring, automation and control, extraction, production; processing; waste disposal, and maintenance, construction, and operations.
- Workers in the petroleum industry including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics.
- Workers for crude oil, petroleum, and petroleum product storage and transportation, including pipeline, marine transport, terminals, rail transport, storage facilities, racks, and road transport for use as end- use fuels such as gasoline, diesel fuel, jet fuel, and heating fuels or feedstocks for chemical manufacturing.
- Petroleum and petroleum product security operations center workers and workers who support maintenance and emergency response services.
- Petroleum and petroleum product operations control rooms, centers, and refinery facilities.
- Retail fuel centers such as gas stations and truck stops, and the distribution systems that support them.
- Supporting new and existing construction projects, including, but not limited to, pipeline construction.
- Manufacturing and distribution of equipment, supplies, and parts necessary for production, maintenance, restoration, and service of petroleum and petroleum product operations and use, including end-users.

**Essential Critical Infrastructure Workforce**

- Transmission and distribution pipeline workers, including but not limited to pump stations and any other required, operations maintenance, construction, and support for petroleum products.

**Natural Gas, Natural Gas Liquids (NGL), Propane, and Other Liquid Fuels**

- Workers who support onshore and offshore drilling operations, platform and drilling construction and maintenance; transportation (including helicopter operations); maritime transportation, supply, and dredging operations; maritime navigation; natural gas and natural gas liquid production, processing, extraction, storage and transportation; well intervention, monitoring, automation and control; waste disposal, and maintenance, construction, and operations.
- Workers in the natural gas, NGL, propane, and other liquid fuels industries including but not limited to those supporting safety, construction, manufacturing, transportation, permitting, operation/maintenance, engineering, physical and cyber security, monitoring, and logistics.
- Transmission and distribution pipeline workers, including compressor stations and any other required operations maintenance, construction, and support for natural gas, natural gas liquid, propane, and other liquid fuels.
- Workers at Liquefied Natural Gas (LNG) and Compressed Natural Gas (CNG) facilities.
- Workers at natural gas, propane, natural gas liquids, liquified natural gas, liquid fuel storage facilities, underground facilities, and processing plants and other related facilities, including construction, maintenance, and support operations personnel.
- Natural gas processing plants workers and those who deal with natural gas liquids.
- Workers who staff natural gas, propane, natural gas liquids, and other liquid fuel security operations centers, operations dispatch and control rooms and centers, and emergency response and customer emergencies (including leak calls) operations.
- Workers supporting drilling, production, processing, refining, and transporting natural gas, propane, natural gas liquids, and other liquid fuels for use as end-use fuels, feedstocks for chemical manufacturing, or use in electricity generation.
- Workers supporting propane gas service maintenance and restoration, including call centers.
- Workers supporting propane, natural gas liquids, and other liquid fuel distribution centers.
- Workers supporting propane gas storage, transmission, and distribution centers.
- Workers supporting new and existing construction projects, including, but not limited to, pipeline construction.
- Workers supporting ethanol and biofuel production, refining, and distribution.
- Workers in fuel sectors (including, but not limited to nuclear, coal, and gas types and liquid fuels) supporting the mining, manufacturing, logistics, transportation, permitting, operation, maintenance, and monitoring of support for resources.
- Workers ensuring, monitoring, and engaging in the physical security of assets and locations associated with natural gas, propane, natural gas liquids, and other liquid fuels.
- Workers involved in the manufacturing and distribution of equipment, supplies, and parts necessary to maintain production, maintenance, restoration, and service of natural gas, propane, natural gas liquids, and other liquid fuels operations and use, including end-users.

## WATER AND WASTEWATER

Workers needed to operate and maintain drinking water and wastewater and drainage infrastructure, including:

- Operational staff at water authorities.

**Essential Critical Infrastructure Workforce**

- Operational staff at community water systems.
- Operational staff at wastewater treatment facilities.
- Workers repairing water and wastewater conveyances and performing required sampling or monitoring, including field staff.
- Operational staff for water distribution and testing.
- Operational staff at wastewater collection facilities.
- Operational staff and technical support for SCADA Control systems.
- Chemical equipment and personal protection suppliers to water and wastewater system.
- Workers who maintain digital systems infrastructure supporting water and wastewater operations.

## TRANSPORTATION AND LOGISTICS

- Workers supporting or enabling transportation and logistics functions, including truck drivers, bus drivers, dispatchers, maintenance and repair technicians, warehouse workers, truck stop and rest area workers, driver training and education centers, Department of Motor Vehicle (DMV) workers, enrollment agents for federal transportation worker vetting programs, towing and recovery services, roadside assistance workers, intermodal transportation personnel, and workers that construct, maintain, rehabilitate, and inspect infrastructure, including those that require cross-jurisdiction travel.).
- Workers supporting the distribution of food, fuels, pharmaceuticals and medical material (including materials used in radioactive drugs), and chemicals needed for water or water treatment and energy maintenance.
- Workers supporting operation of essential highway infrastructure, including roads, bridges, and tunnels (e.g., traffic operations centers and moveable bridge operators).
- Workers of firms providing services, supplies, and equipment that enable warehouse and operations, including cooling, storing, packaging, and distributing products for wholesale or retail sale or use, including cold- and frozen-chain logistics for food and critical biologic products.
- Mass transit workers providing critical transit services and performing critical or routine maintenance to mass transit infrastructure or equipment.
- Workers supporting personal and commercial transportation services including taxis, delivery services, vehicle rental services, bicycle maintenance and car-sharing services, and transportation network providers.
- Workers, including police, responsible for operating and dispatching passenger, commuter, and freight trains and maintaining rail infrastructure and equipment.
- Maritime transportation workers, including port authority and commercial facility personnel, dredgers, port workers, security personnel, mariners, ship crewmembers, ship pilots, tugboat operators, equipment operators (to include maintenance and repair, and maritime-specific medical providers), ship supply workers, chandlers, and repair company workers. Refer to the United States Coast Guard's Marine Safety Information Bulletin "Maintaining Maritime Commerce and Identification of Essential Maritime Critical Infrastructure Workers" for more information.
- Workers, including truck drivers, railroad employees, maintenance crews, and cleaners, supporting transportation of chemicals, hazardous, medical, and waste materials that support critical infrastructure, capabilities, functions, and services, including specialized carriers, crane and rigging industry workers.
- Bus drivers and workers who provide or support intercity, commuter, and charter bus service in support of other essential services or functions.

- Automotive repair, maintenance, and transportation equipment manufacturing and distribution facilities (including those who repair and maintain electric vehicle charging stations).
- Transportation safety inspectors, including hazardous material inspectors and accident investigator inspectors.
- Manufacturers and distributors (to include service centers and related operations) of lighting and communication systems, specialized signage and structural systems, emergency response equipment and support materials, printers, printed materials, packaging materials, pallets, crates, containers, and other supplies needed to support manufacturing, packaging staging and distribution operations, and other critical infrastructure needs.
- Postal Service, parcel, courier, last-mile delivery, and shipping and related workers, to include private companies, who accept, process, transport, and deliver information and goods.
- Workers who supply equipment and materials for maintenance of transportation equipment.
- Workers who repair and maintain vehicles, aircraft, rail equipment, marine vessels, bicycles, and the equipment and infrastructure that enables operations that encompass movement of cargo and passengers.
- Workers who support air transportation for cargo and passengers, including operation distribution, maintenance, and sanitation. This includes air traffic controllers, flight dispatchers, maintenance personnel, ramp workers, fueling agents, flight crews, airport safety inspectors and engineers, airport operations personnel, aviation and aerospace safety workers, security, commercial space personnel, operations personnel, accident investigators, flight instructors, and other on- and off-airport facilities workers.
- Workers supporting transportation via inland waterways, such as barge crew, dredging crew, and river port workers for essential goods.
- Workers critical to the manufacturing, distribution, sales, rental, leasing, repair, and maintenance of vehicles and other transportation equipment (including electric vehicle charging stations) and the supply chains that enable these operations to facilitate continuity of travel-related operations for essential workers.
- Warehouse operators, including vendors and support personnel critical for business continuity (including heating, ventilation, and air conditioning (HVAC) and electrical engineers, security personnel, and janitorial staff), e-commerce or online commerce, and customer service for essential functions.

## PUBLIC WORKS AND INFRASTRUCTURE SUPPORT SERVICES

- Workers who support the construction, maintenance, or rehabilitation of critical infrastructure.
- Workers supporting construction materials production, testing laboratories, material delivery services, and construction inspection.
- Workers who support the operation, inspection, and maintenance of essential public works facilities and operations, including bridges, water and sewer main breaks, fleet maintenance personnel, construction of critical or strategic infrastructure, traffic signal maintenance, emergency location services for buried utilities, maintenance of digital systems infrastructure supporting public works operations, and other emergent issues.
- Workers such as plumbers, electricians, exterminators, builders (including building and insulation), contractors, HVAC Technicians, landscapers, and other service providers who provide services, including temporary construction, that are necessary to maintaining the safety, sanitation, and essential operation

**Essential Critical Infrastructure Workforce**

of residences, businesses and buildings, such as hospitals and senior living facilities.
- Workers personnel, who support operations that ensure, the availability of and access to needed facilities, transportation, energy, and communications through activities such as road and line clearing.
- Workers who support the effective removal, storage, and disposal of residential, industrial, and commercial solid waste and hazardous waste, including at landfill operations.
- Workers who support the operation, inspection, and maintenance of essential dams, locks, and levees.
- Workers who support the inspection and maintenance of aids to navigation and other government-provided services that ensure continued maritime commerce.

## COMMUNICATIONS AND INFORMATION TECHNOLOGY

### Communications
- Maintenance of communications infrastructure, -- including privately owned and maintained communication systems, -- supported by technicians, operators, call centers, wireline and wireless providers, cable service providers, satellite operations, Internet Exchange Points, Points of Presence, Network Access Points, back haul and front haul facilities, and manufacturers and distributors of communications equipment.
- Government and private sector workers, including government contractors, with work related to undersea cable infrastructure and support facilities, including cable landing sites, beach manhole vaults and covers, submarine cable depots, and submarine cable ship facilities.
- Government and private sector workers, including government contractors, supporting Department of Defense internet and communications facilities.
- Network Operations staff, engineers, and technicians to include IT managers and staff, HVAC and electrical engineers, security personnel, software and hardware engineers, and database administrators that manage the network or operate facilities.
- Workers responsible for infrastructure construction and restoration, including but not limited to engineers, technicians, and contractors for construction and engineering of fiber optic cables, buried conduit, small cells, other wireless facilities, and other communications sector-related infrastructure. This includes permitting, construction of new facilities, and deployment of new technology as required to address congestion or customer usage due to unprecedented use of remote services.
- Installation, maintenance, and repair technicians that establish, support, or repair service as needed.
- Central office personnel to maintain and operate central office, data centers, and other network office facilities, including critical support personnel assisting front line workers.
- Customer service and support staff, including managed and professional services, as well as remote providers of support to transitioning workers to set up and maintain home offices, who interface with customers to manage or support service environments and security issues including payroll, billing, fraud, logistics, and troubleshooting.
- Workers providing electronic security, fire, monitoring, and life safety services, and who ensure physical security, cleanliness, and the safety of facilities and personnel, including those who provide temporary licensing waivers for security personnel to work in other States or Municipalities.
- Dispatchers involved with service repair and restoration.
- Retail customer service personnel at critical service center locations to address customer needs, including new customer processing, distributing and repairing equipment, and addressing customer issues, in order to support individuals' remote emergency communications needs

**Essential Critical Infrastructure Workforce**

- Supply chain and logistics personnel to ensure goods and products are available to provision these front-line workers.
- External Affairs personnel to assist in coordinating with local, state, and federal officials to address communications needs supporting COVID-19 response, public safety, and national security.
- Workers responsible for ensuring that persons with disabilities have access to and the benefits of various communications platforms, including those involved in the provision of telecommunication relay services, closed captioning of broadcast television for the deaf, video relay services for deaf citizens who prefer communication via American Sign Language over text, and audio-description for television programming.

**Information Technology**

- Workers who support command centers, including, but not limited to, Network Operations Command Centers, Broadcast Operations Control Centers, and Security Operations Command Centers.
- Data center operators, including system administrators, HVAC and electrical engineers, security personnel, IT managers and purchasers, data transfer solutions engineers, software and hardware engineers, and database administrators for all industries, including financial services.
- Workers who support client service centers, field engineers, and other technicians and workers supporting critical infrastructure, as well as manufacturers and supply chain vendors that provide hardware and software, support services, research and development, information technology equipment (to include microelectronics and semiconductors), HVAC and electrical equipment for critical infrastructure, and test labs and certification agencies that qualify such equipment (to include microelectronics, optoelectronics, and semiconductors) for critical infrastructure, including data centers.
- Workers needed to preempt and respond to cyber incidents involving critical infrastructure, including medical facilities; state, local, tribal, and territorial (SLTT) governments and federal facilities; energy and utilities; banks and financial institutions; securities and other exchanges; other entities that support the functioning of capital markets, public works, critical manufacturing, food and agricultural production; transportation; and other critical infrastructure categories and personnel, in addition to all cyber defense workers who can't perform their duties remotely.
- Suppliers, designers, transporters, and other workers supporting the manufacture, distribution, provision, and construction of essential global, national, and local infrastructure for computing services (including cloud computing services and telework capabilities), business infrastructure, financial transactions and services, web-based services, and critical manufacturing.
- Workers supporting communications systems, information technology, and work from home solutions used by law enforcement, public safety, medical, energy, public works, critical manufacturing, food and agricultural production, financial services, education, and other critical industries and businesses.
- Workers required in person to support Software as a Service businesses that enable remote working, performance of business operations, distance learning, media services, and digital health offerings, or required for technical support crucial for business continuity and connectivity.

# OTHER COMMUNITY- OR GOVERNMENT-BASED OPERATIONS AND ESSENTIAL FUNCTIONS

- Workers to ensure continuity of building functions, including but not limited to security and environmental controls (e.g., HVAC), the manufacturing and distribution of the products required for these functions, and the permits and inspections for construction supporting essential infrastructure.

**Essential Critical Infrastructure Workforce**

- Elections personnel to include both public and private sector elections support.
- Workers supporting the operations of the judicial system, including judges, lawyers, and others providing legal assistance.
- Workers who support administration and delivery of unemployment insurance programs, income maintenance, employment service, disaster assistance, workers' compensation insurance and benefits programs, and pandemic assistance.
- Federal, State, and Local, Tribal, and Territorial government workers who support Mission Essential Functions and communications networks.
- Trade Officials (FTA negotiators; international data flow administrators).
- Workers who support radio, print, internet and television news and media services, including, but not limited to front line news reporters, studio, and technicians for newsgathering, reporting, and publishing news.
- Workers supporting Census 2020.
- Weather forecasters.
- Clergy for essential support.
- Workers who maintain digital systems infrastructure supporting other critical government operations.
- Workers who support necessary permitting, credentialing, vetting, and licensing for essential critical infrastructure workers and their operations.
- Customs and immigration workers who are critical to facilitating trade in support of the national emergency response supply chain.
- Educators supporting public and private K-12 schools, colleges, and universities for purposes of facilitating distance learning or performing other essential functions.
- Workers at testing centers for emergency medical services and other healthcare workers.
- Staff at government offices who perform title search, notary, and recording services in support of mortgage and real estate services and transactions.
- Residential and commercial real estate services, including settlement services.
- Workers supporting essential maintenance, manufacturing, design, operation, inspection, security, and construction for essential products, services, supply chain, and COVID-19 relief efforts.
- Workers performing services to animals in human care, including zoos and aquariums.

## CRITICAL MANUFACTURING

- Workers necessary for the manufacturing of metals (including steel and aluminum), industrial minerals, semiconductors, materials and products needed for medical supply chains and for supply chains associated with transportation, aerospace, energy, communications, information technology, food and agriculture, chemical manufacturing, nuclear facilities, wood products, commodities used as fuel for power generation facilities, the operation of dams, water and wastewater treatment, processing and reprocessing of solid waste, emergency services, and the defense industrial base. Additionally, workers needed to maintain the continuity of these manufacturing functions and associated supply chains, and workers necessary to maintain a manufacturing operation in warm standby.
- Workers necessary for the manufacturing of materials and products needed to manufacture medical equipment and PPE.
- Workers necessary for mining and production of critical minerals, materials and associated essential supply chains, and workers engaged in the manufacture and maintenance of equipment and other

**Essential Critical Infrastructure Workforce**

infrastructure necessary for mining production and distribution.
- Workers who produce or manufacture parts or equipment that supports continued operations for any essential services and increase in remote workforce, including computing and communication devices, semiconductors, and equipment such as security tools for Security Operations Centers (SOCs) or data centers.
- Workers manufacturing or providing parts and equipment that enable the maintenance and continued operation of essential businesses and facilities.

## HAZARDOUS MATERIALS
- Workers who manage hazardous materials associated with any other essential activity, including but not limited to healthcare waste (medical, pharmaceuticals, medical material production, and testing operations from laboratories processing and testing kits) and energy (including nuclear facilities).
- Workers who support hazardous materials response and cleanup.
- Workers who maintain digital systems infrastructure supporting hazardous materials management operations.

## FINANCIAL SERVICES
- Workers who are needed to provide, process, and maintain systems for processing, verification, and recording of financial transactions and services, including payment, clearing, and settlement; wholesale funding; insurance services; consumer and commercial lending; public accounting; and capital markets activities.
- Workers who are needed to maintain orderly market operations to ensure the continuity of financial transactions and services.
- Workers who are needed to provide business, commercial, and consumer access to bank and non-bank financial services and lending services, including ATMs, lending and money transmission, lockbox banking, and to move currency, checks, securities, and payments (e.g., armored cash carriers).
- Workers who support financial operations and those staffing call centers, such as those staffing data and security operations centers, managing physical security, or providing accounting services.
- Workers supporting production and distribution of debit and credit cards.
- Workers providing electronic point of sale support personnel for essential businesses and workers.

## CHEMICAL
- Workers supporting the chemical and industrial gas supply chains, including workers at chemical manufacturing plants, laboratories, distribution facilities, and workers who transport basic raw chemical materials to the producers of industrial and consumer goods, including hand sanitizers, food and food additives, pharmaceuticals, paintings and coatings, textiles, building materials, plumbing, electrical, and paper products.
- Workers supporting the safe transportation of chemicals, including those supporting tank truck cleaning facilities and workers who manufacture packaging items.
- Workers supporting the production of protective cleaning and medical solutions, PPE, chemical consumer and institutional products, disinfectants, fragrances, and packaging that prevents the contamination of food, water, medicine, among others essential products.

**Essential Critical Infrastructure Workforce**

- Workers supporting the operation and maintenance of facilities (particularly those with high risk chemicals and sites that cannot be shut down) whose work cannot be done remotely and requires the presence of highly trained personnel to ensure safe operations, including plant contract workers who provide inspections.
- Workers (including those in glass container manufacturing) who support the production and transportation of chlorine and alkali manufacturing, single-use plastics, and packaging that prevents the contamination or supports the continued manufacture of food, water, medicine, and other essential products.

## DEFENSE INDUSTRIAL BASE

- Workers who support the essential services required to meet national security commitments to the federal government and U.S. Military, including, but are not limited to, space and aerospace workers, nuclear matters workers, mechanical and software engineers (various disciplines), manufacturing and production workers, IT support, security staff, security personnel, intelligence support, aircraft and weapon system mechanics and maintainers, and sanitary workers who maintain the hygienic viability of necessary facilities.
- Personnel working for companies, and their subcontractors, who perform under contract or sub-contract to the Department of Defense (DoD) and the Department of Energy (DoE) (on nuclear matters), as well as personnel at government-owned/contractor operated facilities, and who provide materials and services to the DoD and DoE (on nuclear matters), including support for weapon systems, software systems and cybersecurity, defense and intelligence communications, surveillance, sale of U.S. defense articles and services for export to foreign allies and partners (as authorized by the U.S. government), and space systems and other activities in support of our military, intelligence, and space forces.

## COMMERCIAL FACILITIES

- Workers who support the supply chain of building materials from production through application and installation, including cabinetry, fixtures, doors, cement, hardware, plumbing (including parts and services), electrical, heating and cooling, refrigeration, appliances, paint and coatings, and workers who provide services that enable repair materials and equipment for essential functions.
- Workers supporting ecommerce through distribution, warehouse, call center facilities, and other essential operational support functions, that accept, store, and process goods, and that facilitate their transportation and delivery.
- Workers in hardware and building materials stores necessary to provide access to essential supplies, consumer electronics, technology and appliances retail, and related merchant wholesalers and distributors.
- Workers distributing, servicing, repairing, installing residential and commercial HVAC systems, boilers, furnaces and other heating, cooling, refrigeration, and ventilation equipment.
- Workers supporting the operations of commercial buildings that are critical to safety, security, and the continuance of essential activities, such as on-site property managers, building engineers, security staff, fire safety directors, janitorial personnel, and service technicians (e.g., mechanical, HVAC, plumbers, electricians, and elevator).
- Management and staff at hotels and other temporary lodging facilities that provide for COVID-19 mitigation, containment, and treatment measures or provide accommodations for essential workers.

## RESIDENTIAL/SHELTER FACILITIES AND SERVICES

- Workers providing dependent care services, particularly those whose services ensure essential workers can continue to work.
- Workers who support food, shelter, and social services, and other necessities of life for needy groups and individuals, including in-need populations and COVID-19 responders including travelling medical staff.
- Workers in animal shelters.
- Workers responsible for the leasing of residential properties to provide individuals and families with ready access to available housing.
- Workers responsible for handling property management, maintenance, and related service calls who can coordinate the response to emergency "at-home" situations requiring immediate attention, as well as facilitate the reception of deliveries, mail, and other necessary services.
- Workers performing housing and commercial construction related activities, including those supporting government functions related to the building and development process, such as inspections, permitting, and plan review services that can be modified to protect the public health, but fundamentally should continue and enable the continuity of the construction industry (e.g., allow qualified private third-party inspections in case of federal government shutdown).
- Workers performing services in support of the elderly and disabled populations who coordinate a variety of services, including health care appointments and activities of daily living.
- Workers responsible for the movement of household goods.

## HYGIENE PRODUCTS AND SERVICES

- Workers who produce hygiene products.
- Workers in laundromats, laundry services, and dry cleaners.
- Workers providing personal and household goods, repair, and maintenance.
- Workers providing disinfection services for all essential facilities and modes of transportation and who support the sanitation of all food manufacturing processes and operations from wholesale to retail.
- Workers necessary for the installation, maintenance, distribution, and manufacturing of water and space heating equipment and its components.
- Support required for continuity of services, including commercial disinfectant services, janitorial and cleaning personnel, and support personnel functions that need freedom of movement to access facilities in support of front-line workers.
- Workers supporting the production of home cleaning, pest control, and other essential products necessary to clean, disinfect, sanitize, and ensure the cleanliness of residential homes, shelters, and commercial facilities.
- Workers supporting agriculture irrigation infrastructure.
- Workers supporting the production of home cleaning and pest control products.

## STAY WELL AT HOME

### ORDER OF THE VENTURA COUNTY HEALTH OFFICER

### ORDER DIRECTING PERSONS LIVING IN THE COUNTY OF VENTURA TO STAY AT THEIR PLACES OF RESIDENCE AND RESTRICTING NON-ESSENTIAL ACTIVITIES IN RESPONSE TO COVID-19

### DATE OF ORDER:  MARCH 20, 2020

**Please read this Order carefully.  This Order supplements the Health Officer's Order dated March 17, 2020, and the Governor's Executive Order N-33-20 dated March 19, 2020. All prior orders of the Health Officer remain in place.**

PURSUANT TO  SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, THE HEALTH OFFICER OF VENTURA COUNTY HEREBY ORDERS AS FOLLOWS:

1. Intent.  Consistent with the Governor's Executive Order N-33-20, the intent of this Order is to ensure that the maximum number of persons stay in their places of residence to the maximum extent feasible, while enabling essential services to continue, to slow the spread of COVID-19 to the maximum extent possible.  When persons need to leave their places of residence, whether to obtain or perform vital services, or to otherwise facilitate authorized activities necessary for continuity of social and commercial life, they should at all times reasonably possible comply with Social Distancing Requirements as defined below.  All provisions of this Order should be interpreted to effectuate this intent and to be consistent with and in furtherance of the Governor's Executive Order N-33-20. Failure to comply with any of the provisions of this Order constitutes an imminent threat to public health.

2. Persons to stay in places of residence.  All persons currently living within Ventura County are ordered to stay at their places of residence, as required by the Governor's Executive Order N-33-20, subject to the exemptions set forth in this Order.  This Order applies to all persons in the incorporated cities and the entire unincorporated area of Ventura County (the "County").  To the extent persons are outside of their places of residence, they must at all times as reasonably possible maintain a physical distance of at least six feet from any other person.

   Persons of all ages may leave their places of residence for the purpose of physical activity by themselves or with members of their household in compliance with Social Distancing Requirements, such as walking, running, bicycling or working around their places of residence, including gardening.  Persons experiencing homelessness are exempt from this section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible and to the maximum extent practicable (and to use Social Distancing Requirements in their operation).

1

3. <u>Exemptions to the order to stay in places of residence.</u>  Except for persons governed by section 1 of the Health Officer's Order dated March 17, 2020, persons may leave their places of residence only for Essential Activities and Essential Governmental Functions or Services or to operate or work at Essential Businesses.  (All capitalized terms in this Order are defined in section 7 below.)

4. <u>Businesses to close.</u>  All businesses with a facility in the County, except Essential Businesses, are required to cease all activities at facilities located within the County except Minimum Basic Operations.  For clarity, businesses may continue operations consisting exclusively of employees or contractors performing activities at their own places of residence.  All Essential Businesses are strongly encouraged to remain open.  To the greatest extent feasible, Essential Businesses shall comply with Social Distancing Requirements, including for any customers standing in line.  For the purposes of this Order, businesses as used in this section include any for-profit, non-profit or educational entities, regardless of the nature of their services, the functions they perform, or their corporate or entity structure.

5. <u>Gatherings of more than 10 persons prohibited.</u>  All public and private gatherings of more than 10 persons who are not part of a single household or living unit are prohibited, except for gatherings as part of the operation of an Essential Business.  Nothing in this Order prohibits the gathering of members of a household or living unit within a place of residence or the operation of a shelter for persons experiencing homelessness.

6. <u>Travel prohibited.</u>  All travel, including, but not limited to, travel on motorcycle, automobile or public transit, except for Essential Travel and Essential Activities, is prohibited.  Persons may use public transit only for purposes of performing Essential Activities or to travel to and from work at Essential Businesses or to maintain, provide or receive Essential Governmental Functions or Services.  Persons riding on public transit must comply with Social Distancing Requirements, to the greatest extent feasible.  This Order allows travel into or out of the County to perform Essential Activities, operate Essential Businesses or to maintain or provide Essential Governmental Functions or Services.

7. <u>Definitions and exemptions.</u>

   For the purposes of this Order:

   a. <u>Essential Activities.</u>  Persons may leave their places of residence only to perform any of the following "Essential Activities" (but persons at high risk of severe illness from COVID-19 and persons who are sick are urged to stay in their places of residence to the extent possible except as necessary to seek medical care):
      i. To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including pets), such as, by way of example, obtaining medical supplies

or medication, visiting a health care professional, or obtaining supplies needed to work from a place of residence.

ii. To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation, and essential operation of places of residence.

iii. To engage in outdoor activity, provided the persons comply with Social Distancing Requirements, such as, by way of example, walking, hiking, running, bicycling or yard work.

iv. To perform work providing products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations.

v. To care for a family member or pet in another household.

b. Healthcare Operation.  Persons may leave their places of residence to work for or obtain services at any "Healthcare Operation," including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, or any related and/or ancillary healthcare services, including blood donation centers.  "Healthcare Operation" also includes veterinary care and all healthcare services provided to animals.  This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined.  "Healthcare Operation" does not include fitness and exercise gyms, aquatic centers and similar facilities.

c. Essential Infrastructure.  Persons may leave their places of residence to provide any services or perform any work necessary to the operations and maintenance of "Essential Infrastructure," which means and includes, but is not limited to, public works construction, construction of housing (in particular affordable housing or housing for persons experiencing homelessness), airport and port operations, military installations, water, sewer, gas, electrical, oil and gas production and refining including associated businesses and activities, roads and highways, public transportation, solid waste collection and removal, funeral homes and cemeteries, internet, and telecommunications systems (including the provision of essential global, national, and local infrastructure for computing services, business infrastructure, communications, and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements, to the extent possible.  All U.S. Department of Defense activities are categorically exempt from this Order.

d. Essential Governmental Functions or Services.  Government functions or services performed by first responders, emergency management personnel, emergency dispatchers, court personnel, and law enforcement personnel, and others who need to perform essential governmental functions or services, as such may be

determined by the governmental entity performing those functions or providing such services, shall be considered "Essential Governmental Functions or Services." All persons who perform Essential Governmental Functions or Services are categorically exempt from this Order. Further, nothing in this Order shall prohibit any person from performing or accessing Essential Governmental Functions or Services. Each governmental entity shall identify and designate appropriate employees or contractors to continue providing and carrying out any Essential Governmental Functions or Services. All Essential Governmental Functions or Services shall be performed in compliance with Social Distancing Requirements, to the extent possible.

e. <u>Essential Businesses.</u> "Essential Businesses" means:

    i. Healthcare Operations and Essential Infrastructure;

    ii. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores, and other establishments engaged in the retail sale of canned or frozen food, dry goods, beverages, fresh fruits and vegetables, pet supply, fresh meats, fish and poultry, and any other household consumer products (such as cleaning and personal care products). This includes stores that sell groceries and also sell other non-grocery products, and products necessary to maintaining the safety, sanitation and essential operation of places of residence;

    iii. Any form of agricultural production and processing, including the cultivation of products for personal consumption or use, including farming and services provided by farmworkers, ranching, livestock, and fishing, as well as business activities that support production and processing by providing essential agricultural supplies and services, including transportation, manufacturing, equipment, and services such as cooling, storing, packaging, and distribution of such products for wholesale or retail sale, provided that, to the extent possible, such businesses comply with Social Distancing Requirements and otherwise provide for the health and safety of their employees;

    iv. Businesses that provide food, shelter, and social services, and other necessities of life for economically disadvantaged, compromised or otherwise needy persons;

    v. Newspapers and television, radio, and other media services;

    vi. Gas stations and auto-supply, auto-repair, and related facilities;

    vii. Banks and related financial institutions;

    viii. Hardware stores;

    ix. Plumbers, electricians, exterminators and other service providers who provide services that are necessary to maintaining the safety, sanitation and essential operation of places of residence, Essential Activities and Essential Businesses;

    x. Businesses providing mailing and shipping services, including post office boxes;

    xi. Educational institutions, including public and private K-12 schools, colleges, and universities, for purposes of facilitating distance learning or

4

performing essential functions, in compliance with Social Distancing Requirements, to the greatest extent possible;

xii. Laundromats, drycleaners and laundry service providers;

xiii. Restaurants and other facilities that prepare and serve food, but only for delivery or carry out.  Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and take-away basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

xiv. Businesses that supply products needed for persons to work from their places of residence;

xv. Businesses that supply other Essential Businesses with the support or supplies necessary to operate, including, by way of example, businesses that manufacture products for ultimate use in a Healthcare Operation;

xvi. Businesses that ship or deliver groceries, food, goods or services directly to places of residence;

xvii. Airlines, taxis and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

xviii. Home-based care for seniors, adults or children;

xix. Residential facilities and shelters for seniors, adults and children;

xx. Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

xxi. Childcare facilities providing services that enable employees exempted in this Order to work as permitted.  Childcare facilities must operate under the following mandatory conditions:

1. Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day).
2. Children shall not change from one group to another.
3. If more than one group of children is cared for at one facility, each group shall be in a separate room. Groups shall not mix with each other.
4. Childcare providers shall remain solely with one group of children.

xxii. Hotels, motels, bed-and-breakfast establishments and other businesses that provide transient occupancy for visitors to the County, provided that such businesses require their patrons to stay in place as otherwise required by this Order.

xxiii. Commercial construction provided that such activity implements Social Distancing Requirements to the extent feasible and otherwise provides for the health and safety of employees.

f.   Minimum Basic Operations.  "Minimum Basic Operations" means and includes the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

    i.   The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee benefits, or for related functions.

    ii.   The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their places of residence.

g.   Essential Travel.  "Essential Travel" means and includes travel within or without the County, or between the various counties, for any of the following purposes, subject to Social Distancing Requirements:

    i.   Any travel related to the provision of or access to Essential Activities, Essential Governmental Functions or Services, Essential Businesses or Minimum Basic Operations.

    ii.   Travel to care for elderly persons, minors, dependents, persons with disabilities, or other vulnerable persons.

    iii.   Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals, and any other related services.

    iv.   Travel to return to a place of residence from outside the County.

    v.   Travel required by law enforcement or court order.

    vi.   Travel required for non-residents to return to their places of residence outside the County.

    vii.   Travel engaged in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution.

h.   Hotels, etc.  Places of residence include hotels, motels, shared rental units and similar facilities.

i.   Social Distancing Requirements.  "Social Distancing Requirements" means and includes maintaining at least a six-foot physical distance from other persons, washing hands with soap and water for at least 20 seconds or using hand sanitizer as frequently as possible, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces, and not shaking hands.

8.   Commercial laboratory test results.  All commercial laboratories that test persons in the County for the presence of COVID-19 must report all test results (whether positive or negative) to the County Public Health Department laboratory within eight hours of receiving the test results.

9.   Compliance.  The violation of any provision of this Order constitutes a threat to public health.  Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

6

10. <u>Effective date and time.</u>  This Order shall become effective and operative at 11:59 p.m. on March 20, 2020, and will continue to be in effect until 11:59 p.m. on April 19, 2020, or until it is extended, rescinded, superseded or amended in writing by the Health Officer.

11. <u>Continuing assessment.</u>  The Health Officer will continue to assess the quickly evolving situation, may issue additional orders related to COVID-19 and will review this Order within two weeks of its effective date.

12. <u>Copies of Order.</u>  Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

13. <u>Severability.</u>  If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.  To this end, the provisions of this Order are severable.

14. <u>March 17, 2020, Order.</u>  This Order supplements the Order dated March 17, 2020, which remains in full force and effect pursuant to its terms.

**IT IS SO ORDERED:**

Dated: March 20, 2020

Robert Levin, M.D.
Ventura County Health Officer

**Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.**

7

Exhibit 17, Page 7 of 7

# STAY WELL AT HOME

## ORDER OF THE VENTURA COUNTY HEALTH OFFICER

## ORDER EXTENDING THE HEALTH OFFICER'S ORDER DATED MARCH 17, 2020, AND IMPOSING ADDITIONAL LIMITATIONS ON ACTIVITIES AND BUSINESSES

### DATE OF ORDER:  MARCH 31, 2020

**Please read this Order carefully.  This Order extends the expiration date of the Health Officer's March 17, 2020, Order to April 19, 2020, and imposes additional limitations on the activities of persons and entities.  The Health Officer's March 20, 2020, Order remains in place, except where inconsistent with more restrictive limitations set out in this Order.**

**Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.**

PURSUANT TO  SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, THE HEALTH OFFICER OF VENTURA COUNTY HEREBY ORDERS AS FOLLOWS:

1. <u>Intent.</u>  The intent of this Order is to (a) extend the duration of the Health Officer's Order dated March 17, 2020, to April 19, 2020; (b) keep the Health Officer's March 20, 2020, Order in place except that any more restrictive limitations in this Order shall control; (c) impose new and additional limitations on the activities of persons and entities that are more restrictive than the existing orders; and (d) clarify that a violation of the Health Officer's Orders by a business may subject the business to liability under the state's unfair competition law as well as other civil and criminal penalties.

   The main intent of all Orders, including this Order, is to limit the spread of COVID-19 to the maximum extent possible by keeping all persons in their places of residence to the maximum extent possible.  Failure to comply with any of the provisions of these Orders constitutes an imminent threat to public health.

2. <u>March 17, 2020, and March 20, 2020, Orders.</u>  This Order supplements and extends the Orders dated March 17, 2020, and March 20, 2020, both of which shall remain in full force and effect, except where inconsistent with more restrictive limitations set out in this Order, for the duration of this Order.

3. <u>Procedures for take-out restaurants and entities.</u>  Licensed, permanent food facilities that have been allowed under the current Orders to prepare and offer food via delivery service, pick-up or drive-thru must comply with the following procedures:

1

    a. <u>Containers required.</u>  All food must be completely contained in a suitable container before being transferred to a customer.  For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed.

    b. <u>Must consume food away from premises.</u>  The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption.  The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food.

    c. <u>Six-foot spacing must be maintained.</u>  All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery or drive-thru shall maintain a distance of at least six feet from all other persons.  Current Orders already require that all persons inside the facility must maintain a distance of at least six feet from other persons.

4. <u>Essential Businesses must limit activities to essential goods and services.</u>  The March 20, 2020, Order required all businesses, except Essential Businesses, to close.  The primary purpose for this exception is to provide support for persons required to stay at home or work from home.  In some cases, business types were deemed essential because they supported the maintenance of Essential Infrastructure, Essential Governmental Functions or Services, or Healthcare Operations.  However, it is determined that the activities of businesses deemed to be Essential Businesses should be limited to the provision of those goods and services essential to the overall intent of the Health Officer's Orders.  Therefore:

    a. Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, convenience stores and other establishments that sell food, beverages, pet supplies or household products (such as cleaning and personal care products) necessary to the safe, sanitary and essential operation of places of residence, that are open to the public, shall not sell any goods other than those described in this subsection (a).  The sale of items not listed herein, such as clothing, jewelry, sporting goods, furniture, etc., is prohibited.

    b. Only businesses whose primary business is the sale of food, beverages, pet supplies or household products (such as cleaning and personal care products) qualify as an Essential Business under subdivision (a) above.  For example, a tobacco or vape store that sells a minimal amount of snacks and water as a side business does not qualify as a grocery store, convenience store or similar establishment.  Items, the sale of which constitutes less than 33 percent of a business's gross sales over the last six months, are deemed to be minimal.

    c. Automobile dealerships may remain open only to operate repair shops and/or auto parts supply stores.  Showroom facilities shall be closed, and on-premise sales activities shall cease.

5. <u>Swimming pools and hot tubs to close.</u>  The following facilities shall be closed to all persons: All swimming pools, spas, hot tubs, saunas, steam rooms and similar facilities, except those located at a single-family residence, which shall be used only by members of the household residing at the single-family residence.

2

6. Campgrounds and RV parks to close. All public and private campgrounds and recreational vehicle (RV) parks are to close, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park. All persons residing in an RV shall comply with all Orders otherwise applicable to residents.

7. Admittance to long-term care facilities. Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

   a.   For purposes of this section, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

8. Door-to-door solicitations must cease. Door-to-door solicitations, whether for purposes of sales of goods or services, charitable contributions, signature-gathering or any other commercial or noncommercial purpose, do not constitute Essential Activities or Essential Businesses pursuant to the Order dated March 20, 2020, and, if currently occurring, are occurring in violation of that Order and shall immediately cease.

9. Retail food and beverage facilities. The Public Health Officer recognizes the authority of the Ventura County Environmental Health Division as stated in "Coronavirus COVID-19 Guidance for Food Facilities," and strongly advises all food and beverage facilities to comply with the guidance.

10. Definition of businesses. The terms "business" and "businesses" as used in this Order and the Orders dated March 17, 2020, and March 20, 2020, include any for-profit, non-profit or educational entities (including sole proprietorships, corporations, firms, partnerships, limited liability companies, joint stock companies, associations and other organizations of persons), regardless of the nature of their services or the functions they perform.

11. Violation may constitute unfair competition. Any person that, after notice, operates, manages, maintains or occupies, or continues to operate, manage, maintain or occupy, any business in violation of this Order, the Order dated March 17, 2020, or the Order dated March 20, 2020, may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of the Orders, or any of them.

12. <u>Compliance.</u>  The violation of any provision of this Order constitutes a threat to public health.  Pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

13. <u>Effective date and time.</u>  This Order shall become effective and operative at 11:59 p.m. on March 31, 2020, and will continue to be in effect until 11:59 p.m. on April 19, 2020, or until it is extended, rescinded, superseded or amended in writing by the Health Officer.

14. **Continuing assessment.**  The Health Officer will continue to assess the quickly evolving situation regarding the spread of COVID-19, may issue additional orders related to COVID-19 and will review this Order within two weeks of its effective date.

15. **Copies of Order.**  Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

16. <u>Severability.</u>  If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.  To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

_____
Robert Levin, M.D.
Ventura County Health Officer

Dated: March _31_, 2020

4

Exhibit 18, Page 4 of 4

## STAY WELL AT HOME

### ORDER OF THE VENTURA COUNTY HEALTH OFFICER

### ORDER PROHIBITING ALL GATHERINGS, ADDING TO THE LIST OF ESSENTIAL BUSINESSES, AND REQUIRING IMPLEMENTATION OF SOCIAL DISTANCING PROTOCOLS

### DATE OF ORDER:  APRIL 9, 2020

**Please read this Order carefully.  This Order supplements the Health Officer's Orders dated March 17, 20 and 31, 2020.  All prior Orders issued by the Health Officer remain in effect except where inconsistent with the provisions of this Order, in which case the provisions of this Order shall apply.**

**Pursuant to Health and Safety code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment or both.**

PURSUANT TO SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, THE HEALTH OFFICER OF VENTURA COUNTY HEREBY ORDERS AS FOLLOWS:

1. Intent.  The intent of this Order is to ensure that the maximum number of people stay in their places of residence to the maximum extent feasible to slow the spread of COVID-19 and mitigate the impact of the COVID-19 pandemic on the delivery of critical healthcare services to those in need.  All provisions of this Order must be interpreted to effectuate this intent.

2. Summary of this Order.  This Order supplements and amends existing orders by, among other things: (a) prohibiting all gatherings, no matter the size, outside of places of residences with limited exceptions; (b) adding certain businesses to the list of essential businesses; (c) requiring essential businesses to adopt and implement social distancing protocols; (d) providing guidance for hospital holding units and long-term care facilities; and (e) declaring that violations of Health Officer Orders constitute a nuisance.

3. All Gatherings prohibited.  Notwithstanding any other Order, all public and private gatherings of two or more persons occurring outside a single household or living unit are prohibited, except for limited purposes expressly permitted in this Order. This section supersedes and replaces Section 5 of the March 20, 2020, Order.

    a.  "Gathering" means and is defined as any event or convening that brings together two or more persons in a single room or single space at the same time, including, but not limited to, an auditorium, stadium, golf course, arena, theater, church, casino, conference room, meeting hall, cafeteria, drive-in theater, parking lot, or any other indoor or outdoor space used for non-essential purposes, including, but not limited to, movies, church services, swap meets or

1

similar purposes.

b.   Nothing in this section prohibits members of a single household or living unit from engaging in Essential Travel or Essential Activities together.

c.   Nothing in this section prohibits an event or convening that brings together two or more people as necessary to operate an Essential Business or to perform Essential Governmental Functions or Services.

d.   Gatherings of 10 or fewer persons are permitted at graveside funeral services.

e.   Staff of organizations or associations, including faith-based organizations, may gather in a single space for the sole purpose of preparing and facilitating live-stream or other virtual communications with their members, including worship services, provided that the number of such staff is the fewest necessary to prepare and facilitate those communications, but in no event in excess of seven persons.

4.   Additions to List of Essential Businesses.  The following subsections are added to the list of essential businesses set forth in section 7, subpart (e) of the March 20, 2020, Order:

(xxiv) Bicycle repair and supply shops.  Bicycle shops may engage in the sale of bicycles on-line only and provided that all bicycles are delivered to a place of residence or Essential Business.

(xxv) Service providers that enable residential real estate transactions (including rentals, leases and home sales), including, but not limited to, real estate agents, escrow agents, notaries, and title companies, provided that appointments and other residential viewings must only occur virtually or, if virtual viewing is not feasible, by appointment with no more than two visitors at a time, both whom must reside within the same household or living unit, and one individual showing the unit (except in-person visits are not allowed when the occupant is present in the residence).

(xxvi) Automotive dealerships may engage in the purchase and sale of automobiles (including cars, trucks, motorcycles and motorized scooters) on-line only  and provided that all vehicles are delivered to a place of residence or Essential Business.

5.   All Essential Businesses must have Social Distancing Protocol.  All Essential Businesses must prepare and post by no later than April 12, 2020, a "Social Distancing Protocol" for each of their facilities in the County frequented by the public or employees.  The Social Distancing Protocol must be posted at or near the entrance of the relevant facility and shall be easily viewable by the public and employees.  A copy of the Social Distancing Protocol must also be provided to each employee performing work at the facility.  All Essential Businesses shall implement the Social Distancing Protocol and provide evidence of its implementation to any authority enforcing this Order upon demand.  Completion and posting of the form attached hereto as Appendix A:  Social Distancing Protocol will be compliant with this Order. The

2

Social Distancing Protocol must explain how the business is achieving the following, as applicable:

    a.  Limiting the number of persons who can enter into the facility and work areas at any one time to ensure that persons in the facility and work areas can easily maintain a minimum six-foot distance from one another at all times, except as required to complete the Essential Business activity;

    b.  Where lines may form at a facility, marking increments of six feet, at a minimum, establishing where individuals must stand to maintain adequate social distancing;

    c.  Providing hand sanitizer, soap and water, or other effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by the public and employees and in locations where there is high-frequency employee interaction with the public (e.g., cashiers);

    d.  Providing for contactless payment systems or, if not feasible to do so, providing for disinfecting all payment portals, pens and styluses after each use;

    e.  Regularly cleaning and disinfecting other high-touch surfaces;

    f.  Posting a sign at the entrance of the facility and work area informing the public and employees that they should avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into their elbow; and not shake hands or engage in unnecessary physical contact; and

    g.  Any additional social distancing measures being implemented.

6. <u>Hospitals and Long-Term Care Facilities.</u> The Health Officer recognizes the authority of the guidance documents "Hospital Holding Unit Guidance for COVID-19" and "Long-Term Care Facility Guidance for Preventing and Managing COVID-19" (the current versions of which are available at www.vcemergency.com) and strongly advises all hospitals and Long-Term Care Facilities (as that term is defined in section 7.a of the March 31, 2020, Order) to comply with the guidance.

7. <u>Violation may constitute unfair competition.</u> Any person that, after notice, operates, manages, maintains or occupies, or continues to operate, manage, maintain or occupy, any business in violation of this Order, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200) and subject to civil penalties and other relief as provided therein, for each act or practice in violation of the Orders, or any of them.

8. <u>Compliance.</u> The violation of any provision of this Order constitutes a threat to public health and a public nuisance per se. Pursuant to Health and Safety Code sections 101040 and 120175, Civil Code section 3494 and Code of Civil Procedure section 731, the Health Officer

3

or any other authorized County official may enforce any violation of this Order and abate the public nuisance by obtaining injunctive relief from a court of competent jurisdiction.  In addition, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

9.  Effective date and time.  This Order shall become effective and operative at 11:59 p.m. on April 9, 2020, and will continue to be in effect until 11:59 p.m. on April 19, 2020, or until it is extended, rescinded, superseded or amended in writing by the Health Officer.

10. Continuing assessment.  The Health Officer will continue to assess the quickly evolving situation regarding the spread of COVID-19, may issue additional orders related to COVID-19 and will review this Order prior to its expiration.

11.  Copies of Order.  Copies of this Order shall promptly be:  (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

12.  Severability.  If any provision of this Order, or the application thereof to any person or circumstance, is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.  To this end, the provisions of this Order are severable.

**IT IS SO ORDERED**

_____                    Dated: April ____9____, 2020
Robert Levin, M.D.
Ventura County Health Officer


Attachment:  Appendix A: Social Distancing Protocol

4

## STAY WELL AT HOME

## ORDER OF THE VENTURA COUNTY HEALTH OFFICER

**AMENDED ORDER DIRECTING PERSONS TO STAY AT THEIR HOMES, CLOSING NON-ESSENTIAL BUSINESSES AND PROHIBITING NON-ESSENTIAL ACTIVITIES TO COMBAT THE COVID-19 PANDEMIC**

## DATE OF ORDER:  APRIL 20, 2020

**Please read carefully.  This Order issued by the Ventura County Health Officer shall become effective at 11:59 p.m. on April 20, 2020, and shall amend and restate the Health Officer Order dated April 18, 2020.  Any and all prior violations of previous orders remain prosecutable, criminally or civilly.  Further, all prior closure or cease and desist orders directed at specified persons or business shall remain in effect. Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.**

## TABLE OF CONTENTS

Page No.

1.   Intent and Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
2.   Applicable to entire County . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
3.   Persons to stay at home . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
4.   Persons may leave home for specified purposes . . . . . . . . . . . . . . . . . . . . 3
5.   Special rule for persons 70 years of age or older . . . . . . . . . . . . . . . . . . . . 3
6.   Non-Essential travel is prohibited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
7.   Non-Essential Businesses must close . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     a.  Exceptions for home businesses and limited business operations . . . . . . . . . . 3
8.   Standards applicable to operation of Essential Businesses . . . . . . . . . . . . . . . . 5
9.   Food facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
10.  Essential Businesses must have Social Distancing Protocol . . . . . . . . . . . . . . . 6
11.  Special allowance for completion of firearm sales . . . . . . . . . . . . . . . . . . . 7
12.  Partial list of Non-Essential Businesses and facilities ordered to close . . . . . . . . 7
13.  Partial list of Non-Essential Activities ordered to cease . . . . . . . . . . . . . . . . . 8
14.  [Reserved] . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
15.  Admittance to Long-Term Care Facilities . . . . . . . . . . . . . . . . . . . . . . . . . 9
16.  Hospitals and Long-Term Care Facilities . . . . . . . . . . . . . . . . . . . . . . . . . 9

1

17.   Definitions and exemptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    a.   Essential Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    b.   Healthcare Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    c.   Essential Infrastructure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
    d.   Essential Governmental Functions and Services . . . . . . . . . . . . . . . . . 14
    e.   Essential Businesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
    f.   Minimum Basic Operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    g.   Essential Travel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    h.   Hotels . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    i.   Business . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    j.   Social Distancing Requirements . . . . . . . . . . . . . . . . . . . . . . . . . 18
18.   Commercial laboratory test results . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
19.   Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
20.   Violation may constitute unfair competition . . . . . . . . . . . . . . . . . . . . . 19
21.   Most Restrictive Provisions of County and State Health Orders Enforcable . . . 19
22.   Effective date and time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
23.   Continuing assessment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
24.   Copies of Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
25.   Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

PURSUANT TO SECTIONS 101040, 101085 AND 120175 OF THE HEALTH AND SAFETY CODE, THE HEALTH OFFICER OF VENTURA COUNTY HEREBY ORDERS AS FOLLOWS:

1.   **Intent and Purpose.** The intent of this Order is to cause persons to stay at their places of residence to the maximum extent feasible with the minimum disruption to their social, emotional and economic well-being consistent with the overarching goal of eliminating the COVID-19 pandemic. The purpose of this Order is that by requiring persons to stay at home, while allowing them to engage in essential activities, such as working at essential businesses, purchasing necessities or participating in outdoor activities, that the spread of the virus will be mitigated, and that in the event a case of COVID-19 occurs, the public health officer can more easily trace public contacts.  All provisions of this Order shall be interpreted to effectuate this intent.

2.   **Applicable to entire County.** This Order applies to all persons in the cities and the entire unincorporated area of Ventura County (the "County").

3.   **Persons to stay at home.** All persons currently living within the County are ordered to stay at their places of residence, subject to the exemptions set forth in

2

this Order.  Persons experiencing homelessness are exempt from this section, but are strongly urged to obtain shelter, and governmental and other entities are strongly urged to make such shelter available as soon as possible, and to use Social Distancing Requirements in their operation.[1]

4.   **Persons may leave home for specified purposes.**  Persons may leave their places of residence for the following purposes only:  to engage in an Essential Activity; to provide or receive an Essential Governmental Function or Service; or to operate or work at an Essential Business.  When persons leave their places of residence for purposes authorized under this Order, they shall follow the Social Distancing Requirements to the maximum extent feasible.

5.   **Special rule for persons 70 years of age or older.**  All persons currently living in the County equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to stay in their place of residence and must at all times follow Social Distancing Requirements to the greatest extent feasible.  Such persons may leave their places of residence only as necessary to seek medical care or nutrition or to perform essential work in furtherance of Healthcare Operations or Essential Governmental Functions or Services.

6.   **Non-Essential Travel is prohibited.**  All travel within the County is prohibited except for Essential Travel.  Persons may use public transit only for purposes of performing Essential Activities or to travel to and from work at Essential Businesses or to maintain, provide or receive Essential Governmental Functions or Services.  Persons riding on public transit must comply with Social Distancing Requirements to the greatest extent feasible.  This Order allows travel into or out of the County.

7.   **Non-essential businesses must close.**  All businesses with a facility in the County, except Essential Businesses as listed in section 17 of this Order, are required to cease all activities at facilities located within the County except that they may perform Minimum Basic Operations.

  a.    Exceptions for home businesses and limited business operations. Notwithstanding the above, the following businesses may operate provided

_____

[1] Unless defined when first used, all capitalized terms in this Order are defined in section 17 below.

they comply with all requirements applicable to Essential Businesses and any additional requirements stated below:

(1)     Home Businesses. All businesses may conduct activities and continue operations consisting solely of persons performing activities at their own places of residence.

(2)     Limited Business Operations.  A business as specified below may conduct activities and continue operations at a facility of the business in the County provided that (i) no more than ten (10) employees or independent contractors shall be at the facility during any 24-hour period; (ii) there is no physical interaction between members of the public and employees or independent contractors of the business; (iii) members of the public are not  permitted inside the business's facilities (i.e., all retail or storefront facilities shall remain closed to the public); (iv) Social Distancing Requirements are followed; and (v) any goods sold by the businesses shall be delivered to the purchaser's place of residence or business address, and any services provided by the businesses shall be  provided remotely.

The paragraph immediately above applies only to businesses that meet the definition of a business necessary to maintain continuity of operations of the federal critical infrastructure sectors as defined in the March 19, 2020, Order of the State Public Health Officer (State Shelter Order), and only such businesses may conduct limited business operations under this Order.

Further, all businesses electing to conduct limited business operations must (i) prepare a "Social Distancing Protocol" as set forth in Section 10 below for each facility and post it where it will be easily viewable by the employees and contractors; (ii) provide a copy of the Social Distancing Protocol to each employee or contractor performing work at the facility; (iii)  designate a specific on-duty supervisor or employee to monitor and enforce compliance with the Protocol at all times business operations are occurring; and (iv) permit access to the facility immediately upon request by any officer or employee of the County or its agents who wishes to inspect a business's facilities or operations. Repeated, confirmed failure to comply with Social Distancing Protocol may lead to closure of non-compliant businesses.

4

Exhibit 20, Page 4 of 21

8.  **Standards applicable to operation of Essential Businesses.**  Among other requirements set out in this Order, all Essential Businesses that remain open shall provide only those goods and services that justify their classification as an Essential Business in the first place.  Therefore:

a.  Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, convenience stores and other establishments that sell food, beverages, pet supplies or household products (such as cleaning and personal care products) necessary to the safe, sanitary and essential operation of places of residence, that are open to the public, shall not sell any goods other than those described in this subsection (a).  The sale of items not listed herein, such as clothing, jewelry, sporting goods, furniture, etc., is prohibited.

b.  Only businesses whose primary business is the sale of food, beverages, pet supplies or household products (such as cleaning and personal care products) qualify as an Essential Business under section (a) above.  For example, a tobacco or vape store that sells a minimal amount of snacks and water as a side business does not qualify as a grocery store, convenience store or similar establishment.  Items the sale of which constitute less than 33 percent of a business's gross sales over the last six months are deemed to be minimal.

9.  **Food facilities.**  All permanent food facilities, as defined by Health and Safety Code section 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru.  Permanent food facilities that prepare and offer food via delivery service, pick-up or drive-thru must comply with the following procedures:

a.  Containers required.  All food must be completely contained in a suitable container before being transferred to a customer.  For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed.

b.  Must consume food away from premises.  The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption.  The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food.

5

    c.    <u>Six-foot spacing must be maintained.</u>  All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery or drive-thru shall maintain a distance of at least six feet from all other persons.

    **Retail food and beverage facilities.**  The Health Officer recognizes the authority of the Ventura County Environmental Health Division as stated in "Coronavirus COVID-19 Guidance for Food Facilities" and strongly advises all food and beverage facilities to comply with the guidance.

10.    **Essential Businesses must have Social Distancing Protocol.**  All Essential Businesses must prepare and post a "Social Distancing Protocol" for each of their facilities in the County frequented by the public or employees.  The Social Distancing Protocol must be posted at or near the entrance of the relevant facility and shall be easily viewable by the public and employees.  A copy of the Social Distancing Protocol must also be provided to each employee performing work at the facility.  All Essential Businesses shall implement the Social Distancing Protocol, and shall designate a specific on-duty employee to monitor and enforce compliance with the Protocol at all times the business is open to the public.  Essential Businesses shall provide evidence of its implementation to any authority enforcing this Order upon demand.

Completion and posting of the form attached hereto as Appendix A: Social Distancing Protocol will be compliant with this Order.  The Social Distancing Protocol must explain how the business is achieving the following, as applicable:

    a.    Limiting the number of persons who can enter into the facility and work areas at any one time to ensure that persons in the facility and work areas can easily maintain a minimum six-foot distance from one another at all times, except as required to complete the Essential Business activity;

    b.    Where lines may form at a facility, marking increments of six feet, at a minimum, establishing where individuals must stand to maintain adequate social distancing;

    c.    Providing hand sanitizer, soap and water, or other effective disinfectant at or near the entrance of the facility and in other appropriate areas for use by the public and employees and in locations where there is high-frequency employee interaction with the public (e.g., cashiers);

6

d.  Providing for contactless payment systems or, if not feasible to do so, disinfect for the next customer by disinfecting all payment portals, pens and styluses after each use;

e.  Regularly cleaning and disinfecting other high-touch surfaces;

f.  Posting a sign at the entrance of the facility and work area informing the public and employees that they should avoid entering the facility if they have a cough or fever; maintain a minimum six-foot distance from one another; sneeze and cough into their elbow; and not shake hands or engage in unnecessary physical contact; and

g.  Any additional social distancing measures being implemented.

Repeated, confirmed failure to comply with Social Distancing Protocol may lead to closure of non-compliant businesses.

11.  **Special allowance for completion of firearm sales**.  Under California law persons wishing to purchase a firearm must complete a background check and waiting period, and all sales must be completed in-person.  It is not feasible, therefore, for the Health Officer to require that firearm sales be conducted on-line only.  To accommodate persons who initiated the purchase of a firearm at a store located within the County before March 20, 2020 (i.e., the day firearm stores were ordered to be closed by the Health Officer), firearm stores and purchasers may engage in the actions necessary to complete firearm purchases initiated before March 20, 2020, provided that:

a.  All activities, including the transfer of possession of any firearm, occur by appointment only, and only the purchaser and one person on behalf of the store shall be present;

b.  The firearm store shall remain closed to the general public; and

c.  Social Distancing Requirements shall be followed to the greatest extent feasible.

12.  **Partial list of non-essential businesses and facilities ordered to close.**  The intent and structure of this Order is to list Essential Businesses that may remain open subject to rigorous conditions designed to prohibit the spread of COVID-19

7

to the greatest extent feasible and to require all other businesses to close.  For the sake of clarity, a list of business types that have been ordered to close as Non-Essential is set forth below.  However, it is emphasized that the list below is not intended to be exclusive, and the fact that a business type is not listed below is not intended to imply that it is authorized to stay open as an Essential Business, Healthcare Operation, Essential Governmental Function or Service or Essential Infrastructure:

a.   Bars and nightclubs that do not serve food.
b.   Movie theaters, live performance venues, bowling alleys and arcades.
c.   Gyms, fitness centers and aquatic centers.
d.   Wineries, breweries and tap rooms that provide tastings.
e.   All swimming pools, spas, hot tubs, saunas, steam rooms and similar facilities, except those located at a single-family residence, which shall be used only by members of a household residing at the single-family residence.
f.   All public and private campgrounds and recreational vehicle (RV) parks, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park.  All persons residing in an RV shall comply with all Orders otherwise applicable to residents.
g.   Clothing stores.
h.   Sporting goods stores.
i.   Jewelry stores.
j.   Fabric stores.
k.   Toy and game stores.
l.   Book stores.
m.   Arts and crafts stores.
n.   Pawn brokers.
o.   Gun stores.
p.   Bait and tackle shops.
q.   Furniture stores.
r.   Home decor and party decorations stores.
s.   Tobacco and vaping stores.
t.   Pet grooming.
u.   Hair or nail salons; barbershops.

13.   **Partial list of non-essential activities ordered to cease.**  The intent and structure of this Order is to list essential activities that may continue subject to rigorous conditions designed to prohibit the spread of COVID-19 to the greatest extent

8

feasible and to require all other activities to cease.  For the sake of clarity, a list of activities that have been ordered to cease as non-essential is set forth below. However, it is emphasized that the list below is not intended to be exclusive and the fact that an activity is not listed below is not intended to imply that an activity is authorized:

a.      Door-to-Door Solicitations.  Door-to-door solicitations, whether for purposes of sales of goods or services, charitable contributions, signature-gathering or any other commercial or noncommercial purpose.

14.    **[Reserved]**

15.    **Admittance to Long-Term Care Facilities**.  Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

a.      For purposes of this section, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

16.    **Hospitals and Long-Term Care Facilities**.  The Health Officer recognizes the authority of the guidance documents "Hospital Holding Unit Guidance for COVID-19" and "Long-Term Care Facility Guidance for Preventing and Managing COVID-19" (the current versions of which are available at www.vcemergency.com) and strongly advises all hospitals and Long-Term Care Facilities (as that term is defined in section 15 of this Order) to comply with the guidance.

17.    **Definitions and exemptions.**

For the purposes of this Order:

a.      Essential Activities.  Persons may leave their places of residence only to perform one of the following "Essential Activities" (but persons at high risk

9

of severe illness from COVID-19 and persons who are sick are urged to stay in their places of residence to the extent possible except as necessary to seek medical care):

(1)    To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including pets), such as, by way of example, obtaining medical supplies or medication, visiting a health care professional or obtaining supplies needed to work from a place of residence.

(2)    To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example, canned food, dry goods, fresh fruits and vegetables, pet supply, fresh meats, fish and poultry and any other household consumer products, and products necessary to maintain the safety, sanitation and essential operation of places of residence.

(3)    To engage in funeral services, provided the following restrictions are observed:

(i) For indoor services, where the body of the deceased is present for viewing or in a closed casket, members of the deceased's household and the relatives of the deceased within the second degree (including in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than five persons gather inside the facility at a single time.  Stable groups of five persons (i.e., persons may not substitute in or out of the group) may rotate within the facility providing protocols are implemented to sanitize the facilities between each group visit.
(ii) For graveside services, members of the deceased's household and the relatives of the deceased within the second degree (including in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than 10 persons gather.

(4)    To engage in a wedding ceremony, provided that Social Distancing Requirements are followed to the greatest extent feasible and that no more than 10 persons (who need not be from the same household or living unit), in addition to the couple to be married and the officiant, gather in a stable group.

10

(5)  To attend a gathering of any size to observe or participate in live or virtual presentations to the gathering, such as faith-based services, concerts, plays, political speeches, movies and similar activities, provided that all of the following protocols are followed:

(i) all activity must occur outdoors;
(ii) all persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit, not exceeding five persons;
(iii) all motor vehicles at the gathering must maintain a distance of six feet from all other vehicles:
(iv) the motor vehicle windows must be closed at all times during the event;
(v) all persons must remain in the vehicle in which they arrived at all times during the event;
(vi) no restroom facilities shall be made available to persons at the facility during the event;
(vii) no tangible items of any kind, including food products, may be transferred to persons in the motor vehicles;
(viii) notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to putting on the presentation; and
(ix) all Social Distancing Requirements shall be complied with to the greatest extent feasible.

(6)  To engage in outdoor activity, provided the persons comply with Social Distancing Requirements, such as, by way of example, golfing, tennis, pickle-ball, walking, hiking, running, bicycling, pleasure driving and working around their places of residence, including gardening.

(i) To provide accommodations for persons who wish to golf as a form of outdoor activity, public and private golf courses may operate provided they strictly enforce Social Distancing Requirements and enforce the following additional protocols:

(a) Motorized carts are not allowed;
(b) No more than four golfers (who need not be from the same household or living unit), are allowed per group and each group must be stable (i.e., persons may not substitute in or out

11

of the group);

(c) A distance of at least 30 feet shall be maintained between groups of golfers at all times;

(d) All ball washers shall be covered and flag pins shall be removed and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch surfaces on the greens and tees;

(e) Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate) ;

(f) Practice putting greens shall remain closed;

(g) The "Pro Shop" or similar facility designed for the sale of golf-related equipment and supplies shall remain closed; and

(h) The snack shop(s) and restaurant(s) shall remain closed.

(7)     To perform work providing products and services at an Essential Business or to otherwise carry out activities specifically permitted in this Order, including Minimum Basic Operations and limited business operations.

(8)     To care for a family member or pet in another household.

(9)     To prepare and present a live-stream or other virtual communication by an organization or association to its members, including worship services.  Staff of organizations or associations (who need not be of the same household or living unit), including faith-based organizations, may gather in a single space at the same time solely for the sole purpose of preparing and presenting live-stream or other virtual communications provided that the number of such staff is the fewest necessary to prepare and present those communications, but in no event in excess of ten (10) persons, and that Social Distancing Requirements are followed.

Anti-gathering clause.  It is the intent of this Order that individual persons be permitted to engage in the above Essential Activities.  Where an activity listed above expressly allows a specified number of persons to engage in an activity together, the number of persons expressly stated in the listed activity shall prevail, notwithstanding any other provision in this Order.  Except as expressly permitted, however, all public and private gatherings of any number of persons occurring outside of a household or living unit are

12

prohibited. Nothing in this paragraph prohibits a gathering of two or more persons as necessary to perform or work for Essential Businesses, Essential Governmental Functions or Services, Minimum Basic Operations, or limited business operations. Further, nothing in this paragraph prohibits members of a single household or living unit from engaging in Essential Travel or Essential Activities together.

b.    Healthcare Operation.  Persons may leave their places of residence to work for or obtain services at any "Healthcare Operation," including hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers or any related and/or ancillary healthcare services, including blood donation centers.

    (1)    "Healthcare Operation" includes professional services provided by chiropractors, acupuncturists, veterinarians and all healthcare services provided to animals.

    (2)    "Healthcare Operation" does not include fitness and exercise gyms, aquatic centers and similar facilities.

    (3)    This exemption shall be construed broadly to avoid any impacts to the delivery of healthcare, broadly defined.

c.    Essential Infrastructure.  Persons may leave their places of residence to provide any services or perform any work necessary to the operations and maintenance of "Essential Infrastructure," which means and includes, but is not limited to, public works construction, construction of housing (in particular affordable housing or housing for persons experiencing homelessness), construction of agricultural structures, airport and port operations, military installations, water, sewer, gas, electrical, oil and gas production and refining including associated businesses and activities, roads and highways, public transportation, solid waste collection and removal, funeral homes and cemeteries, internet and telecommunications systems (including the provision of essential global, national and local infrastructure for computing services, business infrastructure, communications and web-based services), provided that they carry out those services or that work in compliance with Social Distancing Requirements, to the extent possible.  All U.S. Department of Defense activities are categorically exempt from this Order.

d.  <u>Essential Governmental Functions or Services.</u>  Government functions or services performed by first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement personnel, and others who need to perform essential governmental functions or services, as such may be determined by the governmental entity performing those functions or services, shall be considered "Essential Governmental Functions or Services."  All persons who perform Essential Governmental Functions or Services are categorically exempt from this Order while performing such governmental functions or services.  Further, nothing in this Order shall prohibit any person from performing or accessing Essential Governmental Functions or Services.  Each governmental entity shall identify and designate appropriate employees or contractors to continue providing and carrying out any Essential Governmental Functions or Services.  All Essential Governmental Functions or Services shall be performed in compliance with Social Distancing Requirements, to the extent possible.

e.  <u>Essential Businesses.</u>  "Essential Businesses" means:

(1)  Healthcare Operations and Essential Infrastructure;

(2)  Grocery stores, certified farmers' markets, farm and produce stands, supermarkets, food banks, convenience stores and other establishments engaged in the retail sale of canned or frozen food, dry goods, beverages, fresh fruits and vegetables, pet supply, fresh meats, fish and poultry and any other household consumer products (such as cleaning and personal care products).  This includes stores that sell groceries and also sell other non-grocery products and products necessary to maintaining the safety, sanitation and essential operation of places of residence;

(3)  Any form of agricultural production and processing, including the cultivation of products for personal consumption or use, including farming and services provided by farmworkers, ranching, livestock, and fishing, as well as business activities that support production and processing by providing essential agricultural supplies and services, including transportation, manufacturing, equipment and services such as cooling, storing, packaging and distribution of such products for wholesale or retail sale, provided that, to the extent possible, such businesses comply with Social Distancing Requirements and

14

otherwise provide for the health and safety of their employees;

(4)    Businesses that provide food, shelter and social services and other necessities of life for economically disadvantaged, compromised or otherwise needy persons;

(5)    Newspapers and television, radio and other media services;

(6)    Gas stations and auto-supply, auto-repair and related facilities;

(7)    Banks and related financial institutions;

(8)    Hardware stores;

(9)    Plumbers, electricians, exterminators, house-cleaners, gardeners and other service providers who provide services that are necessary to maintain the safety, sanitation and essential operation of places of residence, Essential Activities and Essential Businesses;

(10)    Businesses providing mailing and shipping services, including post office boxes;

(11)    Educational institutions, including public and private K-12 schools, colleges and universities, for purposes of facilitating distance learning or performing essential functions, in compliance with Social Distancing Requirements, to the greatest extent possible;

(12)    Laundromats, drycleaners and laundry service providers;

(13)    Restaurants and other facilities that prepare and serve food, but only for delivery, pick-up or drive-thru.  Schools and other entities that typically provide free food services to students or members of the public may continue to do so under this Order on the condition that the food is provided to students or members of the public on a pick-up and take-away basis only.  Schools and other entities that provide food services under this exemption shall not permit the food to be eaten at the site where it is provided, or at any other gathering site;

(14)    Drive-thru car washes, provided the service is automated and no

15

Exhibit 20, Page 15 of 21

attendants or employees are involved in servicing the vehicles;

(15)    Businesses that supply other Essential Businesses with the support or supplies necessary to operate, including, by way of example, businesses that manufacture products for ultimate use in a Healthcare Operation;

(16)    Businesses that ship or deliver groceries, food, goods or services directly to places of residence.  This exemption shall not be used to allow for manufacturing or assembly of non-essential products or for other functions besides those necessary to the delivery operation;

(17)    Airlines, taxis and other private transportation providers providing transportation services necessary for Essential Activities and other purposes expressly authorized in this Order;

(18)    Home-based care for seniors, adults or children;

(19)    Residential facilities and shelters for seniors, adults and children;

(20)    Professional services, such as legal or accounting services, when necessary to assist in compliance with legally mandated activities;

(21)    Childcare facilities providing services that enable employees exempted in this Order to work as permitted.  Childcare facilities must operate under the following mandatory conditions:
(i)  Childcare must be carried out in stable groups of 12 or fewer ("stable" means that the same 12 or fewer children are in the same group each day).
(ii)  Children shall not change from one group to another.
(iii)  If more than one group of children is cared for at one facility, each group shall be in a separate room.  Groups shall not mix with each other.
(iv)  Childcare providers shall remain solely with one group of children.

(22)    Hotels, motels, bed-and-breakfast establishments and other businesses that provide transient occupancy for visitors to the County, provided that such businesses require their patrons to stay in place as otherwise required by this Order.

16

(23)     Commercial construction provided that such activity implements Social Distancing Requirements to the extent feasible and otherwise provides for the health and safety of employees.

(24)     Bicycle stores, including the sales of bicycles, parts and supplies, and the repair of bicycles. Bicycle rentals are not allowed.

(25)     Service providers that enable residential real estate transactions (including rentals, leases and home sales), including, but not limited to, real estate agents, escrow agents, notaries and title companies, provided that appointments and other residential viewing must only occur virtually or, if virtual viewing is not feasible, by appoinntment with no more than two visitors at a time, both of whom must reside within the same household or living unit and one individual showing the unit (except in-person visits are not allowed when the occupant is present in the residence).

(26)     Automobile dealerships and similar businesses with a primary business of automobile sales. In-person sales and long-term leasing transactions are allowed, as well as the operation of repair shops and auto-parts supply stores.  Automobile rentals are not allowed. "Automobiles" include cars, trucks, recreational vehicles, motorcycles and motorized scooters.

(27)     Household appliance stores.

(28)     Shoe repair shops; in-person sales of other goods and services not allowed.

(29)     Boat yards and other businesses that provide for safety, security and sanitation of boats stored at docks and marinas, including the repair of boats.

f.     Minimum Basic Operations.  "Minimum Basic Operations" means and includes the following, provided that employees comply with Social Distancing Requirements, to the extent possible, while carrying out such operations:

(1)     The minimum necessary activities to maintain the value of the business's inventory, ensure security, process payroll and employee

17

benefits, or for related functions.

(2)     The minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their places of residence.

g.     Essential Travel.  "Essential Travel" means and includes travel within or without the County, or between the various counties, for any of the following purposes, subject to Social Distancing Requirements:

(1)     Any travel related to the provision of or access to Essential Activities (including outdoor activities), Essential Governmental Functions or Services, Essential Businesses, Minimum Basic Operations or limited business operations.

(2)     Travel to care for elderly persons, minors, dependents, persons with disabilities or other vulnerable persons.

(3)     Travel to or from educational institutions for purposes of receiving materials for distance learning, for receiving meals and any other related services.

(4)     Travel to return to a place of residence from outside the County.

(5)     Travel required by law enforcement or court order.

(6)     Travel required for non-residents to return to their places of residence outside the County.

(7)     Travel engaged in interstate commerce and otherwise subject to the provisions of the Commerce Clause of the United States Constitution.

h.     Hotels, etc.  Places of residence include hotels, motels, shared rental units and similar facilities.

i.     Business.  The terms "business" and "businesses" as used in this Order include any for-profit, non-profit or educational entities (including sole proprietorships, corporations, firms, partnerships, limited liability companies, joint stock companies, associations and other organizations of

18

persons), regardless of the nature of their services or the functions they perform.

j.   Social Distancing Requirements.  "Social Distancing Requirements" means and includes maintaining at least a six-foot physical distance from other persons, washing hands with soap and water for at least 20 seconds or using hand sanitizer as frequently as possible, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces and not shaking hands.

18.   **Commercial laboratory test results.**  All commercial laboratories that test persons in the County for the presence of COVID-19 must report all test results (whether positive or negative) to the Ventura County Public Health Department laboratory within eight hours of receiving the test results.

19.   **Compliance.**  The violation of any provision of this Order constitutes a threat to public health and a public nuisance per se.  Pursuant to Health and Safety Code sections 101040 and 120175, Civil Code section 3494 and Code of Civil Procedure section 731, the Health Officer or any other authorized County of Ventura official may enforce any violation of this Order and abate the public nuisance by obtaining injunctive relief from a court of competent jurisdiction.  In addition, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

20.   **Violation may constitute unfair competition.**  Any person that, after notice, operates, manages, maintains or occupies or continues to operate, manage, maintain or occupy, any business in violation of this Order, may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of the Orders, or any of them.

21.   **Most Restrictive Provisions of County and State Health Orders Enforcable.** This  Order is issued in light of the March 19, 2020, State Shelter Order, which set baseline statewide restrictions on non-residential business activities effective until further notice, as well as the Governor's March 19, 2020 Executive Order N-33-20 directing California residents to follow the State Shelter Order. This County Health Officer Order adopts in certain respects more stringent restrictions addressing the

19

Exhibit 20, Page 19 of 21

particular facts and circumstances in this County, which are necessary to control the public health emergency as it is evolving within the County and the south coast region. Where a conflict exists between this Order and any state public health order related to the COVID-19 pandemic, the most restrictive provision controls.

22. **Effective date and time.** This Order shall become effective and operative at 11:59 p.m. on April 20, 2020, and will continue to be in effect until 11:59 p.m. on May 15, 2020, or until it is extended, rescinded, superseded or amended in writing by the Health Officer.

23. **Continuing assessment.** The Health Officer will continue to assess the quickly evolving situation, may issue additional orders related to COVID-19 and will review this Order within two weeks of its effective date.

24. **Copies of Order.** Copies of this Order shall promptly be: (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

25. **Severability.** If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**

_____          Dated: April _____, 2020
Robert Levin, M.D.
Ventura County Health Officer


Attachment: Appendix A: Social Distancing Protocol

20

particular facts and circumstances in this County, which are necessary to control the public health emergency as it is evolving within the County and the south coast region. Where a conflict exists between this Order and any state public health order related to the COVID-19 pandemic, the most restrictive provision controls.

22.     **Effective date and time.**  This Order shall become effective and operative at 11:59 p.m. on April 20, 2020, and will continue to be in effect until 11:59 p.m. on May 15, 2020, or until it is extended, rescinded, superseded or amended in writing by the Health Officer.

23.     **Continuing assessment.**  The Health Officer will continue to assess the quickly evolving situation, may issue additional orders related to COVID-19 and will review this Order within two weeks of its effective date.

24.     **Copies of Order.**  Copies of this Order shall promptly be:  (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

25.     **Severability.**  If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.  To this end, the provisions of this Order are severable.

**IT IS SO ORDERED:**


Robert Levin, M.D.
Ventura County Health Officer

Dated: April 20, 2020


Attachment: Appendix A: Social Distancing Protocol


20

# EXECUTIVE DEPARTMENT
# STATE OF CALIFORNIA

### EXECUTIVE ORDER N-60-20

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** on March 19, 2020, I issued Executive Order N-33-20, which directed all California residents to immediately heed current State public health directives; and

**WHEREAS** State public health directives, available at https://covid19.ca.gov/stay-home-except-for-essential-needs/, have ordered all California residents stay home except for essential needs, as defined in State public health directives; and

**WHEREAS** COVID-19 continues to menace public health throughout California; and

**WHEREAS** the extent to which COVID-19 menaces public health throughout California is expected to continue to evolve, and may vary from place to place within the State; and

**WHEREAS** California law promotes the preservation of public health by providing for local health officers—appointed by county boards of supervisors and other local authorities—in addition to providing for statewide authority by a State Public Health Officer; and

**WHEREAS** these local health officers, working in consultation with county boards of supervisors and other local authorities, are well positioned to understand the local needs of their communities; and

**WHEREAS** local governments are encouraged to coordinate with federally recognized California tribes located within or immediately adjacent to the external geographical boundaries of such local government jurisdiction; and

**WHEREAS** the global COVID-19 pandemic threatens the entire State, and coordination between state and local public health officials is therefore, and will continue to be, necessary to curb the spread of COVID-19 throughout the State; and

**WHEREAS** State public health officials have worked, and will continue to work, in consultation with their federal, state, and tribal government partners; and

**WHEREAS** the State Public Health Officer has articulated a four-stage framework—which includes provisions for the reopening of lower-risk businesses and spaces ("Stage Two"), to be followed by the reopening of higher-risk businesses and spaces ("Stage Three")—to allow Californians to gradually resume various activities while continuing to preserve public health in the face of COVID-19; and



**WHEREAS** the threat posed by COVID-19 is dynamic and ever-changing, and the State's response to COVID-19 (including implementation of the four-stage framework) should likewise retain the ability to be dynamic and flexible; and

**WHEREAS** to preserve this flexibility, and under the provisions of Government Code section 8571, I find that strict compliance with the Administrative Procedure Act, Government Code section 11340 et seq., would prevent, hinder, or delay appropriate actions to prevent and mitigate the effects of the COVID-19 pandemic.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8571, 8627, and 8665; and also in accordance with the authority vested in the State Public Health Officer by the laws of the State of California, including but not limited to Health and Safety Code sections 120125, 120130, 120135, 120140, 120145, 120150, 120175, and 131080; do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) All residents are directed to continue to obey State public health directives, as made available at https://covid19.ca.gov/stay-home-except-for-essential-needs/ and elsewhere as the State Public Health Officer may provide.

2) As the State moves to allow reopening of lower-risk businesses and spaces ("Stage Two"), and then to allow reopening of higher-risk businesses and spaces ("Stage Three"), the State Public Health Officer is directed to establish criteria and procedures—as set forth in this Paragraph 2—to determine whether and how particular local jurisdictions may implement public health measures that depart from the statewide directives of the State Public Health Officer.

In particular, the State Public Health Officer is directed to establish criteria to determine whether and how, in light of the extent to which the public health is menaced by COVID-19 from place to place within the State, local health officers may (during the relevant stages of reopening) issue directives to establish and implement public health measures less restrictive than any public health measures implemented on a statewide basis pursuant to the statewide directives of the State Public Health Officer.

The State Public Health Officer is further directed to establish procedures through which local health officers may (during the relevant stages of reopening) certify that, if their respective jurisdictions are subject to proposed public health measures (which they shall specify to the extent such specification may be required by the State Public Health Officer) that are less restrictive than public health measures implemented on a statewide basis pursuant to the statewide directives of the State Public Health Officer, the public health will not be menaced. The State Public Health Officer shall additionally establish procedures to permit, in a manner consistent with public health and

safety, local health officers who submit such certifications to establish and implement such less restrictive public health measures within their respective jurisdictions.

The State Public Health Officer may, from time to time and as she deems necessary to respond to the dynamic threat posed by COVID-19, revise the criteria and procedures set forth in this Paragraph 2. Nothing related to the establishment or implementation of such criteria or procedures, or any other aspect of this Order, shall be subject to the Administrative Procedure Act, Government Code section 11340 et seq. Nothing in this Paragraph 2 shall limit the authority of the State Public Health Officer to take any action she deems necessary to protect public health in the face of the threat posed by COVID-19, including (but not limited to) any necessary revision to the four-stage framework previously articulated by the State Public Health Officer.

3) Nothing in this Order shall be construed to limit the existing authority of local health officers to establish and implement public health measures within their respective jurisdictions that are more restrictive than, or that otherwise exist in addition to, the public health measures imposed on a statewide basis pursuant to the statewide directives of the State Public Health Officer.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 4th day of May 2020.

_____
GAVIN NEWSOM
Governor of California

**ATTEST:**

_____
ALEX PADILLA
Secretary of State



ORDER OF THE STATE PUBLIC HEALTH
OFFICER
May 7, 2020

On March 19, 2020, I issued an order directing all individuals living in the State of California to stay at home except as needed to facilitate authorized, necessary activities or to maintain the continuity of operations of critical infrastructure sectors. (See https://covid19.ca.gov/stay-home-except-for-essential-needs/.) I then set out California's path forward from this "Stay-at-Home" Order in California's Pandemic Roadmap https://www.gov.ca.gov/wp-content/uploads/2020/05/5.4.20-Update-on-Californias-Pandemic-Roadmap.pdf.That Roadmap identifies four stages of the pandemic: safety and preparation (Stage 1), reopening of lower-risk workplaces and other spaces (Stage 2), reopening of higher-risk workplaces and other spaces (Stage 3), and finally an easing of final restrictions leading to the end of the stay at home order (Stage 4).

Today, COVID-19 continues to present a significant risk to the health of individuals throughout California. There are confirmed cases of the virus in 54 of the 58 counties across the State, and each day over the past two weeks over one thousand new cases have been confirmed in California and dozens of people have lost their lives due to the virus. However, owing to Californians' mitigation efforts, statewide data currently demonstrates stable rates of new infections and hospitalizations, the maintenance of surge capacity, and an improved ability to test, contact trace, isolate, and provide support to individuals exposed to COVID-19. As State Public Health Officer, I have determined that the statewide data now supports the gradual movement of the entire state from Stage 1 to Stage 2 of California's Pandemic Resilience Roadmap.

Gradual movement into Stage 2 is intended to reintroduce activities and sectors in a phased manner and with necessary modifications, in order to protect public health and result in a lower risk for COVID-19 transmission and outbreak in a community. Such deliberate phasing is critical to allowing the State to protect the public, and to mitigate and manage the impact of the re-openings, such that our health care delivery system has the capacity to respond to potential increased demands. Differences across the state in the prevalence of COVID-19, as well as testing rates, containment capability, and hospital capacity, have resulted in differences among local health jurisdictions' ability to safely progress through the various stages. The low and stable data reported by some local health officers in their local health jurisdictions, combined with sufficient COVID-19 preparedness, justifies allowance for some variation in the speed with which some local health jurisdictions will be able to move through the phases of Stage 2.

NOW, THEREFORE, I as State Public Health Officer and Director of the California Department of Public Health, order:

1. All local health jurisdictions in the state may begin gradual movement into Stage 2, as set forth in this Order, effective on May 8, 2020; however, a local health jurisdiction may implement or continue more restrictive public health measures if the jurisdiction's Local Health Officer believes conditions in that jurisdiction warrant it.

2. I will progressively designate sectors, businesses, establishments, or activities that may reopen with certain modifications, based on public health and safety needs, and I will add additional sectors, businesses, establishments, or activities at a pace designed to protect public health and safety. Those sectors, businesses, establishments, or activities that are permitted to open will be designated, along with necessary modifications, at https://covid19.ca.gov/roadmap/, as I announce them.

3. To the extent that such sectors are re-opened, Californians may leave their homes to work at, patronize, or otherwise engage with those businesses, establishments, or activities and must, when they do so, continue at all times to practice physical distancing, minimize their time outside of the home, and wash their hands frequently. To prevent further spread of COVID-19 to and within other jurisdictions within the State, Californians should not travel significant distances and should stay close to home. My March 19, 2020, Order otherwise remains in full effect.

4. The California Department of Public Health has set forth criteria to help local health officers assess the capacity of their local health jurisdictions to move through Stage 2. Local health jurisdictions that meet the criteria and follow the process set forth https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID-19-County-Variance-Attestation-Memo.aspx will be permitted to move through Stage 2 more quickly than the State as a whole and reopen additional low-risk businesses before the rest of the state, if they choose to do so. A list of the sectors, businesses, establishments, or activities, and any necessary modifications, that such a qualifying jurisdiction may choose to reopen will be available at https://covid19.ca.gov/roadmap-counties/, and may be expanded if I deem it to be in the interest of public health and safety.

Pursuant to the authority under EO N-60-20, and Health and Safety Code sections 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this Order is to go into effect immediately and shall stay in effect until further notice.

This Order is being issued to protect the public health of Californians as we move as expeditiously to minimize risk to the extent possible throughout the Stages of the Pandemic Resilience Roadmap.

Sonia Y Angell, MD, MPH
State Public Health Officer & Director
California Department of Public Health

**STAY WELL VC**
**Safely Reopening Ventura County**

**ORDER OF THE VENTURA COUNTY HEALTH OFFICER SUPPLEMENTING THE STATE PUBLIC HEALTH OFFICER'S ORDER DATED MARCH 19, 2020, TO ADDRESS THE UNIQUE NEEDS OF VENTURA COUNTY IN RESPONSE TO THE COVID-19 PANDEMIC**

**DATE OF THIS ORDER: MAY 7, 2020**

**WHEREAS** on March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency to exist in the State of California as a result of the threat of COVID-19; and

**WHEREAS** on March 12, 2020, the County of Ventura Health Officer ("County Health Officer") issued a Declaration of Local Health Emergency pursuant to Health and Safety Code section 101080, finding that there existed an imminent and proximate threat of the spread of COVID-19 in Ventura County ("County"), and said Declaration was ratified by the County of Ventura Board of Supervisors on March 12, 2020; and

**WHEREAS** on March 17, 2020, the County Health Officer issued an order directing that all individuals past a certain age remain in their places of residence, limiting the operation of food facilities, and closing specified businesses that serve large gatherings; and

**WHEREAS** on March 19, 2020, the State Public Health Officer issued an order requiring that all individuals living in the State of California stay at home except as needed to maintain continuity of operations of critical infrastructure sectors as defined ("State Stay at Home Order"); and

**WHEREAS** the County Health Officer is required by Health and Safety Code section 101030 to enforce and observe all orders of the State Public Health Officer and all statutes relating to public health; and

**WHEREAS** State law permits local health officers to issue public health orders that are more restrictive, but not less restrictive, than an order issued by the State Public Health Officer, the County Health Officer, based on his evaluation of the unique needs and circumstances existing within the County, issued additional health orders on March 20, March 31, April 9, April 18 and April 20, 2020; and

1

**WHEREAS** the County Health Officer has determined that there no longer exists a need for local health orders that are more restrictive than the State Stay at Home Order with respect to many activities of individuals and businesses, and that the public health and welfare would best be served by a single set of regulations where reasonable to avoid public confusion between State and local orders; and

**WHEREAS** the State of California has identified businesses on its website at https://covid19.ca.gov/roadmap/ that are able to reopen under the statewide order; and

**WHEREAS** the County Health Officer has determined that some elements of his current order are not addressed by the State Stay at Home Order, and that the public health would be served by supplementing the State Stay at Home Order as set forth below;

**NOW, THEREFORE**, I, Dr. Robert Levin, the County Health Officer, pursuant to Health and Safety Code sections 101040, 101085 and 120175, hereby issue the following order ("Local Order") to be effective immediately:

**IT IS HEREBY ORDERED THAT**:

1.  **Commercial laboratory test results.** All commercial laboratories that test persons in the County for the presence of COVID-19 must report all test results (whether positive or negative) to the Ventura County Public Health Department laboratory within eight hours of receiving the test results.

2.  **Special rule for persons 70 years of age or older.** All persons currently living in the County equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to stay in their place of residence and must at all times follow Social Distancing Requirements to the greatest extent feasible. Such persons may leave their places of residence only as necessary to seek medical care or exercise or nutrition or to perform essential work in furtherance of Healthcare Operations or Essential Governmental Functions or Services.

    a.  For purposes of this section, "Healthcare Operations" means and includes hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, chiropractors, acupuncturists or any related and/or ancillary healthcare services, including blood donation centers, and veterinarians and all other healthcare services provided to

2

Exhibit 23, Page 2 of 10

animals. "Healthcare Operation" does not include fitness and exercise gyms, aquatic centers and similar facilities.

b.  For purposes of this section, "Essential Governmental Functions or Services" means government functions or services performed by first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement personnel, and others who perform essential governmental functions or services as such may be determined by the governmental entity performing those functions or services.

3.  **Admittance to Long-Term Care Facilities.** Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

a.  For purposes of this Local Order, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

4.  **Hospitals and Long-Term Care Facilities.** The County Health Officer recognizes the authority of the guidance documents "Hospital Holding Unit Guidance for COVID-19" and "Long-Term Care Facility Guidance for Preventing and Managing COVID-19" (the current versions of which are available at www.vcemergency.com) and strongly advises all hospitals and Long-Term Care Facilities to comply with the guidance.

5.  **All businesses must establish, implement and enforce COVID-19 prevention plans**.  All businesses must establish, implement and enforce a site-specific prevention plan in accordance with the State of California COVID-19 industry Guidance and associated checklist found at https://covid19.ca.gov/roadmap/. Prior to reopening, all businesses must register and attest to their preparedness for safely reopening at vcreopen.com.  Businesses that were operating under the previous order must also register and attest to their adherence to state guidelines within ten days at vcreopen.com.

As a condition of operation, each business must post a written notice explaining how it will comply with Social Distancing Requirements in conspicuous places

where it can easily be seen by employees and patrons of the business facility. The written posting shall identify by name and telephone number the County Covid Compliance Hotline where compliance related questions or complaints may be reported by employees and patrons.

Further, all businesses, as a condition of operation, shall admit without delay any officer, employee or agent of the County of Ventura or local city to their business facilities for the purposes of inspection for monitoring and compliance. The failure to cooperate with such inspectors, or repeated and confirmed violations of COVID-19 prevention requirements, may lead to issuance of a business-specific closure order by the County Health Officer.

6.  **Social Distancing Requirements defined.** "Social Distancing Requirements" means and includes maintaining at least a six-foot physical distance from other persons, washing hands with soap and water for at least 20 seconds or using hand sanitizer as frequently as possible, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces and not shaking hands.

7.  **Food facilities.** Under the State Stay at Home Order, all permanent food facilities, as defined by Health and Safety Code section 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. This Local Order, in addition, requires that permanent food facilities that prepare and offer food via delivery service, pick-up or drive-thru must comply with the following procedures:

a.  Containers required. All food must be completely contained in a suitable container before being transferred to a customer. For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed.

b.  Must consume food away from premises. The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption. The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food.

c.  Six-foot spacing must be maintained. All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery or drive-thru

shall maintain a distance of at least six feet from all other persons.

8.  **Primary retail business must be critical infrastructure to be fully open**. Only retail businesses whose primary line of business qualifies as critical infrastructure under the State Stay at Home Order may be fully open to the public, e.g., businesses whose primary business is the sale of food, beverages, pet supplies, household cleaning products, etc. Items the sale of which constitute less than 33 percent of a business's gross sales over the last six months are considered to be less than primary. For example, a tobacco or vape store that sells a minimal amount of snacks and water as a side business does not qualify as a grocery store, convenience store or similar establishment that can be fully open to the public under the current State Stay at Home Order.

9.  **Businesses and activities that must remain closed even if allowed by State Stay at Home Order.** The State Stay at Home Order does not expressly address every type of business activity. To avoid confusion, this Local Order prohibits the following businesses and activities, whether or not allowed by the State Stay at Home Order:

    a.  All swimming pools, spas, hot tubs, saunas, steam rooms and similar facilities, except those located at a single-family residence, which shall be used only by members of a household residing at the single-family residence.

    b.  All public and private campgrounds and recreational vehicle (RV) parks, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park. All persons residing in an RV shall comply with all orders otherwise applicable to residents.

10. **List of activities ordered to cease.** The following activities are deemed non-essential and harmful to public health, and therefore are prohibited whether or not allowed by the State Stay at Home Order:

    a.  Door-to-Door Solicitations. Door-to-door solicitations, whether for purposes of sales of goods or services, charitable contributions, signature-gathering or any other commercial or noncommercial purpose.

11. **Essential activities allowed.** The State Stay at Home Order implicitly allows for persons to leave their places of residence to engage in essential activities, but does not expressly address that issue. The State Public Health Officer has issued guidance, primarily in the form of posted answers to "Frequently Asked

5

Exhibit 23, Page 5 of 10

Questions," which are frequently amended or otherwise changed. For the sake of clarity and guidance to persons residing in the County, this section of the Local Order sets forth those activities that the County Health Officer deems to be essential and allowed. However, to the extent any activity described herein conflicts with and is more permissive than the State Stay at Home Order as it is currently written or as it may be amended, the State Stay at Home Order shall take precedence and shall be enforced.

a.  Persons may leave their places of residence only to perform one of the following essential activities:

(1)  To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including pets), such as, by way of example, obtaining medical supplies or medication, visiting a health care professional or obtaining supplies needed to work from a place of residence.

(2)  To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example, canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation and essential operation of places of residence.

(3)  To engage in funeral services, provided the following restrictions are observed:

(i) For indoor services, where the body of the deceased is present for viewing or in a closed casket, members of the deceased's household and the relatives of the deceased within the second degree (including in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than five persons gather inside the facility at a single time. Stable groups of five persons (i.e., persons may not substitute in or out of the group) may rotate within the facility providing protocols are implemented to sanitize the facilities between each group visit.
(ii) For graveside services, members of the deceased's household and the relatives of the deceased within the second degree (including

6

in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than 10 persons gather.

(4)  To engage in a wedding ceremony, provided that Social Distancing Requirements are followed to the greatest extent feasible and that no more than 10 persons (who need not be from the same household or living unit), in addition to the couple to be married and the officiant, gather in a stable group.

(5)  To attend a gathering of any size to observe or participate in live or virtual presentations to the gathering, such as faith-based services, concerts, plays, political speeches, movies and similar activities, provided that all of the following protocols are followed:

> (i) all activity must occur outdoors;
> (ii) all persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit;
> (iii) all motor vehicles at the gathering must maintain a distance of six feet from all other vehicles;
> (iv) the motor vehicle windows must be closed at all times during the event;
> (v) all persons must remain in the vehicle in which they arrived at all times during the event;
> (vi) no restroom facilities shall be made available to persons at the facility during the event;
> (vii) no tangible items of any kind, including food products, may be transferred to persons in the motor vehicles;
> (viii) notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to putting on the presentation; and
> (ix) all Social Distancing Requirements shall be complied with to the greatest extent feasible.

(6)  To engage in outdoor activity, provided the persons comply with Social Distancing Requirements, such as, by way of example, golfing, tennis, pickle-ball, walking, hiking, running, bicycling, pleasure driving and working around their places of residence, including gardening.

> (i) To provide accommodations for persons who wish to golf as a

7

form of outdoor activity, public and private golf courses may operate provided they strictly enforce Social Distancing Requirements and enforce the following additional protocols:

(a) Motorized carts are not allowed;
(b) No more than four golfers (who need not be from the same household or living unit), are allowed per group and each group must be stable (i.e., persons may not substitute in or out of the group);
(c) A distance of at least 30 feet shall be maintained between groups of golfers at all times;
(d) All ball washers shall be covered and flag pins shall be removed and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch surfaces on the greens and tees;
(e) Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate);
(f) Practice putting greens shall remain closed;
(g) The "Pro Shop" or similar facility designed for the sale of golf-related equipment and supplies shall remain closed; and
(h) The snack shop(s) and restaurant(s) shall remain closed.

(7)  To otherwise carry out activities specifically permitted in this Local Order.

(8)  To care for a family member or pet in another household.

(9)  To prepare and present a live-stream or other virtual communication by an organization or association to its members, including worship services. Staff of organizations or associations (who need not be of the same household or living unit), including faith-based organizations, may gather in a single space at the same time solely for the purpose of preparing and presenting live-stream or other virtual communications provided that the number of such staff is the fewest necessary to prepare and present those communications, but in no event in excess of 10 persons, and that Social Distancing Requirements are followed.

12.   **Compliance.** The violation of any provision of this Local Order or the State Stay at Home Order constitutes a threat to public health and a public nuisance per se.  In

8

Exhibit 23, Page 8 of 10

addition, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the County Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Local Order.

13. **Violation may constitute unfair competition.** Any person that, after notice, operates, manages, maintains or occupies or continues to operate, manage, maintain or occupy, any business in violation of this Local Order or the State Stay at Home Order may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of this Local Order, the State Stay at Home Order, any predecessor order, or any of them.

14. **More restrictive provisions of local and State orders enforceable.** This Local Order is issued to supplement the State Stay at Home Order, which establishes minimum requirements for individuals and businesses, as well as the Governor's March 19, 2020 Executive Order N-33-20 directing California residents to follow the State Stay at Home Order. This Local Order adopts in certain respects more stringent restrictions addressing the particular facts and circumstances in this County, which are necessary to control the public health emergency as it is evolving within the County and the south coast region. Where a conflict exists between this Local Order and any State public health order, including the State Stay at Home Order, the more restrictive provision controls.

15. **Applicable to entire County.** This Local Order applies to all persons in the cities and the entire unincorporated area of the County.

16. **Effective date and time; repeal of prior order.** This Local Order shall become effective and operative at 11:59 p.m. on May 7, 2020, and will continue to be in effect until 11:59 p.m. on May 31, 2020, or until it is extended, rescinded, superseded or amended in writing by the County Health Officer. The County Health Officer order dated April 20, 2020, is hereby repealed and replaced with this Local Order, except that all prior violations of previous orders remain prosecutable, criminally or civilly. All prior closure or cease and desist orders directed at specified persons or businesses shall remain in force, but shall be reviewed by enforcement staff and rescinded if appropriate.

17. **Copies of Local Order.** Copies of this Local Order shall promptly be: (1) made

9

available at the County of Ventura Public Health Office, 2240 East Gonzalez
Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County
Public Health Department website (available at www.vchca.org/ph); and (3)
provided to any member of the public requesting a copy of this Local Order.

18.    **Severability.** If any provision of this Local Order or the application thereof to any
person or circumstance is held to be invalid by a court of competent jurisdiction,
the remainder of the Local Order, including the application of such part or
provision to other persons or circumstances, shall not be affected and shall
continue in full force and effect. To this end, the provisions of this Local Order
are severable.

**IT IS SO ORDERED:**


Robert Levin, M.D.
Ventura County Health Officer

Dated: May **7** , 2020


Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to
comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.

10

**VC EMERGENCY**.com !
**OFFICIAL VENTURA COUNTY INCIDENT INFORMATION SOURCE**
(https://www.vcemergency.com)

## Coronavirus Information

(/)

🏠 (/)   Stay Well/FAQs (/staywellvc/)   Residents (/families/)   Rental Assistance (/rent/)   Coping with Stress (/coping/)

Medical Providers (/healthcare/)   Business (/business/)   Newsroom (/newsroom/)   Resources (/resources/)

Donate (/donate/plasma)

### PUBLIC HEALTH ORDERS / COMPLIANCE / FREQUENTLY ASKED QUESTIONS

Health Orders (/staywellvc) | COVID Business Compliance (/business/covidcompliance) | General FAQs (/staywellvc/faqs-general)

**COVID BUSINESS COMPLIANCE – (805)-202-1805 | EMAIL: covidcompliance@ventura.org** (mailto:covidcompliance@ventura.org)

**(Click question to see answer)**

**STAY AT HOME ORDER AND SOCIAL DISTANCING**

Is this order mandatory? What happens if I don't comply?

When does the Order go into effect and how long will it last?

Exhibit 24, Page 1 of 9

⌃

/

Can this Order be changed?

 Yes. Follow updates on www.vcemergency.com (https://www.vcemergency.com). We will also share updates with the media.

What is the difference between "stay well at home" and "social distancing"?

What are the social distancing guidelines I still need to follow?

Who counts as a family member?

When practicing social distancing, how far should I stay away from others if I must be away from my home?

## HEALTHCARE AND HELPING SICK RELATIVES

What if I need to visit a health care provider?

Can I still seek non-essential medical care like eye exams, teeth cleaning, elective procedures?

What should I do if I'm sick or a family member is sick?

What should I do if I'm sick or a family member is sick and needs to go to the hospital or a medical provider? How can I protect others?

Exhibit 24, Page 2 of 9

Can I leave home to care for my elderly parents or friends who require assistance to care for themselves? Or a friend or family member who has disabilities?

Can I visit loved ones in the hospital, nursing home, skilled nursing facility, or other residential care facility?

What do I do about my loved one who needs care from me?

## SCHOOLS AND CHILDCARE

Does the Order allow me to have my children in childcare? Will my daycare be shut down?

If my child's school is providing food or meals, can I leave home to go to the school to pick up the food or meals?

## WHAT CAN I DO? WHAT'S OPEN?

What if I'm in a line and there isn't six feet between me and others?

How can I access free or reduced-price meals for myself or my family?

Should I stock up on food, necessities like toilet paper, and on medicines?

Can grocery stores, farmers markets, and other food retailers remain open?

Are non-profit organizations allowed to continue operating?

Can a car dealership stay open?

Can Recreational Vehicles be repaired?

Can I go to a vet or pet hospital if my pet is sick?

Can I go out to do laundry or have my laundry done?

Can I go to the bank?

Can bike stores stay open? What about bike rentals?

May cannabis stores continue to operate under the current health officer order?

Where do I report a business that stays open in violation of the Stay Well at Home order?

Can Florists be open?

Can a dog grooming business be open?

**Can gun shops be open?**

Yes. With the elimination of the essential business model in the local health order, and reliance on the State health order model for critical infrastructure, the Sheriff and local health officer have determined that the gun stores may fully open to the public provided they implement and register site-specific prevention plans as described www.vcreopens.com.

Can Equestrian Centers/Horseback Riding be open?

Can Jet Ski/Boat/Bike Rentals be open?

**Can Archery/Shooting Ranges be open?**

Yes.

Can a Remote Control Plane Range be open?

Outdoor Photography is permitted with restrictions. Commercial or permitted photo shoots are not allowed.

Can churches be open for in person services?

Can Barbershops and Hair Salons reopen?

## WHAT'S CLOSED?

Can I go to a bar/nightclub/theater?

Can I go to the gym or health club?

## SHOPPING, GETTING AROUND, DAILY NEEDS, AND OUTDOOR RECREATION

Can I go to the store (grocery store, market, corner store, food bank, etc.) to buy food and other things?

Can I take public transportation (bus, subway, train)?

Can I go shopping for things other than food/groceries?

Can I still get deliveries from online stores?

Can I still order the things I need online and have them delivered to my residence?

Can I use ride share, on demand service, or a taxi?

Can I eat inside a restaurant?

Can I shop inside local stores?

Can golf courses and driving ranges be open?

Can I use a golf cart?

Can I go swimming?

## WHAT DO I DO ABOUT WORK?

I work for an essential infrastructure organization – can I leave home to go to work?

What do I do about my kids? I have to work.

Can I keep working from home?

What if I want to go to work and I'm not sick?

## TRAVEL

I am currently on vacation outside the County–Does the Order allow me to return home?

What happens if I leave the County to go on a planned vacation?

I'm visiting and staying in a hotel, with family/friends, or in a short term rental. What should I do? Can I go home?

## WHERE CAN I FIND ADDITIONAL INFORMATION?

**For recommendations on how to protect your family members and loved ones, please visit:**

- Preventing the Spread of COVID-19 (https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-prevent-spread.html)
- Watch for Symptoms (https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html)
- Recommended Cleaning Products (https://www.americanchemistry.com/Novel-Coronavirus-Fighting-Products-List.pdf)
- FAQs regarding the virus, prevention, symptoms, testing, and treatment. (https://www.cdc.gov/coronavirus/2019-ncov/faq.html)
- FAQs regarding lost wages and financial assistance. (https://www.edd.ca.gov/about_edd/coronavirus-2019/faqs.htm)

**Please follow the President's Coronavirus Guidelines for America — 15 Days to Slow the Spread of Coronavirus (COVID-19).**

- Whitehouse- 15 Days to Slow the Spread (https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf)

**For pets:**

- Open Letter to Federal, State & Local Government Officials Regarding Pets and COVID-19 Precautions (https://vcportal.ventura.org/covid19/docs/2020-03-17_Open_Letter_to_Government_Officials_on_Coronavirus_and_Pet_Supplies.pdf)

(https://www.vcemergency.com)

OFFICE OF EMERGENCY SERVICES

EMERGENCY OPE

Exhibit 24, Page 8 of 9

INFORMATION HOTLINE - **(805) 465-6650**

© All Rights Reserved - Ventura County - Office Of Emergency Services

Exhibit 24, Page 9 of 9

**STAY WELL VC**
**Safely Reopening Ventura County**

**ORDER OF THE VENTURA COUNTY HEALTH OFFICER SUPPLEMENTING THE STATE PUBLIC HEALTH OFFICER'S ORDER DATED MARCH 19, 2020, TO ADDRESS THE UNIQUE NEEDS OF VENTURA COUNTY IN RESPONSE TO THE COVID-19 PANDEMIC**

**DATE OF THIS ORDER: MAY 7, 2020**

**[As amended May 20, 2020]**

**WHEREAS** on March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency to exist in the State of California as a result of the threat of COVID-19; and

**WHEREAS** on March 12, 2020, the County of Ventura Health Officer ("County Health Officer") issued a Declaration of Local Health Emergency pursuant to Health and Safety Code section 101080, finding that there existed an imminent and proximate threat of the spread of COVID-19 in Ventura County ("County"), and said Declaration was ratified by the County of Ventura Board of Supervisors on March 12, 2020; and

**WHEREAS** on March 17, 2020, the County Health Officer issued an order directing that all individuals past a certain age remain in their places of residence, limiting the operation of food facilities, and closing specified businesses that serve large gatherings; and

**WHEREAS** on March 19, 2020, the State Public Health Officer issued an order requiring that all individuals living in the State of California stay at home except as needed to maintain continuity of operations of critical infrastructure sectors as defined ("State Stay at Home Order"); and

**WHEREAS** the County Health Officer is required by Health and Safety Code section 101030 to enforce and observe all orders of the State Public Health Officer and all statutes relating to public health; and

**WHEREAS** State law permits local health officers to issue public health orders that are more restrictive, but not less restrictive, than an order issued by the State Public Health Officer, the County Health Officer, based on his evaluation of the unique needs and circumstances existing within the County, issued additional health orders on March 20, March 31, April 9, April 18 and April 20, 2020; and

1

**WHEREAS** the County Health Officer has determined that there no longer exists a need for local health orders that are more restrictive than the State Stay at Home Order with respect to many activities of individuals and businesses, and that the public health and welfare would best be served by a single set of regulations where reasonable to avoid public confusion between State and local orders; and

**WHEREAS** the State of California has identified businesses on its website at https://covid19.ca.gov/roadmap/ that are able to reopen under the statewide order; and

**WHEREAS** the County Health Officer has determined that some elements of his current order are not addressed by the State Stay at Home Order, and that the public health would be served by supplementing the State Stay at Home Order as set forth below;

**NOW, THEREFORE**, I, Dr. Robert Levin, the County Health Officer, pursuant to Health and Safety Code sections 101040, 101085 and 120175, hereby issue the following order ("Local Order") to be effective immediately:

**IT IS HEREBY ORDERED THAT**:

1. **Commercial laboratory test results.** All commercial laboratories that test persons in the County for the presence of COVID-19 must report all test results (whether positive or negative) to the Ventura County Public Health Department laboratory within eight hours of receiving the test results.

2. **Special rule for persons 70 years of age or older.** All persons currently living in the County equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to stay in their place of residence and must at all times follow Social Distancing Requirements to the greatest extent feasible. Such persons may leave their places of residence only as necessary to seek medical care or exercise or nutrition or to perform essential work in furtherance of Healthcare Operations or Essential Governmental Functions or Services.

   a. For purposes of this section, "Healthcare Operations" means and includes hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, chiropractors, acupuncturists or any related and/or ancillary healthcare services, including blood donation centers, and veterinarians and all other healthcare services provided to

animals. "Healthcare Operation" does not include fitness and exercise gyms, aquatic centers and similar facilities.

b.  For purposes of this section, "Essential Governmental Functions or Services" means government functions or services performed by first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement personnel, and others who perform essential governmental functions or services as such may be determined by the governmental entity performing those functions or services.

3.    **Admittance to Long-Term Care Facilities.** Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

a.  For purposes of this Local Order, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

4.    **Hospitals and Long-Term Care Facilities.** The County Health Officer recognizes the authority of the guidance documents "Hospital Holding Unit Guidance for COVID-19" and "Long-Term Care Facility Guidance for Preventing and Managing COVID-19" (the current versions of which are available at www.vcemergency.com) and strongly advises all hospitals and Long-Term Care Facilities to comply with the guidance.

5.    **All businesses must establish, implement and enforce COVID-19 prevention plans**.  All businesses must establish, implement and enforce a site-specific prevention plan in accordance with the State of California COVID-19 industry Guidance and associated checklist found at https://covid19.ca.gov/roadmap/. Prior to reopening, all businesses must register and attest to their preparedness for safely reopening at vcreopen.com.  Businesses that were operating under the previous order must also register and attest to their adherence to state guidelines within ten days at vcreopen.com.

As a condition of operation, each business must post a written notice explaining how it will comply with Social Distancing Requirements in conspicuous places

3

where it can easily be seen by employees and patrons of the business facility. The written posting shall identify by name and telephone number the County Covid Compliance Hotline where compliance related questions or complaints may be reported by employees and patrons.

Further, all businesses, as a condition of operation, shall admit without delay any officer, employee or agent of the County of Ventura or local city to their business facilities for the purposes of inspection for monitoring and compliance. The failure to cooperate with such inspectors, or repeated and confirmed violations of COVID-19 prevention requirements, may lead to issuance of a business-specific closure order by the County Health Officer.

6.   **Social Distancing Requirements defined.** "Social Distancing Requirements" means and includes maintaining at least a six-foot physical distance from other persons, washing hands with soap and water for at least 20 seconds or using hand sanitizer as frequently as possible, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces and not shaking hands.

7.   **Repealed May 20, 2020** ~~**Food facilities.** Under the State Stay at Home Order, all permanent food facilities, as defined by Health and Safety Code section 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. This Local Order, in addition, requires that permanent food facilities that prepare and offer food via delivery service, pick-up or drive-thru must comply with the following procedures:~~

~~a.   Containers required. All food must be completely contained in a suitable container before being transferred to a customer. For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed.~~

~~b.   Must consume food away from premises. The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption. The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food.~~

~~c.   Six-foot spacing must be maintained. All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery or drive-thru~~

4

Exhibit 25, Page 4 of 10

~~shall maintain a distance of at least six feet from all other persons.~~

8.    **Repealed May 20, 2020  ~~Primary retail business must be critical infrastructure to be fully open.~~** ~~Only retail businesses whose primary line of business qualifies as critical infrastructure under the State Stay at Home Order may be fully open to the public, e.g., businesses whose primary business is the sale of food, beverages, pet supplies, household cleaning products, etc. Items the sale of which constitute less than 33 percent of a business's gross sales over the last six months are considered to be less than primary. For example, a tobacco or vape store that sells a minimal amount of snacks and water as a side business does not qualify as a grocery store, convenience store or similar establishment that can be fully open to the public under the current State Stay at Home Order.~~

9.    **Businesses and activities that must remain closed even if allowed by State Stay at Home Order.** The State Stay at Home Order does not expressly address every type of business activity. To avoid confusion, this Local Order prohibits the following businesses and activities, whether or not allowed by the State Stay at Home Order:

      a.  All swimming pools, spas, hot tubs, saunas, steam rooms and similar facilities, except those located at a single-family residence, which shall be used only by members of a household residing at the single-family residence.

      b.  All public and private campgrounds and recreational vehicle (RV) parks, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park. All persons residing in an RV shall comply with all orders otherwise applicable to residents.

10.   **List of activities ordered to cease.** The following activities are deemed non-essential and harmful to public health, and therefore are prohibited whether or not allowed by the State Stay at Home Order:

      a.  _Door-to-Door Solicitations._ Door-to-door solicitations, whether for purposes of sales of goods or services, charitable contributions, signature-gathering or any other commercial or noncommercial purpose.

11.   **Essential activities allowed.** The State Stay at Home Order implicitly allows for persons to leave their places of residence to engage in essential activities, but does not expressly address that issue. The State Public Health Officer has issued guidance, primarily in the form of posted answers to "Frequently Asked

5

Questions," which are frequently amended or otherwise changed. For the sake of clarity and guidance to persons residing in the County, this section of the Local Order sets forth those activities that the County Health Officer deems to be essential and allowed. However, to the extent any activity described herein conflicts with and is more permissive than the State Stay at Home Order as it is currently written or as it may be amended, the State Stay at Home Order shall take precedence and shall be enforced.

a.  Persons may leave their places of residence only to perform one of the following essential activities:

(1)  To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including pets), such as, by way of example, obtaining medical supplies or medication, visiting a health care professional or obtaining supplies needed to work from a place of residence.

(2)  To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example, canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation and essential operation of places of residence.

(3)  To engage in funeral services, provided the following restrictions are observed:

(i) For indoor services, where the body of the deceased is present for viewing or in a closed casket, members of the deceased's household and the relatives of the deceased within the second degree (including in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than five persons gather inside the facility at a single time. Stable groups of five persons (i.e., persons may not substitute in or out of the group) may rotate within the facility providing protocols are implemented to sanitize the facilities between each group visit.

(ii) For graveside services, members of the deceased's household and the relatives of the deceased within the second degree (including

in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than 10 persons gather.

(4)  To engage in a wedding ceremony, provided that Social Distancing Requirements are followed to the greatest extent feasible and that no more than 10 persons (who need not be from the same household or living unit), in addition to the couple to be married and the officiant, gather in a stable group.

(5)  To attend a gathering of any size to observe or participate in live or virtual presentations to the gathering, such as faith-based services, concerts, plays, political speeches, movies and similar activities, provided that all of the following protocols are followed:

> (i) all activity must occur outdoors;
> (ii) all persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit;
> (iii) all motor vehicles at the gathering must maintain a distance of six feet from all other vehicles;
> (iv) the motor vehicle windows must be closed at all times during the event;
> (v) all persons must remain in the vehicle in which they arrived at all times during the event;
> (vi) no restroom facilities shall be made available to persons at the facility during the event;
> (vii) no tangible items of any kind, including food products, may be transferred to persons in the motor vehicles;
> (viii) notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to putting on the presentation; and
> (ix) all Social Distancing Requirements shall be complied with to the greatest extent feasible.

(6)  To engage in outdoor activity, provided the persons comply with Social Distancing Requirements, such as, by way of example, golfing, tennis, pickle-ball, walking, hiking, running, bicycling, pleasure driving and working around their places of residence, including gardening.

> (i) To provide accommodations for persons who wish to golf as a

7

form of outdoor activity, public and private golf courses may operate provided they strictly enforce Social Distancing Requirements and enforce the following additional protocols:

> (a) Motorized carts are not allowed;
> (b) No more than four golfers (who need not be from the same household or living unit), are allowed per group and each group must be stable (i.e., persons may not substitute in or out of the group);
> (c) A distance of at least 30 feet shall be maintained between groups of golfers at all times;
> (d) All ball washers shall be covered and flag pins shall be removed and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch surfaces on the greens and tees;
> (e) Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate);
> (f) Practice putting greens shall remain closed;
> (g) The "Pro Shop" or similar facility designed for the sale of golf-related equipment and supplies shall remain closed; and
> (h) The snack shop(s) and restaurant(s) shall remain closed.

(7)  To otherwise carry out activities specifically permitted in this Local Order.

(8)  To care for a family member or pet in another household.

(9)  To prepare and present a live-stream or other virtual communication by an organization or association to its members, including worship services. Staff of organizations or associations (who need not be of the same household or living unit), including faith-based organizations, may gather in a single space at the same time solely for the purpose of preparing and presenting live-stream or other virtual communications provided that the number of such staff is the fewest necessary to prepare and present those communications, but in no event in excess of 10 persons, and that Social Distancing Requirements are followed.

12.  **Compliance.** The violation of any provision of this Local Order or the State Stay at Home Order constitutes a threat to public health and a public nuisance per se.  In

8

Exhibit 25, Page 8 of 10

addition, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the County Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Local Order.

13. **Violation may constitute unfair competition.** Any person that, after notice, operates, manages, maintains or occupies or continues to operate, manage, maintain or occupy, any business in violation of this Local Order or the State Stay at Home Order may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of this Local Order, the State Stay at Home Order, any predecessor order, or any of them.

14. **More restrictive provisions of local and State orders enforceable.** This Local Order is issued to supplement the State Stay at Home Order, which establishes minimum requirements for individuals and businesses, as well as the Governor's March 19, 2020 Executive Order N-33-20 directing California residents to follow the State Stay at Home Order. This Local Order adopts in certain respects more stringent restrictions addressing the particular facts and circumstances in this County, which are necessary to control the public health emergency as it is evolving within the County and the south coast region. Where a conflict exists between this Local Order and any State public health order, including the State Stay at Home Order, the more restrictive provision controls.

15. **Applicable to entire County.** This Local Order applies to all persons in the cities and the entire unincorporated area of the County.

16. **Effective date and time; repeal of prior order.** This Local Order shall become effective and operative at 11:59 p.m. on May 7, 2020, and will continue to be in effect until 11:59 p.m. on May 31, 2020, or until it is extended, rescinded, superseded or amended in writing by the County Health Officer. The County Health Officer order dated April 20, 2020, is hereby repealed and replaced with this Local Order, except that all prior violations of previous orders remain prosecutable, criminally or civilly. All prior closure or cease and desist orders directed at specified persons or businesses shall remain in force, but shall be reviewed by enforcement staff and rescinded if appropriate.

17. **Copies of Local Order.** Copies of this Local Order shall promptly be: (1) made

9

Exhibit 25, Page 9 of 10

available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Local Order.

18. **Severability.** If any provision of this Local Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Local Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Local Order are severable.

**IT IS SO ORDERED:**

Robert Levin, M.D.
Ventura County Health Officer

Dated: May **7**, 2020

Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.

10

Exhibit 25, Page 10 of 10

**STAY WELL VC**
**Safely Reopening Ventura County**

**ORDER OF THE VENTURA COUNTY HEALTH OFFICER SUPPLEMENTING THE STATE PUBLIC HEALTH OFFICER'S ORDER DATED MARCH 19, 2020, TO ADDRESS THE UNIQUE NEEDS OF VENTURA COUNTY IN RESPONSE TO THE COVID-19 PANDEMIC**

**DATE OF THIS ORDER: <u>MAY 7, 2020</u>**

**[As amended May 20, 2020 and May 22, 2020]**

**WHEREAS** on March 4, 2020, Governor Gavin Newsom proclaimed a State of Emergency to exist in the State of California as a result of the threat of COVID-19; and

**WHEREAS** on March 12, 2020, the County of Ventura Health Officer ("County Health Officer") issued a Declaration of Local Health Emergency pursuant to Health and Safety Code section 101080, finding that there existed an imminent and proximate threat of the spread of COVID-19 in Ventura County ("County"), and said Declaration was ratified by the County of Ventura Board of Supervisors on March 12, 2020; and

**WHEREAS** on March 17, 2020, the County Health Officer issued an order directing that all individuals past a certain age remain in their places of residence, limiting the operation of food facilities, and closing specified businesses that serve large gatherings; and

**WHEREAS** on March 19, 2020, the State Public Health Officer issued an order requiring that all individuals living in the State of California stay at home except as needed to maintain continuity of operations of critical infrastructure sectors as defined ("State Stay at Home Order"); and

**WHEREAS** the County Health Officer is required by Health and Safety Code section 101030 to enforce and observe all orders of the State Public Health Officer and all statutes relating to public health; and

**WHEREAS** State law permits local health officers to issue public health orders that are more restrictive, but not less restrictive, than an order issued by the State Public Health Officer, the County Health Officer, based on his evaluation of the unique needs and circumstances existing within the County, issued additional health orders on March 20, March 31, April 9, April 18 and April 20, 2020; and

1

WHEREAS the County Health Officer has determined that there no longer exists a need for local health orders that are more restrictive than the State Stay at Home Order with respect to many activities of individuals and businesses, and that the public health and welfare would best be served by a single set of regulations where reasonable to avoid public confusion between State and local orders; and

WHEREAS the State of California has identified businesses on its website at https://covid19.ca.gov/roadmap/ that are able to reopen under the statewide order; and

WHEREAS the County Health Officer has determined that some elements of his current order are not addressed by the State Stay at Home Order, and that the public health would be served by supplementing the State Stay at Home Order as set forth below;

NOW, THEREFORE, I, Dr. Robert Levin, the County Health Officer, pursuant to Health and Safety Code sections 101040, 101085 and 120175, hereby issue the following order ("Local Order") to be effective immediately:

IT IS HEREBY ORDERED THAT:

1.  **Commercial laboratory test results.** All commercial laboratories that test persons in the County for the presence of COVID-19 must report all test results (whether positive or negative) to the Ventura County Public Health Department laboratory within eight hours of receiving the test results.

2.  **Special rule for persons 70 years of age or older.** All persons currently living in the County equal to or older than 75 years of age, or equal to or older than 70 years of age with an active or unstable comorbidity, are ordered to stay in their place of residence and must at all times follow Social Distancing Requirements to the greatest extent feasible. Such persons may leave their places of residence only as necessary to seek medical care or exercise or nutrition or to perform essential work in furtherance of Healthcare Operations or Essential Governmental Functions or Services.

    a.  For purposes of this section, "Healthcare Operations" means and includes hospitals, clinics, dentists, pharmacies, pharmaceutical and biotechnology companies, other licensed healthcare facilities, healthcare suppliers, home healthcare services providers, mental health providers, chiropractors, acupuncturists or any related and/or ancillary healthcare services, including blood donation centers, and veterinarians and all other healthcare services provided to

2

animals. "Healthcare Operation" does not include fitness and exercise gyms, aquatic centers and similar facilities.

b.  For purposes of this section, "Essential Governmental Functions or Services" means government functions or services performed by first responders, emergency management personnel, emergency dispatchers, court personnel, law enforcement personnel, and others who perform essential governmental functions or services as such may be determined by the governmental entity performing those functions or services.

3.      **Admittance to Long-Term Care Facilities.** Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

a.  For purposes of this Local Order, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

4.      **Hospitals and Long-Term Care Facilities.** The County Health Officer recognizes the authority of the guidance documents "Hospital Holding Unit Guidance for COVID-19" and "Long-Term Care Facility Guidance for Preventing and Managing COVID-19" (the current versions of which are available at www.vcemergency.com) and strongly advises all hospitals and Long-Term Care Facilities to comply with the guidance.

5.      **All businesses must establish, implement and enforce COVID-19 prevention plans**.  All businesses must establish, implement and enforce a site-specific prevention plan in accordance with the State of California COVID-19 industry Guidance and associated checklist found at https://covid19.ca.gov/roadmap/. Prior to reopening, all businesses must register and attest to their preparedness for safely reopening at vcreopen.com.  Businesses that were operating under the previous order must also register and attest to their adherence to state guidelines within ten days at vcreopen.com.

As a condition of operation, each business must post a written notice explaining how it will comply with Social Distancing Requirements in conspicuous places

3

where it can easily be seen by employees and patrons of the business facility. The written posting shall identify by name and telephone number the County Covid Compliance Hotline where compliance related questions or complaints may be reported by employees and patrons.

Further, all businesses, as a condition of operation, shall admit without delay any officer, employee or agent of the County of Ventura or local city to their business facilities for the purposes of inspection for monitoring and compliance. The failure to cooperate with such inspectors, or repeated and confirmed violations of COVID-19 prevention requirements, may lead to issuance of a business-specific closure order by the County Health Officer.

6. **Social Distancing Requirements defined.** "Social Distancing Requirements" means and includes maintaining at least a six-foot physical distance from other persons, washing hands with soap and water for at least 20 seconds or using hand sanitizer as frequently as possible, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces and not shaking hands.

7. **Repealed May 20, 2020**  ~~**Food facilities.** Under the State Stay at Home Order, all permanent food facilities, as defined by Health and Safety Code section 113849, may only prepare and offer food that is provided to customers via delivery service, via pick-up for takeout dining, and via drive-thru. This Local Order, in addition, requires that permanent food facilities that prepare and offer food via delivery service, pick-up or drive-thru must comply with the following procedures:~~

~~a.  Containers required. All food must be completely contained in a suitable container before being transferred to a customer. For example, ice cream cones are not allowed; ice cream scoops in a covered container are allowed.~~

~~b.  Must consume food away from premises. The exception for take-out food activities is designed to enable persons who are confined to their places of residence to obtain prepared food to take back to their places of residence for consumption. The take-out food shall not be consumed anywhere within the line-of-sight of a person standing in front of the facility that sold the food.~~

~~c.  Six-foot spacing must be maintained. All persons waiting in line or otherwise congregating outside a food facility selling food via take-out, delivery or drive-thru~~

4

~~shall maintain a distance of at least six feet from all other persons.~~

8.    **Repealed May 20, 2020  ~~Primary retail business must be critical infrastructure to be fully open.~~** ~~Only retail businesses whose primary line of business qualifies as critical infrastructure under the State Stay at Home Order may be fully open to the public, e.g., businesses whose primary business is the sale of food, beverages, pet supplies, household cleaning products, etc. Items the sale of which constitute less than 33 percent of a business's gross sales over the last six months are considered to be less than primary. For example, a tobacco or vape store that sells a minimal amount of snacks and water as a side business does not qualify as a grocery store, convenience store or similar establishment that can be fully open to the public under the current State Stay at Home Order.~~

9.    **Businesses and activities that must remain closed even if allowed by State Stay at Home Order.** The State Stay at Home Order does not expressly address every type of business activity. To avoid confusion, this Local Order prohibits the following businesses and activities, whether or not allowed by the State Stay at Home Order:

       a.  All swimming pools, spas, hot tubs, saunas, steam rooms and similar facilities, except those located at a single-family residence, which shall be used only by members of a household residing at the single-family residence.

       b.  All public and private campgrounds and recreational vehicle (RV) parks, except that persons who certify that their RV is their primary residence may be permitted to stay in the RV park. All persons residing in an RV shall comply with all orders otherwise applicable to residents.

10.   **List of activities ordered to cease.** The following activities are deemed non-essential and harmful to public health, and therefore are prohibited whether or not allowed by the State Stay at Home Order:

       a.  Door-to-Door Solicitations. Door-to-door solicitations, whether for purposes of sales of goods or services, charitable contributions, signature-gathering or any other commercial or noncommercial purpose.

11.   **Essential activities allowed.** The State Stay at Home Order implicitly allows for persons to leave their places of residence to engage in essential activities, but does not expressly address that issue. The State Public Health Officer has issued guidance, primarily in the form of posted answers to "Frequently Asked

5

Questions," which are frequently amended or otherwise changed. For the sake of clarity and guidance to persons residing in the County, this section of the Local Order sets forth those activities that the County Health Officer deems to be essential and allowed. However, to the extent any activity described herein conflicts with and is more permissive than the State Stay at Home Order as it is currently written or as it may be amended, the State Stay at Home Order shall take precedence and shall be enforced.

a.   Persons may leave their places of residence ~~only~~ **[Repealed May 22, 2020]** to perform one of the following essential activities:

(1)  To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including pets), such as, by way of example, obtaining medical supplies or medication, visiting a health care professional or obtaining supplies needed to work from a place of residence.

(2)  To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example, canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation and essential operation of places of residence.

(3)  To engage in funeral services, provided the following restrictions are observed:

(i) For indoor services, where the body of the deceased is present for viewing or in a closed casket, members of the deceased's household and the relatives of the deceased within the second degree (including in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than five persons gather inside the facility at a single time. Stable groups of five persons (i.e., persons may not substitute in or out of the group) may rotate within the facility providing protocols are implemented to sanitize the facilities between each group visit.

(ii)    For graveside services, members of the deceased's household and the relatives of the deceased within the second degree (including

6

in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than 10 persons gather.

(4)  To engage in a wedding ceremony, provided that Social Distancing Requirements are followed to the greatest extent feasible and that no more than 10 persons (who need not be from the same household or living unit), in addition to the couple to be married and the officiant, gather in a stable group.

(5)  To attend a gathering of any size to observe or participate in live or virtual presentations to the gathering, such as faith-based services, concerts, plays, political speeches, movies and similar activities, provided that all of the following protocols are followed:

> (i) all activity must occur outdoors;
> (ii) all persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit;
> (iii) all motor vehicles at the gathering must maintain a distance of six feet from all other vehicles;
> (iv) the motor vehicle windows must be closed at all times during the event;
> (v) all persons must remain in the vehicle in which they arrived at all times during the event;
> (vi) no restroom facilities shall be made available to persons at the facility during the event;
> (vii) no tangible items of any kind, including food products, may be transferred to persons in the motor vehicles;
> (viii) notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to putting on the presentation; and
> (ix) all Social Distancing Requirements shall be complied with to the greatest extent feasible.

(6)  To engage in outdoor activity, provided the persons comply with Social Distancing Requirements, such as, by way of example, golfing, tennis, pickle-ball, walking, hiking, running, bicycling, pleasure driving and working around their places of residence, including gardening.

> (i) To provide accommodations for persons who wish to golf as a

7

form of outdoor activity, public and private golf courses may operate provided they strictly enforce Social Distancing Requirements and enforce the following additional protocols:

> (a) Motorized carts are not allowed;
> (b) No more than four golfers (who need not be from the same household or living unit), are allowed per group and each group must be stable (i.e., persons may not substitute in or out of the group);
> (c) A distance of at least 30 feet shall be maintained between groups of golfers at all times;
> (d) All ball washers shall be covered and flag pins shall be removed and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch surfaces on the greens and tees;
> (e) Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate);
> (f) Practice putting greens shall remain closed;
> (g) **Repealed May 22, 2020** ~~The "Pro Shop" or similar facility designed for the sale of golf-related equipment and supplies shall remain closed; and~~
> (h) **Repealed May 22, 2020** ~~The snack shop(s) and restaurant(s) shall remain closed.~~

(7)  To otherwise carry out activities specifically permitted in this Local Order.

(8)  To care for a family member or pet in another household.

(9)  To prepare and present a live-stream or other virtual communication by an organization or association to its members, including worship services. Staff of organizations or associations (who need not be of the same household or living unit), including faith-based organizations, may gather in a single space at the same time solely for the purpose of preparing and presenting live-stream or other virtual communications provided that the number of such staff is the fewest necessary to prepare and present those communications, but in no event in excess of 10 persons, and that Social Distancing Requirements are followed.

12.  **Compliance.** The violation of any provision of this Local Order or the State Stay at Home Order constitutes a threat to public health and a public nuisance per se.  In

8

addition, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the County Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Local Order.

13. **Violation may constitute unfair competition.** Any person that, after notice, operates, manages, maintains or occupies or continues to operate, manage, maintain or occupy, any business in violation of this Local Order or the State Stay at Home Order may, in addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of this Local Order, the State Stay at Home Order, any predecessor order, or any of them.

14. **More restrictive provisions of local and State orders enforceable.** This Local Order is issued to supplement the State Stay at Home Order, which establishes minimum requirements for individuals and businesses, as well as the Governor's March 19, 2020 Executive Order N-33-20 directing California residents to follow the State Stay at Home Order. This Local Order adopts in certain respects more stringent restrictions addressing the particular facts and circumstances in this County, which are necessary to control the public health emergency as it is evolving within the County and the south coast region. Where a conflict exists between this Local Order and any State public health order, including the State Stay at Home Order, the more restrictive provision controls.

15. **Applicable to entire County.** This Local Order applies to all persons in the cities and the entire unincorporated area of the County.

16. **Effective date and time; repeal of prior order.** This Local Order shall become effective and operative at 11:59 p.m. on May 7, 2020, and will continue to be in effect until 11:59 p.m. on May 31, 2020, or until it is extended, rescinded, superseded or amended in writing by the County Health Officer. The County Health Officer order dated April 20, 2020, is hereby repealed and replaced with this Local Order, except that all prior violations of previous orders remain prosecutable, criminally or civilly. All prior closure or cease and desist orders directed at specified persons or businesses shall remain in force, but shall be reviewed by enforcement staff and rescinded if appropriate.

17. **Copies of Local Order.** Copies of this Local Order shall promptly be: (1) made

9

available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Local Order.

18.   **Severability.** If any provision of this Local Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of the Local Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect. To this end, the provisions of this Local Order are severable.

**IT IS SO ORDERED:**

Robert Levin, M.D.
Ventura County Health Officer

Dated: May **7**, 2020

Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.

10

**STAY WELL VC**
**Safely Reopening Ventura County**

**HEALTH OFFICER ORDER**
**COUNTY OF VENTURA**

**FOR CONTROL OF COVID-19 WITHIN THE COUNTY OF VENTURA**

**Effective Date:  May 29, 2020, 11:59 p.m.**

**Please read this Order carefully.**  This Order issued by the Ventura County Health Officer shall become effective at 11:59 p.m. on May 29, 2020.  At that time, all current Orders of the Ventura County Health Officer shall expire and no longer be of any force or effect, except any and all prior violations of the previous orders remain prosecutable, criminally or civilly.  Pursuant to Health and Safety Code section 120295 et seq., violation of or failure to comply with this Order is a misdemeanor punishable by fine, imprisonment, or both.

**UNDER THE AUTHORITY OF CALIFORNIA HEALTH AND SAFETY CODE SECTIONS 101040, 101085 AND 120175, THE HEALTH OFFICER OF THE COUNTY OF VENTURA ORDERS:**

1.      **Admittance to Long-Term Care Facilities.**  Long-Term Care Facilities may not refuse to admit any person who has been diagnosed with or treated for COVID-19 after that person has been discharged from a health care facility and approved for admittance to a Long-Term Care Facility by the Ventura County Public Health Department.

> a.  For purposes of this Order, "Long-Term Care Facility" means a long-term care facility, skilled nursing facility, intermediate care facility, congregate living health facility, nursing facility, hospice facility, residential care facility for the elderly, residential facility, or community care facility as defined in Health and Safety Code sections 1250, 1502, 1503.5 and 1569, and regulations promulgated thereunder, as they may be amended from time to time.

2.      **Hospitals and Long-Term Care Facilities.**  The County Health Officer recognizes the authority of the guidance documents "Hospital Holding Unit Guidance for COVID-19" and "Long-Term Care Facility Guidance for Preventing and Managing COVID-19" (the current versions of which are available at www.vcemergency.com) and strongly advises all hospitals and Long-Term Care Facilities to comply with the guidance.

1

3.      **Businesses must establish, implement and enforce COVID-19 prevention plans**.  Businesses, with the exception of  businesses operated from home, must establish, implement and enforce a site-specific prevention plan in accordance with the State of California COVID-19 industry Guidance and associated checklist found at https://covid19.ca.gov/roadmap/.  Prior to reopening, businesses must register and attest to their preparedness for safely reopening at vcreopen.com.  Businesses that were operating under  a previous order must also register and attest to their adherence to state guidelines.

As a condition of operation, each business must post a written notice explaining how it will comply with Social Distancing Requirements in conspicuous places where it can easily be seen by employees and patrons of the business facility.  The written posting shall identify by name and telephone number the County COVID-19 Compliance Hotline where compliance related questions or complaints may be reported by employees and patrons.

Further, businesses, as a condition of operation, shall admit without delay any officer, employee or agent of the County of Ventura or local city to their business facilities for the purposes of inspection for monitoring and compliance.  The failure to cooperate with such inspectors, or repeated and confirmed violations of COVID-19 prevention requirements, may lead to issuance of a business-specific closure order by the County Health Officer.

4.      **Places of Worship and Providers of Religious Services and Cultural Ceremonies.**

a.   The California Department of Public Health directed on May 25, 2020, that upon a county public health department's approval, in-person attendance at religious services or cultural ceremonies is authorized, but is limited to 25 percent of building capacity, or a maximum of 100 attendees, whichever is fewer.

b.   In accordance with the California Department of Public Health's direction on May 25, 2020, this Order provides the Ventura County's Public Health Department's approval for implementation of subsection (a) immediately above.

c.   This Order does not obligate places of worship and providers of religious services and cultural ceremonies to resume in-person activities.

d.   The Health Officer recommends that places of worship and providers of religious services and cultural ceremonies consider and implement as may be appropriate the guidance issued by the California Department of Public Health on Places of Worship and Providers of Religious Services and Cultural Ceremonies.

e.  As a condition of operating under this authority, places of worship or providers of religious services or cultural ceremonies shall post a written notice explaining how it will comply with the guidance issued by the California Department of Public Health where it can easily be seen by employees or patrons of the establishment.  The posted notice shall prominently display the name and telephone number of the County Covid Compliance Hotline where compliance related questions or complaints may be reported by employees and patrons.

5.     **Activities allowed outside of place of residence.**  The State Stay at Home Order allows for persons to leave their places of residence to engage in certain activities.  The State Public Health Officer has issued guidance, primarily in the form of posted answers to "Frequently Asked Questions," that can be ambiguous and frequently amended or otherwise changed.  For the sake of clarity and guidance to persons residing in Ventura County, this section of the Order sets forth a non-exclusive list of activities outside of a person's place of residence that the County Health Officer has deemed to be allowed.  To the extent any activity described herein conflicts with and is more permissive than the State Stay at Home Order as it is currently written or as it may be amended, the State Stay at Home Order shall take precedence and shall be enforced.

     a.  Persons may leave their places of residence to perform the following activities, among others:

       (1)  To engage in activities or perform tasks essential to their health and safety, or to the health and safety of their family or household members (including pets), such as, by way of example, obtaining medical supplies or medication, visiting a health care professional or obtaining supplies needed to work from a place of residence.

       (2)  To obtain necessary services or supplies for themselves and their family or household members, or to deliver those services or supplies to others, such as, by way of example, canned food, dry goods, fresh fruits and vegetables, pet supplies, fresh meats, fish and poultry, and any other household consumer products, and products necessary to maintain the safety, sanitation and essential operation of places of residence.

       (3)  To engage in funeral services, provided the following restrictions are observed:

       (i)  For graveside services, members of the deceased's household and the relatives of the deceased within the second degree (including in-laws) may gather for the activity provided that Social Distancing Requirements are followed and that no more than 10 persons gather.

3

Exhibit 27, Page 3 of 6

(4)   To engage in a wedding ceremony outside a place of worship, provided that Social Distancing Requirements are followed to the greatest extent feasible and that no more than 10 persons (who need not be from the same household or living unit), in addition to the couple to be married and the officiant, gather in a stable group.

(5)   To attend a gathering of any size to observe or participate in live or virtual presentations to the gathering, such as faith-based services, concerts, plays, political speeches, movies and similar activities, provided that all of the following protocols are followed:

> (i)   All activity must occur outdoors;
> (ii) All persons attending the activity must be inside a motor vehicle occupied only by persons from the same household or living unit;
> (iii)   All motor vehicles at the gathering must maintain a distance of six feet from all other vehicles;
> (iv)   All persons must remain in the vehicle in which they arrived at all times during the event;
> (v)   No restroom facilities shall be made available to persons at the facility during the event;
> (vi) Notwithstanding the above, one or more persons, not exceeding five, may enter nearby buildings as necessary to putting on the presentation; and
> (vii)  Social Distancing Requirements shall be complied with to the greatest extent feasible.

(6)   To engage in outdoor activity, provided the persons comply with Social Distancing Requirements, such as, by way of example, golfing, tennis, pickle-ball, walking, hiking, running, bicycling, pleasure driving and working around their places of residence, including gardening.

> (i)      To provide accommodations for persons who wish to golf as a form of outdoor activity, public and private golf courses may operate provided they strictly enforce Social Distancing Requirements and enforce the following additional protocols:

>> (a)   Motorized carts are allowed provided that only one person may occupy a cart at any time (except where drivers are required for disability accommodations);
>> (b)   No more than four golfers (who need not be from the same household or living unit), are allowed per group and

4

each group must be stable (i.e., persons may not substitute in or out of the group);

(c)   A distance of at least 30 feet shall be maintained between groups of golfers at all times;

(d)   All ball washers shall be covered and flag pins shall either be removed or affixed to prevent handling by golfers, and the cup on each green shall be inverted or otherwise installed to eliminate high-frequency touch surfaces on the greens and tees;

(e)   Persons may use a driving range provided that range balls are properly sanitized before distribution to customers (stand-alone golf driving ranges may also operate).

(7)   To otherwise carry out activities specifically permitted in this Order.

(8)   To care for a family member or pet in another household.

(9)   To prepare and present a live-stream or other virtual communication by an organization or association to its members, including worship services.  Staff of organizations or associations (who need not be of the same household or living unit), including faith-based organizations, may gather in a single space at the same time solely for the purpose of preparing and presenting live-stream or other virtual communications provided that the number of such staff is the fewest necessary to prepare and present those communications, but in no event in excess of 10 persons, and that Social Distancing Requirements are followed.

6.   **Social Distancing Requirements defined.**  "Social Distancing Requirements" means and includes maintaining at least a six-foot physical distance from other persons, washing hands with soap and water for at least 20 seconds or using hand sanitizer as frequently as possible, covering coughs or sneezes (into the sleeve or elbow, not hands), regularly cleaning high-touch surfaces and not shaking hands.

7.   **Compliance.**  The violation of any provision of this Order or the State Stay at Home Order constitutes a threat to public health and a public nuisance per se.  In addition, pursuant to Government Code sections 26602 and 41601 and Health and Safety Code section 101029, the County Health Officer requests that the Sheriff and all chiefs of police in the County ensure compliance with and enforce this Order.

8.   **Violation may constitute unfair competition.**  Any person that, after notice, operates, manages, maintains or occupies or continues to operate, manage, maintain or occupy, any business in violation of this Order or the State Stay at Home Order may, in

addition or in the alternative to any other civil and criminal penalties allowed by law, be subject to liability under the Unfair Competition Law (chapter 5 of part 2 of division 7 of the Business and Professions Code, commencing at section 17200), and subject to civil penalties and other relief as provided therein, for each act or practice in violation of this Order, the State Stay at Home Order, any predecessor order, or any of them.

9.      **More restrictive provisions of local and State orders enforceable.**  Where a conflict exists between this Order and any State public health order, the more restrictive provision controls.

10.      **Applicable to entire County.**  This Order applies to all persons in the cities and the entire unincorporated area of the County.

11.      **Effective date and time; repeal of prior order.**  This Order shall become effective and operative at 11:59 p.m. on May 29, 2020, and will continue to be in effect until 11:59 p.m. on June 14, 2020, or until it is extended, rescinded, superseded or amended in writing by the County Health Officer.

12.      **Copies of  This Order.**  Copies of this Order shall promptly be:  (1) made available at the County of Ventura Public Health Office, 2240 East Gonzalez Road, Suite 210, Oxnard, California, 93036; (2) posted on the Ventura County Public Health Department website (available at www.vchca.org/ph); and (3) provided to any member of the public requesting a copy of this Order.

13.      **Severability.**  If any provision of this Order or the application thereof to any person or circumstance is held to be invalid by a court of competent jurisdiction, the remainder of this Order, including the application of such part or provision to other persons or circumstances, shall not be affected and shall continue in full force and effect.  To this end, the provisions of this Order are severable.


**IT IS SO ORDERED:**


*Robert Levin MD*

**Robert Levin, M.D.**
**Ventura County Health Officer**                    Dated:  May 29, 2020


6

FOR PUBLICATION

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

# FILED

MAY 22 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| SOUTH BAY UNITED PENTECOSTAL CHURCH, a California nonprofit corporation; BISHOP ARTHUR HODGES III, an individual, | No. 20-55533 D.C. No. 3:20-cv-00865-BAS-AHG Southern District of California, San Diego |
| Plaintiffs-Appellants, | |
| v. | ORDER |
| GAVIN NEWSOM, in his official capacity as the Governor of California; XAVIER BECERRA, in his official capacity as the Attorney General of California; SONIA ANGELL, in her official capacity as California Public Health Officer; WILMA J. WOOTEN, in her official capacity as Public Health Officer, County of San Diego; HELEN ROBBINS-MEYER, in her official capacity as Director of Emergency Services; WILIAM D, GORE, in his official capacity as Sheriff of the County of San Diego, | |
| Defendants-Appellees. | |

Before:  SILVERMAN, NGUYEN, and COLLINS, Circuit Judges.

This appeal challenges the district court's denial of appellants' motion for a

temporary restraining order and order to show cause why a preliminary injunction

should not issue in appellants' challenge to the application of the State of

California and County of San Diego's stay-at-home orders to in-person religious

services.  Appellants have filed an emergency motion seeking injunctive relief permitting them to hold in-person religious services during the pendency of this appeal.

We have jurisdiction to review the denial of a temporary restraining order where, as here, "the circumstances render the denial 'tantamount to the denial of a preliminary injunction.'" *Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*, 869 F.2d 1306, 1308 (9th Cir. 1989) (internal citation omitted); *see also* 28 U.S.C. § 1292(a)(1).  Accordingly, the motion to dismiss for lack of jurisdiction (Docket Entry No. 24) is denied.

The request to take judicial notice (Docket Entry No. 25) is granted.

In evaluating a motion for an injunction pending appeal, we consider whether the moving party has demonstrated that they are likely to succeed on the merits, that they are likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in their favor, and that an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Feldman v. Ariz. Sec'y of State's Office*, 843 F.3d 366, 367 (9th Cir. 2016) ("The standard for evaluating an injunction pending appeal is similar to that employed by district courts in deciding whether to grant a preliminary injunction.").

We conclude that appellants have not demonstrated a sufficient likelihood of success on appeal.  Where state action does not "infringe upon or restrict practices because of their religious motivation" and does not "in a selective manner impose burdens only on conduct motivated by religious belief," it does not violate the First Amendment.  *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533, 543 (1993).  We're dealing here with a highly contagious and often fatal disease for which there presently is no known cure.  In the words of Justice Robert Jackson, if a "[c]ourt does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact."  *Terminiello v. City of Chicago*, 337 U.S. 1, 37 (1949) (Jackson, J., dissenting).

The remaining factors do not counsel in favor of injunctive relief.  *See Winter*, 555 U.S. at 20.  We therefore deny the emergency motion for injunctive relief pending appeal (Docket Entry No. 2).[1]

---

[1] Judge Collins would grant the motion and has filed a dissent.

*South Bay United Pentecostal Church v. Newsom*, No. 20-55533

**FILED**

MAY 22 2020

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

COLLINS, Circuit Judge, dissenting:

Plaintiffs-Appellants South Bay United Pentecostal Church (the "Church") and its Bishop, Arthur Hodges III (collectively, "Plaintiffs"), move for a preliminary injunction pending appeal that would allow them to conduct in-person church services. The State of California's refusal to allow them to hold such services likely violates the Free Exercise Clause of the First Amendment, and so I would grant the requested injunction. Because the majority concludes otherwise, I respectfully dissent.

# I

The Church is a Christian congregation in Chula Vista, California. Until the recent COVID-19 pandemic, the Church held between three and five Sunday services every week, which would attract 200–300 congregants each. Its sanctuary seats 600.

On March 19, 2020, Governor Gavin Newsom issued Executive Order N-33-20. The order generally required "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors." The federal list of critical sectors did not include churches. The State public health officer subsequently designated a comprehensive set of "Essential Critical Infrastructure

Workers." That list designated clergy as essential, but only if they were holding services "through streaming or other technologies that support physical distancing and state public health guidelines."

On April 28, the Governor announced a four-stage "Reopening Plan" or "Resilience Roadmap," under which the State would initially relax the stay-at-home order for some organizations but not others. At Stage 1, only "critical infrastructure" was exempted. At Stage 2, curbside retail and additional factories making previously non-essential "things like toys, clothing, . . . [and] furniture" would be permitted to reopen. Stage 2 entities also included ones that would reopen at a later date within that stage, such as schools (in an adapted form), childcare, dine-in restaurants, outdoor museums, "destination retail, including shopping malls and swap meets," and office-based businesses where telework is not possible. At Stage 3, "higher risk workplaces" like churches could reopen, along with bars, movie theaters, hair salons, and "more personal & hospitality services." And at Stage 4, concerts, conventions, and spectator sports could reopen. The Governor predicted that while Phase 2 would begin in "weeks, not months," Phase 3 would begin in "months, not weeks."

On May 4, the Governor announced that Stage 2 would commence within a week. On May 8, Plaintiffs sued the Governor and several other state officers (collectively, "the State") as well as various local officials, claiming that the

Reopening Plan's decision to place churches within Stage 3 instead of Stage 2 violated the Free Exercise Clause of the First Amendment.  The County of San Diego implemented the Reopening Plan in an order dated May 9, 2020.  Plaintiffs filed an amended complaint on May 11.

On May 15, 2020, the district court denied Plaintiffs' motion for both a temporary restraining order ("TRO") and an order to show cause ("OSC") why a preliminary injunction allowing the Church to hold in-person services should not issue.  Plaintiffs appealed and concurrently moved for a preliminary injunction in this court.

## II

We have jurisdiction over this appeal under our controlling decision in *Religious Tech. Ctr., Church of Scientology Int'l, Inc. v. Scott*, 869 F.2d 1306 (9th Cir. 1989).[1]  Both in *Religious Tech. Ctr.* and in this case, the plaintiffs filed a motion for a TRO and for an OSC why a preliminary injunction should not issue; the district court denied the motion "for a TRO and an OSC following a hearing at which all parties were represented"; and the specific grounds on which the district court denied the motion "foreclosed any interlocutory relief."  *Id*. at 1308–09.  As to the latter point, the district court below agreed with the State that the Reopening

---

[1] The State questioned our jurisdiction in its initial opposition to Plaintiffs' motion in this court, but it did not renew that objection in its subsequent formal opposition. Nonetheless, we have an obligation to consider the issue *sua sponte*.

Plan is a "neutral law of general application" that is therefore subject only to rational basis review under *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  Given that this threshold legal conclusion is indisputably fatal to Plaintiffs' Free Exercise claim, "[t]he futility of any further hearing was thus patent; there was nothing left to talk about."  *Id.* at 1309.  The order was thus "tantamount to a denial of a preliminary injunction," *id.* at 1308, and we therefore have jurisdiction under 28 U.S.C. § 1292(a)(1).

## III

Plaintiffs seek a preliminary injunction pending appeal, and the standards for such relief are well-settled.  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "Under our 'sliding scale' approach, 'the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.'"  *Hernandez v. Sessions*, 872 F.3d 976, 998 (9th Cir. 2017) (quoting *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012)).  Here, all of these factors favor the Plaintiffs.

## A

In seeking injunctive relief pending appeal, Plaintiffs principally rely on their claim under the First Amendment's Free Exercise Clause, which provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof*." U.S. CONST. amend. I (emphasis added). This restriction is fully applicable to the States through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). I conclude that Plaintiffs have established a very strong likelihood of success on the merits of their Free Exercise claim.

## 1

As a threshold matter, the State contends that, in light of the ongoing pandemic, the constitutional standards that would normally govern our review of a Free Exercise claim should *not* be applied. "Although the Constitution is not suspended during a state of emergency," the State tells us, "constitutional rights may be reasonably restricted 'as the safety of the general public may demand'" (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 29 (1905)). According to the State, the current emergency conditions preclude us from applying *Lukumi*'s familiar framework for evaluating Free Exercise claims and require us instead to apply *Jacobson*'s "highly deferential" standard of review, under which we are supposedly limited "'to a determination of whether the [Governor's] actions were

taken in good faith and whether there is some factual basis for [the] decision'" (quoting *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971)).  As the State sees it, there is no "reason why *Jacobson* would not extend *to the First Amendment and other constitutional provisions*" (emphasis added).  I am unable to agree with this argument, which seems to me to be fundamentally inconsistent with our constitutional order.  *Cf. Sterling v. Constantin*, 287 U.S. 378, 397–98 (1932) ("If this extreme position could be deemed to be well taken, it is manifest that the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land; that the restrictions of the Federal Constitution upon the exercise of state power would be but impotent phrases[.]").

The State's motion cites no authority that can justify its extraordinary claim that the current emergency gives the Governor the power to restrict any and all constitutional rights, as long as he has acted in "good faith" and has "some factual basis" for his edicts.  Nothing in *Jacobson* supports the view that an emergency *displaces* normal constitutional standards.  Rather, *Jacobson* provides that an emergency may justify temporary constraints *within* those standards.  As the Second Circuit has recognized, *Jacobson* merely rejected what we would now call a "substantive due process" challenge to a compulsory vaccination requirement, holding that such a mandate "was within the State's police power."  *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015); *see also Zucht v. King*, 260 U.S.

174, 176 (1922) (*Jacobson* "settled that it is within the police power of a state to provide for compulsory vaccination").  *Jacobson*'s deferential standard of review is appropriate in that limited context.  It might have been relevant here if Plaintiffs were asserting a comparable substantive due process claim, but they are not.

Instead, Plaintiffs assert a claim under the Free Exercise Clause, whose standards are well-established and which applies to the States under the Fourteenth Amendment.  *Cantwell*, 310 U.S. at 303.  *Jacobson* had no occasion to address a Free Exercise claim, because none was presented there.  (That is unsurprising, because the Free Exercise Clause had not yet been held to apply to the States when *Jacobson* was decided in 1905.  *See Phillips*, 775 F.3d at 543.)  Consequently, *Jacobson* says nothing about what standards would apply to a claim that an emergency measure violates some other, *enumerated* constitutional right; on the contrary, *Jacobson* explicitly states that other constitutional limitations may continue to constrain government conduct.  *See* 197 U.S. at 25 (emergency public health powers of the State remain subject "to the condition that no rule . . . shall contravene the Constitution of the United States, nor infringe any right granted or secured by that instrument").  The State suggests that the Second Circuit's decision in *Phillips* applied *Jacobson* to bar a First Amendment challenge, but *Phillips* actually confirms my narrower reading of *Jacobson*.  After applying *Jacobson* to reject the plaintiffs' *substantive due process* challenge to New York's vaccination

requirement, the court then addressed (and rejected) the plaintiffs' Free Exercise challenge by applying not *Jacobson*, but the familiar *Lukumi* framework that governs all Free Exercise claims.  *See Phillips*, 775 F.3d at 543.

The Fourth Circuit's decision in *Chalk* likewise provides no support for the State's position.  In *Chalk*, the defendants were pulled over for driving at 11:00 PM in violation of Asheville, North Carolina's four-night curfew, and a search of their car revealed dynamite caps and other "materials from which an incendiary bomb could be readily produced."  *See* 441 F.2d at 1278–79.  On appeal from the defendants' subsequent convictions, the Fourth Circuit rejected the defendants' challenge to the traffic stop, which was "focused on the curfew imposed by the mayor as a restriction on *their right to travel*."  *Id*. at 1283 (emphasis added).  Applying a deferential standard of review, the court held that the temporary travel restrictions imposed by the short-lived curfew were justified in light of the significant civil unrest in Asheville that had led to the curfew order.  *Id*. at 1282–83.  Given that the defendants were not engaged in any expressive (or religious) activity while driving, the First Amendment was not directly implicated by the traffic stop in *Chalk*, and so the decision has little relevance here.  If anything, *Chalk*'s discussion of the First Amendment undercuts the State's argument.  The Fourth Circuit stated in dicta that any incidental impact on First Amendment rights from the curfew would be governed by the intermediate scrutiny standard of

*United States v. O'Brien*, 391 U.S. 367 (1968), and the court likened the brief

restriction on travel to a time, place, and manner restriction.  *See* 441 F.2d at 1280–

81, 1283.  The fact that *Chalk* attempted to fit its comments within such existing

First Amendment categories refutes the State's notion that the existence of an

emergency results in a wholesale displacement of conventional constitutional

standards.

Moreover, the State overlooks that we have expressly rejected a comparably

broad reading of *Chalk* in addressing a First Amendment challenge to "an

emergency order prohibiting access to portions of downtown Seattle, Washington,

during the 1999 World Trade Organization (WTO) conference."  *Menotti v. City of

Seattle*, 409 F.3d 1113, 1117, 1142 n.55 (9th Cir. 2005).  Instead of applying a

broad "'emergency exception'" based on *Chalk*, we analyzed the emergency order

*within* the rubric of established First Amendment time, place, and manner

principles, which we held provided ample room to "take[] into account a balance

of the competing considerations of expression and order."  *Id*. at 1142 & n.55.

Accordingly, I conclude that Plaintiffs' challenge must be evaluated under

the traditional *Lukumi* framework that governs Free Exercise claims.[2]

---

[2] Notably, the State does not cite or rely upon the circuit court decision that most directly supports its reading of *Jacobson*, which is *In re Abbott*, 954 F.3d 772 (5th Cir. 2020).  For the reasons stated, I am unable to agree with the Fifth Circuit's conclusion that "*Jacobson* instructs that *all* constitutional rights may be reasonably restricted to combat a public health emergency."  *Id*. at 786 (emphasis in original);

2

In addressing a Free Exercise claim under *Lukumi*, the first question is whether the challenged restriction is one "that is neutral and of general applicability." 508 U.S. at 531. If the answer is yes, then "we review [it] for a rational basis." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1084 (9th Cir. 2015). If the answer is no, then the restriction is subject to strict scrutiny—that is, it "must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest." *Lukumi*, 508 U.S. at 531–32. In denying the requested relief, the district court held that the State's Reopening Plan is a "neutral law of general application" and that it "is rationally based on protecting safety and stopping the virus spread." Alternatively, the district court held that the Reopening Plan is narrowly tailored to promote the State's compelling interest in public health.[3] In my view, Plaintiffs have a high likelihood of success in their appeal of these rulings.

*see also In re Rutledge*, 956 F.3d 1018, 1028 (8th Cir. 2020) (generally endorsing the Fifth Circuit's description of emergency powers under *Jacobson*). Beyond that limited observation, I express no view on the very different substantive constitutional questions presented in those cases.

[3] The district court actually reached this alternative conclusion in the context of addressing Plaintiffs' likelihood of success on their Free Exercise claim under the *California* Constitution. Reliance on the California Constitution, however, would be inappropriate here. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89 (1984).

**a**

As the Supreme Court explained in *Lukumi*, "the minimum requirement of neutrality is that a law not discriminate on its face." 508 U.S. at 533. Accordingly, where a regulation's operative language restricts conduct by *explicit* reference to the conduct's religious character, it is not facially neutral. *Id.* (citing the law at issue in *McDaniel v. Paty*, 435 U.S. 618 (1978), which applied specifically to members of the clergy, as an example of a law that on its face "imposed special disabilities on the basis of religious status") (cleaned up). Because the restrictions at issue here explicitly "reference . . . religious practice, conduct, belief, or motivation," they are not "facially neutral." *Stormans*, 794 F.3d at 1076.

In framing its restrictions in response to the pandemic, California did not purport simply to proscribe specific forms of underlying physical conduct that it identified as dangerous, such as failing to maintain social distancing or having an excessive number of persons within an enclosed space. Instead, Executive Order N-33-20 presumptively prohibited California residents from leaving their homes for any reason, except to the extent that an *exception* to that order granted *back* the freedom to conduct particular activities or to travel back and forth to such activities. *See* Cal. Exec. Order N-33-20 (Mar. 19, 2020)[4] (ordering "all

---

[4] *See* https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf.

individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors," except as the State "may designate additional sectors as critical").[5]  In announcing its Reopening Plan, the State has adopted a phased approach that will progressively add more and more exceptions to the baseline stay-at-home prohibition by designating additional specific categories of activities that, in the State's judgment, do not present an undue risk to public health.  *See* Order of the Cal. Pub. Health Officer (May 7, 2020)[6] ("I will progressively designate sectors, businesses, establishments, or activities that may reopen with certain modifications, based on public health and safety needs, and I will add additional sectors, businesses, establishments, or activities at a pace designed to protect public health and safety.").

As set forth by the State, the four-stage Reopening Plan assigns "retail (curbside only), manufacturing & logistics" to the initial portion of "Phase 2," and in-store retail, "child care, offices & limited hospitality, [and] personal services" to

---

[5] Even the most ardent proponent of a broad reading of *Jacobson* must pause at the astonishing breadth of this assertion of government power over the citizenry, which in terms of its scope, intrusiveness, and duration is without parallel in our constitutional tradition.  But since Plaintiffs do not directly challenge the validity of the original Order here, I do not address the point further.

[6] *See* https://www.cdph.ca.gov/Programs/CID/DCDC/CDPH%20Document%20 Library/COVID-19/SHO%20Order%205-7-2020.pdf.

a later portion of Phase 2.  (On May 20, 2020, San Diego County was given approval to begin this later portion of Phase 2; it aims to promptly reopen both dine-in restaurants and in-store retail businesses.[7])  By contrast, "religious services" are *explicitly* assigned to a "Stage 3" that also includes "movie theaters" and other "personal & hospitality services."  All reopenings under the Plan are subject to detailed, activity-by-activity State guidance that sets forth the specific actions that each activity (such as "manufacturing" or "warehousing facilities") must take (*e.g.*, use of face coverings, social distancing, sanitation, and employee training) in order to reopen, and to stay open.

By *explicitly* and categorically assigning all in-person "religious services" to a future Phase 3—without any express regard to the number of attendees, the size of the space, or the safety protocols followed in such services[8]—the State's Reopening Plan undeniably "discriminate[s] on its face" against "religious conduct."  *Lukumi*, 508 U.S. at 533.  Although the State insists that it has not acted out of antipathy towards religion, the "constitutional benchmark is 'government

---

[7] *See* Lori Weisberg, *San Diego County gets the OK from state to resume dining-in at restaurants*, SAN DIEGO UNION-TRIBUNE (May 20, 2020), https://www.sandiegouniontribune.com/business/story/2020-05-20/san-diego-county-gets-the-ok-from-state-to-resume-dining-in-at-restaurants.

[8] In this respect, this case differs from *Roberts v. Neace*, __ F.3d __, 2020 WL 2316679 (6th Cir. May 9, 2020), in which the challenged order prohibited "[a]ll mass gatherings," and "faith-based" events were merely listed as one *example* of such "mass gatherings."  *Id*. at *1, 3.

*neutrality*,' not 'government avoidance of bigotry.'"  *Roberts*, 2020 WL 2316679,

at *4 (quoting *Colorado Christian Univ. v. Weaver*, 534 F.3d 1245, 1260 (10th Cir.

2008)).  Because the Reopening Plan, on its face, is not neutral, it is subject to

strict scrutiny.  *Lukumi*, 508 U.S. at 531–32.

**b**

Even if the Reopening Plan were not facially discriminatory, it would still

fail *Lukumi*'s additional requirement that the restrictions be "of general

applicability."  508 U.S. at 531.

Under California's approach—in which an individual can leave the home

only for the *enumerated* purposes specified by the State—these categories of

authorized activities provide the operative rules that govern one's conduct.  While

the resulting highly reticulated patchwork of designated activities and

accompanying guidelines may make sense from a public health standpoint, there is

no denying that this amalgam of rules is the very antithesis of a "generally

applicable" prohibition.  The State is continually making judgments, at the

margins, to decide what additional activities its residents may and may not engage

in, and thus far, "religious services" have not made the cut.  I am at a loss to

understand how the State's current maze of regulations can be deemed "generally

applicable."  *See Ward v. Polite*, 667 F.3d 727, 740 (6th Cir. 2012) ("At some

point, an exception-ridden policy takes on the appearance and reality of a system

of individualized exemptions, the antithesis of a neutral and generally applicable policy.").

The State contends that its plan is generally applicable because it assertedly classifies activities neutrally, in accordance with the State's sense of their perceived risk.  But that is not how the Reopening Plan works.  Warehousing and manufacturing facilities are categorically permitted to open, so long as they follow specified guidelines.  But in-person "religious services"—merely *because* they are "religious services"—are categorically *not* permitted to take place *even if they follow the same guidelines*.  This is, by definition, *not* a generally applicable regulation of underlying physical conduct.

### 3

The only remaining question is whether the Reopening Plan's treatment of religious services satisfies strict scrutiny.  The district court concluded that it did, but that is plainly wrong.

The State's undeniably compelling interest in public health "could be achieved by narrower [regulations] that burdened religion to a far lesser degree." *Lukumi*, 508 U.S. at 546.  As Plaintiffs have reiterated throughout these proceedings, they will "comply[] with every single guideline that other businesses are required to comply with."  In their papers in the district court, Plaintiffs provided a list illustrating the range of measures they are ready and willing to

implement on reopening, including spacing out the Church's seating, requiring congregants to wear face coverings, prohibiting the congregation from singing, and banning hugging, handshakes, and hand-holding.  By regulating the specific underlying risk-creating *behaviors*, rather than banning the particular *religious setting* within which they occur, the State could achieve its ends in a manner that is the "least restrictive way of dealing with the problem at hand."  *Roberts*, 2020 WL 2316679, at *5.[9]

The State's only response on the narrow-tailoring point is to insist that there is too much risk that congregants will not follow these rules.  But as the Sixth Circuit recently explained in *Roberts*, the State's position on this score illogically assumes that the very same people who cannot be trusted to follow the rules at their place of worship *can* be trusted to do so at their workplace: the State cannot "assume the worst when people go to worship but assume the best when people go to work or go about the rest of their daily lives in permitted social settings." *Roberts*, 2020 WL 2316679, at *3.

*       *       *

Therefore, I conclude that Plaintiffs are highly likely to succeed on the merits of their Free Exercise Clause claim.

---

[9] On this score, it is noteworthy that, earlier today, the CDC issued "Interim Guidance for Communities of Faith."  *See* https://www.cdc.gov/coronavirus/2019-ncov/php/faith-based.html.

## B

All of the remaining considerations strongly favor the entry of an injunction pending appeal.  The Bishop's inability to hold in-person worship services, and the Church members' inability to attend them, are certainly irreparable injuries.  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1008 (10th Cir. 2004) (en banc) (Seymour, J., concurring in relevant part for a majority of the court) ("[T]he violation of one's right to the free exercise of religion necessarily constitutes irreparable harm."), *aff'd sub nom. Gonzales v. O Centro Espirita Beneficiente Uniao Do Vegetal*, 546 U.S. 418 (2006).  The injury here is particularly poignant, given that Pentecost—which the eponymously named Church greatly desires to celebrate—falls on May 31.  Indeed, the State explicitly "does not question the sincerity of Plaintiffs' belief that it is essential to gather in person for worship services."

I do not doubt the importance of the public health objectives that the State puts forth, but the State can accomplish those objectives without resorting to its current inflexible and overbroad ban on religious services.  The balance of equities, and the public interest, strongly favor requiring the State to honor its constitutional

duty to accommodate a critical element of the free exercise of religion—public worship.

For these reasons, I would grant Plaintiffs' request for a preliminary injunction.  I respectfully dissent.