TIFFANY N. NORTH, State Bar No. 228068
County Counsel, County of Ventura
CHRISTINE A. RENSHAW, State Bar No. 249648
Assistant County Counsel
800 South Victoria Avenue, L/C #1830
Ventura, California 93009
Telephone:  (805) 654-2588
Facsimile:  (805) 654-2185
E-mail:     christine.renshaw@ventura.org

Attorneys for Defendants County of Ventura (also erroneously sued as Ventura County Public Health Care Agency), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin and William T. Foley

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY MCDOUGALL, an individual; JULIANA GARCIA, an individual; SECOND AMENDMENT FOUNDATION; CALIFORNIA GUN RIGHTS FOUNDATION; and FIREARMS POLICY COALITION, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF VENTURA, CALIFORNIA; BILL AYUB, in his official capacity; WILLIAM T. FOLEY, in his official capacity, ROBERT LEVIN, in his official capacity; and VENTURA COUNTY PUBLIC HEALTH CARE AGENCY, <br><br> Defendants. | No. 2:20 cv-02927 CBM(ASX) <br><br> DEFENDANTS' BRIEF <br><br> Judge: Hon. Consuelo B. Marshall <br><br> Trial:            Not Set <br> Complaint Filed:  March 28, 2020 |

Pursuant to the Court's order of July 12, 2022 (Dkt. No. 67 ), defendants County of Ventura (also erroneously sued as Ventura County Public Health Care Agency), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin, and William T. Foley ("Defendants") submit this brief in light of the United States Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) 597 U.S.___ [142 S.Ct. 2111] ("*Bruen*").

1

DEFENDANTS' BRIEF

# I
# INTRODUCTION

In *Bruen*, the Supreme Court held that "the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home." (*Bruen*, *supra*, 142 S.Ct. at p. 2122.) The Court ruled that the New York law that required residents to "demonstrate a special need for self-protection" to obtain a handgun license was unconstitutional. (*Id.* at pp. 2121, 2156, internal quotations marks omitted; *id.* at pp. 2161-2162 (Kavanaugh, J., and Roberts, C.J., concurring) ["underscor[ing] . . . the limits of the Court's decision"]; *id.* at pp. 2156-2162 (Alito, J., concurring).) In doing so, *Bruen* fundamentally altered the legal analysis governing Second Amendment challenges which previously applied a tiered level of scrutiny to such claims; but its holding was limited. *Bruen* did not affect the constitutionality of the Ventura County COVID-19 Health Orders ("Health Order") at issue here. To the contrary, under *Bruen*, the Health Order does not even trigger Second Amendment analysis because it did not "infringe" anyone's rights to "keep and bear arms." Even if it did, per *Bruen*, the Health Order is well within states' and local governments' historical authority to regulate firearms. As such, Defendants' motion to dismiss should still be granted.

# II
# ARGUMENT

**A.** **<u>*Bruen* Changed the Second Amendment Analysis</u>**

Prior to *Bruen*, and following *District of Columbia v. Heller* (2008) 554 U.S. 570 ("*Heller*"), and *McDonald v. City of Chicago* (2010) 561 U.S. 742 ("*McDonald*"), federal courts applied a "two-step framework for analyzing Second Amendment challenges that combine[d] history with means-end scrutiny." (*Bruen*, *supra*, 142 S.Ct. at p. 2125, internal quotation marks omitted); *United*

///

2

DEFENDANTS' BRIEF

*States v. Chovan* (9th Cir. 2013) 735 F.3d 1127, 1136.) That two-step analysis formed the basis for plaintiffs' Second Amendment argument in this case.

The *Bruen* Court rejected that two-step analysis, and any interest-balancing inquiry (i.e. strict or intermediate scrutiny test), in favor of a "methodology centered on constitutional text and history." (*Bruen*, *supra*, 142 S.Ct. at pp. 2128-2130.) Thus, "the standard . . . is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects [it]." Then, to be upheld, a regulation must be demonstrably "consistent with the Nation's historical tradition of firearm regulation." (*Id.* at pp. 2129-2130.)  As set forth below, the constitutionality of the Health Order is unaffected by this analytical change, or by *Bruen*'s core holding.  Defendants' motion to dismiss should still be granted.

**B.     The Health Order Does Not "Infringe" Any Second Amendment Rights**

*Bruen* emphasizes that Second Amendment analysis must begin with its "plain" text, which provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2nd Amend.; *Bruen*, *supra*, 142 S.Ct. at p. 2126).  Thus, to trigger this analysis, the law at issue must plainly "infringe[]" on either the Second Amendment right to "keep" or to "bear" arms.  (*Id*. at pp. 2134-2135.)

The Health Order here is constitutional because it does not "infringe" on either of the Second Amendment rights protected by *Bruen*.[1/]  Unlike the laws struck down in *Heller*, *McDonald*, and *Bruen*, it does not ban, or prohibit anyone from keeping or bearing arms for self-defense in the home or in public.  (*Bruen*, *supra*, 142 S.Ct. at pp. 2156-2157*; Heller*, *supra*, 554 U.S. at pp. 628, 630 [striking down law that "totally bans handgun possession in the home"]; *McDonald*, *supra*,

---

[1/] The Defendants' previous concession that the Health Order may have "presented a . . . 'very small' burden on the Second Amendment right" in support of its Motion to Dismiss was made under the Ninth Circuit's now-defunct two-step analysis and after *Bruen,* and is no longer applicable. (Motion to Dismiss Dkt. 42 at 21; *Bruen*, *supra*, 142 S.Ct. at pp. 2144-2145, 2149 .)

561 U.S. at p. 750 [striking down law "banning handgun possession"].) Nor does it require that firearms be stored or transported in a way rendering them "inoperable." (*Heller*, *supra*, 554 U.S. at pp. 628, 632.) Indeed, the Health Order does not regulate the purchase, sale, storage, possession, or use of firearms in anyway; it merely required all non-essential business to close during the early weeks of the COVID-19 pandemic.

By contrast, the New York law at issue in *Bruen* criminalized possessing a firearm publicly without a license, obtainable only if a gun owner could prove "proper cause," which required him or her to "demonstrate a special need for self-protection distinguishable from that of the general community." (*Bruen*, *supra*, 142 S.Ct. at p. 2123, citing N.Y. Penal Law Ann. § 400.00(2)(f).) *Bruen* struck down this law explicitly for features entirely absent from the Health Order: a "special-need requirement" and the "unchanneled discretion" afforded state licensing officials to determine if an applicant possess such a "special-need." (*Id*. at p. 2161) (Kavanaugh, J., and Roberts, C.J., concurring).)

The Health Order here bears none of the same features, nor anything remotely similar to that of the New York law at issue in *Bruen*. It is not a licensing or permitting scheme; does not give government officials discretion over individuals' ability to carry firearms for self-defense outside the home; nor does it impact the ability to use a gun for self-defense. As such, the Health Order does not infringe plaintiffs' Second Amendment rights under *Bruen*.

**C.     *Bruen*'s Reasoning Shows Why the Health Order is Constitutional**

Because the Health Order does not infringe plaintiffs' Second Amendment rights, the Court need not go any further. *Bruen*'s reasoning, however, offers further support here. *Bruen* recognizes that states have long had and exercised the authority to regulate the *manner* in which firearm rights were exercised, so long as the regulations did not "altogether prohibit" the right to keep or bear arms. (*Bruen*, *supra*, 142 S.Ct. at pp. 2147-2148.)

In explaining its reasoning, *Bruen* favorably cited, *inter alia*, numerous 19th-century state court decisions upholding laws banning concealed carry but not banning public carry altogether. (*Bruen*, *supra*, 142 S.Ct. 2111 at pp. 2168-2171.) These decisions, read with *Bruen's* analysis, demonstrate that a government's police power can be used to enact firearms regulations that impose less than a total prohibition on keeping arms for self-defense. (*See* Saul Cornell, *The Long Arc of Arms Regulation in Public: From Surety to Permitting 1328–1928* (2022), 55 U.C. Davis L.Rev. 2545, 2591 [Reconstruction era state constitutions "expressly recognized broad police power authority to regulate arms"].) *Bruen* also made clear that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." (*Bruen*, *supra,* 142 S.Ct. at p. 2162 (Kavanaugh, J., and Roberts, C.J., concurring), citing *Heller*, *supra*, 554 U.S. at p. 636.)

This reasoning is consistent with Second Amendment jurisprudence holding that governments may place certain limits on where the right is exercised, how the right is exercised and who may exercise the right. (*Heller*, *supra*, 554 U.S. at pp. 626-627; *U.S. v. Carpio-Leon* (4th Cir. 2012) 701 F.3d 974, 977 ["the Second Amendment does not guarantee the right to possess for *every purpose*, to possess *every type of weapon*, to possess at *every place*, or to possess by *every person*"]; *U.S. v. Huitron-Guizar* (10th Cir. 2012) 678 F.3d 1164, 1166 ["The right to bear arms, however venerable, is qualified by what one might call the 'who,' 'what,' 'where,' 'when,' and 'why'"].) Here, the Health Order is no different: it simply required all non-essential business, including gun stores, to close during the early weeks of the COVID-19 pandemic and did not regulate the purchase, sale, storage, possession, or use of firearms in any way.

**D.** **"Relevantly Similar" Historical Analogues Support the Health Order's Constitutionality Under *Bruen***

Since the Health Order does not "infringe" on any Second Amendment right, the inquiry should end there. However, should the Court decide otherwise, *Bruen*

directs it to evaluate historical regulations by way of analogy, an inquiry easily satisfied here. (*Bruen*, *supra*, 142 S.Ct. at pp. 2132-2133.) The *Bruen* Court identified two metrics for making the determination between laws that are "relevantly similar": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." (*Ibid*.) The government need only "identify a well-established and representative historical analogue, not a historical twin," and even if "not a dead ringer for historical precursors," a law still may "pass . . . muster." (*Id*. at p. 2133 , italics omitted.) After all, "[t]he regulatory challenges posed by firearms today are not always the same as those" in 1791 or 1868 and "the Constitution can, and must, apply to circumstances beyond those the Founders anticipated." (*Id*. at p. 2132.)

Numerous historic regulations and laws can be analogized to the Health Order. A number of laws from the 1700s and 1800s were enacted for public safety, welfare, or the "public good," including preventing harm from firearms, regulating the possession and storage of gunpowder, conditioning gun ownership on the gun owner taking an oath of loyalty to the state, limiting the carrying of concealed weapons, and prohibiting weapons in certain circumstances. (Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control* (2004) 74 Fordham L.Rev. 487, 506-508, 510-515.) Here, the Health Order was a generally applicable mandate enacted for the "public good:" to prevent the spread of COVID-19.

Moreover, the Second Amendment has never protected the immediate right to purchase a firearm. (*Silvester v. Harris* (9th Cir. 2016) 843 F.3d 816, 827 ("*Silvester*").) California has a long history of delaying possession of firearms without impinging on the Second Amendment. Indeed, California has had some kind of waiting period statute for firearm purchases continuously since 1923. (*Id*. at p. 823.) The *Silvester* court held that the law requiring the 10-day waiting period did not place a substantial burden on the Second Amendment right because

it did not prevent, restrict or place any conditions on how guns were stored or used after a purchaser took possession. (*Id.* at p. 827.) The court also noted that historically, the delivery of weapons took time:

> "There is, moreover, nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business." (*Silvester*, *supra*, 843 F.3d at p. 827.)

As such, the Second Amendment, has historically, never protected immediate or convenient purchase and sale of guns.

Outside the firearms context, in times of emergency such as war, pandemic or natural disaster, federal, state and local governments have historically issued temporary, general regulations that overrode the convenience of purchasers of various goods and services. (See, e.g., *Compagnie Francaise de Navigation a Vapeur v. Board of Health of State of Louisiana* (1902) 186 U.S. 380 [health quarantine prohibiting disembarkation of healthy passengers and cargo into infected area], cited with approval in *Camara v. Municipal Court of City and County of San Francisco* (1967) 387 U.S. 523, 539 [recognizing that warrantless search may be permissible under Fourth Amendment in public health emergency].) As such, the temporary delay in plaintiffs' ability to purchase a firearm as a result of the Health Order did not impinge on the Second Amendment right as it was historically understood.

7

DEFENDANTS' BRIEF

*Bruen* is abundantly clear that "[p]roperly interpreted, the Second Amendment allows a 'variety' of gun regulations." (*Bruen*, *supra*, 142 S.Ct. at p. 2162 (Kavanaugh, J., and Roberts, C.J., concurring), citing *Heller*, *supra*, 554 U.S. at p. 636.) Fingerprinting, background and mental health restrictions, waiting periods, training in firearms handling, among others, are permissible even if not directly, historically traceable because they are based on state and local governments' legitimate authority to uphold peace and good order. (*Ibid*.) The Health Order is analogous to and significantly less burdensome than what the *Bruen* Court indicated were *per se* constitutional. Unlike the right to use, possess, or otherwise keep and bear arms in the name of self-defense (which rights the Health Order does not implicate), history and tradition is well-established that any right to purchase or sell firearms is subject to regulation, including delay in purchasing a firearm without violating the Second Amendment.

Thus, even if the Health Order is found to infringe on Second Amendment rights in some way (which Defendants deny), these and other analogous regulations examples show its well-established historical roots and sufficient to establish its constitutionality under *Bruen*.

**E.     *Bruen* Has No Impact on This Case Since *Jacobson* Applies**

This Court correctly determined that *Jacobson v. Massachusetts* (1905) 197 U.S. 11 ("*Jacobson*") applies to this case. *Bruen* does not hold otherwise. The Supreme Court has long recognized that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members." (*Jacobson*, *supra*, 197 U.S. at p. 27; see also *Kansas v. Hendricks* (1997) 521 U.S. 346, 356 [recognizing continuing validity of *Jacobson*], and *South Bay United Pentecostal Church v. Newsom* (2020) 140 S.Ct. 1613 ("*South Bay*") (Roberts, C.J., concurring).) The Supreme Court has permitted states to enact "quarantine laws and health laws of every description." (*Jacobson*, *supra*, 197 U.S. at p. 25, internal quotations omitted.) Although the Constitution is not

suspended during a public health emergency, the Supreme Court has held that state governments are entitled to deference, both generally in the management of their state's public health (*Id.* at p. 38), and specifically in making decisions in areas of scientific uncertainty. (*Marshall v. United States* (1974) 414 U.S. 417, 427.)

The Supreme Court reaffirmed the proposition, rooted in *Jacobson*, that members of the judiciary "are not public health experts, and . . . should respect the judgement of those with special expertise and responsibility in this area." (*Roman Catholic Diocese of Brooklyn v. Cuomo* (Nov. 25, 2020) 141 S.Ct. 63, 68.) Indeed, a majority of the *Roman Catholic Diocese of Brooklyn* Court expressly recognized the deference due states in the management of public health. (*Id.* at p. 74 (Kavanaugh, J., concurring) ["The Constitutional principally entrusts the safety and health of the people to the politically accountable officials of the States," and "[f]ederal courts therefore must afford substantial deference to state and local authorities about how best to balance competing policy considerations during the pandemic"], quoting *South Bay*, *supra*, 140 S.Ct. at p. 1613 (Roberts, C.J., concurring); *id*. at p. 76 (Roberts, C.J., dissenting) (reaffirming position in *South Bay*); *id*. at p. 78 (Breyer, J., dissenting) ["courts must grant elected officials broad discretion when they undertake to act in areas fraught with medical and scientific uncertainties" (internal quotation omitted)]; *id*. at p. 79 (Sotomayor, J., dissenting) ["Justices of this Court play a deadly game in second guessing the expert judgment of health officials about the environments in which a contagious virus, now infecting a million Americans each week, spreads most easily"].

Additionally, recent case law affirms that *Jacobson* is still good law. (*Stewart v. Justice* (U.S Dist. Ct. S.D. W.V. Feb. 9, 2021) 2021 WL 472937 at *3). Several circuit courts have applied the *Jacobson* framework to COVID-19 related challenges. (*Ibid*.; *Big Tyme Investments, L.L.C. v. Edwards* (5th Cir. 2021) 985 F.3d 456; *League of Independent Fitness Facilities & Trainers, Inc. v. Whitmer* (6th Cir. 2020) 814 Fed.Appx. 125, 127; *Illinois Republican Party v.*

*Pritzker* (7th Cir. 2020) 973 F.3d 760, 763.) Thus, the *Jacobson* framework is still the proper lens through which to analyze plaintiffs' Second Amendment claims. As such, *Bruen* has no impact here.

## III

## CONCLUSION

The Health Order is constitutional under both *Bruen* and *Jacobson.* Thus, this Court's granting of Defendants' motion to dismiss should stand.

TIFFANY N. NORTH
County Counsel, County of Ventura

Dated: September 12, 2022      By          /s/
CHRISTINE A. RENSHAW
Assistant County Counsel

Attorneys for Defendants County of Ventura (also erroneously sued as Ventura County Public Health Care Agency), Sheriff William Ayub (erroneously sued as "Bill Ayub"), Robert Levin and William T. Foley