Ronda Baldwin-Kennedy, Esq. (SB #302813)
Jerome A Clay, Esq. (327175)
**LAW OFFICE OF RONDA BALDWIN-KENNEDY**
5627 Kanan Rd. #614
Agoura Hills, CA 91301
Phone: (951) 268-8977
Fax: (702) 974-0147
Email: ronda@lorbk.com

Raymond M. DiGuiseppe (SB #228457)
**THE DIGUISEPPE LAW FIRM, P.C.**
4320 Southport-Supply Road, Suite 300
Southport, North Carolina 28461
Phone: 910-713-8804
Fax: 910-672-7705
Email: law.rmd@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KELLY MCDOUGALL, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF VENTURA, CALIFORNIA, *et al.*,<br><br>Defendants. | Case No. 2:20-cv-02927-CBM (ASx)<br><br>**PLAINTIFFS' BRIEF REGARDING FURTHER PROCEEDINGS FOLLOWING REVERSAL AND REMAND** |

Plaintiffs provide this brief in response to this Court's order that the parties address the Ninth Circuit's mandate remanding the matter "to the district court for further proceedings consistent with the United States Supreme Court's decision in

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. \_\_\_\_ (2022).

## I. Background

The case comes back to this Court after the Supreme Court issued its decision in *Bruen* while the case was pending on appeal from this Court's order granting Defendants' motion to dismiss the case for failure to state a claim for relief under the Second Amendment. That claim stemmed from Defendants' public health orders shuttering access to firearms and ammunition retailers, and shooting ranges, for 48 days straight during the onset of the COVID-19 pandemic, while allowing a litany of other businesses to continue operations under basic safety protocols that retailers and shooting ranges in the firearms industry just as easily could have implemented.

Initially, in ruling on the motion to dismiss, this Court correctly concluded that "the claim is not moot" even if "Plaintiffs could purchase firearms, ammunition, and visit firing ranges at least by May 7, 2020," when the shutdowns were finally lifted, because if "Defendants violated the Second Amendment" as alleged, they" would be entitled to nominal damages and thus "can obtain relief for their claim." Dkt. No. 53 at 8. *See Uzuegbunam v. Preczewski*, \_\_ U.S. \_\_, 141 S.Ct. 792, 802 (2021) ("for the purpose of Article III standing, nominal damages provide the necessary redress for a completed violation of a legal right"); *id.* at 796-97, 801.[1]

---

[1] It should clear that the opinion in *Brach v. Newsom*, 38 F.4th 6 (9th Cir. 2022), dismissing as a moot a challenge to COVID-related suspensions of in-person instruction in schools, does not change the analysis. There, not only did the plaintiffs *not* seek nominal damages, *id.* at 12, but the suspensions had self-executing sunsets that "automatically permitted schools to reopen permanently" once triggered, *id.*, the Governor has since "unequivocally renounce[d]" any further use of school closures, the Governor has since "publicly reaffirm[ed]" his commitment to keeping all schools open, and the Legislature has declared the same intention, even enacting "financial penalties for schools that continue to operate remotely," *id.* at 13. Here, at no time have any of the Defendants made any such affirmations, much less enacted any local legislation designed to ensure that the challenged shutdowns will not reoccur. Instead, the orders on their face provided for perpetual extensions, and Defendants have only since doubled-down on their ability to take such actions. Indeed, Defendants abandoned any claim of mootness on appeal. Ninth Circuit Case No. 20-56220, Dkt. No. 24, p. 11, n. 5 (Defendants noted that, while they had argued mootness at the district court level, "this issue is not part of the appeal.").

On the question whether Plaintiffs had plausibly demonstrated a violation of the Second Amendment, the Court found that the claim could not survive under the test of *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 30-31 (1905), Dkt. No. 53 at 9-14, and, even if it did, the claim failed "traditional constitutional analysis," *id.* at 15-17. Since this Court's order on Defendants' motion, and before *Bruen* was even decided, *Jacobson* has been discredited as a viable framework for analyzing public health orders infringing on enumerated fundamental rights. *See Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring) (where Justice Gorsuch forcefully argued, with no contest from any of the other justices, that the *Jacobson* framework was limited to the very different, "implied 'substantive due process' right to 'bodily integrity'" at stake there, which was subject to nothing more than "rational basis review"). Indeed, it was settled long before *Bruen* that no form of "rational basis" scrutiny is appropriate for analyzing Second Amendment claims. *District of Columbia v. Heller*, 554 U.S. 570, 627 n.27 (2008); *accord United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019).

## II.     The Impact of *Bruen*

And now that *Bruen* is here, we see that *no* form of interest-balancing is proper—not even intermediate or *strict* scrutiny, much less "rational basis" scrutiny. The Supreme Court expressly rejected "two-step" tests like the one this Court was bound to apply at the time it ruled on Defendants' motion. *See* Dkt. No. 53 at 15-17 (applying the two-step interest-balancing test of *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)). This test, like most in the other circuits, invariably devolved into a form of "intermediate" scrutiny that deferred to the judgment of the government concerning the propriety of the challenged actions, *see Silvester v. Harris*, 843 F.3d 816, 829 (9th Cir. 2016) (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 1000 (9th Cir. 2015)) ("The State is required to show only that the regulation

1 'promotes a substantial government interest that would be achieved less effectively
2 absent the regulation'"). This Court's analysis also inevitably rested on such
3 "intermediate" scrutiny. Dkt. 53 at 15-16 (applying *Sylvester* to reject this claim).

*Bruen* calls for something completely different, harkening back to *Heller*: under the *one*-step test *Heller* had always envisioned, the court asks only whether "the Second Amendment's plain text covers" the regulated conduct. 142 S.Ct. at 2129. If so, "the Constitution presumptively protects that conduct," and the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* That is, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

An historical analysis like this "can be difficult" because "it sometimes requires resolving threshold questions, and making nuanced judgments about which evidence to consult and how to interpret it.'" *Bruen*, 142 S.Ct. at 2130 (quoting *McDonald v. City of Chicago*, 561 U.S. at 803–804 (2010) (Scalia, J., concurring). The court provided guidance in the proper application of this test. It explained that the Second Amendment's "meaning is fixed according to the understandings of those who ratified it," although its protection "can, and must, apply to circumstances beyond those the Founders specifically anticipated," so that, for example, to it "'extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Id.* at 2132 (quoting *Heller*, 554 U.S. at 584)). "Much like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding." *Id.* "[T]his historical inquiry that courts must conduct will often involve reasoning by analogy"—i.e., "a determination of whether the historical and current regulations are '"relevantly similar."'" *Id.* While an "historical *twin*" isn't necessary, the government must

"identify a well-established and representative historical *analogue*." *Id.* at 2133.

Further, "*Heller* and *McDonald* point toward at least two metrics" as key factors in this analysis: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S.Ct. at 2133. "Therefore, whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '*central'* considerations when engaging in an analogical inquiry." *Id.* (quoting *McDonald*, 561 U.S. at 767). Importantly, however, in no event may courts "engage in independent means-end scrutiny under the guise of an analogical inquiry, because "the Second Amendment is the 'product of an interest balancing *by the people*," not the evolving product of federal judges." *Id.* n. 7 (quoting *Heller*, 554 U.S. at 635) (emphasis in *Bruen*).

The Supreme Court also established parameters for the nature and scope of historical evidence relevant to this inquiry. *Bruen*, 142 S.Ct. at 2136 ("when it comes to interpreting the Constitution, not all history is created equal"); *id.* at 2136-37 (discussing the relative weight and significance of evidence spanning from the early English common law, to the colonial era, the founding era, the time of the Second Amendment's adoption, its later ratification, the civil war era, and beyond); *id.* at 2136-37 (explaining that evidence from the time of the Amendment's adoption in 1791 is primary, evidence from the mid-to-late-19th-century is "secondary," anything beyond that is of little, if any, relevance at all, and the text will ultimately control over any post-ratification evidence that conflicts with its meaning).

Therefore, the job of this Court in deciding this claim is to determine whether Defendants' actions in barring the County residents' access to firearms retailers and shooting ranges for 48 days on the basis of the asserted necessities or conveniences arising from the early pandemic can be justified as being consistent with the text of the Second Amendment and the Nation's historical tradition of restraints on the rights it secures—i.e., the "*how and why*" of the burdens Defendants imposed.

### III. The Proper Course of Action

Given the job of the Court, the job of the parties—and principally the job of the *government*, which bears all the burden as *Bruen* makes plain—is to provide the Court with the tools it needs to properly determine and rule on the claim. Because the parties and the Court were previously laboring under the standards of the now-invalidated Ninth Circuit's two-step test, that work has yet to be done. Again, far from developing any *evidence* to justify their shutdown orders—much less evidence from the *relevant* historical periods—Defendants have carried no burden *at all*, as they've simply doubled-down on the bald assertion that their judgments were good and were entitled to deference under the then-prevailing interest-balancing test.

The previous motion to dismiss should be set aside and the case should be fully litigated anew under the proper standards in order to develop a proper record that supports a proper decision under *Bruen*. That all starts with an amended complaint in which Plaintiffs set the stage as it should be set under *Bruen*—as they *would have* but for having to operate under the old world of interest-balancing. "Generally, leave to amend should be granted with 'extreme liberality.'" *L. Tarango Trucking v. County of Contra Costa*, 181 F.Supp.2d 1017, 1028 (N.D. Cal. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990)); *see also Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048,1049 (9th Cir. 2003) (there is "the presumption in favor of granting leave to amend"). This is particularly true when, as here, the justification for amendment is to ensure the claim is adjudicated in accordance with the now controlling law—for the unquestionable benefit of all parties, the Court, and the judicial system as a whole.

In fact, allowing amendment of the complaint for these purposes is also fully consistent with the standards for permitting reconsideration of a previous dismissal and for amending a previous judgment. "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or

the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). A motion to modify a judgment is similarly "justified by an intervening change in controlling law." *Allstate, Inc. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2003); *accord Talent Mobile Development, Inc. v. Headios Group*, 382 F.Supp.3d 953, 960 (C.D. Cal. 2019). The availability of new evidence is also an appropriate ground for such relief. *Pyramid Lake Paiute Tribe of Indians v. Hodel*, 882 F.2d 364, 369, n. 5 (9th Cir. 1989); *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). While, again, it's *the government's* burden to identify and unearth historically relevant evidence to support the challenged actions, the fact is, the *legal issue* of whether such evidence exists is now an essential question that must be resolved, whereas it previously was not because the then-prevailing Ninth Circuit legal standards largely negated the significance of this issue.

So, if the Court's order on the motion to dismiss had not already been vacated by the Ninth Circuit, reconsideration of that order would certainly be appropriate based on the intervening change in controlling law. And, if reconsideration is appropriate on this basis, amendment of the complaint certainly is too.

Therefore, setting aside the previous motion to dismiss and having Plaintiffs file a second-amended complaint is the proper course of action in this case. Defendants will then have full opportunity to respond as they fit, with either an Answer or another motion to dismiss testing the claim's facial validity. Either way, this is what's necessary to ensure the claim is properly adjudicated and both parties are afforded a full and fair opportunity to develop the relevant record under *Bruen*.

Should this Court decide to continue adjudication of the previous motion to dismiss, and should Defendants now proffer any evidence that they claim serves as sufficiently similar a historical analogue under the *Bruen* framework, because it is *their* burden to proffer such evidence at the outset—essentially as the *movant* under

this framework—Plaintiffs should be afforded an opportunity to respond to any such evidence and provide rebuttal evidence concerning these historical questions before the Court renders any ruling on that motion to dismiss.

Dated: September 12, 2022

/s/ *Ronda Baldwin-Kennedy*
Ronda Baldwin-Kennedy

/s/ *Raymond DiGuiseppe*
Raymond DiGuiseppe

Attorneys for Plaintiffs