UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DONALD MCDOUGALL, *et al.*, <br><br> Plaintiff, <br> v. <br><br> COUNTY OF VENTURA, CALIFORNIA, *et al.*, <br><br> Defendant. | Case No.: 2:20-cv-02927-CBM(ASx) <br><br> **ORDER RE: MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT [58][67]** |

The matter before the Court is the Ninth Circuit's Order vacating this Court's Order re Motion to Dismiss and remanding the case for further proceedings consistent with the United States Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S.——, 142 S. Ct. 2111, 213 L.Ed.2d 387 (2022). (Dkt. No. 62.) Both parties filed briefs addressing the mandate from the Circuit. (Dkt. Nos. 68, 69.)

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

This is an action under 42 U.S.C. § 1983 for violation of the right to bear arms under the Second Amendment against Defendants County of Ventura, William Ayub (Sheriff of Ventura County), Dr. Robert Levin (Public Health Medical Director and Health Officer for Ventura County), and William T. Foley (Director of the Ventura County Public Health Care Agency) (collectively,

1

"Defendants").[1] On March 4, 2020, Governor Gavin Newsom proclaimed a state of emergency in California due to COVID-19. (FAC ¶ 34.) As a result, the County of Ventura issued a series of public health orders, including a May 20, 2020 "Stay Well at Home" Order ("Stay Well Order"), that resulted in a 48-day closure of non-essential businesses. It is undisputed that gun shops, ammunition shops, and firing ranges were non-essential businesses and were therefore required to be closed from March 20, 2020 to May 7, 2020. (*See* Dkt. No. 45 at 4:9-17.)

Plaintiffs Donald McDougall ("McDougall") and Juliana Garcia ("Garcia") are residents of the County of Ventura. (FAC at ¶¶ 7–8.) McDougall purchased a firearm from a licensed firearm dealer and left another firearm with a licensed gunsmith. (*Id*. at ¶ 59.) McDougall alleges he was unable to retrieve his firearms and unable to acquire ammunition due to the Stay Well Order. (*Id*.) Garcia desired to purchase a firearm and ammunition, but was unable to acquire a Firearm Safety Certificate ("FSC") or purchase a firearm and ammunition due to the Stay Well Order. (*Id*.) Second Amendment Foundation, Inc. ("SAF"), California Gun Rights Foundation ("CGF"), and Firearms Policy Coalition, Inc. ("FPC") (collectively, the "Institutional Plaintiff's") are nonprofit organizations whose members in the County were allegedly affected by the Stay Well Order. (*Id*. at ¶¶ 9–11.)

The FAC alleges that Defendants violated Plaintiffs' rights under the Second Amendment because the issuance and enforcement of the Stay Well Order prevented McDougall, Garcia, and members of the Institutional Plaintiffs from buying, selling, and transferring firearms and ammunition, as well as training with firearms at firing ranges ("Count I"). (FAC at ¶¶ 65–66, 81.) Plaintiffs seek

---

[1] Plaintiffs asserted a violation of the "Right to Travel" as Count II of the First Amended Complaint "(FAC"). (FAC ¶¶ 82–88.) However, in their Opposition to the Motion to Dismiss, Plaintiffs dismissed Count II "[i]n the interest of economy and efficiency." (Opp. at 1, n.l.) Therefore, the Court considered only Count I in its Order re Motion to Dismiss. (Dkt. No. 53.)

declaratory relief, injunctive relief, and nominal damages against Defendants. (FAC at Prayer for Relief.)

On October 21, 2020, the Court granted Defendants' Motion to Dismiss the FAC for failure to state a claim. (Dkt. No. 53.) The Court applied the standard set forth in *Jacobson v. Massachusetts* to determine whether the Stay Well Order violated the Second Amendment. *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). *Jacobson* involved a constitutional challenge to a state law and a rule promulgated by the board of health of Cambridge, Massachusetts, which required inhabitants of the city to be vaccinated against smallpox. *Jacobson*, 197 U.S. at 12–13.[2] The Court entered judgment dismissing the FAC with prejudice.[3] (Dkt. No. 54.) On November 19, 2020, Plaintiffs appealed the Court's Dismissal Order. (Dkt. No. 55.) On January 20, 2022, the Ninth Circuit reversed the Dismissal Order and held that the Stay Well Order resulting in a 48-day closure of gun shops, ammunition shops, and firing ranges burdened conduct protected by the Second Amendment, based on a historical understanding of the scope of the Second Amendment right. (Dkt. No. 58.) The panel concluded that the Court erred by determining that *Jacobson* applied to Plaintiff's Second Amendment claim. (*Id.*) On March 8, 2022, upon the vote of a majority of non-recused active judges on the Ninth Circuit, the Chief Judge ordered that the case be reheard *en banc* and the January 20, 2022 order be vacated. *McDougall v. Cnty. of Ventura*, 26 F.4th 1016

---

[2] At the time of the Dismissal Order, federal courts were relying on *Jacobson* in cases bringing constitutional challenges to state and local orders aimed at curbing the spread of COVID-19. *See S. Bay United Pentecostal Church v. Newsom,* 140 S. Ct. 1613 (2020) (citing to *Jacobson* in denying an injunction brought on First Amendment grounds.); *Robinson v. Attorney General,* 957 F.3d 1171, 1179–80 (11th Cir. 2020) (applying *Jacobson* to affirm the district court's grant of an injunction); *In re Rutledge,* 956 F.3d 1018, 1028 (8th Cir. 2020) (holding district court erred by not using *Jacobson* to evaluate Arkansas abortion restrictions).
[3] Plaintiffs did not request leave to amend in their Opposition to Defendants' Motion to Dismiss. (Dkt. No. 43.)

3

(9th Cir. 2022). On June 23, 2022, the Supreme Court decided *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022) ("*Bruen*"). On June 29, 2022, the Ninth Circuit vacated this Court's judgment and remanded the case for further proceedings consistent with the Supreme Court's decision in *Bruen*. (Dkt. No. 62.)

## II. THE SECOND AMENDMENT FRAMEWORK

The *Bruen* Court rejected the two-step framework for analyzing Second Amendment challenges based on *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Bruen*, 142 S. Ct. at 2125, 2127 n.4. The Court noted that *Heller* "demands a test rooted in the Second Amendment's text, as informed by history." 142 S. Ct. at 2127. *Bruen* thus adopted the following two-part test:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, ... the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command.

*Id*. at 2126 (quoting *Konigsberg v. State Bar of Cal*., 366 U.S. 36, 49 n.10, 81 S.Ct. 997, 6 L.Ed.2d 105 (1961)).

Step one of *Bruen* requires a textual analysis determining whether the challenger is "part of 'the people' whom the Second Amendment protects," whether the weapon at issue is "in common use today for self-defense," and whether the "proposed course of conduct" falls within the Second Amendment. *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (citing *Bruen,* 142 S. Ct. at 2134–35.).

"If the first step is satisfied, the Court proceeds to *Bruen* step two, at which the 'government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id*. (citing *Bruen,* 142 S. Ct. at 2130). "Thus, to carry its burden, the government must produce representative analogues to demonstrate that the challenged law is

consistent with a historical tradition of regulation." *Id*. (citing *Bruen,* 142 S. Ct. at 2127, 2131–33).

The Ninth Circuit has interpreted step two as not requiring a "historical twin" but rather using history to "guide our consideration of modern regulations that were unimaginable at the founding." *Id.* (citing *Bruen,* 142 S. Ct. at 2132). "*Bruen*, therefore, instructs that the analogue must be 'relevantly similar' as judged by 'at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.'" *Id*. (citing *Bruen* at 2132–33). "In other words, in analyzing a burden on the possession of firearms, we look to 'whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified'" *Id*. (citing *Bruen,* 142 S. Ct. at 2133).

### III. DISCUSSION

*Bruen* replaced the Ninth Circuit's two-prong test with a new framework for analyzing Second Amendment challenges. Under this new framework, the Court's analysis begins with the Second Amendment's "plain" text, which provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., amend. II; *Bruen*, 142 S.Ct. at 2126). Thus, to trigger this analysis, the law at issue must plainly "infringe[]" on either the Second Amendment right to "keep" or to "bear" arms. *Id*. at 2134–35.

By its plain text, the Stay Well Order's closure of non-essential businesses resulted in the closure of gun shops, ammunition shops, and firing ranges, which delayed the acquisition of firearms from affected businesses. Thus, the "proposed course of conduct"—namely, the acquisition of firearms—falls within the Second Amendment. Therefore, step one of the *Bruen* test is met. Under *Bruen* step two, the Court finds that the Stay Well Order does not violate the Second Amendment because it comports with a history and tradition of regulating the possession of

5

goods during times of emergency such as war, pandemic, or natural disaster.

First, Defendants cite to historical issuances of temporary, general regulations in times of emergency such as war, pandemic or natural disaster, that overrode the convenience of purchasers of various goods and services. *See, e.g., Jacobson,* 197 U.S. 11 (compulsory smallpox vaccination); *Compagnie Francaise de Navigation a Vapeur v. Bd. of Health of State of Louisiana,* 186 U.S. 380 (1902) (health quarantine prohibiting disembarkation of healthy passengers and cargo into infected area), *cited with approval in Camara v. Mun. Court of City and Cty. of San Francisco*, 387 U.S. 523, 539 (1967) (recognizing that warrantless search may be permissible under Fourth Amendment in public health emergency). *Bruen* expressly recognized that "cases implicating unprecedented societal concerns," like the one here, "may require a more nuanced approach." 142 S. Ct. at 2132. The temporary delay in the ability to acquire a firearm as a result of the Stay Well Order did not impinge on the Second Amendment right as it was historically understood. Indeed, such regulations are not new as the *Jacobson* Court recognized that to hold in favor of the plaintiff "would practically strip the legislative department of its function to care for the public health and the public safety when endangered by epidemics of disease." *Jacobson*, 197 U.S. at 37.

Second, Defendants also cite to firearm regulations from the 1700s and 1800s which were enacted for public safety, welfare, or public good. (Defendants' Motion at 6:13–19.) These laws include statutes conditioning gun ownership on the owner taking an oath of loyalty to the state (*e.g.*, Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts 31; Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 Pa. Laws 123, 126), regulating the possession and storage of gunpowder (*e.g.*, Act of June 26, 1792, ch. X, 1792 Mass. Acts 208 (addressing the carting and transporting of gunpowder in Boston); Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627 (concerning the storage of gunpowder); Act of Dec. 6, 1783, ch. MLIX, 11 Pa. Stat. 209), limiting the carrying of concealed weapons (*e.g.,* Act of

6

Mar. 18, 1859, 1859 Ohio Laws 56 (prohibiting the carrying of concealed weapons); Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15; Act of Feb. 2, 1838, 1838 Va. Acts ch. 101, at 76 (preventing the carrying of concealed weapons), and prohibiting weapons in certain circumstances (*e.g.*, § 6, 1831 Ohio Laws at 162.). These statutes make clear the Nation's historical tradition of firearm regulations. Defendants also cite to the 10-day waiting period for firearm purchases upheld in *Silvester v. Harris,* 843 F.3d 816, 827 (9th Cir. 2016) ("*Silvester*"). As the Ninth Circuit recognized in *Silverster,*

> "There is, moreover, nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business."

*Silvester*, supra, 843 F.3d at 827. Such government regulations on the possession of a firearm are further supported by permissible licensing regimes requiring applicants to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling employed by 43 states and found to be "constitutionality permissible." *Bruen*, *supra*, 142 S.Ct. at 2162 (Kavanaugh, J., and Roberts, C.J., concurring).

Notably, the Stay Well Order does not "ban or prohibit anyone from keeping or bearing arms for self-defense in the home or in public." (Defendants' Brief at 3:21–23.) Nor does the Stay Well Order "regulate the purchase, sale, storage, possession, or use of firearms in anyway; it merely required all non-essential businesses to close during the early weeks of the COVID-19 pandemic." (*Id.* at 4:4–6.) Moreover, the Stay Well Order is distinguishable from the New York law at issue in *Bruen,* which afforded state officials unlicensed discretion to determine if a gun owner proved "proper cause" for the licensee to possess a firearm publicly. *Bruen*, 142 S. Ct. at 2123. "Proper cause" required applicants to "demonstrate a special need for self-protection distinguishable from that of the

general community." *Id.* *Bruen* struck down this law due to the discretion afforded state licensing officials to determine if an application possessed such a "special need." 142 s. Ct. at 2161. In this case, the Stay Well Order applied to all non-essential businesses equally and is "not a licensing or permitting scheme; does not give government officials discretion over individuals' ability to carry firearms for self-defense outside the home; nor does it impact the ability to use a gun for self-defense." (Defendants' Brief 4:17-20.)

      COVID-19 presented a public health emergency to which the County of Ventura responded by mandating ordinances for the safety of others. The Stay Well Order did not prohibit the right to bear arms. Rather, the Stay Well Order affected the activity of businesses deemed to be nonessential under the circumstances of the pandemic. Notably, the Stay Well Order allowed for "essential activities" which included "activities" and "tasks essential to [the people's] health and safety, or to the health and safety of their family or household members." (Dkt. No. 42-1, Ex. 17.) Under the terms of the Stay Well Order, Plaintiffs were not prohibited from making arrangements for taking possession of firearms previously purchased or purchasing a firearm through other means. The Court finds that the Stay Well Order mandating the closure of businesses during the height of the pandemic, which resulted in a 48-day closure of nonessential businesses, is grounded in longstanding tradition of upholding governmental measures to protect public health during times of emergency.

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

8

## IV. CONCLUSION

Accordingly, under the *Bruen* framework for analyzing Second Amendment regulations, the Stay Well Order does not violate the Second Amendment. Therefore, the First Amended Complaint fails to state a claim as a matter of law.

**IT IS SO ORDERED.**

DATED: JULY 31, 2023

CONSUELO B. MARSHALL
UNITED STATES DISTRICT JUDGE